No. _____

# In the Supreme Court of the United States

ELIZABETH MIRABELLI, LORI ANN WEST, JANE ROE, JANE BOE,
JOHN POE, JANE POE, JOHN DOE, and JANE DOE,

*Applicants,*

v.

ROB BONTA, in his official capacity as Attorney General of California; TONY
THURMOND, in his official capacity as the California State Superintendent of Public
Instruction; LINDA DARLING-HAMMOND, in her official capacity as President of the
California State Board of Education, et al.

*Respondents.*

## EMERGENCY APPLICATION TO VACATE INTERLOCUTORY STAY ORDER ISSUED BY THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

To the Honorable Elena Kagan, Associate Justice of the Supreme Court
of the United States and Circuit Justice for the Ninth Circuit

THOMAS BREJCHA
PETER BREEN
CHRISTOPHER J.F. GALIARDO
THOMAS MORE SOCIETY
309 West Washington Street
Suite 1250
Chicago, IL 60606

MICHAEL MCHALE
THOMAS MORE SOCIETY
10506 Burt Circle, Suite 110
Omaha, NE 68114

PAUL M. JONNA
  *Counsel of Record*
CHARLES S. LIMANDRI
JEFFREY M. TRISSELL
LIMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
(858) 759-9930
pjonna@limandri.com

*Counsel for Applicants*

## PARTIES TO THE PROCEEDING

Applicants (plaintiffs-appellees below) are Elizabeth Mirabelli, Lori Ann West, Jane Roe, Jane Boe, John Poe, Jane Poe, John Doe, and Jane Doe.[1]

Respondents (defendants-appellants below) are Rob Bonta, in his official capacity as Attorney General of California; Tony Thurmond, in his official capacity as the California State Superintendent of Public Instruction; Linda Darling-Hammond, in her official capacity as President of the California State Board of Education; Cynthia Glover Woods, in her official capacity as Vice President of the California State Board of Education; and Francisco Escobedo, Brenda Lewis, James J. McQuillen, Sharon Olken, Gabriela Orozco-Gonzalez, Kim Pattillo Brownson, Haydee Rodriguez, Alison Yoshimoto-Towery, and Anya Ayyappan, all in their official capacities as members of the California State Board of Education.

## LIST OF RELATED PROCEEDINGS

United States Court of Appeals (9th Cir.):

*Mirabelli* v. *Bonta*, No. 25-8056 (Jan. 5, 2026) (granting stay pending appeal), App.1a-13a.

*Mirabelli* v. *Bonta*, No. 25-8056 (Dec. 26, 2025) (granting administrative stay), App.14a-16a.

United States District Court (S.D. Cal.):

*Mirabelli* v. *Olson*, No. 23-cv-768 (Dec. 24, 2025) (denying stay pending appeal), App.17a-21a.

---

[1] The names "Jane Roe," "Jane Boe," "John Poe," "Jane Poe, "John Doe," and "Jane Doe" are pseudonyms used to protect the identities of minor children and their families.

*Mirabelli* v. *Olson*, No. 23-cv-768 (Dec. 22, 2025) (permanent injunction), App.22a-25a.

*Mirabelli* v. *Olson*, No. 23-cv-768 (Dec. 22, 2025) (order granting summary judgment), App.26a-77a.

*Mirabelli* v. *Olson*, No. 23-cv-768 (Oct. 15, 2025) (order certifying class), App.78a-90a.

*Mirabelli* v. *Olson*, No. 23-cv-768 (Apr. 10, 2025) (denying motion to dismiss action as moot), App.91a-96a.

*Mirabelli* v. *Olson*, No. 23-cv-768 (Jan. 7, 2025) (denying motion to dismiss for failure to state a claim), App.97a-122a.

*Mirabelli* v. *Olson*, No. 23-cv-768 (Sep. 14, 2023) (order granting preliminary injunction and denying motion to dismiss), App.123a-158a.

# TABLE OF CONTENTS

PARTIES TO THE PROCEEDING ................................................................. i

LIST OF RELATED PROCEEDINGS ........................................................... i

JURISDICTION........................................................................................... 7

BACKGROUND AND PROCEDURAL HISTORY...................................... 8

    A.  The California Department of Education ("CDE") and its Adoption of Parental Exclusion Policies. ..................................................... 8

    B.  Plaintiff Parents and Teachers........................................................ 10

    C.  Procedural History. ......................................................................... 13

    D.  The District Court's Permanent Injunction and the Ninth Circuit's Stay Order. .................................................................................... 15

REASONS FOR GRANTING THE APPLICATION ................................. 17

    I.  There is a Reasonable Probability that the Court Would Consider this Case Certworthy and a Fair Prospect it Would Reverse................................ 18

        A.  The Free Exercise Clause protects parents' and teachers' rights to opt out of California's exclusion policies..................................... 18

        B.  Substantive Due Process protects parents' rights to opt out of California's exclusion policies. ................................................. 26

    II.  The Equitable Factors Favor Plaintiffs............................................ 31

    III.  Given the Importance and Urgency of the Issues, the Court May Construe this Application as a Petition for a Writ Of Certiorari................... 33

CONCLUSION............................................................................................ 34

APPENDIX................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Acad. of Pediatrics* v. *Lungren*,
  940 P.2d 797 (Cal. 1997) ................................................................. 10, 20

*Bellotti* v. *Baird*,
  443 U.S. 622 (1979) .................................................................................. 27

*Blair* v. *Appomattox Cty. Sch. Bd.*,
  147 F.4th 484 (4th Cir. 2025) ............................................................... 33

*Brown* v. *Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) .................................................................................. 27

*Butt* v. *California*,
  842 P.2d 1240 (Cal. 1992) .......................................................................... 8

*Davidson* v. *Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) .................................................................. 25

*Doe No. 1* v. *Bethel Loc. Sch. Dist. Bd. of Educ.*,
  No. 23-3740, 2025 WL 2453836 (6th Cir. Aug. 26, 2025) ................... 3, 19

*Foote* v. *Ludlow Sch. Comm.*,
  128 F.4th 336 (1st Cir. 2025) ......................................................... 5, 29, 33

*Free Speech Coal., Inc.* v. *Paxton*,
  606 U.S. 461 (2025) .................................................................................. 22

*Fulton* v. *City of Philadelphia*,
  593 U.S. 522 (2021) ........................................................ 5, 20, 21, 22, 25

*Ginsberg* v. *New York*,
  390 U.S. 629 (1968) .................................................................................. 27

*Hill* v. *NCAA*,
  865 P.2d 633 (Cal. 1994) .......................................................... 5, 10, 20

*Hodgson* v. *Minnesota*,
  497 U.S. 417 (1990) .................................................................................. 27

*Hollingsworth* v. *Perry*,
  558 U.S. 183 (2010) .................................................................................. 17

*In re M.T.*,
    326 Cal. Rptr. 3d 808 (Cal. App. 2024) ................................................. 10

*James* v. *City of Boise*,
    577 U.S. 306 (2016) .................................................................................. 26

*John & Jane Parents 1* v. *Montgomery Cty. Bd. of Educ.*,
    144 S. Ct. 2560 (2024) ............................................................................ 30

*John & Jane Parents 1* v. *Montgomery Cty. Bd. of Educ.*,
    78 F.4th 622 (4th Cir. 2023) .................................................................. 34

*Kaltenbach* v. *Hilliard City Schs.*,
    No. 24-3336, 2025 WL 1147577 (6th Cir. Mar. 27, 2025) ................. 6, 34

*Kennedy* v. *Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) .................................................................................. 18

*Lavigne* v. *Great Salt Bay Cmty. Sch. Bd.*,
    146 F.4th 115 (1st Cir. 2025) .............................................................. 6, 31

*Lee* v. *Poudre Sch. Dist. R-1*,
    -- S. Ct. --, No. 25-89, 2025 WL 2906469 (2025) .................................. 31

*Lee* v. *Poudre Sch. Dist. R-1*,
    135 F.4th 924 (10th Cir. 2025) .............................................................. 24

*Littlejohn* v. *Sch. Bd. of Leon Cty.*,
    132 F.4th 1232 (11th Cir. 2025) ................................................. 31, 33, 34

*Mahanoy Area Sch. Dist.* v. *B. L.*,
    594 U.S. 180 (2021) ............................................................................ 28, 29

*Mahmoud* v. *Taylor*,
    606 U.S. 522 (2025) ..........................1, 2, 3, 7, 18, 19, 20, 22, 25, 26, 32

*Marmet Health Care Ctr., Inc.* v. *Brown*,
    565 U.S. 530 (2012) .................................................................................. 26

*Merrill* v. *Milligan*,
    142 S. Ct. 879 (2022) .......................................................................... 17, 31

*Meyer* v. *Nebraska*,
    262 U.S. 390 (1923) ............................................................................ 18, 26

*Miller* v. *McDonald*,
    -- S. Ct. --, No. 25-133, 2025 WL 3506969 (2025) ............................ 19, 26

*Mueller* v. *Auker*,
700 F.3d 1180 (9th Cir. 2012) ............................................................... 23

*Parents Protecting Our Children, UA* v. *Eau Claire Area Sch. Dist.*,
145 S. Ct. 14 (2024) ............................................................... 6, 30, 31

*Parham* v. *J. R.*,
442 U.S. 584 (1979) ............................................................... 23

*Pierce* v. *Society of Sisters*,
268 U.S. 510 (1925) ............................................................... 18

*Planned Parenthood Affils.* v. *Van de Kamp*,
226 Cal. Rptr. 361 (Cal. App. 1986) ............................................................... 10

*Ricard* v. *Geary Cty. Unified Sch. Dist. 475*,
No. 22-cv-4015, 2022 WL 1471372 (D. Kan. May 9, 2022) ............................... 28, 34

*Roman Cath. Diocese of Brooklyn* v. *Cuomo*,
592 U.S. 14 (2020) ............................................................... 32

*San Diegans for Mt. Soledad Nat'l War Mem'l* v. *Paulson*,
548 U.S. 1301 (2006) ............................................................... 17

*Santosky* v. *Kramer*,
455 U.S. 745 (1982) ............................................................... 23

*Stanley* v. *Illinois*,
405 U.S. 645 (1972) ............................................................... 23, 24

*T. F.* v. *Kettle Moraine Sch. Dist.*,
No. 21-cv-1650, 2023 WL 6544917 (Wis. Cir. Ct. June 1, 2022) ........................... 34

*Tandon* v. *Newsom*,
593 U.S. 61 (2021) ............................................................... 26

*Tennessee* v. *Cardona*,
737 F. Supp. 3d 510 (E.D. Ky. 2024) ............................................................... 28

*Troxel* v. *Granville*,
530 U.S. 57 (2000) ............................................................... 22, 24

*United States* v. *Texas*,
144 S. Ct. 797 (2024) ............................................................... 17

*Vernonia Sch. Dist. 47J* v. *Acton*,
515 U.S. 646 (1995) ............................................................... 27, 28

*Wilderness Soc., Inc.* v. *Rey*,
   622 F.3d 1251 (9th Cir. 2010) ............................................. 25

*Wis. Legislature* v. *Wis. Elections Comm'n*,
   595 U.S. 398 (2022) ........................................................ 20

*Wisconsin* v. *Yoder*,
   406 U.S. 205 (1972) ........................... 2, 3, 7, 18, 19, 25, 26

**Statutes**

2024 Cal. Stats. ch. 95 ........................................................ 14

28 U.S.C. 1651(a) ....................................................... 1, 7, 17

42 U.S.C. 1983 .................................................................. 11

Cal. Educ. Code § 220 ........................................................... 9

Cal. Educ. Code § 220.1 ....................................................... 14

Cal. Educ. Code § 220.3 ....................................................... 14

Cal. Educ. Code § 220.5 ....................................................... 14

Cal. Educ. Code § 33301 ........................................................ 8

Cal. Welf. & Inst. Code § 15630 .............................................. 23

**Rules & Regulations**

9th Cir. Gen. Ord. ¶ 6.2(a) .................................................. 17

9th Cir. Gen. Ord. ¶ 6.4(d) .................................................. 17

9th Cir. Gen. Ord. ¶ 6.11 ...................................................... 7

9th Cir. Rule 27-10 ............................................................. 7

Cal. Code Regs. tit. 5, § 4670(a)(3) .......................................... 9

Cal. Code Regs. tit. 22, § 83001(g)(2) ........................................ 9

Supreme Court Rule 10 ......................................................... 17

Supreme Court Rule 22 ........................................................ 1, 7

Supreme Court Rule 23 ........................................................ 1, 7

**Constitutional Provisions**

Cal. Const. art. I, § 1 ................................................................. 5, 10, 15

Cal. Const. art. IX, § 2 ................................................................... 8

Cal. Const. art. IX, § 5 ................................................................... 8

Cal. Const. art. IX, § 6 ................................................................... 8

Cal. Const. art. IX, § 7 ................................................................... 8

**Other Authorities**

Tobias B. Wolff, *Discretion in Class Certification*,
   162 U. Pa. L. Rev. 1897 (2014) ................................................ 24

Giuseppe Cardinal Versaldi, *"Male and Female He Created Them": Towards a Path of Dialogue on the Question of Gender Theory in Education*,
   Congregation Cath. Educ. (Feb. 2, 2019) ................................ 11

TO THE HONORABLE ELENA KAGAN, ASSOCIATE JUSTICE OF THE UNITED STATES SUPREME COURT FOR THE NINTH CIRCUIT:

Pursuant to Rules 22 and 23 of this Court, and 28 U.S.C. 1651(a), Applicants respectfully request that this Court vacate the Ninth Circuit's January 5, 2026, interlocutory order staying the district court's injunction pending appeal (App.1a-13a) and reinstate the district court's December 22, 2025, permanent injunction (App.22a-25a) pending further proceedings in the Ninth Circuit and this Court. In addition, given the importance and urgency of the issues, the Court may construe this application as a petition for a writ of certiorari before judgment.

\* \* \*

California is requiring public schools to hide children's expressed transgender status at school from their own parents—including religious parents—and to actively facilitate those children's "social transition" over their parents' express objections, even after this Court's recent decision in *Mahmoud* v. *Taylor*, 606 U.S. 522 (2025). California parents (including religious parents) are suffering grievously under the state's regime. Plaintiffs John and Jane Poe were not told that their junior-high daughter was being treated as male at school for most of a year. Only after she attempted suicide did they learn the truth. Unable to afford private school, this devout Catholic family transferred her to another public school, expressly requesting notice of her gender expression and the use of her legal name and biological pronouns. That school refused, citing the State's policies. To this day, the Poes continue to be left in the dark regarding their daughter's gender presentation at school.

Teachers also face a direct collision of duty and conscience. Two Christian middle school teachers, Plaintiffs Elizabeth Mirabelli and Lori Ann West, were presented with a list of seven students transitioning genders, six of whose parents were unaware. See 5-Plt.Exs-1123-24 (list).[2] Their school required them to use one set of names and pronouns in class and another when calling parents. Believing this constituted systematic deception, they sought relief in April 2023 and won a preliminary injunction in September 2023. App.123a-158a. Previously protected, the Ninth Circuit's stay means they and teachers across California are again forced to lie to parents.

On December 22, 2025, after full discovery and a searching review of the record, the district court entered summary judgment and issued a classwide permanent injunction, on both Free Exercise and Substantive Due Process grounds, relying in significant part on this Court's decisions in *Mahmoud* v. *Taylor*, 606 U.S. 522 (2025) and *Wisconsin* v. *Yoder*, 406 U.S. 205 (1972). App.26a. The court held that parents—including religious parents—have the right to notice and opt out before a school socially transitions their child. A few days later, on December 26, 2025, the Ninth Circuit issued an administrative stay, App.14a-16a, which it shortly thereafter converted into a stay pending appeal of the entire injunction. App.1a-13a.

The Ninth Circuit's order flouted *Mahmoud*, instead applying an unpublished, divided, Sixth Circuit decision that badly misread both *Mahmoud* and *Yoder* to apply

---

[2] The lower court orders are attached in the Appendix hereto. Citations to "Plt.Exs" refers to the Exhibits filed with the Ninth Circuit at ECF No. 11.

2

only to religious burdens imposed by "curricular requirements." App.10a-11a (quoting *Doe No. 1* v. *Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 23-3740, 2025 WL 2453836, *7 n.3 (6th Cir. Aug. 26, 2025)). Following *Bethel*, the panel concluded that *Mahmoud* does not require schools to allow parents to opt out of "general operational policies that involve no instruction," no matter their effect on the parents' right to control the religious upbringing of their children. App.10a-11a (quoting *Bethel*, 2025 WL 2453836, *7 n.3).

The Ninth Circuit's cursory order should be immediately vacated. As *Mahmoud* recognized, in line with *Yoder*, "government policies" that "substantially interfer[e] with parents' ability to direct the religious development of their children" impose a cognizable (and common) burden on parents' religious rights and trigger strict scrutiny 606 U.S. at 546, 554 (internal quotation marks omitted). Nothing about *Mahmoud* is limited to "curricular requirements." See, *e.g.*, *Yoder*, 406 U.S. at 211 (requiring strict scrutiny where neither the "curriculum *or social environment*" of modern high schools were consistent with the parent plaintiffs' religious beliefs) (emphasis added). And California's policies unquestionably interfere with parents' ability to direct the religious upbringing of their children.

The Poe parents thus remain completely sidelined by the school—*to this day*—pursuant to California's policy that requires withholding information about their daughter's gender presentation at school. The same is true of Plaintiffs John and Jane Doe, also devout Catholics, who were lied to by each of their daughter's teachers, and eventually discovered that the school had begun socially transitioning their daughter

3

as early as *fifth grade*. They are still being denied notice about her current gender expression at school under Defendants' policy.

Then, as more teachers and parents sought similar relief across the State, more plaintiffs were added, and the case was certified as a class action. App.78a-90a. Twice, Plaintiffs moved for a classwide preliminary injunction against the California Attorney General, the California State Superintendent, and the California State Board of Education members ("Defendants") because of ongoing, irreparable harm to the named Plaintiffs and putative class. But the Defendants protested, and the district court deferred ruling on the motions. According to California, this case "raise[d] questions of constitutional law on a topic that has garnered significant public interest and litigation," and if the district court granted an early injunction, it would "be deprived of the kind of fully developed record that should be considered in addressing important issues like those presented here." D.C. Dkt. 142 at 3, 7.

Discovery solidified that California's policies violated the Plaintiffs' constitutional rights. Cross-examination of Defendants' experts revealed that California's purported safety rationale was actually *furthered* by including parents in decision making. See App.28a-30a; App.41a-45a. Indeed, one defense expert specifically opined that referring to a child "as a chosen gender in one environment, but not in a different setting, can be 'harmful' in that it can 'increase dysphoria, [and] increase mental health risks.' " App.51a (quoting 17-Plt.Exs-4207-08); see also 18-Plt.Exs-4504-05 (https://bit.ly/4pyclKG). Thus, all of the harm here was (and is) borne by the Plaintiffs, including the Poe Family who have long been pleading for relief "now" and

without "[a]ny further delay" as they seek to save their daughter's life. 5-Plt.Exs-1247.

The California Department of Education's ("CDE") mandate flows from its interpretation of the Privacy Clause of the California Constitution. Cal. Const. art. I, § 1. Under the Privacy Clause, an invasion of privacy is permitted so long as there is a "sufficient countervailing interest," *Hill* v. *NCAA*, 865 P.2d 633, 657 (Cal. 1994), or, as Defendants described it, "a compelling need to do so." App.8a. The district court observed this is the "very definition of a discretionary exemption." App.149a; App.70a-71a n.13 (citing *Fulton* v. *City of Philadelphia*, 593 U.S. 522, 533 (2021)). Nevertheless, the Ninth Circuit rejected the Teacher-Plaintiffs' Free Exercise claim without even mentioning *Fulton*. Instead, it held that California's policies do not explicitly require teachers to directly lie and so there was no burden on religion. See App.11a (quoting App.146a).

Lastly, on the Substantive Due Process claim, the Ninth Circuit panel summarily followed *Foote* v. *Ludlow School Committee*, 128 F.4th 336 (1st Cir. 2025) (per curiam), *pet. for cert. pending* (No. 25-77), stating only that Plaintiffs were not likely to succeed because "the challenged policies here appear to be analogous to the policy at issue in *Foote.*" App.9a-10a. And despite an explicit email from Child Poe's school to her parents rejecting their objections and stating that "[b]ecause of these legal protections, we will be addressing your student by their preferred name in the classroom and school setting," 3-Plt.Exs-609, the Ninth Circuit panel held that they "will not be substantially injured from the issuance of a stay." App.13a.

5

Challenges to policies like California's have been percolating for years and "present[] a question of great and growing national importance." *Parents Protecting Our Children, UA* v. *Eau Claire Area Sch. Dist.*, 145 S. Ct. 14, 14 (2024) (Alito, J., dissenting). Some include heartbreaking allegations of attempted suicide. See, *e.g.*, *Kaltenbach* v. *Hilliard City Schs.*, No. 24-3336, 2025 WL 1147577, *2 (6th Cir. Mar. 27, 2025) (Thapar, J., concurring). Others concern staff secretly providing a student with a chest binder to wear during the day—which can permanently warp a ribcage. See *Lavigne* v. *Great Salt Bay Cmty. Sch. Bd.*, 146 F.4th 115, 119 (1st Cir. 2025). Indeed, with six separate certiorari petitions relating to similar policies having been presented to this Court, see §§ I.B.3, III, *infra*, a litany of different tragic stories have been told, all preventable.

Accordingly, the district court's injunction below should not have been controversial. Its provisions are tailored to the harm suffered, prohibiting the state from: (1) requiring or permitting school staff to mislead parents about their child's gender presentation at school; (2) requiring or permitting school staff to use transgender names or pronouns over parental objection; (3) requiring religiously objecting school staff to use transgender names and pronouns in school when that use is concealed from the child's parents; and (4) interfering with school staff communicating to parents that their child has manifested gender incongruity. The order also requires the state to (5) insert a short statement reflecting the court's holding in the state's instructional training for teachers. App.23a-25a. And while the panel below misread the certified class to include "every" parent and public school

employee in California, the actual certified class comprises only those California parents and public school employees who object to, or submit a religious opt-out from, Defendants' parental exclusion policies. App.80a.

As the district court noted, this Court "has historically and repeatedly declared that parents have a right, grounded in the Constitution, to direct the education, health, and upbringing, and to maintain the well-being of, their children." App.137a. Yet the Ninth Circuit's stay—premised largely on its view of the merits—squarely evades *Mahmoud* and *Yoder* and strips parents of their core authority with respect to an issue with significant religious and developmental impact: that is, a child's growth into adulthood. App.1a-16a.

In light of the order's violation of controlling Ninth Circuit precedent, Plaintiffs are also today filing a motion for en banc reconsideration of the stay order. See 9th Cir. Gen. Ord. ¶ 6.11; 9th Cir. Rule 27-10. But California parent's religious and fundamental parental rights—and the health and safety of their children—are too precious for them to delay seeking relief from this Court. This Court should vacate the Ninth Circuit panel's cursory order and permit the district court's permanent injunction to take effect.

## JURISDICTION

Applicants seek review of the Ninth Circuit's grant of interlocutory stay pending appeal. The Court has authority to grant this application under the All Writs Act, 28 U.S.C. 1651(a), and Rules 22 and 23 of this Court.

## BACKGROUND AND PROCEDURAL HISTORY

**A. The California Department of Education ("CDE") and its Adoption of Parental Exclusion Policies.**

In January 2016, the California Department of Education ("CDE") published a new Legal Advisory and an accompanying FAQs page "regarding application of California's antidiscrimination statutes to transgender youth in schools." App.104a; App.131a. The purpose of the Legal Advisory was "to provide California school districts with updated guidance on the minimum requirements for compliance with California's prohibition on gender identity discrimination." 9-Plt.Exs-2124 (https://bit.ly/49hQT6G). The FAQs also linked to model board policies and model administrative regulations. 9-Plt.Exs-2136 (https://bit.ly/4j9ROdA). Concerning both the FAQs and the linked model policies, the Legal Advisory stated that "[i]t is recommended that these materials are reviewed by superintendents, principals, administrators and [others] … to ensure compliance with the educational equity and nondiscrimination requirements of" California law. 9-Plt.Exs-2125.

The CDE's interpretation of California law is binding on school districts. The California Constitution makes public schooling a responsibility of the state. Cal. Const. art. IX, §§ 5-6. The public school system is managed through the California Department of Education, Cal. Const. art. IX, §§ 2, 7; Cal. Educ. Code § 33301, which has "general supervision" over school districts. 9-Plt.Exs-2239-40; 9-Plt.Exs-2251-52 (PMQ Depo.). The State "is obliged to intervene" when local school districts go awry. *Butt* v. *California*, 842 P.2d 1240, 1256 (Cal. 1992). Thus, if the CDE investigates and determines a school district is out of compliance with any aspect of California law, it

can and must order the school district to comply. Cal. Code Regs. tit. 5, § 4670(a)(3); 9-Plt-Exs-2002-03, 2070-72. School districts have "a ministerial duty under state law to comply with the CDE's corrective actions." 9-Plt.Exs-2143-50.

In the FAQs, the CDE stated that: (1) "school districts should accept and respect a student's assertion of their gender identity where the student expresses that identity at school";[3] (2) "schools *must* consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, including the student's family"; (3) "schools are *required* to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents" except in the "very rare" situations where "there is a specific and compelling 'need to know' "; and (4) "[a] transgender student's right to privacy does not restrict a student's right to openly discuss and express their gender identity or to decide when or with whom to share private information." 9-Plt.Exs-2130-33. Plaintiffs and the district court collectively refer to these specific statements in the FAQs as the CDE's "Parental Exclusion Policy." 1-Plt.Exs-17.

The California Attorney General also posted a "State of Pride" page on the California DOJ website. App.81a. It states: "You have the right to disclose—or not disclose—your gender identity on your own terms, regardless of your age," and that

---

[3] California prohibits discrimination based on "gender identity" in public schools, Cal. Educ. Code § 220, with gender identity defined as "a person's identity based on the individual's stated gender identity … without regard to any contrary statement by … a family member." Cal. Code Regs. tit. 22, § 83001(g)(2).

no school has the right to "out" a student "to anyone without your permission, including your parents." 10-Plt.Exs-2383-89, 2474, 2481-85 (https://bit.ly/49ayGrt). He subsequently also published a "Legal Alert" condemning "Forced Disclosure Policies" as illegal under various aspects of California law. 10-Plt.Exs-2500-03 (https://bit.ly/4syIR26).

The CDE states that its Parental Exclusion Policy is rooted in the Privacy Clause of the California Constitution. App.36a (quoting Cal. Const. art. I, § 1). This Privacy Right has two components: "(1) interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')." *Hill* v. *NCAA*, 865 P.2d 633, 654 (Cal. 1994). Like any other person, minors have certain autonomy privacy rights, *Am. Acad. of Pediatrics* v. *Lungren*, 940 P.2d 797, 814-15 (Cal. 1997) (abortion), and certain informational privacy rights. *In re M.T.*, 326 Cal. Rptr. 3d 808, 820-24 (Cal. App. 2024) (gender identity); *Planned Parenthood Affils.* v. *Van de Kamp*, 226 Cal. Rptr. 361, 378-80 (Cal. App. 1986) (sexual intimacy). However, even if privacy rights are implicated, there is no violation of the right to privacy when there is a "sufficient countervailing interest" warranting the privacy invasion. *Hill*, 865 P.2d at 657.

### B. Plaintiff Parents and Teachers.

Plaintiffs Elizabeth Mirabelli, Lori Ann West, Jane Boe, and Jane Roe are teachers from the Escondido Union School District ("EUSD"), a K-8 school district located in San Diego County that serves roughly 14,000-16,000 students. App.67a-

70a, 124a; see 22-Plt.Exs-5518-21, 5540 (Complaint); 4-Plt.Exs-966-1051; 5-Plt.Exs-1053-1238 (declarations). They alleged that forced compliance with the policies violated their Free Exercise and Free Speech rights and sought relief under 42 U.S.C. 1983. As they explained, "[u]nder the 'principle of subsidiarity,' it is very important that educators do not preempt the role of parents," because "participants in the process of education are only able to carry out their responsibilities in the name of the parents, with their consent and, to a certain degree, with their authorization." 4-Plt.Exs-969 (quoting Giuseppe Cardinal Versaldi, *"Male and Female He Created Them": Towards a Path of Dialogue on the Question of Gender Theory in Education*, Congregation Cath. Educ. (Feb. 2, 2019)). The district court found that their religious objections were "well-articulated, integrated, and comprehensive." App.145a.

The Poe Family and the Doe Family, both devoutly Catholic, later joined this lawsuit as Parent-Plaintiffs. App.58a-60a; App.105a-106a; see 5-Plt.Exs-1239-1313; 3-Plt.Exs-605-10 (declarations). The Poe Family's daughter ("Child Poe") attended Clovis Unified School District ("CUSD") schools and began identifying as transgender upon entering seventh grade in Fall 2022. She socially transitioned for that entire academic year without her parents' knowledge or consent. In March 2023, her parents obtained counseling for her because they could tell she was unwell but did not know why. Only when Child Poe unsuccessfully attempted suicide six months later did doctors treating her inform her parents about her ongoing gender transition at school.

After Child Poe was released from the hospital, her parents moved her to CUSD's online public school and then to Yosemite Valley Charter School ("YVCS")—an online

11

public charter school. But the CDE's Parental Exclusion Policy dogged them at each step. Because Mr. and Mrs. Poe cannot afford to place their daughter in a private school, they have repeatedly instructed YVCS that they do not consent to her transition. But YVCS has ignored their instructions.

The Doe Family's daughter ("Child Doe") attends Pasadena Unified School District ("PUSD") schools. She began identifying as transgender and presenting as a boy at school, without informing her parents, sometime during her fifth-grade year starting Fall 2020. Her transgender identity intensified when she started sixth grade. In September 2021, Child Doe informed her parents she was transgender. Her parents suggested that they should, as a family, take time to think about and discuss her feelings before taking any action. As a result, Mr. and Mrs. Poe believed Child Doe's school was not actively socially transitioning her.

The next year, when their daughter was in seventh grade, Child Doe's parents discovered that her school had been socially transitioning her without their permission. They confronted the principal, who denied the transitioning was occurring at school even while admitting that, if it were, it would be kept secret pursuant to the CDE's Parental Exclusion Policy. Towards the end of seventh grade, Child Doe appeared to desist from the identity and informed her parents that she was not transgender. But then, near the end of eighth grade, her parents discovered she had re-transitioned at school. They moved her to a new school within PUSD because they cannot afford private schooling. Presently, they believe she has re-desisted but

12

cannot know because PUSD continues to follow the CDE's Parental Exclusion Policies.

## C. Procedural History.

Plaintiffs Mirabelli and West filed this action on April 27, 2023, and promptly moved for a preliminary injunction. D.C. Dkt. 1, 5. In September 2023, the district court held Mirabelli and West had standing to sue the CDE Defendants, granted a preliminary injunction, and denied the CDE Defendants' motion to dismiss. App.123a. Although the preliminary injunction protected only Mirabelli and West, EUSD felt compelled to apply its reasoning districtwide. When EUSD advised the Attorney General of its plan, he warned EUSD the plan was illegal and could prompt an enforcement action. 23-Plt.Exs-5987-88; 12-Plt.Exs-2892-96.

Later, with other teachers (Jane Boe and Jane Roe) and parents (the Poe Family and the Doe Family) seeking to join the action, in June 2024, Plaintiffs moved to amend the complaint to add plaintiffs, add Attorney General Bonta, and convert the case into a class action. D.C. Dkt. 118. After Plaintiffs filed the operative Second Amended Class Action Complaint in August 2024, 22-Plt.Exs-5493-613, they immediately moved for class certification. D.C. Dkt. 136. Plaintiffs also filed an early motion for summary judgment and entry of a permanent injunction or, alternatively, for a classwide preliminary injunction. D.C. Dkt. 137. The Attorney General requested that both motions be stayed pending discovery, which the district court granted. D.C. Dkt. 142, 144, 221.

Shortly thereafter, the Attorney General and CDE Defendants moved to dismiss the Second Amended Complaint on standing grounds, D.C. Dkt. 150, 156, and

13

Plaintiffs filed a motion for a classwide preliminary injunction motion. D.C. Dkt. 153. The district court vacated the hearing on the preliminary injunction motion and addressed only the motions to dismiss. See D.C. Dkt. 240. The district court found standing as to all Defendants and denied the motions to dismiss. App.97a.

In the interim, to address Parental Notification Policies issued by a half-dozen school districts, see D.C. Dkt. 220-1 (collecting policies), California passed AB 1955, a new statute that prohibited school districts from adopting any policy that provides parents notice of their child's gender transition, and that prohibited school districts from requiring any individual teacher to do so—"unless otherwise required by state or federal law." 2024 Cal. Stats. ch. 95 (creating Cal. Educ. Code §§ 220.1, 220.3, 220.5). In January 2025, the CDE Defendants removed their Legal Advisory and FAQs and replaced them with a new webpage tied to AB 1955. 9-Plt.Exs-2153-55 (https://bit.ly/4pafHmU).

The new webpage quoted AB 1955's legislative findings, including that "[p]upils have a constitutional right to privacy when it comes to sensitive information about them," and that "[p]olicies that require outing pupils without their consent violate pupils' right to privacy." But the webpage explained that "AB 1955 does not mandate non-disclosure" and that "AB 1955 does not specifically address whether a school employee may voluntarily disclose any information related to a pupil's … gender identity … to any other person without the pupil's consent." Because Defendants did not abandon the content of the FAQs or how they applied to Plaintiffs, the district court found the case not moot. App.18a-19a, 32a-33a; App.91a-96a.

### D. The District Court's Permanent Injunction and the Ninth Circuit's Stay Order.

At the end of extensive discovery, including twenty-five depositions, in July 2025 Plaintiffs filed renewed motions for class certification and for summary judgment and entry of a classwide permanent injunction. 4-Plt.Exs-887-965. Although EUSD Defendants filed a cross-motion for summary judgment, State Defendants did not. The summary judgment hearing was ultimately set for November 17, 2025. In the interim, the district court severed and stayed the claims against EUSD, 1-Plt.Exs-63-66, and certified a modified class. App.78a-90a.

The class further contained four administrative subclasses, based around the four substantive claims: (1) school employees who "object" to complying with the Parental Exclusion Policy; (2) employees who "submit a request for a religious exemption or opt-out" from complying with the same; (3) parents who "object" to the Parental Exclusion Policy's application "against them"; and (4) parents who "submit a request for a religious exemption or opt-out" from the same. App.89a-90a.

At the November hearing, Defendants conceded there was no genuine dispute of material fact. App.35a-36a (quoting 2-Plt.Exs-405). On December 22 the district court granted Plaintiffs' summary judgment motion, App.26a-77a, and entered a classwide permanent injunction for the four certified subclasses. App.22a-25a. Accordingly, the injunction contained four parts tailored to the practical manner in which the Plaintiffs had been harmed. The Defendants were enjoined from enforcing "(1) the Privacy Provision of the California Constitution, Cal. Const. art. I, § 1; [or] (2) any other provision of California law," so as to: (a) permit a teacher to lie or mislead a

parent about their child's gender presentation at school; (b) permit a teacher to socially transition a child over their parent's objection; (c) require a teacher to socially transition a child without their parent's knowledge; and (d) prevent a teacher from informing a parent about the child's social transition. App.24a.

The injunction separately required a statement prominently placed in teacher training materials providing that: "Parents and guardians have a federal constitutional right to be informed if their public school student child expresses gender incongruence. Teachers and school staff have a federal constitutional right to accurately inform the parent or guardian of their student when the student expresses gender incongruence. These federal constitutional rights are superior to any state or local laws, state or local regulations, or state or local policies to the contrary." App.24a-25a. At base, the order simply and modestly (i) allows teachers to communicate truthfully with parents about what name and pronouns their child is using at school, and (ii) gives parents the ability to opt out of Parental Exclusion Policies.

That evening, Defendants moved for a stay pending appeal, which the district court denied two days later on December 24. App.17a. On that same day, Defendants moved the Ninth Circuit for a stay pending appeal. On December 26, a Ninth Circuit panel[4] granted an administrative stay, App.14a, and on January 5, 2026, a stay pending appeal. App.1a.

---

[4] In the Ninth Circuit, the Chief Judge does not sit on the motions panel, but in cases of "exceptional importance," the Ninth Circuit immediately draws a merits panel and

## REASONS FOR GRANTING THE APPLICATION

Under the All Writs Act, this Court "may issue all writs necessary or appropriate" that aid its jurisdiction and are permitted by law. 28 U.S.C. 1651(a). To obtain vacatur of a stay order, an applicant "ordinarily must show (i) a reasonable probability that this Court would eventually grant review and a fair prospect that the Court would reverse, and (ii) that the applicant would likely suffer irreparable harm absent the stay." *Merrill* v. *Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (citing *Hollingsworth* v. *Perry*, 558 U.S. 183, 190 (2010) (per curiam)); see *United States* v. *Texas*, 144 S. Ct. 797, 797-78 (2024) (Barrett, J., concurring) (factors apply to vacatur of stay). "In deciding whether to [vacate] a stay pending appeal or certiorari, the Court also considers the equities (including the likely harm to both parties) and the public interest." *Id.* (Kavanaugh, J., concurring) (citing *Hollingsworth*, 558 U.S. at 190).

This Court is likely to grant review in the context of a conflict among the lower courts on "an important federal question," when necessary as "an exercise of this Court's supervisory power," or if the issue "has not been, but should be, settled by this Court." Supreme Court Rule 10. "[T]ry[ing] to predict whether four Justices would vote to grant certiorari … is always a difficult and speculative inquiry." *San Diegans for Mt. Soledad Nat'l War Mem'l* v. *Paulson*, 548 U.S. 1301, 1303 (2006) (Kennedy, J., in chambers). Applicants satisfy this standard.

---

assigns the motion to it. 9th Cir. Gen. Ord. ¶¶ 6.2(a), 6.4(d). Since Chief Judge Murguia sat on the panel, the panel below is ostensibly the merits panel.

I. **There is a Reasonable Probability that the Court Would Consider this Case Certworthy and a Fair Prospect it Would Reverse.**

   A. **The Free Exercise Clause protects parents' and teachers' rights to opt out of California's exclusion policies.**

**1. Parents' Free Exercise Claim.** "At its heart, the Free Exercise Clause of the First Amendment protects 'the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of' religious acts." *Mahmoud* v. *Taylor*, 606 U.S. 522, 546 (2025) (quoting *Kennedy* v. *Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022)). Drawing on both *Meyer* v. *Nebraska*, 262 U.S. 390 (1923), and *Pierce* v. *Society of Sisters*, 268 U.S. 510 (1925), fifty years ago, this Court held that a rule impinging on parents' rights to control "the *religious* upbringing and education of their minor children" triggers strict scrutiny under the Free Exercise Clause. *Wisconsin* v. *Yoder*, 406 U.S. 205, 231 (1972) (emphasis added). Most recently, the Court has instructed that when the government " 'substantially interfer[es] with the religious development' of the parents' children," then "we need not ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny." *Mahmoud*, 606 U.S. at 564 (quoting *Yoder*, 406 U.S. at 218).

In *Yoder*, Amish parents objected to having their children attend high school and be in an environment "hostile to Amish beliefs" where the children would be "pressure[d] to conform" to worldviews in conflict with those beliefs. 406 U.S. at 211. The Court held that strict scrutiny applied because "the modern high school is not equipped, *in curriculum or social environment*, to impart the values promoted by Amish society." *Id.* at 211-12 (emphasis added). In *Mahmoud*, religious parents objected to the school reading story books to their children that taught "that it is

18

hurtful, perhaps even hateful, to hold the view that gender is inextricably bound with biological sex." 606 U.S. at 553. The books were "designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *Id.* at 550. Accordingly, they "carr[ied] with them 'a very real threat of undermining' the religious beliefs that parents wish to instill in their children." *Id.* at 553-54 (quoting *Yoder*, 406 U.S. at 218). The Court then explained that strict scrutiny applies when, as there, "the burden imposed is of the *same character* as that imposed in *Yoder*." *Id.* at 564 (emphasis added).

Here, the schools' facilitation of a secret gender transition for young children, which may have permanent and life-altering consequences, is orders of magnitude worse than the burdens imposed in *Mahmoud* and *Yoder*. Yet relying on a fractured, unpublished, Sixth Circuit opinion, the Ninth Circuit held that *Mahmoud* is "a narrow decision focused uniquely on coercive 'curricular requirements'," and does not require an opt out of "general operational policies that involve no instruction." App.10a-11a (quoting *Doe No. 1* v. *Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 23-3740, 2025 WL 2453836, at *7 n.3 (6th Cir. Aug. 26, 2025)). But as concurring Judge Larsen explained, "[w]hether a policy applies in the school classroom, lunchroom, or restroom, it may still substantially interfere with parents' rights to instill in their children the principles of their faith." *Bethel*, 2025 WL 2453836, *12-13 (Larsen, J., concurring). This Court has already recognized the same after *Mahmoud*. *Miller* v. *McDonald*, -- S. Ct. --, No. 25-133, 2025 WL 3506969 (2025) (vacating lower court judgment against Amish parents' Free Exercise challenge to application of New York student vaccine mandate and remanding

for reconsideration in light of *Mahmoud*). This Court should recognize the same again here and vacate the Ninth Circuit's stay in light of *Mahmoud*.

**2. Teacher's Free Exercise Claim.** Turning to broader Free Exercise Clause analysis, a law that burdens religion is subject to strict scrutiny if it contains "a mechanism for individualized exemptions." *Fulton* v. *City of Philadelphia*, 593 U.S. 522, 533 (2021). This is true "regardless whether any exceptions have been given,' because the mere "availability of exceptions … 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id*. at 537.

Here, the Privacy Clause of the California Constitution, which is the basis for the CDE's Parental Exclusion Policy, is rife with "individualized exemptions" which have been granted liberally. The Privacy Clause protects against "the dissemination or misuse of sensitive and confidential information." *Hill* v. *NCAA*, 865 P.2d 633, 654 (Cal. 1994). But even if there is an invasion of privacy, courts ask whether "the invasion of privacy is justified because it substantively furthers one or more countervailing interests." *Id*. at 859. Under this analysis, countervailing interests must be "legally authorized and socially beneficial," with their "relative importance … determined by their proximity to the central functions of a particular … enterprise" and "the extent to which [the conduct] furthers legitimate and important competing interests." *Am. Acad. of Pediatrics* v. *Lungren*, 940 P.2d 797, 811 n.15 (Cal. 1997).

In its specific application of the Privacy Clause in its Parental Exclusion Policy, the CDE stated that parents can be informed of their child's gender transition if they have "a specific and compelling 'need to know.' " 9-Plt.Exs-2132. On the California DOJ

website, it was explained that, "under some limited circumstances your school can tell your parents something about your … gender identity—but only if they have a very good reason for doing so. It really depends on the circumstances." 10-Plt.Exs-2474, 2484. The CDE did not provide any parameters for this "need to know" test, but the California DOJ explained that a "good reason" does not include "to punish you, harass you, discriminate against you, or retaliate against you for complaining about something." 10-Plt.Exs-2474. As the district court found, the standardless nature of this "need to know" or "good reason" test necessarily triggers strict scrutiny. App.71a, 129a (citing *Fulton*, 593 U.S. at 533).

The Ninth Circuit's only basis for evading *Fulton* was the ambiguous statement that "the district court's ruling … is predicated on the challenged policies 'requir[ing] teachers to withhold' information about a student's gender nonconformity 'with the knowledge that the information will be impossible for the parents to obtain from the school'," but that the "premise … that these policies categorically forbid disclosure of information … is contradicted by the record." App.11a (quoting App.146a). The quoted portions come from the district court's September 2023 preliminary injunction order in which it rejected the defense argument that there was no burden on religion because "the policy does not require plaintiffs to 'lie' to parents," and cited the hearing transcript. App.146a (citing 4-Plt.Exs-6091-92). That discussion shows that the district court did not adopt a false premise, but correctly apprehended that parents do not get to know about their child's gender transition unless the government decides they have a "compelling" "need to know."

Indeed, in discovery, Plaintiffs attempted to confirm who makes the decision, whether the analysis is truly standardless, and whether the discretion is cabined in any way. Defendants responded by confirming that the analysis is truly standardless: "Whether there is a compelling 'need to know' would necessarily vary based on all of the factors present in a specific situation. It is not possible to speculate about every potential scenario where it might be warranted to disclose a pupil's gender nonconforming status to a parent over the pupil's objection." 21-Plt.Exs-5398. Under *Fulton*, this "mechanism for individualized exemptions" triggers strict scrutiny. 593 U.S. at 533.

**3. Strict Scrutiny.** To satisfy "strict scrutiny," the "government must demonstrate that its policy advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Mahmoud*, 606 U.S. at 565 (quoting *Fulton*, 593 U.S. at 541). "[A]s a practical matter," strict scrutiny "is fatal in fact absent truly extraordinary circumstances." *Free Speech Coal., Inc.* v. *Paxton*, 606 U.S. 461, 485 (2025).

Here, the Ninth Circuit never engaged in a strict scrutiny analysis. But as the district court held, the Defendants first "identif[ied] a general interest in providing a 'safe' learning environment." App.63a. But after reviewing all of the expert evidence, the district court concluded that "the notion of a learning environment where students are insulated from their parents' discovery of a nonconforming gender identity is somehow better for a child, is yet to be proven," App.64a, because Defendants' experts conceded that "those studies do not exist in either direction regarding negative outcomes or benefits." App.50a (quoting 19-Plt.Exs-4930-31). Even if Defendants'

evidence supported them,[5] the law presumes "fit parents act in the best interests of their children," *Troxel* v. *Granville*, 530 U.S. 57, 68 (2000) (plurality), due to natural bonds of affection. *Parham* v. *J. R.*, 442 U.S. 584, 602 (1979). This presumption can be overcome only by a *judicial finding* that the parents are not acting in their child's best interest, *Santosky* v. *Kramer*, 455 U.S. 745, 768-69 (1982), or "[i]n an emergency situation." *Mueller* v. *Auker*, 700 F.3d 1180, 1187 (9th Cir. 2012). That presumption is not overcome simply because a child disagrees with her parents' decision. *Parham*, 442 U.S. at 603. Indeed, parental unfitness cannot be presumed categorically. *Stanley* v. *Illinois*, 405 U.S. 645, 657 (1972). And even were student safety a compelling concern, as the district court held, California's mandatory reporting regime is more than adequate to protect students from actual abuse, but not adequate for California's purpose of protecting children's so-called "privacy." App.30a; Cal. Welf. & Inst. Code § 15630.

The Defendants also identified "a compelling governmental interest in protecting students' privacy as to their bodily autonomy, even with respect to their parents." App.64a. Indeed, the point of Parental Exclusion Policies has always been to comply with the Privacy Clause of the California Constitution—not student safety. App.28a-31a; see 9-Plt.Exs-2132-33; 10-Plt.Exs-2483-84. But, as the district court further held,

---

[5] In their Ninth Circuit briefing, Defendants notably ignored their own experts and cited online articles because not even their experts agree that a parent is unfit if he or she does not affirm a child's desired gender transition. App.29a-30a; 1-Plt.Exs-15-16; 19-Plt.Exs-4741-42; 17-Plt.Exs-4309-12, 4315-16.

in so contending, Defendants "misapprehend the supremacy of federal constitutional rights." App.31a.

**4. Breadth of Relief.** Plaintiffs asked the district court to grant class certification, while also explaining that California's Parental Exclusion Policies could be facially invalidated. See Tobias B. Wolff, *Discretion in Class Certification*, 162 U. Pa. L. Rev. 1897, 1938 & n.217 (2014) (noting the similarity between the two). In light of the presumptions in favor of parents, across-the-board restrictions on parental rights are particularly appropriate for facial invalidation. See*, e.g.*, *Troxel*, 530 U.S. at 77 (Souter, J., concurring); *Stanley*, 405 U.S. at 654 (holding statute invalid that presumed all unwed fathers were unfit despite the fact some unwed fathers are unfit); *Lee* v. *Poudre Sch. Dist. R-1*, 135 F.4th 924, 937 (10th Cir. 2025) (McHugh, J., concurring) (Parental Exclusion Policies "turn[] this presumption on its head").

The district court first certified a class, App.78a-90a, and then entered a classwide injunction. App.22a-77a. The Ninth Circuit, in turn, held that it had "serious concerns" that not all members of the class had standing. App.6a-7a.[6] Why this would be the case is unclear. The district court found that all class members have materially identical Article III injury because the Parental Exclusion Policies directly interfere with all class member parents' rights to direct their children's upbringing, education, and medical treatment and with all Plaintiffs' First Amendment rights. App.83a. To

---

[6] Without explanation, the Ninth Circuit also stated that the district court failed to undertake a "rigorous analysis" before certifying the class. App.7a. But the parties fully briefed the issue and the Court engaged in a lengthy analysis of the question. App.78a-90a.

reach its contrary conclusion, the panel relied on decisions that clash with the informational injury doctrine and are manifestly dubious. After all, a legally cognizable injury is an "inability to rely on the validity of the information" provided. *Davidson* v. *Kimberly-Clark Corp.*, 889 F.3d 956, 971 (9th Cir. 2018); see also *Wilderness Soc., Inc.* v. *Rey*, 622 F.3d 1251, 1258-59 (9th Cir. 2010) (discussing doctrine and collecting cases).

Indeed, in *Mahmoud*, the Court recognized that parents suffer a cognizable burden when public schools substantially interfere with their efforts to direct the religious upbringing of their children. 606 U.S. at 547. The same is thus true here, and the injury is common to both named Plaintiffs and members of the certified class. Nor is the injury here merely informational. The policies transfer the decision whether and how to respond to a child's gender incongruence from parents to schools even though a child's presentation of gender incongruence does not by itself mean that social transition is appropriate. App.48a-54a.

**5. This Case is Certworthy.** There is a reasonable probability that four justices would grant certiorari and a fair prospect that five would reverse because this Court's decisions in *Mahmoud* and *Fulton* are clear and unambiguous. The Sixth Circuit's and now the Ninth Circuit's attempt to cabin *Mahmoud* to "curricular instruction" overlooks that parental religious direction over their public-school children is a "robust" "principle of general applicability" that extends beyond "discrete educational requirement[s] or element[s] of the curriculum" to a public school's "rules and standards of conduct on its students." *Mahmoud*, 606 U.S. at 557-558; see also *Yoder*,

406 U.S. at 212 (holding Amish families burdened because "the modern high school is not equipped, *in curriculum or social environment*, to impart the values promoted by Amish society") (emphasis added).

When the lower courts get the law so egregiously wrong, this Court has not hesitated to intervene. See, *e.g.*, *Wis. Legislature* v. *Wis. Elections Comm'n*, 595 U.S. 398, 401 (2022) (per curiam) ("Summarily correcting the error gives the court sufficient time"); *Tandon* v. *Newsom*, 593 U.S. 61, 64 (2021) (per curiam) ("This is the fifth time the Court has summarily rejected the Ninth Circuit's analysis"); *James* v. *City of Boise*, 577 U.S. 306, 307 (2016) (per curiam) ("The Idaho Supreme Court, like any other state or federal court, is bound by this Court's interpretation of federal law"); *Marmet Health Care Ctr., Inc.* v. *Brown*, 565 U.S. 530, 532 (2012) (per curiam) (the "court's interpretation of the FAA was both incorrect and inconsistent with clear instruction in the precedents of this Court"). In light of how poorly the Sixth Circuit and the Ninth Circuit misunderstood *Mahmoud*, this Court should vacate the Ninth Circuit's stay order before the error spreads. Accord *Miller*, 2025 WL 3506969.

### B. Substantive Due Process protects parents' rights to opt out of California's exclusion policies.

**1. Background on Parents' Rights.** Under the Fourteenth Amendment's protection of liberty, every American has the right "to marry, establish a home and bring up children." *Meyer* v. *Nebraska*, 262 U.S. 390, 399 (1923). A necessary corollary of the right to *have* a family is that parents have "the right of control" over their children. *Id.* at 400. "[C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their

26

children is basic in the structure of our society." *Ginsberg* v. *New York*, 390 U.S. 629, 639 (1968). "Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, i.e., the right to come and go at will. They are subject, even as to their physical freedom, to the control of their parents or guardians." *Vernonia Sch. Dist. 47J* v. *Acton*, 515 U.S. 646, 654 (1995). This Court, however, has explained that parental control is not a limit on the child's liberty—*but a fulfillment of it*:

> [T]he tradition of parental authority is not inconsistent with our tradition of individual liberty [for a child]; rather, the former is one of the basic presuppositions of the latter. Legal restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding.

*Bellotti* v. *Baird*, 443 U.S. 622, 638-39 (1979) (plurality).

Even in the context of federal rights, the Court has only permitted the overriding of parental *consent* through a "judicial bypass" mechanism. *Hodgson* v. *Minnesota*, 497 U.S. 417, 479 (1990) (Scalia, J., concurring in part). Indeed, "[a]lthough the Court has held that parents may not exercise an absolute, and possibly arbitrary, veto over [certain] decision[s], it has never challenged … that … decision should be made after notification to and consultation with a parent." *Id.* at 445 (cleaned up).

At the time of the ratification of the Fourteenth Amendment, "[t]he concept of total parental control over children's lives extended into the schools." *Brown* v. *Ent. Merchs. Ass'n*, 564 U.S. 786, 830 (2011) (Thomas, J., dissenting). Traditionally, parents "delegate[] to school officials their own control of [their child]" under the doctrine of *in*

*loco parentis* "under circumstances where the children's actual parents cannot protect, guide, and discipline them." *Mahanoy Area Sch. Dist.* v. *B. L.*, 594 U.S. 180, 192 (2021). However, *in loco parentis* is not "consonant with compulsory education laws." *Vernonia*, 515 U.S. at 655; see *Mahanoy*, 594 U.S. at 216 (Thomas, J., dissenting). Thus, in the modern context of "compulsory" education, parents must *only* be "treated as having relinquished the measure of authority that the schools must be able to exercise in order to carry out their state-mandated educational mission." *Mahanoy*, 594 U.S. at 198-200 (Alito, J., concurring).

**2. Parents' Rights Are Infringed Here.** A social transition encompasses behaving—in all regards—as a member of the opposite sex. That includes adopting a new name and pronouns, adopting a new opposite-sex presentation (hair, clothes, makeup), and beginning to use sex-segregated facilities and participating in sex-segregated activities as a member of the opposite sex. 6-Plt.Exs-1321-22, 1349-51, 61 (expert report). Examining the Nation's historical traditions, several courts have held that "parents retain a constitutionally protected right to guide their own children on matters of identity, including the decision to adopt or reject various gender norms and behaviors," *Tennessee* v. *Cardona*, 737 F. Supp. 3d 510, 556 (E.D. Ky. 2024), and "to have a say in what a minor child is called and by what pronouns they are referred." *Ricard* v. *Geary Cty. Unified Sch. Dist. 475*, No. 22-cv-4015, 2022 WL 1471372, *8 (D. Kan. May 9, 2022). Whether viewed under the traditional understanding of *in loco parentis*, or a more modern understanding, this right reaches into the schools. Parents only delegate authority over their children "under circumstances" when they "cannot

protect, guide, and discipline them." *Mahanoy*, 594 U.S. at 192. They do not delegate authority to expand those circumstances and cut them out. More, parents only relinquish authority needed for the school to carry out its "educational mission," *id.* at 198-200 (Alito, J., concurring)—they do not delegate the authority to make decisions regarding whether their child is a boy or a girl.

Like the above courts, the district court here rightly held that "when gender incongruence is observed … parents have a right to be informed." App.48a (emphasis omitted). In its stay order, the Ninth Circuit panel waved away the district court's lengthy analysis based solely on a different circuit's holding that a social transition "is not a form of *medical treatment* that gives rise to a substantive due process claim." App.9a-10a (citing *Foote* v. *Ludlow Sch. Comm.*, 128 F.4th 336, 350-52 (1st Cir. 2025), *pet. for cert. pending* (No. 25-77)) (emphasis added).

The record here, however, contradicted this conclusion. Plaintiffs' two experts characterized a social transition as a form of psychological treatment. *See* 6-Plt.Exs-1320, 1339-51, 1361-62; 6-Plt.Exs-1553-59. One expert even undertook a comprehensive review of Child Poe's therapy records to explain why and how a school's secret social transition of her should be considered unethical psychological treatment. 6-Plt.Exs-1557-65. California's expert Darlene Tando explained that, "while being transgender is not a pathological condition, like a disease, it will be important for you [the parent] to look at your child's being transgender as something concrete, *like a medical condition*." 17-Plt.Exs-4249-50, 4253-55. Othertimes she directly said "I do believe being transgender *is a medical condition*," 17-Plt.Exs-4259-60, and analogized

transgender status to needing supplemental oxygen, antibiotics, a cast for a broken arm, or cough syrup. 17-Plt.Exs-4256-58, 4266-69. California's second expert, Christine Brady, similarly testified that "*[b]y itself*, social transition is psychologically beneficial and is a *medically recognized treatment* for gender dysphoria," and that "[t]he treatment for gender dysphoria … includes social affirmation of the individual's preferred pronouns and names." 20-Plt.Exs-5183, 5185; *see* 20-Plt.Exs-4951-56.

But as the district court explained, focusing on whether social transition is "medical" treatment is a "red herring." App.48a. "The constitutional question is really not whether expressing gender incongruence is pathological or healthy, or, whether social transitioning is or is not a medical procedure." App.47a. Rather, "the question is whether being involved in *potentially* serious medical or psychological decision-making for their school student is a parent's constitutional right. It is." App.48a (emphasis added).

**3. This Case is Certworthy.** There is a reasonable probability that four justices would grant certiorari and a fair prospect that five would reverse because, as the Court is aware, several challenges to various Parental Exclusion Policies are pending in the lower courts and this Court. Three such challenges have already been presented to this Court, but had jurisdictional and immunity defects that are not present in this case. *John & Jane Parents 1* v. *Montgomery Cty. Bd. of Educ.*, 144 S. Ct. 2560 (2024) (denying certiorari) (dismissed on the basis that parents lacked standing); *Parents Protecting Our Children, UA* v. *Eau Claire Area Sch. Dist.*, 145 S. Ct. 14 (2024) (Kavanaugh, J., would grant the petition) (Alito, J., joined by Thomas, J., dissenting

from denial of certiorari) (dismissed on the basis that parents lacked standing); *Lee* v. *Poudre Sch. Dist. R-1*, -- S. Ct. --, No. 25-89, 2025 WL 2906469 (2025) (Alito, J., joined by Thomas, J., and Gorsuch, J., statement respecting denial of certiorari) (dismissed on the basis of *Monell*). Indeed, from those cases, four Justices have already indicated that the issues in this case are certworthy.

Many of the above cases were hard to address because some courts have resorted to procedural devices to evade a "particularly contentious constitutional question." *Lee*, 2025 WL 2906469 (Statement of Alito, J.) (quoting *Parents Protecting Our Children,* 145 S. Ct. at 14-15 (Alito, J., dissenting) (brackets omitted). But these cases will continue knocking on this Court's door because of lower courts' ongoing refusal to address the merits. See *Littlejohn* v. *Sch. Bd. of Leon Cty.*, 132 F.4th 1232 (11th Cir. 2025) (dismissal affirmed under "shocks the conscience" test), *pet. for cert pending* (No. 25-259); *Lavigne* v. *Great Salt Bay Cmty. Sch. Bd.*, 146 F.4th 115 (1st Cir. 2025) (dismissal affirmed on *Monell* grounds), *pet. for cert pending* (No. 25-759). Here, by contrast, there is an ample record on which the Court can rest modest emergency relief.

## II. The Equitable Factors Favor Plaintiffs.

In addition to the merits, the court considers whether the applicant will "likely suffer irreparable harm absent the stay," and "considers the equities." *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring). "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

*Mahmoud*, 606 U.S. at 569 (quoting *Roman Cath. Diocese of Brooklyn* v. *Cuomo*, 592 U.S. 14, 19 (2020) (per curiam)).

Turning to the equities, the Ninth Circuit held that "the public interest in protecting students and avoiding confusion among schoolteachers and administrators weighs in favor of a stay." App.13a. On its face, the district court's order simply requires truthful communication with parents, which is how teachers and parents have communicated for decades. App.22a-25a. Allowing the district court's order to go back into effect will therefore provide greater transparency and less confusion, not more. Rather, as the district court noted, "it is almost like the State Defendants [have been] trying to confuse the question," App.34a, which is an old playbook.

An injunction also favors public safety. There was no meaningful disagreement among the parties' experts as to safety, as the district court already found. App.49a-52a. Indeed, California's expert Darlene Tando explained that "where a child is being referred to as a chosen gender in one environment, but not in a different setting, [it] can be 'harmful' in that it can 'increase dysphoria, [and] increase mental health risks.'" App.51a (quoting 17-Plt.Exs-4207-08). Or as California's second expert, Christine Brady, opined: "kids need support and help if they're experiencing these mental health disparities." App.50a (quoting 19-Plt.Exs-4920). And Plaintiffs presented undisputed evidence that the Child Poe attempted suicide *under* Defendants' exclusion policies. App.58a-59a; 5-Plt.Exs-1240-45, 1252-67; 3-Plt.Exs-606-10.

Each day the Ninth Circuit stay remains in place, school employees are authorized or required to treat parents as outsiders to a child's social transition at school— information that shapes how parents respond to mental-health risks, bullying, peer pressure, and family conflict.

### III. Given the Importance and Urgency of the Issues, the Court May Construe this Application as a Petition for a Writ Of Certiorari.

Should the Court deem it inadvisable to grant emergency relief right away, the Court may treat this application as a petition for certiorari before judgment. As the Court knows, in addition to the three petitions referenced above, three more challenges to Parental Exclusion Policies are currently pending before this Court— in two of which the Circuit Court reached the merits, although none of them address Free Exercise rights. *Foote* v. *Ludlow*, No. 25-77 (petition for cert. filed July 18, 2025); *Littlejohn* v. *Sch. Bd. of Leon Cty. Fla.*, No. 25-259 (petition for cert. filed Sep. 3, 2025); see also *Lavigne* v. *Great Salt Bay Sch. Cmty. Bd.*, No. 25-759 (petition for cert. filed Dec. 22, 2025) (action dismissed on *Monell* grounds). The First Circuit in *Foote* and the Eleventh Circuit in *Littlejohn* both held that parents do not have a substantive due process right to direct their child's gender transition. *Foote* v. *Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025); *Littlejohn* v. *Sch. Bd. of Leon Cty., Fla.*, 132 F.4th 1232 (11th Cir. 2025). The Fourth Circuit also rejected such a claim as part of a qualified immunity analysis. *Blair* v. *Appomattox Cty. Sch. Bd.*, 147 F.4th 484, 493 (4th Cir. 2025).

These decisions reveal an emerging split. In nearly every one of the above cases, the panel fractured, with judges writing separately to condemn Parental Exclusion

Policies. *John & Jane Parents 1* v. *Montgomery Cty. Bd. of Educ.*, 78 F.4th 622, 639-43 (4th Cir. 2023) (Niemeyer, J., dissenting); *Littlejohn*, 132 F.4th at 1287-309 (Tjoflat, J., dissenting); *Lee*, 135 F.4th at 936-38 (McHugh, J., concurring); *Kaltenbach*, 2025 WL 1147577, *1-5 (Thapar, J., concurring). Further, at the trial court level, the district court here was only the latest of several to have ruled that such policies are unconstitutional. See *Ricard* v. *Geary Cty. Unified Sch. Dist. 475*, No. 22-cv-4015, 2022 WL 1471372, *8 (D. Kan. May 9, 2022); *T. F.* v. *Kettle Moraine Sch. Dist.*, No. 21-cv-1650, 2023 WL 6544917 (Wis. Cir. Ct. June 1, 2022). These cases have been percolating for long enough, and real children's lives—including Child Poe and Child Doe—are irreparably at risk. If the Court is unable to grant emergency relief, it should instead set this case for plenary review.

## CONCLUSION

The Court should vacate the Ninth Circuit's interlocutory order staying the district court's injunction until disposition of any petition for certiorari. In addition, given the importance and urgency of the issues, the Court may construe this application as a petition for a writ of certiorari before judgment.

Respectfully submitted.

/s/ Paul M. Jonna

| | |
|---|---|
| THOMAS BREJCHA | PAUL M. JONNA |
| PETER BREEN | *Counsel of Record* |
| CHRISTOPHER J.F. GALIARDO | CHARLES S. LIMANDRI |
| THOMAS MORE SOCIETY | JEFFREY M. TRISSELL |
| 309 West Washington Street | LIMANDRI & JONNA LLP |
| Suite 1250 | P.O. Box 9120 |
| Chicago, IL 60606 | Rancho Santa Fe, CA 92067 |
| | (858) 759-9930 |
| MICHAEL MCHALE | pjonna@limandri.com |
| THOMAS MORE SOCIETY | |
| 10506 Burt Circle, Suite 110 | |
| Omaha, NE 68114 | |

JANUARY 2026

# APPENDIX

Order of the United States Court of Appeals for the Ninth Circuit granting stay pending appeal, *Mirabelli* v. *Bonta*, No. 25-8056 (Jan. 5, 2026).................................................................................... 1a

Order of the United States Court of Appeals for the Ninth Circuit granting administrative stay, *Mirabelli* v. *Bonta*, No. 25-8056 (Dec. 26, 2025).................................................................................. 14a

Order of the United States District Court for the Southern District of California denying stay pending appeal, *Mirabelli* v. *Olson*, No. 23-cv-768 (Dec. 24, 2025)....................................................... 17a

Order of the United States District Court for the Southern District of California issuing a permanent injunction, *Mirabelli* v. *Olson*, No. 23-cv-768 (Dec. 22, 2025) ........................................... 22a

Order of the United States District Court for the Southern District of California granting summary judgment, *Mirabelli* v. *Olson*, No. 23-cv-768 (Dec. 22, 2025)......................................... 26a

Order of the United States District Court for the Southern District of California certifying the class, *Mirabelli* v. *Olson*, No. 23-cv-768 (Oct. 15, 2025)................................................................ 78a

Order of the United States District Court for the Southern District of California denying motion to dismiss action as moot, *Mirabelli* v. *Olson*, No. 23-cv-768 (Apr. 10, 2025) ................................... 91a

Order of the United States District Court for the Southern District of California denying motion to dismiss action for failing to state a claim, *Mirabelli* v. *Olson*, No. 23-cv-768 (Jan. 7, 2025) ...................................... 97a

Order of the United States District Court for the Southern District of California issuing a preliminary injunction and denying motion to dismiss, *Mirabelli* v. *Olson*, No. 23-cv-768 (Sep. 14, 2023)............................... 123a

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JAN 5 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ELIZABETH MIRABELLI, an individual; LORI ANN WEST, an individual; JANE ROE, an individual, on behalf of herself and all others similarly situated; JANE BOE, an individual, on behalf of herself and all others similarly situated; JOHN POE, an individual, on behalf of himself and all others similarly situated; JANE POE, an individual on behalf of herself and all others similarly situated; Dr JOHN DOE, an individual, on behalf of himself and all others similarly situated; Miss JANE DOE, an individual, on behalf of herself and all others similarly situated, | No. 25-8056 D.C. No. 3:23-cv-00768-BEN-VET Southern District of California, San Diego ORDER |

Plaintiffs - Appellees,

v.

ROB BONTA, in his official capacity as Attorney General of California; TONY THURMOND, in his official capacity as the California State Superintendent of Public Instruction; LINDA DARLING-HAMMOND, in her official capacity as President of the California State Board of Education; CYNTHIA GLOVER WOODS, in her official capacity as Vice President of the California State Board of Education; FRANCISCO ESCOBEDO, in his official capacity as a member of the California State Board of Education; BRENDA LEWIS, in her official capacity as a member of the California State Board of Education; JAMES J. MCQUILLEN, in his official

(1a)

capacity as a member of the California State
Board of Education; SHARON OLKEN, in
her official capacity as a member of the
California State Board of Education;
GABRIELA OROZCO-GONZALEZ, in her
official capacity as a member of the
California State Board of Education; KIM
PATTILLO BROWNSON, in her official
capacity as a member of the California State
Board of Education; HAYDEE
RODRIGUEZ, in her official capacity as a
member of the California State Board of
Education; ALISON YOSHIMOTO-
TOWERY, in her official capacity as a
member of the California State Board of
Education; ANYA AYYAPPAN, in her
official capacity as a member of the
California State Board of Education,

                Defendants - Appellants,

and

MARK OLSON, in his official capacity as
President of the EUSD Board of Education,
FRANK HUSTON, in his official capacity
as Vice President of the EUSD Board of
Education, JOAN GARDNER, in her
official capacity as a member of the EUSD
Board of Education, DOUG PAULSON, in
his official capacity as a member of the
EUSD Board of Education, ZESTY
HARPER, in her official capacity as a
member of the EUSD Board of Education,
LUIS RANKINS-IBARRA, in his official
capacity as Superintendent of EUSD, JOHN
ALBERT, both in his personal capacity and
in his official capacity as Assistant
Superintendent of EUSD, TRENT SMITH,
both in his personal capacity and in his

official capacity as Director of Integrated
Student Services for EUSD, TRACY
SCHMIDT, both in her personal capacity
and in her official capacity as Director of
Integrated Student Supports for EUSD,
STEVE WHITE, both in his personal
capacity and in his official capacity as
Principal of Rincon Middle School at
EUSD, NAOMI PORTER, in her official
capacity as a member of the California State
Board of Education, ESCONDIDO UNION
SCHOOL DISTRICT, a local educational
agency,

Defendants.

Before: Mary H. Murguia, Chief Judge, and Andrew D. Hurwitz and Salvador
Mendoza, Jr., Circuit Judges.

PER CURIAM:

Plaintiff-Appellees are four parents and four Escondido Union School

District ("EUSD") teachers who challenge a host of California state laws that

Plaintiffs refer to as "the State's Parental Exclusion Policies." According to

Plaintiffs, these challenged laws are described in the California Department of

Education's 2016 "Legal Advisory regarding application of California's

antidiscrimination statutes to transgender youth in schools" and its accompanying

FAQs. The challenged policies allegedly violate teachers' and parents'

constitutional rights by requiring teachers to hide a student's gender nonconformity

and social transition, including from the student's parents, unless the student

(3a)

consents to disclosure of that information.  Plaintiffs bring individual claims under Title VII of the Civil Rights Act and a class action through 42 U.S.C. § 1983, seeking injunctive and declaratory relief against California state officials ("State Appellants"), EUSD, and several EUSD officials.[1]  Plaintiffs sought to certify a class action with four subclasses that share common questions premised on: (1) violation of teachers' First Amendment free speech rights; (2) violation of teachers' First Amendment free exercise rights; (3) violation of parents' Fourteenth Amendment substantive due process rights; and (4) violation of parents' First Amendment free exercise rights.

The district court certified the class of all California public school employees and parents of children attending public school who object to the challenged state laws under Rule 23(b)(2).  On December 22, 2025, the district court granted permanent injunctive relief to all its members.  The district court found that various California laws violate parents' substantive due process and free exercise rights to be informed "after a student says or dresses in a way that suggests a non-conforming gender identity."  The district court also concluded that public school employees have free speech and free exercise rights to provide information about a student's gender expression to the student's parents.

---

[1] Plaintiffs' claims against EUSD and EUSD officials were severed and stayed by the district court.  This appeal only concerns Plaintiffs' claims against the State Appellants.

(4a)

Based on these conclusions, the court entered an injunction that bars State Appellants from "implementing or enforcing" "the Privacy Provision of the California Constitution . . . [and] any other provision of California law" that would "permit or require any employee in the California state-wide education system [to] mislead[] [a] parent or guardian . . . about their child's gender presentation at school." The injunction prohibits State Appellants from "permit[ting] or requir[ing] any employee in the California state-wide education system to use a name or pronoun to refer to [a] child that [does] not match the child's legal name and natal pronouns, where a child's parent or legal guardian has communicated their objection to such use." The injunction directs the State to include a notice in educator training materials that: "Parents and guardians have a federal constitutional right to be informed if their public school student child expresses gender incongruence."

The State Appellants now move for an emergency stay of the district court's permanent injunction. For the reasons discussed herein, we grant the motion.

## LEGAL STANDARD

When deciding whether to grant a stay pending appeal, "a court considers four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the

(5a)

other parties interested in the proceeding; and (4) where the public interest lies.'"

*Nken v. Holder*, 556 U.S. 418, 425–26 (2009) (quoting *Hilton v. Braunskill*, 481

U.S. 770, 776 (1987)). "The first two factors . . . are the most critical." *Id.* at 434.

## I.

After considering the record at this preliminary stage, we conclude that the

State Appellants have shown that "there is a substantial case for relief on the

merits." *Simon v. City & Cnty. of S.F.*, 135 F.4th 784, 816 (9th Cir. 2025) (quoting

*Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012)).

## A.

First, we have serious concerns with the district court's class certification

and injunction that covers every parent of California's millions of public school

students and every public school employee in the state. Courts across the country,

including in our circuit, have routinely rejected similar claims by parents and

teachers due to lack of standing. *See, e.g.*, *City of Huntington Beach v. Newsom*,

790 F. Supp. 3d 812, 823–24 (C.D. Cal. 2025) (dismissing for lack of standing

parents' claim where parents did not allege that their own child's factual

circumstance implicated California Assembly Bill 1955's restriction on informing

parents of their children's decision to use a different name or pronouns); *Chino*

*Valley Unified Sch. Dist. v. Newsom*, No. 2:24-cv-01941-DJC-JDP, 2025 WL

1151004, at *5 (E.D. Cal. Apr. 17, 2025) (same); *Parents Protecting Our Children,*

*UA v. Eau Claire Area Sch. Dist., Wis.*, 95 F.4th 501, 504–06 (7th Cir. 2024)

(affirming dismissal for lack of standing a parental association's claim where the

complaint failed to allege that even one of the association's members experienced

an injury attributable to the challenged policies), *cert. denied*, 145 S. Ct. 14 (2024);

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 629–31

(4th Cir. 2023) (concluding parents lacked standing where parents did not allege

that their own children had gender support plans or were otherwise likely to

experience future harm from the challenged policies), *cert. denied*, 144 S. Ct. 2560

(2024). "Article III does not give federal courts the power to order relief to any

uninjured plaintiff, class action or not." *TransUnion LLC v. Ramirez*, 594 U.S.

413, 431 (2021) (internal quotations and citation omitted).

Further, the district court failed to undertake the "rigorous analysis" required

by Rule 23 before granting relief on a class-wide basis. *See Wal-Mart Stores, Inc.

v. Dukes*, 564 U.S. 338, 351 (2011). This weighs against the district court's

conclusion that Plaintiffs have satisfied the prerequisites of Rule 23 for class

certification. The wide scope of the district court's injunction violates the principle

that "[i]njunctive relief must be tailored to remedy the specific harm alleged." *See

Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2003); *see also

Trump v. CASA, Inc.*, 606 U.S. 831, 868 (2025) (Alito, J., concurring) ("[D]istrict

courts should not view [*CASA*] as an invitation to certify nationwide classes

(7a)

without scrupulous adherence to the rigors of Rule 23.  Otherwise, the universal injunction will return from the grave under the guise of 'nationwide class relief,' and [*CASA*] will be of little more than minor academic interest.").

### B.

Second, the district court's ruling reiterated that the State is "prohibiting public school teachers from informing parents of their child's gender identity" through its "parental exclusion" policies, yet the district court failed to clearly identify the set of policies it relied on to reach this conclusion.  A preliminary review of the record shows that the State does not categorically forbid disclosure of information about students' gender identities to parents without student consent. [2] For example, guidance from the California Attorney General expressly states that schools can "allow disclosure where a student does not consent where there is a compelling need to do so to protect the student's wellbeing," and California Education Code § 49602 allows disclosure to avert a clear danger to the well-being of a child, Cal. Educ. Code § 49602.  It is thus not clear from the district court's order which particular policies are problematic, and it is doubtful that all of those policies categorically forbid disclosure of information, again "suggesting that the injunctive relief ordered may have been broader than necessary," *see CASA*, 606

---

[2] The district court's injunction appears largely premised on the informal 2016 Legal Advisory and FAQ page posted on the California Department of Education's website, which has been removed.

U.S. at 861, and not "tailored to remedy the specific harm alleged," *see Winter*, 508 F.3d at 886.

## C.

Third, we are skeptical of the district court's decision on the merits, which primarily relies on substantive due process. The district court concluded that parents have the right to be informed when gender incongruence is observed and make the decision about whether future professional investigation or medical care is needed. But the Supreme Court has cautioned that we must be "reluctant to expand the concept of substantive due process," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), to avoid usurping "authority that the Constitution entrusts to the people's elected representatives," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239–40 (2022).

Our sister circuit recently analyzed a similar claim in *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025), *pet. for cert. pending* (No. 25-77), and concluded that "using the [s]tudent's chosen name and pronouns—something people routinely do with one another, and which requires no special training, skill, medication, or technology" is not a form of medical treatment that gives rise to a substantive due process claim. *Id.* at 350. The district court distinguished this case from *Foote*, reasoning that *Foote* did not involve allegations of school officials misrepresenting the student's gender transition when asked by parents. But the

(9a)

challenged policies here appear to be analogous to the policy at issue in *Foote*, which "provides that 'parents are not to be informed of their child's transgender status and gender-affirming social transition to a discordant gender identity unless the child, of any age, consents.'" *See Foote*, 128 F.4th at 352. We thus conclude that the State Appellants have made a strong showing that the district court likely erred in its substantive due process analysis.

<h3 style="text-align:center">D.</h3>

Because the State has sufficiently shown a substantial case for relief on the merits based on the sweeping nature of the district court's injunction, the dubious class certification, and the weakness of Plaintiffs' substantive due process claim, we may grant the stay on those grounds alone and need not reach the remaining First Amendment claims. Nonetheless, we address those briefly.

First, the district court's analysis of the parents' free exercise claims relied on *Mahmoud v. Taylor*, 606 U.S. 522 (2025), to conclude that the challenged policies triggered strict scrutiny and failed under that test. In *Mahmoud*, the Supreme Court applied strict scrutiny where a school district subjected "young children" to "unmistakably normative" books that "explicitly contradict[ed] their parents' religious views" and encouraged teachers "to reprimand any children who disagree[d]" or "express[ed] a degree of religious confusion." 606 U.S. at 550, 555–56 & n.8. However, *Mahmoud* has been described as a narrow decision

10

(10a)

focused on uniquely coercive "curricular requirements."  *See Doe No.1 v. Bethel Loc. Sch. Dist. Bd. of Educ.*, No. 23-3740, 2025 WL 2453836, at *7 n.3 (6th Cir. Aug. 26, 2025).  As the Sixth Circuit explained, "[b]ecause *Mahmoud*'s reasoning principally relates to curricular requirements, we are thus unpersuaded that it stands for the broad proposition that strict scrutiny is automatically triggered when a school does not allow religious students to opt out of any school policy that interferes with their religious development, including general operational policies that involve no instruction."  *Id.*  Here, the challenged policies appear to apply only when a *student* makes the voluntary decision to share their gender nonconformity with the school.  We thus disagree with the district court's cursory assertion that the challenged policies "impose a similar, if not greater, burden on free exercise" as the policies in *Mahmoud*.  Accordingly, the district court improperly extended the reasoning of *Mahmoud* to the instant case.

Second, the district court's ruling on the subclass of public school teachers' free exercise claim is predicated on the challenged policies "requir[ing] teachers to withhold" information about a student's gender nonconformity "with the knowledge that the information will be impossible for the parents to obtain from the school."  However, as explained above, the district court's premise—that these policies categorically forbid disclosure of information—is contradicted by the record.

(11a)

Finally, as Plaintiffs concede, the teachers' free speech claim "rises and falls on parents' rights." Because State Appellants are likely to defeat the parents' constitutional claims, we need not address the merits of the free speech claims here.

## II.

Next, we consider three other factors in assessing a motion for a stay: "whether the applicant will be irreparably injured absent a stay"; "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and "where the public interest lies." *Nken*, 556 U.S. at 426 (quoting *Hilton*, 481 U.S. at 776).

The remaining equitable factors weigh in favor of a stay. Justice Alito warned of universal injunctions under the guise of class relief. *CASA*, 606 U.S. at 868 (Alito, J., concurring). Here, the injunction is sweeping, ambiguous, and based on a lax enforcement of class certification principles. It further relies on a faulty reading of the policies at issue.

In considering irreparable harm, "we acknowledge the harms involved in denying the duly elected branches the policies of their choice." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 994 (9th Cir. 2025) (citing *CASA*, 606 U.S. at 860–61). At this stage, the government has demonstrated irreparable harm.

Because the policies at issue do not categorically forbid disclosure of

(12a)

information about students' gender identities to parents without student consent, other parties in this action, including the Plaintiffs, will not be substantially injured from the issuance of a stay. Additionally, the public interest in protecting students and avoiding confusion among schoolteachers and administrators weighs in favor of a stay.

## CONCLUSION

For the reasons above, we **GRANT** the State Appellants' motion for a stay pending appeal.[3]

**EMERGENCY MOTION FOR STAY GRANTED.**

---

[3] We deny as moot Plaintiffs' request for oral argument on the instant motion. Dkt. No. 11 at 35.

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

DEC 26 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ELIZABETH MIRABELLI, an individual; LORI ANN WEST, an individual; JANE ROE, an individual, on behalf of herself and all others similarly situated; JANE BOE, an individual, on behalf of herself and all others similarly situated; JOHN POE, an individual, on behalf of himself and all others similarly situated; JANE POE, an individual on behalf of herself and all others similarly situated; Dr JOHN DOE, an individual, on behalf of himself and all others similarly situated; Miss JANE DOE, an individual, on behalf of herself and all others similarly situated,<br><br>        Plaintiffs - Appellees,<br><br>  v.<br><br>ROB BONTA, in his official capacity as Attorney General of California; TONY THURMOND, in his official capacity as the California State Superintendent of Public Instruction; LINDA DARLING-HAMMOND, in her official capacity as President of the California State Board of Education; CYNTHIA GLOVER WOODS, in her official capacity as Vice President of the California State Board of Education; FRANCISCO ESCOBEDO, in his official capacity as a member of the California State Board of Education; BRENDA LEWIS, in her official capacity as a member of the California State Board of Education; JAMES J. MCQUILLEN, in his official | No. 25-8056<br><br>D.C. No.<br>3:23-cv-00768-BEN-VET<br>Southern District of California,<br>San Diego<br><br>ORDER |

capacity as a member of the California State Board of Education; SHARON OLKEN, in her official capacity as a member of the California State Board of Education; GABRIELA OROZCO-GONZALEZ, in her official capacity as a member of the California State Board of Education; KIM PATTILLO BROWNSON, in her official capacity as a member of the California State Board of Education; HAYDEE RODRIGUEZ, in her official capacity as a member of the California State Board of Education; ALISON YOSHIMOTO-TOWERY, in her official capacity as a member of the California State Board of Education; ANYA AYYAPPAN, in her official capacity as a member of the California State Board of Education,

Defendants - Appellants,

and

MARK OLSON, in his official capacity as President of the EUSD Board of Education, FRANK HUSTON, in his official capacity as Vice President of the EUSD Board of Education, JOAN GARDNER, in her official capacity as a member of the EUSD Board of Education, DOUG PAULSON, in his official capacity as a member of the EUSD Board of Education, ZESTY HARPER, in her official capacity as a member of the EUSD Board of Education, LUIS RANKINS-IBARRA, in his official capacity as Superintendent of EUSD, JOHN ALBERT, both in his personal capacity and in his official capacity as Assistant Superintendent of EUSD, TRENT SMITH, both in his personal capacity and in his

(15a)

official capacity as Director of Integrated
Student Services for EUSD, TRACY
SCHMIDT, both in her personal capacity
and in her official capacity as Director of
Integrated Student Supports for EUSD,
STEVE WHITE, both in his personal
capacity and in his official capacity as
Principal of Rincon Middle School at
EUSD, NAOMI PORTER, in her official
capacity as a member of the California State
Board of Education, ESCONDIDO UNION
SCHOOL DISTRICT, a local educational
agency,

       Defendants.

Before: MURGUIA, Chief Judge, and HURWITZ and MENDOZA, Circuit
Judges.

     The court has received Defendants' emergency motion for stay pending
appeal and for an immediate administrative stay. Dkt. No. 7. An administrative
stay is "only intended to preserve the status quo until the substantive motion for a
stay pending appeal can be considered on the merits, and does not constitute in any
way a decision as to the merits of the motion for stay pending appeal." *Doe #1 v.
Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019). The request for an administrative
stay is GRANTED. The district court's December 22, 2025 permanent injunction
is temporarily stayed pending further order.

     The response to the emergency motion is due December 30, 2025. The
optional reply in support of the emergency motion is due December 31, 2025.

1
2
3
4
5
6
7
8                                   **UNITED STATES DISTRICT COURT**
9                                 **SOUTHERN DISTRICT OF CALIFORNIA**
10
11     **ELIZABETH MIRABELLI, an**          ) Case No.:  23-CV-0768-BEN-VET
12     **individual, et al.,**              )
                                            ) **ORDER DENYING REQUEST FOR**
13                          Plaintiffs,     ) **STAY**
14            **v.**                        )
                                            )
15     **MARK OLSON, in his official**      )
16     **capacity as President of the EUSD**)
       **Board of Education, et al.,**      )
17                          Defendants.     )
18     _____     )
19
20          The parties are familiar with the facts of this case, and because of the relatively
21   short time between the court's order granting summary judgment and the filing of this
22   application, the facts will not be repeated here.  However, a brief recap of the State
23   Defendants' posturing in this case, as relevant to the issue of irreparable harm, will be
24   briefly restated-minus legal jargon.
25          This case began when two teachers alleged that their rights were being infringed
26   because the Escondido Unified School District (EUSD) was restricting their ability to
27   communicate with parents about a child's manifesting gender incongruity.  EUSD argued
28   that they were compelled to do what they did because the State Defendants had published

                                              -1-

1  FAQ's that forced them to do it.  The school teachers sued.  The State Defendants
2  represented to the Court that they did not belong in this lawsuit, that the FAQs were
3  voluntary guidance, and that the state would not enforce them.  The State Defendants'
4  argument was transparent—they meant none of it.  The Court granted a Preliminary
5  Injunction, and the case proceeded forward.

6      The complaint was then amended to add parents and teachers beyond the two
7  initial teachers.  Again, the State Defendants moved to dismiss, this time arguing that the
8  FAQs had been taken down, they were no longer an issue, and that the case was "moot."
9  The State Defendants also argued that a new law had been enacted, AB 1955.  According
10  to the State Defendants, this too mooted the case since AB 1955 did not bar teachers from
11  disclosing information to parents.  This new argument was as transparent as those that
12  came before.  The motion to dismiss was denied.  Next came a motion to hold the State
13  Defendants in contempt because, among other things, the PRISM program, which
14  supposedly had replaced the FAQs, also contained language that would prohibit teachers
15  from disclosing information to parents.  In response, the State Defendants filed a
16  declaration by counsel for the CDE, Mr. Garfinkel, in which he declared under penalty of
17  perjury that "AB 1955 does not prohibit staff from voluntarily disclosing a student's
18  gender identity to parents."  (Garfinkel OSC Decl. ¶ 10).  Mr. Garfinkel also stated,
19  "[a]though I reviewed a draft of the text for the PRISM training, I did not review any
20  links to third-party resources.  I cannot recall if this was because the links were not 'live'
21  at the time of my review, or simple oversight.  Either way, it was inadvertent.  Because I
22  did not review the links, I was not aware of the language that Plaintiffs complain of.  (*Id.*
23  ¶ 11.)

24      Fortunately, this Court had watched the oral argument in *City of Huntington Beach*
25  during which the Attorney General had admitted to the panel that simply because AB
26  1955 had been passed, that did not prevent the State from barring teachers from
27  disclosing information to parents.  Of course, this was consistent with this Court's
28

-2-

23-CV-0768-BEN-VET

(18a)

1  holding that the case was not moot and in contradiction to what the State Defendants had
2  at least implicitly argued to this Court.

3      So what is the point? Prior to the FAQ's there had been no prohibition against
4  teachers speaking to parents about their child's gender incongruity, at least none has been
5  brought to this Court's attention during this lengthy and contentious litigation.
6  Furthermore, the State Defendant's inconsistent positions as to whether or not they
7  should be in this lawsuit to begin with, whether by eliminating the FAQs teachers are free
8  to speak to parents, whether the enactment of AB 1955 made that clear, and lastly that the
9  PRISM program should have reflected that parents could be informed about their child's
10  gender incongruity, notwithstanding the child's objection, all make their argument that
11  the state will suffer irreparable harm ring hollow.

12      In any event, the State Defendant's argument that a stay would preserve long-
13  standing laws is also inaccurate.  The State Defendants have failed to point out what
14  those laws are.  In any event, this court's order does not hold any law to be
15  unconstitutional.  What this Court's order does is to clear up confusion caused by the
16  State Defendants, beginning with the FAQs, and bars enforcement of any applicable law
17  that would infringe on the long-standing tradition, as supported by Supreme Court
18  precedent, that parents have the right to the care, custody, and control, including making
19  health care decisions, for their children.  In short, this Court's order preserves what most
20  parents and government actors have honored, acknowledged, and protected for decades,
21  if not centuries.

22
23      Defendant requests a stay of this Court's Decision and permanent injunction
24  pending appeal, or in the alternative, a 14-day administrative stay.  The Defendant says
25  that if the Decision is allowed to stay in effect, it would "irrevocably alter the status quo
26  and will create chaos and confusion among students, parents, teachers, and staff at
27  California's public schools.  And this chaos and confusion would arise several days
28

-3-

23-CV-0768-BEN-VET

(19a)

1    before the Christmas holiday."

2        **DISCUSSION**

3        "A stay is not a matter of right, even if irreparable injury might otherwise result.  It

4    is instead 'an exercise of judicial discretion,' and 'the propriety of its issue is dependent

5    upon the circumstances of the particular case.'" *Nken v. Holder*, 556 U.S. 418, 433

6    (2009).  In exercising its discretion, a court is to be guided by four legal principles or

7    factors: "(1) whether the stay applicant has made a strong showing that he is likely to

8    succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay;

9    (3) whether issuance of the stay will substantially injure the other parties interested in the

10   proceedings; and (4) where the public interest lies." *Id.*  "The first two factors. . . are the

11   most critical." *Id.* at 434.  The Defendant here has not shown a strong likelihood of

12   success on the merits, *i.e.*, the first factor, or the likelihood of irreparable injury, the

13   second factor.

14        As to the first factor, the Defendant's case on the merits is weak, as Parents have

15   had a long-recognized parental privacy right to raise and support their children according

16   to their own values and beliefs, and to work through their differences in a loving and

17   nurturing way.  As to the second factor, the Defendant argues irreparable injury will

18   occur without a stay because "the ability afforded to parents by this Court to demand that

19   their child be misgendered by school staff indisputably cannot be limited to just their

20   child."  (Dkt. No. 309 at 5).  However, the Defendants admit that "AB 1955 does not

21   prohibit staff from voluntarily disclosing a student's gender identity to parents."

22   (Garfinkel Decl. ¶ 10).  "[S]imply showing some 'possibility of irreparable injury,' fails

23   to satisfy the second factor. . . , the 'possibility' standard is too lenient." *Id.* at 434-35

24   (citations omitted).  While there is the possibility that an abusive parent will be notified

25   without a stay, there continue to exist criminal laws against parental abuse of their

26   children.  This Court's decision in no way affects those laws, and the Defendant is free to

27   continue to enforce the same.  Consequently, the second factor does not weigh in favor of

28   a stay.  The third and fourth factors weigh heavily against granting a stay as the enjoined

-4-

laws are infringing on the long-standing constitutional rights of citizens.

The Court has given the State plenty of opportunity and time to provide evidence that demonstrates that State law does not run afoul of the Federal Constitution. Instead, the State argues that the State Constitution supersedes the Federal Constitution. The Court's Decision simply requires a return to the status quo ante litem as it existed prior to the parental exclusion policies. Having considered the relevant factors, the request for a stay pending appeal and an administrative stay is **DENIED**.

**IT IS SO ORDERED.**

DATED:     December 23, 2025

_____
**HON. ROGER T. BENITEZ**
United States District Judge

-5-



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH MIRABELLI, an individual, on behalf of herself and all others similarly situated; LORI ANN WEST, an individual, on behalf of herself and all others similarly situated; et al., | Case No.: 3:23-cv-0768-BEN-VET **ORDER GRANTING PLAINTIFFS' MOTION FOR A CLASS-WIDE PERMANENT INJUNCTION** |
| Plaintiffs, | |
| v. | |
| MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al., | |
| Defendants. | |

ORDER GRANTING MOTION FOR CLASS-WIDE PERMANENT INJUNCTION

(22a)

# I.    <u>INTRODUCTION</u>

Plaintiffs Elizabeth Mirabelli, Lori Ann West, Jane Roe, and Jane Boe ("Teacher Plaintiffs"), and Plaintiffs John Poe, Jane Poe, John Doe, and Jane Doe ("Parent Plaintiffs"), brought this action under 42 U.S.C. § 1983 seeking injunctive and declaratory relief against Defendants Attorney General Rob Bonta ("AG Bonta"), Defendants State Superintendent Tony Thurmond and State Board of Education Members Linda Darling-Hammond, Cynthia Glover Woods, Francisco Escobedo, Brenda Lewis, James J. McQuillen, Sharon Olken, Gabriela Orozco-Gonzalez, Kim Pattillo Brownson, Haydee Rodriguez, Alison Yoshimoto-Towery, and Anya Ayyappan ("CDE Defendants").

Before this Court is Plaintiffs' Motion for Summary Judgment and for a Class-Wide Permanent Injunction. The Court heard oral argument on the motion on November 17, 2025. After considering the papers submitted, supporting documentation, and applicable law, the Court **GRANTS** the Motion.

# II.    <u>PERMANENT INJUNCTION</u>

**IT IS HEREBY ORDERED** that:

1.    Defendants Attorney General Rob Bonta, State Superintendent Tony Thurmond and State Board of Education Members Linda Darling-Hammond, Cynthia Glover Woods, Francisco Escobedo, Brenda Lewis, James J. McQuillen, Sharon Olken, Gabriela Orozco-Gonzalez, Kim Pattillo Brownson, Haydee Rodriguez, Alison Yoshimoto-Towery, and Anya Ayyappan, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, are enjoined from implementing or enforcing: (1) the Privacy Provision of the California Constitution, Cal. Const. art. I, § 1; (2) any other provision of California law, including equal protection provisions such as Cal. Educ. Code §§ 200, 220, Cal. Gov. Code § 11135; or (3) any regulations or guidance, such as the 2016 "Legal Advisory regarding application of California's antidiscrimination statutes to transgender youth in schools" and accompanying FAQ page, or Cal. Code Regs., tit.

1    5, §§4900-4965, or the newly produced PRISM cultural competency training, in such

2    a manner as to:

3        (a): permit or require any employee in the California state-wide education

4    system from misleading the parent or guardian of a minor child in the education

5    system about their child's gender presentation at school, whether by: (i) directly lying

6    to the parent; (ii) preventing the parent from accessing educational records of the

7    child; or (iii) using a different set of preferred pronouns/names when speaking with

8    the parents than is being used at school;

9        (b): permit or require any employee in the California state-wide education

10    system to use a name or pronoun to refer to that child that do not match the child's

11    legal name and natal pronouns, where a child's parent or legal guardian has

12    communicated their objection to such use;

13        (c): require any employee in the California state-wide education system to  use

14    a name or pronoun to refer to a child that do not match the child's legal name and

15    natal pronouns while concealing that social gender transition from the child's

16    parents, over the employee's conscientious or religious objection;

17        (d): or in any way interfere with a teacher or other school administrator,

18    counselor or staff from communicating to parents that his, her, or their child has

19    manifested a form of gender incongruity such as changing preferred names or

20    pronouns.

21        2.      Defendants shall provide forthwith, by personal service or otherwise,

22    actual notice of this order to all personnel who are responsible for implementing or

23    enforcing the enjoined provisions. Within 20 days, the government shall file a

24    declaration establishing proof of such notice.

25        3.      Defendants shall include in a prominent place in PRISM training

26    materials, and in any other state-created or approved instruction on the gender-related

27    rights of student and faculty, the following statement:

28        **"Parents and guardians have a federal constitutional right to be informed**

ORDER GRANTING MOTION FOR CLASS-WIDE PERMANENT INJUNCTION

1  **if their public school student child expresses gender incongruence.  Teachers and**
2  **school staff have a federal constitutional right to accurately inform the parent or**
3  **guardian of their student when the student expresses gender incongruence.**
4  **These federal constitutional rights are superior to any state or local laws, state or**
5  **local regulations, or state or local policies to the contrary."**

6      4.    Further, because enjoining Defendants from enforcing unconstitutional
7  policies will impose no financial burden, Plaintiffs are not required to post a bond or
8  undertaking.

9      **IT IS SO ORDERED.**

10 DATED:    December 22, 2025

11                                          _____
                                            **HON. ROGER T. BENITEZ**
12                                          United States District Judge

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORDER GRANTING MOTION FOR CLASS-WIDE PERMANENT INJUNCTION

1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11  ELIZABETH MIRABELLI, and LORI          Case No.:  3:23-cv-768-BEN-WVG
    ANN WEST, individually and on behalf
12  of herself and all others similarly situated,
13  et al.,

14               Plaintiffs,               **ORDER GRANTING SUMMARY
                                           JUDGMENT IN FAVOR OF THE
15  v.                                     PLAINTIFFS ON CLAIMS 1, 2, 3, 6,
                                           7, AND 8, DECLARING
16  MARK OLSON, in his official capacity as CONSTITUTIONAL RIGHTS, AND
    President of the EUSD Board of         GRANTING A PERMANENT
17  Education, et al.,                     INJUNCTION
18               Defendants.               [Dkt. 247]**

19

20       Long before Horace Mann advocated in the 1840's for a system of common

21  schools and compulsory education, parents have carried out their rights and responsibility

22  to direct the general and medical care and religious upbringing of their child.  "The

23  history and culture of Western civilization reflect a strong tradition of parental concern

24  for the nurture and upbringing of their children.  This primary role of the parents in the

25  upbringing of their children is now established beyond debate as an enduring American

26  tradition."  *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).  It is a right and a

27  responsibility that parents still hold.  *Mahmoud v. Taylor,* 145 S. Ct. 2332, 2357 (2025)

28  (applying *Yoder* as "embod[ying] a principle of general applicability").  The role of a

1

1  parent includes a duty to recognize symptoms of illness and to seek medical advice.

2  *Parham v. J.R*., 442 U.S. 584, 604 (1979).  These rights are protected by the First and

3  Fourteenth Amendments to the Constitution.  *Troxel v. Granville*, 530 U.S. 57, 65-66

4  (2000) ("It is cardinal with us that the custody, care and nurture of the child reside first in

5  the parents, whose primary function and freedom include preparation for obligations the

6  state can neither supply nor hinder.").  Fortunately, the natural bonds of affection

7  normally lead parents to act in the best interests of their child.  *Parham*, 442 U.S. at 602.

8       With these longstanding principles in mind, this case presents the following four

9  questions about a parent's rights to information as against a public school's policy of

10  secrecy when it comes to a student's gender identification.  First, do parents have a right

11  to gender information based on the Fourteenth Amendment's substantive due process

12  clause?  Second, do parents have a right to gender information protected by the First

13  Amendment's free exercise of religion clause?  Third, do religious public school teachers

14  have a right to provide gender information to parents based on the First Amendment's

15  free exercise clause?  Fourth, do public school teachers have a right to communicate

16  accurate gender information to parents based on the First Amendment free speech clause?

17  In each case, this Court concludes that, as a matter of law, the answer is "yes."  Parents

18  have a right to receive gender information and teachers have a right to provide to parents

19  accurate information about a child's gender identity.[1]

---

26  [1] This summary judgment decision addresses only the certified class of parents and

27  teachers and their federal constitutional claims brought in the form of a class action against the California Superintendent of Public Instruction, the Members of the California

28  State Board of Education, and the State Attorney General (the "State Defendants").

2

1

2       Historically, school teachers informed parents of physical injuries or questions

3  about a student's health and well-being.  For example, where an eight-year old student is

4  sexually assaulted at school, the school owes a duty to inform the parents.  *Phyllis P. v.*

5  *Superior Court*, 183 Cal. App. 3d 1193, 1196 (1986) ("We hold that such a special

6  relationship exists here between defendants and petitioner, and defendants had a duty to

7  notify petitioner upon learning of the first series of sexual assaults upon [the student].").

8  But for something as significant as a student's expressed change of gender, California

9  public school parents end up left in the dark.  When it comes to a student's change in

10  gender identity, California state policymakers apparently do not trust parents to do the

11  right thing for their child.  So, the state purposefully interferes with a parent's access to

12  meaningful information about their child's gender identity choices.  The state does this by

13  prohibiting public school teachers from informing parents.  The State Defendants explain

14  that these policies are needed to prevent bullying and harassment.  Preventing student

15  bullying and harassment in school is a laudable goal.  The problem is that the parent

16  exclusion policies seem to presume that it is the parents that will be the harassers from

17  whom students need to be protected.

18       Even if the State Defendants could demonstrate that excluding parents was good

19  policy on some level, such a policy cannot be implemented at the expense of parents'

20  constitutional rights.  The difficult and long lasting issues of gender nonconformity leave

21  parents to suffer adverse consequences over a lifetime.  The State Defendants, on the

22  other hand, have no personal investment in a student's health and the State Defendants

23  will not be exposed to a lifetime of a student's mental health issues.  Instead, that will be

24  the parents' grief to bear alone.

25       If parents were informed early on (as is their right) after a student says or dresses

26  in a way that suggests a non-conforming gender identity, four of the five probable

27  outcomes will be positive.  One, the parents might fully affirm their child's new gender

28  identity.  According to the defense experts, this is the best possible outcome of having the

23-cv-00768-BEN-WVG

1  child's gender identity affirmed in both school and home life.  "Depends on the reactions

2  of the family.  But in situations where they are supported and not rejected, they fare

3  better, yes."  Deposition Transcript of Dr. Christine Brady, Dkt. 243-7, at 209;

4  Deposition Transcript of Dr. Erica Anderson, Ph.D, Dkt 247-10, at 25 ("And – and the

5  scientific literature confirms that children grow up healthy and happy when they are

6  supported by the adults and caregivers in their lives."); *Id*. at 123 ("This is a well-known

7  view of people in the field, which is that children who are supported by their families do

8  better than those who are not.").

9       Two, the parents might arrange health care from clinicians like Dr. Szajnberg, Dr.

10  Brady, Dr. Anderson, or Darlene Tando, to help the child work through issues

11  therapeutically.  Once again, this is a good outcome according to the defense experts

12  because the child can be authentic and supported in both school and home life.

13       Three, the parents might not take a position while waiting to see if the child's

14  gender identity persists over time.  Still, the child can be authentic at school and in home

15  life and at least one third of young children eventually de-transition with time.

16  Deposition Transcript of Dr. Christine Brady, Dkt. 243-7, at 84-86.

17       Four, although they love their child, the parents might disagree completely.

18  "Parents – in my vast experience with . . . thousands of families over a long career,

19  parents love their children.  They want what's best for them.  Do parents always agree

20  with every decision of their children?  No.  Do they have good reasons? Almost always."

21  Deposition Transcript of Dr. Erica Anderson, Ph.D, Dkt 247-10, at 52.  Even the defense

22  experts agree that parental disagreement is a valid reaction.

23          Q. And so just to -- just because a
24          parent is not immediately affirming that doesn't mean
        they don't love their child, correct?
25          A. Yes.
        Q. And that does not mean they'll
26          abuse their child, correct?
27          A. I can't guarantee that.
28          Q. It doesn't necessarily mean that.

1  You would agree, correct?
2  A. Correct.

3  Deposition Transcript of Darlene Tando, LMFT, Dkt. 243-3, at 245.

4  Overall, it is a grave mistake to deprive parents of information about their child's

5  gender at school, according to Dr. Anderson: "My objection is depriving parents of the

6  knowledge of what's going on with their child's gender at school, particularly if the child

7  chooses a different preferred name and pronouns and wants accommodations and that is

8  information that is shared throughout the school by -- by teachers, staff, and students.

9  To deprive parents of that information is a grave mistake in my opinion."  Deposition

10  Transcript of Dr. Erica Anderson, Ph.D, Dkt 247-10, at 57.  Disagreement is not abuse,

11  and the court so finds.  In contrast, adolescent social transitioning without parents usually

12  results in serious problems for the adolescent.  Dr. Anderson testified,

13  Q.  Okay.  Say with an adolescent.  Are you aware of
14  circumstances where in any context and adolescent has socially
    transitioned without the help or knowledge of their parents?
15  A.  I am.  And some of those cases involve kids in
16  California.  And the cases only come to my attention because
    there is a rupture and serious problems with the child."
17

18  Deposition Transcript of Dr. Erica Anderson, Ph.D, Dkt 247-10, at 116.

19  Five.  For the isolated instances where a parent or caregiver commits physical

20  abuse on a child, there are mandatory reporting laws and a complete law enforcement and

21  judicial system in place.   Even there, "courts have recognized that a state has no interest

22  in protecting children from their parents unless it has some definite and articulable

23  evidence giving rise to a reasonable suspicion that a child has been abused or is in

24  imminent danger of abuse."  *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir.

25  2000).

26  Three Supreme Court Justices recently described this issue as "a particularly

27  contentious question," *i.e.*, "whether a school district violates parents' fundamental rights

28  when, without parental knowledge or consent, it encourages a student to transition to a

5

1    new gender or assists in that process." *Lee v Poudre*, (Oct 14, 2025) (Alito, Thomas,
2    Gorsuch) (statement respecting denial of certiorari). These Justices describe the question
3    as one of "great and growing national importance." *Id*.

4        The state bases its legal position on a derogation of the parents' federal
5    constitutional right to care for and raise their children and an unwarranted aggrandizing
6    of a student's state-created right to privacy. California's education policymakers may be
7    experts on primary and secondary education but they would not receive top grades as
8    students of Constitutional Law. They misapprehend the supremacy of federal
9    constitutional rights. *Doe v. Dynamic Physical Therapy, LLC*, 607 U.S. ___, No. 25-180
10   (Dec. 8, 2025) (quoting U.S. Const., Art. IV, cl. 2) (per curiam). They misperceive
11   federal constitutional rights belonging to parents as weak-kneed and frail and subservient
12   to the student's right to privacy. Yet, under federal constitutional law, "parents [ ] retain
13   a substantial, if not the dominant, role." *Parham*, 442 U.S. at 604. How did they arrive
14   at this miscalculation?

15       The State Defendants mix up legal constructs. The Attorney General on behalf of
16   the State of California says Plaintiffs' lawsuit is "properly understood as seeking a
17   federal constitutional exemption from the California constitutional right to privacy, as
18   applied to gender identity in the school context." State Defs' Oppo to Plaintiffs' MSJ,
19   Dkt 256, at 9. But the Attorney General gets it upside down. Plaintiffs do not ask the
20   State to magnanimously permit a sort of federal constitutional exemption. What
21   Plaintiffs seek is to force the State to respect their enduring federal constitutional rights as
22   citizens of the United States.

23   ## I.    BACKGROUND

24       The Plaintiffs move for summary judgment against the state defendants. Earlier,
25   Plaintiffs' claims for money damages against all defendants and all claims against the
26   Escondido Union School District were severed and stayed. The Plaintiffs have been
27   certified as a class under F.R.C.P Rule 23(b)(2) and (b)(1)(A). The Plaintiffs' class
28   action seeks prospective relief against the State Defendants in the form of a permanent

23-cv-00768-BEN-WVG

1  injunction enjoining school gender policies they refer to as "Parental Exclusion Policies."

2  These policies were developed at the State Department of Education under the apparent

3  authority of the Superintendent of Public Instruction and the Board of Education.  *See*

4  *e.g.*, Model Policy AR 5145, Exh 12 Dkt 153-3 at 89-95.   The policies have been

5  adopted by local school districts throughout the state.[2]  *See* Dkt 207-1, at 5-21 (listing

6  598 California school districts that have similar policies).   The gender policies were

7  described in more detail in this Court's earlier Order granting a preliminary injunction.

8  *See* Order (dated September 14, 2023) Dkt 42.

9       These parental exclusion policies are designed to create a zone of secrecy around a

10  school student who expresses gender incongruity.  The policies restrain public school

11  teachers and staff from informing parents about a child's unusual gender expression,

12  unless the child consents.  The policies apply to children as young as two and as old as

13  seventeen.  The policies do not permit teachers to use their own judgment in responding

14  to an inquiring parent.  Unless the child consents, the teacher who communicates about a

15  child's gender incongruity faces adverse employment action.  However, prohibiting

16  accurate answers to a parent's question is, the plaintiff class asserts, a violation of several

17  federal constitutional rights.  In particular, the parents subclass asserts rights under the

18  First and Fourteenth Amendments while the teacher subclass asserts rights under the free

19  speech and the free exercise clauses of the First Amendment.

20       The State Defendants initially claimed that the whole question is a moot point.

21  They originally said that by taking down the FAQ page on gender identity from their

22  official website it should be obvious that their policies have changed.  But the State

23

24  _____

25  [2] *See e.g., Regino v. Staley*, 133 F.4th 951, n.1 (9th Cir. 2025) (describing Chico Unified
   School District's Regulation #5145.3 which is based on a sample regulation circulated by

26  the California School Boards Association in accordance with directives issued by
   the California Department of Education, a regulation similar to the polices addressed here

27  that restrict school teachers from informing parents about their child's gender identity

28  changes).

23-cv-00768-BEN-WVG

1  Defendants have declined to enter into a consent judgment binding themselves and their

2  successors in office.  And recently, when faced with the presence of fresh statements of

3  the parental exclusion policies in a newly state published cultural competency training

4  program called PRISM, the State Defendants have formally withdrawn their claim that

5  the case is moot.  *See* Plaintiffs' Ex Parte Motion for Sanctions, Dkt 292; Notice of

6  Withdrawal of Mootness Argument Pertaining to Plaintiffs' Motion for Summary

7  Judgment, Dkt 298.  And so, the actual chilling effect of the parental exclusion policies

8  on Plaintiffs' constitutional rights remains.

9      To avoid confusion, it is noted that this case is not about the recently enacted

10 California Assembly Bill 1955.  AB 1955 prohibits forced disclosure by teachers.  It does

11 not, by its terms, prohibit a teacher's voluntary disclosure.  *City of Huntington Beach v.*

12 *Newsom*, Appeal No. 25-3826, 2025 US App. LEXIS 29953 *11 (9th Cir. Sept. 12, 2025)

13 (mem. disp.) ("[n]othing in the language of these provisions [of AB 1955] forbids a

14 school employee from deciding to disclose such information to a parent . . . . Nor does

15 anything in these provisions [of AB 1955] forbid a school district from adopting a policy

16 that employees *may* elect to make such disclosures.") (emphasis in original).  This is

17 precisely the injunctive relief the Plaintiffs class seeks in this case.  The class seeks an

18 injunction which would permit teachers to disclose (of their own volition) gender identity

19 information to parents.

20     Does the passage of AB 1955 effectively mean the Plaintiffs have won?  Do

21 teachers now have a green light to inform parents once again, as they have done since the

22 days of Horace Mann?  No.  The State Defendants, on one hand, say that AB 1955 does

23 not prevent voluntary disclosure while, on the other hand, the State Defendants say that

24 voluntary disclosure is prohibited by the privacy clause of the state constitution and other

25 state anti-discrimination laws.  Moreover, the text of AB 1955 says that it did not change

26 existing law.  *See e.g.,* Cal. Educ. Code §220.3 (b) ("Subdivision (a) does not constitute a

27 change in, but is declaratory of, existing law."); Cal. Educ. Code § 220.5 (b) (same).

28 Does "existing law" include existing regulatory policies?  The plaintiffs make the point

8

1    that it is almost like the State Defendants are trying to confuse the question.[3]  To dispel

2    any uncertainty, this Court asked that question of the Deputy Attorney General

3    representing the State Defendants.  To his credit, he agreed that notwithstanding AB

4    1955, other state laws could still be used to prohibit disclosure of gender identification

5    information to parents.

> Court:  And let me ask you whether or not you agree that
> there are other laws that could prohibit or restrain a teacher or a
> school district from disclosing to the parents that their child has
> manifested a gender incongruity besides 1955?
>
> Mr. Quade: Yes, I think there are.

Hearing Transcript (Nov. 24, 2025), Dkt. 303, at 75.  Nowhere in the body of AB 1955

can be found a positive statement that teachers *may voluntarily inform* a student's

parents.  So, this case continues to present a live dispute about a parent's right *to receive*

*information* about their child and whether a teacher may voluntarily *offer information*

about their student's gender expression with a parent.

---

[3] *See* Hearing Transcript (Nov. 24, 2025), Dkt. 303, at 78:
> Counsel for Plaintiffs:  And, honestly, it's intentionally
> confusing.  They posted a Web page with model policies that
> say you can't disclose it.  Every school district adopted them
> without asking questions.  They're still on the books.  Then we
> filed this case, and they played games, and then they changed
> the page with the new language from AB 1955, and no one
> knows what it means.
>      On the one hand, they say teachers can voluntarily
> disclose -- whatever that means.  And how do you – how do
> you reconcile that with what the Attorney General says on his
> Web page?  Here's what's really happening.  What's really
> happening is the FAQ page accomplished its objective.   Every
> school has these policies on the books.

23-cv-00768-BEN-WVG

1    The dispute must be resolved against the legal backdrop of the federal constitutional

2    right to direct the medical care and religious upbringing of a child, including the right to

3    make important medical care decisions.  While there are no genuine issues of material

4    fact, the factual context is the case where a child's unusual gender expression may be a

5    sign of psychological distress that *may need treatment* and the constitutional right of

6    parents to know.

7    ## II.    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

8    The class action plaintiffs seek summary judgment and declaratory and injunctive

9    relief from the State Defendants.[4]  The class claims numbered 1,2,3,6,7, and 8 are

10    addressed in reverse order, from strongest to weakest, beginning with the class claims of

11    parents and ending with the class claims of teachers.

12    ## III.    APPLICABLE LAW

13    Federal Rule of Civil Procedure 56 sets forth the well-known standard for

14    summary judgment as explained by a trio of Supreme Court cases: *Celotex Corp. v.*

15    *Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986);

16    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  The standards

17    are not disputed here.  Under these standards, summary judgment may be entered where

18    there are no genuine issues of material fact and the moving party is entitled to judgment

19    as a matter of law.  The State Defendants do not contend that genuine issues of material

20    fact are present that require trial.  When asked at the hearing about what genuine issues of

21    material fact were present in this case, the Deputy Attorney General could not point to a

22    fact issue, instead explaining "fundamentally … in our view, plaintiffs' constitutional

23    claims are not cognizable; they're not viable. . . .   So recognizing that this is a motion for

24

25

26

27    [4] Claims for money damages and for violations of Title VII have been severed and
28    stayed.

10

1  summary judgment, I think that our view of it is that as a matter of law, these claims are

2  not correct."  Hearing Transcript at 125-26.[5]

3          As mentioned above, the State Defendants defend their parental exclusion policies

4  by relying on state-created privacy rights.  The State Defendants see one source of those

5  state-created rights as flowing from the California Constitution.  Article 1, Section 1 of

6  the California Constitution provides, "All people are by nature free and independent and

7  have inalienable rights.  Among these are . . . privacy."  Another source of student

8  privacy rights mentioned by the State Defendants is found in state anti-discrimination

9  laws.  The primary statue is California Education Code §220.  Section 220 prohibits

10  discrimination by educational institutions in the following terms: "[n]o person shall be

11  subjected to discrimination on the basis of . . . gender, gender identity, gender expression

12  . . . or any other characteristic that is contained in the definition of hate crimes set forth in

13  Section 422.55 of the Penal Code."[6]

14

15

16  [5] The only potential issue of fact the State Defendants identify in their briefing (at page
   37) is whether or not "respecting a student's social transition is medical treatment."  The
17  State Defendants contend that social transitioning is not medical treatment.  This is not a
   material fact essential to deciding the constitutional claims.  But if it were a material fact,
18  there is no genuine issue.  The Ninth Circuit has already decided that social transitioning
   is indeed a type of medical treatment for gender dysphoria.  *See Doe v. Horne*, 115 F.4th
19  1083, n.13 (9th Cir. 2024) ("The goal of medical treatment for gender dysphoria is to
   alleviate a transgender patient's distress by allowing them to live consistently with their
20  gender identity.  This treatment, 'commonly referred to as 'transition,'' includes 'one or
   more of the following components: (i) social transition, including adopting a new name,
21  pronouns, appearance, and clothing, and correcting identity documents . . . .'").
22

23

24  [6] California Penal Code §422.55 provides: "For purposes of this title, and for purposes of
   all other state law unless an explicit provision of law or the context clearly requires a
25  different meaning, the following shall apply: (a) "Hate crime" means a criminal act
   committed, in whole or in part, because of one or more of the following actual or
26  perceived characteristics of the victim: (1) Disability. (2) Gender. (3) Nationality. (4)
   Race or ethnicity. (5) Religion. (6) Sexual orientation. (7) Association with a person or
27  group with one or more of these actual or perceived characteristics. (b) "Hate crime"
   includes, but is not limited to, a violation of Section 422.6."  In turn, Penal Code §422.6
28

11

1    However, where state-created rights run headlong into federal constitutional rights,

2  federal rights are supreme. "The Supremacy Clause supplies a rule of decision when

3  federal and state laws conflict. . . . So, for example, when a regulated party cannot

4  comply with both federal and state directives, the Supremacy Clause tells us the state law

5  must yield." *Martin v. United States*, 605 U.S 395, 409 (2025) (citation omitted).

6    **IV.   ANALYSIS**

7       **A.  Parents' 14th Amendment Substantive Due Process Rights (Claim 7)**

8    Parents of public school children assert that the state's parental exclusion policies

9  violate their substantive due process rights as parents. Substantive due process rights are

10  rooted in the Fourteenth Amendment Due Process Clause which "provides heightened

11  protection against government interference with certain fundamental rights and liberty

12  interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). For a substantive due process

13  claim, a court's analysis begins by carefully formulating the asserted right and adopting a

14  narrow definition of the interest at stake. *Regino v. Staley*, 133 F.4th 951, 964-65 (9th

15  Cir. 2025). Next, a court considers whether the right is deeply rooted in this nation's

16  history and tradition and implicit in the concept of ordered liberty, such that neither

17  liberty nor justice would exist if it was sacrificed. *Id*. at 965.

18    The right of parents to make decisions about their children -- including decisions

19  on education, medical care and religious training – is long-recognized and deeply rooted

20  in American history. "The Supreme Court has long recognized 'the fundamental right of

21  parents to make decisions concerning the care, custody, and control of their children.'"

22

23  _____

24  provides: "(a) A person, whether or not acting under color of law, shall not, by force or

25  threat of force, willfully injure, intimidate, interfere with, oppress, or threaten any other

26  person in the free exercise or enjoyment of a right or privilege secured by the
Constitution or laws of this state or by the Constitution or laws of the United States in

27  whole or in part because of one or more of the actual or perceived characteristics of the

28  victim listed in subdivision (a) of Section 422.55."

23-cv-00768-BEN-WVG

1    *Regino,* 133 F.4th at 965 (quoting *Troxel*, 530 U.S. at 66).  "More than 75 years ago, in

2    *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923), we held that the 'liberty' protected by

3    the Due Process Clause includes the right of parents to 'establish a home and bring up

4    children' and 'to control the education of their own.'" *Troxel,* 530 U.S at 66.  "The

5    liberty interest at issue in this case—the interest of parents in the care, custody, and

6    control of their children—is perhaps the oldest of the fundamental liberty interests

7    recognized by this Court." *Troxel,* 530 U.S. at 65.

8          The parental right is broad and encompasses both a right to direct a child's

9    education and a duty to provide for a child's health care.  The Supreme Court has

10   specifically recognized that within the broader parental right to raise children lies a

11   narrower right to decide when a child needs health care.  In *Parham v. J.R.,* 442 U.S. 584,

12   602 (1979), the Supreme Court said,

13              Our jurisprudence historically has reflected Western

14       civilization concepts of the family as a unit with broad parental
         authority over minor children.  Our cases have consistently

15       followed that course; our constitutional system long ago
         rejected any notion that a child is "the mere creature of the

16       State" and, on the contrary, asserted that  parents generally

17       "have the right, coupled with the high duty, to recognize and
         prepare their children for additional obligations." Surely, this

18       includes a "high duty" to recognize symptoms of illness and to
         seek and follow medical advice.  The law's concept of the

19       family rests on a presumption that parents possess what a child
         lacks in maturity, experience, and capacity for judgment

20       required for making life's difficult decisions.  More important,

21       historically it has recognized that natural bonds of affection
         lead parents to act in the best interests of their children.

22

23

24   (citing *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925); *Wisconsin v. Yoder*, 406

25   U.S. 205, 213 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); and *Meyer v.*

26   *Nebraska*, 262 U.S. 390, 400 (1923)).  And "[s]imply because the decision of a parent is

27   not agreeable to a child or because it involves risks does not automatically transfer the

28   power to make that decision from the parents to some agency or officer of the state."

23-cv-00768-BEN-WVG

1    *Parham*, 442 U.S. at 603. "Most children, even in adolescence, simply are not able to

2    make sound judgments concerning many decisions, including their need for medical care

3    or treatment. Parents can and must make those judgments." *Id.*

4          So strong is the parental right to make health care decisions for a child that even

5    the dissenting Justices in *Parham* took time to describe the necessity of a shield (from

6    state interference) for the parent-child relationship:

> 7    The rule in favor of deference to parental authority is designed
> 8    to shield parental control of child rearing from state
>    interference. The rule cannot be invoked in defense of
> 9    unfettered state control of child rearing or to immunize from
>    review the decisions of state social workers. The social worker-
> 10    child relationship is not deserving of the special protection and
>    deference accorded to the parent-child relationship, and state
> 11    officials acting in loco parentis cannot be equated with parents.
> 12

13    *Parham*, 442 U.S. at 637-38 (Brennan, J, Marshall, J, Stevens, J, concurring in part and

14    dissenting in part) (citations omitted). At the same time, the constitutional rights of

15    parents are not unlimited or unbounded. *Regino*, 133 F. 4th at 961. The Supreme Court

16    has upheld a state prohibition on children selling a Jehovah's Witnesses Watchtower

17    magazines on public sidewalks over a parent's First and Fourteenth Amendment rights,

18    noting "neither rights of religion nor rights of parenthood are beyond limitation." *Prince*

19    *v. Massachusetts*, 321 U.S. 158, 166 (1944); *cf. Jehovah's Witnesses of Wash. v. King*

20    *Cty. Hosp.*, 278 F. Supp. 488, 498 (W.D. Wash. 1967), *aff'd*, 390 U.S. 598 (1968) (per

21    curiam) (upholding state's authority to order necessary blood transfusions to minor

22    children, contrary to the expressed beliefs and directions of their parents); *see also Pickup*

23    *v. Brown*, 740 F.3d 1208, 1236 (9th Cir. 2014) ("the fundamental rights of parents do not

24    include the right to choose a specific type of provider for a specific medical or mental

25    health treatment that the state has reasonably deemed harmful.").

26          The State Defendants do not disagree in principle. How could they? The State

27    Defendants disagreement is not about the recognition of parental constitutional rights.

28    The State Defendants disagree over where to draw lines. In this case, the parent plaintiffs

1 seek a modest drawing of the lines.  The parent plaintiffs want accurate information about

2 their children from school staff.  They reasonably contend that accurate information is

3 necessary to carry out the right and duty to direct their children in religion, in medical

4 care, and in life.

5          The State Defendants draw the lines differently.  The State Defendants argue that

6 their policies do not amount to government coercive (*e.g.,* coercing a minor into having

7 an abortion) or restraining conduct, so they do not offend the Constitution, citing *Foote v.*

8 *Ludlow Sch. Comm.*, 128 F.4th 336, 353 (1st Cir. 2025).  But unlike in this case[7], in

9 *Foote* there was "no allegation suggest[ing] that, when the Parents tried to speak with

10 school officials about the Student, the officials misrepresented the name the Student had

11 chosen for in-school use."  *Id*.  And while the court was sympathetic ("we are

12 sympathetic to the Parents' interest in having as much information as possible about their

13 child's well-being and behavior in school revealed to them"), it drew the lines differently

14 and concluded that "this canon *does not require governments to assist* parents in

15 exercising their fundamental right to direct the upbringing of their children."  *Id.* at 355

16 (emphasis added); *see also Anspach v. City of Phila*., 503 F.3d 256, 266 (3d Cir. 2007)

17 (where teen obtained emergency contraceptive pills from a government clinic, the clinic

18 was not constitutionally required to assist by notifying parents).

19          Closer to home, the Ninth Circuit has recognized that there is an absence of

20 precedential rulings on this subject within this circuit.  But it would be error to not decide

21 these issues in the first instance simply because of a lack of precedent.  *Regino*, 133 F.4th

22 at 961-62 ("Because existing precedent did not expressly address Regino's articulation of

23 her asserted fundamental rights, the district court held that the rights she asserted were

24 not fundamental.  This was error.  We have never held that a plaintiff asserting a

25 substantive due process claim must show that existing precedent clearly establishes the

26

27

28 [7] *See e.g.,* Decl of John Poe, Dkt 247-7 at ¶¶26-28; Decl of John Doe, Dkt 247-9 at ¶5.

23-cv-00768-BEN-WVG

1  asserted fundamental right, and we see no reason to import this standard now.").  The

2  parent plaintiff class in this case do not ask schools for "assistance" in caring for their

3  child.  Instead, they ask schools to not erect barriers and to simply permit accurate

4  communications about the well-being of their children.  They want an end, to use the

5  words of the Supreme Court, of "substantial interference" from the state public school

6  system.  *Mahmoud*, 145 S. Ct. at 2350-51.

7       The parents' main concern about whether their child might be expressing gender

8  incongruity is because of the relationship to a medical condition known as *gender*

9  *dysphoria*.  Left untreated, gender dysphoria is a serious condition which can develop

10  into anxiety, depression, and even suicidal ideation.  The Ninth Circuit recently described

11  the condition flawlessly in *Pritchard v. Blue Cross Blue Shield of Ill.,* No. 23-4331, 2025

12  U.S. App. LEXIS 29943, at *7-8 (9th Cir. Nov. 17, 2025):

13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
> Someone's gender identity is their "inner sense of belonging to a particular sex, like male or female."  Most people are cisgender, and their "actual sex" matches the sex they "are assigned . . . based solely on the appearance of their external genitalia."  For transgender people, however, their gender identity and sex do not match.  As the American Psychiatric Association has recognized, this "gender incongruence, in and of itself, does not constitute a mental disorder."  However, a transgender person can suffer from gender dysphoria if the "marked incongruence between their experienced/expressed gender and assigned gender" causes "clinically significant distress or impairment in social, occupational, or other important areas of functioning."  Without treatment, gender dysphoria can lead to anxiety, depression, suicide, and other mental health problems.

23  
24  
25  
26  
> Healthcare providers can treat gender dysphoria using counseling, hormone therapy, surgery, and other forms of gender-affirming care.  Providers adapt the treatments used to the medical needs of each patient; not all patients need each treatment.

27  

28  

23-cv-00768-BEN-WVG

1   Dr. Nathan M. Szajnberg, M.D., is a double-board certified psychiatrist with forty years

2   of experience.  Szajnberg testified that gender dysphoria is a specific medical diagnosis.

3   Deposition Transcript of Szajnberg, Dkt 247-11 at 18.  Dr. Szajnberg explains that

4   "gender identity issues can percolate through, and the child does fine, or it can transform

5   into gender identity disorder.  And if it does, we now know from the literature they are --

6   it's replete with other serious psychiatric diagnoses, like major depression, autism, and so

7   on." Transcript of Szajnberg, Dkt 247-11 at 100.

8       Consider these three case examples.  In *Regino*, the child was eleven years old and

9   in fifth grade.  She began to feel depressed and anxious likely due to her mother's breast

10  cancer and her grandfather's passing.  The school counselor "addressed issues of gender

11  identity and sexuality" with the child.  133 F.4th at 957.  Within a few months the child

12  began to express she felt like a boy and wanted a new name and pronouns. *Id.*  The

13  counselor relayed the name/pronoun decision to her teacher and eventually other school

14  personnel. *Id.* at 958.  Late in the school year, the child told her grandmother who, in

15  turn, told the child's mother. *Id.*  Regino let her child know that she supported her and

16  would assist in her transition, if that is what she wanted.  Importantly, the mother also

17  arranged for counseling to discuss the depression and anxiety. *Id.*  Over the spring and

18  summer, the child's feelings about being a boy subsided. *Id.*  According to *Regino*, the

19  child identified as a girl again and remained in counseling for depression and anxiety. *Id.*

20      Had the mother continued to be uninformed about her student's gender non-

21  conformity at school, the child would not have known of or benefitted from her mother's

22  support.  Her mother was able to arrange for counseling, which of course, an eleven year-

23  old could not do on her own.  Through counseling, her underlying issues of depression

24  and anxiety are being treated and her child's mistaken feelings about her gender are not

25  complicating the treatment.  In effect, Regino did what parents normally do: she

26  supported her child in an emotionally difficult time and arranged expert help for their

27  child.  In this case, social transitioning may have mistakenly masked a more serious

28  mental health challenge.

17

23-cv-00768-BEN-WVG

1    The State Defendants' expert, Dr. Brady, tells the second story of another child: an
2    autistic boy who liked the color pink and mistakenly concluded that he must be a girl.
3    The patient had autism spectrum disorder and because of his cognitive rigidity, he
4    thought that if he liked pink, he must be a girl.  Deposition Transcript of Brady, Dkt 243-
5    7, 112-114.  Dr. Brady describes it this way.  "So in that particular case, the patient
6    presented to me because of the questions that they were asking themselves.  And so our
7    time together was spent on exploring why they felt that way and how they came to
8    conclude that they were female identified.  And during that time, I did affirm the patient
9    and use appropriate name and pronouns that she had chosen at that time.  But we
10   explored that some more, and she came to understand that colors are not necessarily
11   gendered and was more expansive in her ability to -- I'm sorry.  At the end of therapy, he
12   was using he again but in his ability to kind of understand gender more fully."  *Id.*  The
13   boy, after a time of supportive counseling came to understand his innate male gender.
14   Dr. Brady noted, "at least at the time we terminated therapy, he had come to a place
15   where he was identifying as male but identified he had feminine qualities. *Id.*

16   Because of counseling with Dr. Brady, the boy-who-liked-pink is living a
17   healthier, more self-aware and integrated life.  The counseling with Dr. Brady would not
18   have taken place without the boy's parents being informed about his gender questioning.
19   Because the parents were informed, they did what parents usually do and sought expert
20   advice.  The boy could not have arranged for counselling with Dr. Brady by himself.
21   Had the parents been unaware of their boy's new gender expression, the boy may have
22   continued through his years mistakenly thinking he must be a girl and suffered from all of
23   the dysphoria that may have followed.

24   The third case study is a cautionary tale.  While attending a California public
25   school in 7th grade their daughter, child Poe, began exhibiting at school a significant
26   change of identifying as a boy.  The child's teachers were prohibited by school district
27   policies from informing child Poe's parents and the Poes remained oblivious.
28   Meanwhile, the school accepted and perpetuated child Poe's new gender expression.

23-cv-00768-BEN-WVG

(43a)

1    The Plaintiffs' experts and the State's experts agree that when a child expresses a

2 new gender it is a significant event.  It may be a sign or signal that a serious unhealthy

3 condition of gender dysphoria may be occurring or is in the offing.  It also may be that

4 that the child is fine.  Like a child experiencing headaches, an incongruous expression of

5 gender may signal a serious medical condition needing interventional care and treatment

6 or it may be something that needs no treatment.  In either case, our nation's laws

7 normally respect the parents' rights and role of deciding whether further investigation

8 should be pursued.

9    Had they known of their child's new gender expression at school, the Poe parents

10 (like most parents) would probably have sought an opinion from an expert like Dr. Brady.

11 They may have pursued therapeutic counseling with Dr. Anderson.  They may have

12 asked a neuropsychologist to rule out other conditions or comorbidities like generalized

13 anxiety, depression, autism, or bipolar disorder, etc.  The point is that had they known,

14 the Poe parents would have had an opportunity to exercise their parental judgment in

15 deciding what do, as is their constitutional right under *Parham*.  And their child would

16 have received what the Plaintiffs and all experts agree is the best for a child: at least the

17 parents' involvement, and perhaps like Regino, even the parents' support.  But the Poe

18 child did not get that support.  She did not tell her parents.  Her teachers did not tell her

19 parents.  The school administration did not tell her parents. Instead, in accordance with

20 state policies, the school required secrecy from its teachers and employees while

21 promoting her new name.

22    As it turned out, child Poe's change in gender expression was a tremendously

23 significant sign.  The Poe parents did not learn of their child's deteriorated mental health

24 until after she attempted suicide.  Adding insult to constitutional injury, California public

25 schools still refuse to use the child's given female name in spite of the Poe parents'

26 instructions.  *See* Supp. Decl of John Poe, Dkt 269-2, at 2 & Exh. 1.  Dr. Szajnberg, after

27 reviewing child Poe's medical records, summarizes what went wrong.

28

1
2
3
4
5
6
7
8
9
10

       The school knew that this girl had issues around -- had
gender issues.  Let's not use the diagnosis yet.  But gender
issues and [the school] facilitated her transition from what they
understand was their responsibility or their duty to transitioning
to a different gender without informing the parents.  That's the
major issue as I see here  …  and the school started their social
transitioning in August of 2022 without involving the parents.
So this has been sort of a chronic repetition of keeping secret
from the parents something this child was struggling with.  And
this child shows -- this is a good example of a child who
expresses issues about gender identity uncertainty or confusion
or coming to terms with it that then evolves into more serious
gender dysphoria and even life-threatening gender dysphoria
with all the associated diagnoses.

11    Deposition Transcript of Szajnberg, Dkt 247-11, at 106-107.  Dr. Szajnberg continues:

12
13
14
15
16
17
18
19

       Here is how I see this, as a physician, now.  The school
knew in August '22 this girl was struggling with her gender.
They did not inform the parents.  For months the parents knew
nothing about this.  And you can see from the record, this girl
got sicker and sicker, until she's hospitalized.  Had they
informed the parents, hypothetically, the parents could have
started working with the girl, with the school, with their
therapist so there would be no September hospitalization, there
would be no series of multiple psychotropic drugs, there would
not be a girl who is hallucinating.  We could have prevented all
of this.  We wouldn't be sitting here today.

20    *Id.* at 122-23.

21       The policy of acknowledging and perpetuating a child's gender incongruent name

22    and pronouns is known as social transitioning.  According to the State Defendants' parent

23    exclusion policies, when a student says he or she wants to be known by a new name or

24    pronoun, the school does not sit idly by.  In an earlier Order, this Court described how the

25    State Defendants' policies require teachers and staff to immediately use a student's newly

26    announced name and pronouns and record the new monikers in school records.

27       The State Defendants do not dispute that the policies require formal recognition

28    and perpetuation of a student's change in gender identity.  Instead, they argue that it is

1   not social transitioning, or if it is social transitioning, then it is not medical care.  Rather,

2   the State Defendants explain that their policies are akin to a polite social courtesy.  For

3   example, the State Defendants offer that,

4               [r]especting a transgender person's request to be called by a
5               name and pronouns consistent with their gender identity is far
                afield from anything that courts have recognized as medical
6               treatment.  Doing so involves no medical procedure,
                examination, or hospitalization; need not be performed by
7               medical personnel; and is not regulated as part of the practice of
8               medicine.

9   State Defendants' Oppo., Dkt 256, at 32.  Though the claim is in tension with *Doe v.*

10  *Horne*'s footnote 13[8], it is repeated throughout the briefing.[9]

11          Nevertheless, the secrecy aspect of the policy not only does not assist parents, it

12  deprives parents of the opportunity to evaluate a significant medical sign and decide

13  whether to pursue psychological counseling, psychiatric care, gender-affirming care,

14  family acceptance, or something else.  When these signs of a potentially serious

15  conditions appear, it is the parents' right and duty to investigate, evaluate, and decide on

16

17  _____

18  [8] *Doe*, 115 F.4th at 1107 & n.13.

19

20  [9] *See e.g.,* State Defendants' Oppo., Dkt 256, at 31: "Parent Plaintiffs argue that student-
    privacy policies interfere with their due process right to direct medical treatment of their
21  children.  Their argument is based on an implausible assertion that when school staff
    honor students' names and pronouns, or other aspects of a student's social transition, they
22  are providing medical (or psychological) treatment. But parental rights to make medical
    decisions are irrelevant here because when school staff honor students' requests to
23  socially transition in schools they are not providing medical treatment."; *Id.* at 33,
24  "Unsurprisingly, no court has held that simply using a transgender student's requested
    name and pronouns constitutes medical treatment."; *Id.* at 35, "When school staff refer to
25  students by their requested names and pronouns, they are not administering medical
    treatment."; and *Id.* at 37, "Plaintiffs have failed to plausibly allege (much less prove)
26  that a teacher respecting a student's name and pronouns is medical treatment giving rise
27  to a substantive due process claim."
28

1  whether to pursue help from medical or mental health professionals.  The State

2  Defendants' policies trammel on the parent plaintiffs' substantive due process rights.  Dr.

3  Szajnberg describes the significance of a child's expression of gender incongruence like

4  this,

5       Q. You would agree that gender incongruence in
6       the absence of an impairment in functioning or a
         maladaptive behavior would not be considered gender
7       dysphoria?

8       THE WITNESS:  It depends. There's not a
9       simple yes or no for me. If you think of development,
         healthy development or illness development as a
10      trajectory over time, it could be that
11      gender something, over here at this time period may be
         stable and continue on without any maladaptive
12      disruption, or it could be that gender something or
13      other is an early sign of a medical illness, like
         gender dysphoria.
14      I think this example from Child Poe is an
15      example. When she had her AVM malformation, in what I
         read, she -- it actually bled into her brain, she would
16      have had a headache.  Now, headaches are not
17      infrequent in kids in school, but most schools, I
         think -- like my kid's school.  If my kid has a
18      headache, they would call me; they expect me to take
19      care of it.
         If a school had decided, well, we don't want
20      to call the parent over this headache, this girl could
21      have died from her AV malformation.  So most headaches
         don't go on to AV malformation.  Those are really rare,
22      in fact.  But it shouldn't be up to the school alone to
23      decide whether an early perturbation in development is
         going to evolve into something serious or is a normal
24      perturbation of development.

25

26  Deposition Transcript of Szajnberg, Dkt 247-11, at 71-72.

27       The constitutional question is really not whether expressing gender incongruence is

28  pathological or healthy, or, whether social transitioning is or is not a medical procedure.

22

(47a)

1  That debate is a red herring.  The constitutional question is about *when* gender

2  incongruence is *observed*, whether parents have a right to be informed and make the

3  decision about whether further professional investigation or therapy is needed.  Put

4  another way, the question is whether being involved in potentially serious medical or

5  psychological decision-making for their school student is a parent's constitutional right.

6      It is.  "Simply because the decision of a parent is not agreeable to a child or

7  because it involves risks does not automatically transfer the power to make that decision

8  from the parents to some agency or officer of the state . . . .  Most children, even in

9  adolescence, simply are not able to make sound judgments concerning many decisions,

10  including their need for medical care or treatment.  Parents can and must make those

11  judgments." *Parham*, 442 U.S. at 603.  Medically, it is also the preferred course of

12  action.  Dr. Szajnberg opines,

13      Q.  And how would that have occurred when Child Poe is indicating that mom
14      [has] -- rejected her for even a sexual orientation change?

15      A.   Look, this is my bread and butter as a
16      psychiatrist.  If I tell a parent, "I think your child
       has major depression," they don't celebrate and say,
17      "Thank you very much.  I'm so glad."  They usually have
       a reaction of, "Oh, no."  They try to deny it.  They
18      don't want to accept it.  That's normal.
19      So if I said, a diagnosis of general anxiety
       disorder, they're not happy with the diagnosis.  Just
20      like any parent wouldn't be happy to be told, Listen,
       we think your kid has Hodgkin's lymphoma, which is
21      curable.  They're not going to be happy about it, but
       you need to involve the parent in the illness
22      treatment.
23      Why make gender dysphoria a separate kind of
       treatment than any other medical treatment where we
24      would want the parents involved?  And if the parents
       are having trouble with it, that's our job as
25      physicians or as therapists to help them through it.
26      We don't tell them, your kid has Hodgkin's
27      lymphoma, we're not going to tell you, we're just going
28

23

23-cv-00768-BEN-WVG

(48a)

1  to treat your kid without your knowing about it and
2  tough luck.  We would never do that in medicine.

3  Q.  Did you ever have occasion to treat youth who
4  had been rendered homeless because they had disclosed
   that they identified by a different gender to their
5  parents?

6
7  A.  That's my San Francisco job you're describing.
   Too many of them.  And right around Eighth and Market,
   that's where they lived, so to speak.  So too many.
8

9  Q.  So that's a very real risk of disclosing
   gender identity to parents, that the child would be
10 rendered homeless?

11
12 A.  If you don't work with the parents.  If you
   don't work with the parents, that's a risk.  The school
13 needs to work with the parents to prevent adverse
   outcome of any psychiatric diagnosis.
14 If they say to a parent, your kid is very,
15 very depressed and bring them to a doctor, and the
   doctor says, no, it's really major depression, then the
16 parents and the doctor, and maybe the school,
17 collaborate to accept the diagnosis and then treat the
   child well.
18

19 Deposition Transcript of Szajnberg, Dkt 247-11, at 108-110.  The defense experts do not

20 meaningfully disagree.  Dr. Christine Brady, Ph.D, is a psychologist who has treated

21 1,000 gender incongruent youth.  One hundred percent of her current patients are

22 transgender and gender nonconforming youth.  Deposition Transcript of Brady, Dkt 243-

23 7, at 43.  As an expert for the State Defendants, Dr. Brady opines that "everybody has a

24 gender identity or has a gender.  And so, you know, that can sometimes be different from

25 your sex; that can be aligned with your sex.  Gender is just, you know, how you identify

26 or don't identify with your sex."  *Id*. at 56.

27     Sometimes, a child mistakes his gender and a conversation with a therapist will

28 help the child realize his mistake.  Dr. Brady estimates that twenty percent of patients that

23-cv-00768-BEN-WVG

1   think they want to socially transition later decide not to.  *Id*. at 115.  And of her own

2   patients, approximately ten percent are on the autistic spectrum.  *Id*. at 127.

3         To engage in social transitioning, Dr. Brady opines that a person need not see a

4   mental health professional.  *Id*. at 167.  On the other hand, she says that "kids need

5   support and help if they're experiencing these mental health disparities."  *Id*. at 167.

6   When she sees a youth at her gender clinic, she requires a parent's or other caregiver's

7   involvement.  Dr. Brady states, "In the context of gender clinic, in order to get to gender

8   clinic, you have to be out to at least one caregiver."  *Id*. at 171; 216 (same).

9         When a child as young as five years old decides to socially transition at school

10   without their parents' knowledge and without the benefit of a psychological evaluation,

11   Dr. Brady opines that the benefits still outweigh the risks.  *Id*. at 177.  But her opinion in

12   this respect carries no weight because she concedes there are no studies to support her

13   opinion.  Dr. Brady testifies,

14

15           "But overall, I believe the benefits outweigh any potential risk
             that might be present.  But the literature would indicate that

16           there is no risk.
             Q.  What literature is that?

17           A.  The lack of evidence that indicates that there is a risk.
             There are no studies that show any data regarding risk."

18           ***

19           "The percent of kids that identify as transgender is quite small,
             and so running studies with that specific scenario in mind

20           would be very hard to conduct.  *I'll note those studies do not

21           exist in either direction regarding negative outcomes or
             benefits*."

22

23   *Id*. at 177-78 (emphasis added).

24         Darlene Tando is another defense expert.  Tando is a licensed clinical social

25   worker with approximately 100 current clients, most of which are transgender.

26   Approximately 30% or more of her patients are on the autistic spectrum.  Deposition

27   Transcript of Tando, Dkt. 243-3, at 275-76.  Like patients of Dr. Brady, in order to be

28   seen in Tando's practice, a child's parent must first consent.  *Id*. at 56.  Tando says that

23-cv-00768-BEN-WVG

1    the words "gender" and "gender identity" are synonymous and that they mean a sense of

2    oneself: "I consider the word gender to be synonymous with gender identity and I use

3    them interchangeably. I believe it is the internal sense of self, psychological sense of

4    self, identifying as male, female, all genders, both genders, no gender." *Id.* at 69. She

5    believes a child as young as three years old can "understand and assert their gender

6    identity." *Id.* at 143-44. While gender is not a medical condition, according to Tando,

7    she concedes that "I think that a misalignment or an incongruence with one's designated

8    sex and authentic gender identity could be considered a medical condition." *Id.* at 189;

9    194-95.

10      Similar to other experts, Tando acknowledges that gender dysphoria can have

11    effects ranging from unpleasant to life-threatening. *Id.* at 109. A trans-identifying person

12    who does not have gender dysphoria is at a greater risk of developing dysphoria if they

13    do not receive proper support and affirmation, according to Tando. *Id.* at 260-61. And

14    Tando observes that where a child is being referred to as a chosen gender in one

15    environment, but not in a different setting, can be "harmful" in that it can "increase

16    dysphoria, [and] increase mental health risks." *Id.* at 142-43.

17      In her testimony, Tando agrees that it is important for parents to know (*id.* at 118),

18    in part because parents ultimately have the power to influence whether or not a child fully

19    socially transitions. *Id.* at 121. In apparent contrast to state policymakers, Tando agrees

20    that if parents believe that their child would be harmed with social transitioning, the

21    parents should be notified. *Id.* at 138. Not surprisingly, Tando notes that a parent's role

22    in understanding their child's behavior is important, and her book says that parents are

23    the best historians of behaviors which is extremely beneficial to the course of treatment,

24    adding: "it is an essential role in the journey." *Id.* at 175.

25      Tando testified, "I believe it's optimal for parents to understand and affirm the

26    child's gender identity." *Id.* at 239. And she agrees that parents will do everything they

27    can to help their children, even if they are initially shocked. *Id.* at 246. Parents may be

28    shocked at first, but Tando agrees that because parents want what is best for their child,

1   they will likely support and affirm the child.  *Id.* at 247-49.  In fact, Tando says that it is

2   normal for parents to not respond positively to their child telling them that they are

3   transgender and that the reaction does not mean that the parent is a bigot, hateful, or

4   abusive.  *Id.* at 254-55.

5        Tando concluded her deposition testimony by disagreeing with other experts and

6   opining that even where parents object or have instructed a school *not* to affirm their

7   child's preferred identity, "I think that it would still be beneficial to the child to be

8   referred to appropriately in one context."  *Id.* at 324.

9        In contrast, Dr. Erica Anderson, Ph.D, a former member of the board of directors

10  of WPATH, says that, "it's hard to imagine any circumstances under which it is a good

11  idea to socially transition a child without support of parents."  Deposition of Anderson,

12  Dkt 247-10 at 117.  Dr. Anderson is a clinical psychologist who sees patients who are

13  gender questioning or transgender for evaluation and possible treatment.  *Id.* at 18-19.

14  Gender identity persistence is one of recurring issues in her work: "is this child likely

15  going to persist in this transgender identity or a different gender identity.  And that's a --

16  that's a sticky wicket, trying to figure that out."  *Id.* at 52.

17       Parental support for children is important for a child's health, according to Dr.

18  Anderson.  "Children deserve the support of adults, especially parents . . . . And that's

19  what I've understood as a psychologist.  And -- and the scientific literature confirm that

20  children grow up healthy and happy when they are supported by the adults and the

21  caregivers in their lives."  *Id.* at 25.  Dr. Anderson holds the opinion that schools should

22  bring to a parent's attention issues of their child's gender dysphoria.  Dr. Anderson

23  testifies,

24          Children -- children have things that go on at
            school that parents are notified about all the time.
25          There are probably thousands and thousands of such
            notifications going on throughout California schools
26          today.  If a child falls on the playground and scrapes
            their knee and gets some kind of first aid, parents are
27          notified.  If a child needs to take medication at school

28

27

1
2

    for any reason, patients are notified.  If a child is
failing in their academic performance, schools -- or
parents are notified.

3
4

    I am not persuaded that this is a reason to
carve out -- that there's justification to carve out a
social transition, which is not a neutral act, it's a

5
6

psychotherapeutic intervention.  And I'm not persuaded
that school -- people at school are qualified to -- to
determine does this child suffer from gender dysphoria

7
8

or not or are there other psychological factors at play.
That is really to be brought to the attention of -- of
parents and for parents to intervene, as the

9
10

guidelines -- the very guidelines that Dr. Brady and
Ms. Tando use, recommend, that social transition can be
done with the concurrence of the parents.  Nowhere in

11
12

any guidelines have I come across advice to school
people that they should go ahead and socially transition
kids without notifying parents.

13

*Id.* at 90-91.  Lastly, Dr. Anderson said that she has had discussions with Dr. Cass (author

14

of the most comprehensive review of scientific literature on transgenderism and social

15

transitioning) and said, "[w]e agreed that, you know, as put in the report, social transition

16

is not [a] neutral act and *it should be done selectively and carefully*."  *Id.* at 102

17

(emphasis added).

18

       The State Defendants' own experts say it is good if a child's gender expression is

19

affirmed (which is facilitated in school).  However, the parental exclusion policies

20

presume that a child will not receive affirmation or support at home if parents are

21

informed over the child's objection.  Consequently, the state privacy policies assume that

22

a ½ loaf of bread is better than no loaf at all.  In other words, it is better to give at least

23

some school affirmation for a non-conforming gender student even though school secrecy

24

means the child is deprived of the opportunity to receive parent affirmation.   The

25

counterargument to that is that if parents are not informed at all, there will be gender

26

incongruent children that *would have been affirmed* by their parents, had the parents been

27

informed, but who will instead be forced to struggle without their parents' involvement

28

23-cv-00768-BEN-WVG

1  and affirmation.  That group of schoolchildren will be deprived of the whole loaf of

2  affirmation.

3       Along the same lines, that group of schoolchildren will be deprived of their

4  parents' wisdom and opportunity to act in the child's best interest such as exploring

5  counseling with a mental health expert, family discussions, or simply patient observation

6  over time, etc.  These schoolchildren will not have the benefit of their parent's

7  involvement, at all.  In other words, while these state privacy policies may be intended to

8  protect a gender incongruent student may have the actual effect of depriving that student

9  of what they need most and what is clinically the best: affirmation and support from their

10  own parents.

11       As for whether gender incongruence is an unhealthy medical condition in need of

12  treatment, or, whether social transitioning at school is medical treatment, does not matter.

13  Under the Fourteenth Amendment, parents have a substantive due process right to know

14  of and explore whether their own child's gender incongruence is a medical or

15  psychological condition and whether and what kind of treatment or approach is in their

16  child's best interest.  The State Defendants' experts say that a child's gender identity is

17  innate.  There is no evidence presented to back up that assertion.  But even if there is a

18  question, it is best answered by parents taking the child to a mental health provider to

19  explore the question, instead of leaving a child to answer the question on his or her own.

20       This Court has previously described the longstanding and enduring rights of

21  parents to direct the upbringing and medical care of their children.[10]  That right has been

22  acknowledged by the U.S. Supreme Court once again in *Mahmoud v. Taylor*, 145 S. Ct.

23  2332 (2025).  There are no genuine issues of material fact.  The plaintiff parents are not

24  claiming that the Fourteenth Amendment gives them a right to prescribe school

25  curriculum, or force the schools to administer medical care, or disclose student private

---

[10] *See* Order (Sept 14, 2023), Dkt 42 at 14-18.

23-cv-00768-BEN-WVG

1    personal information to unrelated adults.  This Court holds that a parental right to be

2    informed about the gender identity expressed within the schoolhouse gate of one's child

3    lives comfortably within the limits of the Fourteenth Amendment right.

4         There are no genuine issues of material fact.  By their policies of social

5    transitioning and secrecy from parents and by stifling teachers who would voluntarily talk

6    with parents about the incongruent gender expressions of their children at school, the

7    parent plaintiffs have proven that the State Defendants' policies significantly infringe on

8    the federal constitutional right of the parent class members as a matter of law and the

9    parent class members are entitled to a permanent injunction.

10    **B.  Parents' First Amendment Free Exercise Rights** (**Claims 6 & 8**)

11         The subclass of parents (and guardians) of public school children also seek a

12    declaration that the State Defendants privacy policies violate their First Amendment

13    rights to the free exercise of religion and specifically to direct the religious upbringing of

14    their children (Claims 6 & 8).  Applying *Mahmoud v. Taylor,* 145 S. Ct. 2332 (2025)*,* the

15    parents' free exercise claim prevails.

16         The First Amendment to the U.S. Constitution reminds government that "Congress

17    shall make no law respecting an establishment of religion, or prohibiting the free exercise

18    thereof; or abridging the freedom of speech, or of the press; or the right of the people

19    peaceably to assemble, and to petition the Government for a redress of grievances."  U.S.

20    Const. Amend. 1.

21         "We have long recognized the rights of parents to direct 'the religious upbringing'

22    of their children.  And we have held that those rights are violated by government policies

23    that 'substantially interfere with the religious development' of children.  Such

24    interference, we have observed, 'carries with it precisely the kind of objective danger to

25    the free exercise of religion that the First Amendment was designed to prevent."

26    *Mahmoud*, 145 S. Ct. at 2350-51.  Although State Defendants may see it as an

27    unwelcome administrative burden, the Supreme Court reminds us that public school

28    activities that take place inside the schoolhouse gate are not beyond the reach of a

23-cv-00768-BEN-WVG

1  parent's free exercise right.  "And the right to free exercise, like other First Amendment

2  rights, is not 'shed . . . at the schoolhouse gate.'"  *Id.* at 2350 (quoting *Tinker v. Des*

3  *Moines Independent Community School Dist.*, 393 U. S. 503, 506-507 (1969)).

4  The plaintiff parents here sincerely hold religious beliefs like the plaintiffs in

5  *Mahmoud.*  In *Mahmoud*, the parents "believe[d] they have a 'sacred obligation' or 'God-

6  given responsibility' to raise their children in a way that is consistent with their religious

7  beliefs and practices."  *Id.* at 2351.  The same is true of the parent plaintiffs in this case.[11]

8  "As devout Catholics, my husband and I believe that there are only two genders—male

9  and female—and that God made every person as either male or female.  We accept the

10  Church's teaching that nobody can be born in the wrong body, that nobody can change

11  their sex, and that efforts to do so are both sinful and harmful."  Decl of Jane Poe, Dkt

12  247-6, at ¶4; Decl. of John Poe, Dkt 247-7, at ¶4.  "As the leaders of a devout Catholic

13  family, my husband and I believe the Catholic Church's teaching that there are only two

14  sexes, male and female, that each one of us was made as male or female by God for a

15  reason, and that one's sex cannot be changed.  We also believe that as parents we have a

16  special duty to protect our children and raise them according to our faith tradition."  Decl

17  of Jane Doe, Dkt 247-8, at ¶3.  "My daughter, Child Doe, attends a public high school

18

19

---

20  [11] "Parent Plaintiffs' religious faith teaches them that God immutably created each person

21  as male or female, that these two distinct, complementary sexes reflect the image of God,

22  and that the rejection of one's biological sex is a rejection of the image of God within that

23  person.  Thus, Parent Plaintiffs' religious faith precludes them from adhering to or

24  espousing transgender theory, whether in the form of the traditional, clinical view of

25  transgenderism or the more modern view of gender diversity."  Amended Complaint at

26  ¶442.  "Parent Plaintiffs' religious faith also teaches them that the parent-child

27  relationship was ordained by God and that parents have the ultimate right and

28  responsibility to care for and guide their children.  Thus, they have a religious duty to

   guide their children and to refrain from doing anything that would be harmful to them or

   would create an unreasonable risk of harm to them.  This requires them to be actively

   involved in all significant decision-making by their children, including gender transition."

   Amended Complaint at ¶443.

23-cv-00768-BEN-WVG

1   within Pasadena Unified School District in the County of Los Angeles.  We are a devout

2   Roman Catholic family . . . .  My daughter attends weekly mass with my wife and me."

3   Decl. of John Doe, Dkt 247-9, at ¶2.

4        In *Mahmoud*, as in this case, the parents "believe that biological sex reflects divine

5   creation, that sex and gender are inseparable, and that children should be encouraged to

6   accept their sex and to live accordingly."  145 S. Ct. at 2354.  An assertion of a sincere

7   religious belief is generally accepted in law.  And while religious beliefs need not be

8   acceptable, logical, consistent, or comprehensible to others in order to merit First

9   Amendment protection, in this case the Poes', the Does', and the class of parents' beliefs

10   are logical, consistent, and historical.  *Thomas v. Review Bd.*, 450 U.S. 707, 714, (1981)

11   ("[T]he resolution of [whether a belief is religious] is not to turn upon a judicial

12   perception of the particular belief or practice in question; religious beliefs need not be

13   acceptable, logical, consistent, or comprehensible to others in order to merit First

14   Amendment protection.").  *Mahmoud* explains, "[a] government burdens the religious

15   exercise of parents when it requires them to submit their children to instruction that poses

16   'a very real threat of undermining' the religious beliefs and practices that the parents wish

17   to instill."  145 S. Ct. at 2342 (quoting *Wisconsin v. Yoder*, 406 U. S. 205, 218 (1972)).

18        Parents in *Mahmoud,* and here, face school policies that keep them in the dark

19   about things their schools are doing in conflict with their sincerely-held religious beliefs

20   and which undermine their parental efforts to teach and train their children in their

21   religion.  In *Mahmoud*, the schools rebuffed parental requests to know when transgender

22   books were used in class.  It was a modest request.  The parents did not ask to have the

23   curriculum changed.  They did not ask their school for "assistance" in exercising their

24   rights.  They just wanted notice and the opportunity to opt their children out of the

25   offensive book readings.  As the Supreme Court described it, "[i]t must be emphasized

26   that what the parents seek here is not the right to micromanage the public school

27   curriculum, but rather to have their children opt out of a particular educational

28   requirement that burdens their well-established right 'to direct the religious upbringing of

their children.'" *Id*. at 2363.  Unfortunately, the school district refused to communicate this information to the parents.

### *1. The Poes' Story*

The plaintiff parents in this case face a similar barrier of school silence.  The plaintiff parents here need information too -- about if and when their child announces a new name/pronoun and school staff begins using the change of their child's name/pronoun.  In effect, if not in deed, their California public school concealed from child Poe's parents information about the child Poe's gender expression.  Consider what the Poe family faced:

> [O]n August 29, 2023, my wife and I attended our daughter's middle school's "back-to-school" night.  During that event, we met with several of her teachers in the classroom of her "GATE" teacher.  None of the teachers mentioned to us that she was presenting as a different gender at school or had requested a preferred name and preferred pronouns.  Her "GATE" teacher informed us of our daughter's involvement in the PRISM club, but did not tell us anything about the club (we did not realize it was the gay club) or that our daughter was the President.  To us, the teachers all referred to our daughter by using her legal name and biological pronouns.

Decl of John Poe, Dkt 247-7, at ¶7.  The administrators were not forthright with the Poes about whether the school perpetuated their child's new gender-diverse name.  "Upon learning the school socially transitioned our daughter without our knowledge and consent, my wife and I attended an in-person meeting with the school principal and school psychologist to ask if they were calling our daughter by a different name or using different pronouns.  They said, "no," and indicated their practice of using preferred names was limited to nicknames, such as "Johnny" for the name "John."  However, we learned that this was a lie."  Decl of John Poe, Dkt 247-7, at ¶11.  As months passed, the school continued to stonewall child Poe's parents.

> [I]n January 2024, we repeatedly reached out to our daughter's teachers at the charter school to ask about how she was doing.

23-cv-00768-BEN-WVG

> One of our specific questions was whether our daughter was presenting as male at school. We did not get a response from her teachers. Instead, an administrator from Central Valley Charter Schools sent my wife a lengthy email. In that email, the administrator block-quoted large portions of the CDE's FAQ guidance, and summed up her conclusion with the following statement: "We cannot share the gender identity of the student with the parent even if that gender identity is expressed openly in class."

Decl of John Poe, Dkt 247-7, at ¶16. "Various emails over the next few months confirmed that Yosemite Valley was continuing to use our daughter's preferred male name and pronouns in violation of our instructions and in violation of our religious beliefs." Decl of John Poe, Dkt 247-7, at ¶23.

### 2. The Does' Story

The parents of child Doe have endured a similar experience. "Since the fifth grade, my daughter repeatedly transitioned to and desisted from a male transgender identity, which led me and my wife to request that her school communicate with us forthrightly about her. However, citing to the California Department of Education's FAQ guidance on gender identity, her school repeatedly and directly lied to us and refused to answer our questions." Decl of John Doe, Dkt 247-9, at ¶5.

> To find out more about what was happening on campus, my wife immediately set up parent-teacher conferences with three of our daughter's six teachers. In each conference, my wife repeatedly and conspicuously referred to her as "my daughter" and by her given name. After discussing academics, my wife asked each teacher simply if there was anything about her that the teacher felt was important for us to know—whether socially, emotionally, or for any other reason at all. Although at least two of the teachers seemed distinctly uncomfortable—one by acting defensive and rude, and the other by appearing nervous—every teacher answered, "No."
>
> However, it was clear to us that, at a minimum, some of the teachers were lying. This was clear because one of her teachers' seating charts showed the use of a male name and pronouns for our daughter. Additionally, it was evident from

34

23-cv-00768-BEN-WVG

(59a)

our daughter's emails that she was not using her given name in class.

After these parent-teacher conferences, my wife and I met with the principal in February 2023. We told the principal that we knew that teachers were using a male name for our daughter and that each of them had lied to her about it. The principal denied any knowledge of the social transition and even denied that it was really happening. But, the principal stated if a child asked to be referred to using a new name and pronouns, and to keep this information from parents, "We are instructed to protect the rights of LGBTQ students. We have to do that, it's the law." My wife asked the principal to show her that "law." The principal then navigated on her laptop to the California Department of Education's FAQ page on AB 1266 and gender identity. My wife responded with, "That's not law, that's FAQs on a website," but the principal responded, "Yes it is, and we have to follow that."

Decl of John Poe, Dkt 247-7, at ¶¶26-28.

If a student changes his or her name due to the school's maintenance of a fluid gender identity construct, these parents would find the change odious to their own religious beliefs. Yet, the State Defendants' policies usually prevent teachers and staff from communicating to a parent this important information. Think of it. A baby is born. The parents give the child its legal name – perhaps even in reverence of a hero or heroine of their religion. The child goes to school. The child expresses a newfound desire to be regarded as a different gender with a different name. Unbeknownst to the parents, school teachers start calling on the child by the different name. School administrators keep the child's progress reports under the different name. The different-name reinforcement continues for months, and then semesters, and then years. Meanwhile, the child-with-a-new-name's parents are left in the dark. And if they happen to ask… the request is met with silence or vague references to a meeting with an administrator. Even if the parents somehow do find out and ask the school to discontinue referring to the child's unofficial

1   assumed name, the policies will not permit the school employees to accommodate the

2   parental request.

3       Such state education policies substantially interfere with the First Amendment

4   rights of parents to direct the religious upbringing of their children.  As *Mahmoud*

5   teaches, "government burdens the religious exercise of parents when it requires them to

6   submit their children to instruction that poses 'a very real threat of undermining' the

7   religious beliefs and practices that the parents wish to instill." 145 S. Ct. at 2342.  After

8   all, "[g]overnment schools, like all government institutions, may not place

9   unconstitutional burdens on religious exercise." *Id.* at 2350.

10      Many plaintiff parents have no other choice than to enroll their children in public

11  schools because the scholastic alternatives are costly.  State truancy laws preclude opting

12  out completely.  Consequently, public schools must reasonably attempt to accommodate

13  parents' free exercise rights.  As *Mahmoud* observes, "[i]t is both insulting and legally

14  unsound to tell parents that they must abstain from public education in order to raise their

15  children in their religious faiths, when alternatives can be prohibitively expensive and

16  they already contribute to financing the public schools." *Id.* at 2360.

17      A defense of administrative difficulty is not sufficient.  Parents do not need to

18  know what happens every school day.  But, some sort of regular information may be

19  constitutionally required.  The State Defendants complain that parents are trying to

20  micromanage the school day.  That is not accurate.  However, the State Defendants'

21  policies do impact students every school day.  Every day that a student is addressed by

22  school staff using a gender incongruent name that insults the faith of the student's parents

23  is another day of constitutional injury.

24      Schools may not insulate themselves from legal liability by weaving the free

25  exercise offense into every-day school life.   Like the school under review in *Mahmoud*,

26  California's public school system,

27          may not insulate itself from First Amendment liability by
            'weaving' religiously offensive material throughout its
28

36

Case: 25-8056, 01/13/2026, DktEntry: 15.1, Page 107 of 203

Case 3:23-cv-00768-BEN-VET    Document 307    Filed 12/22/25    PageID.17283    Page
37 of 52

1    curriculum and thereby significantly increase the difficulty and
2    complexity of remedying parents' constitutional injuries. Were
     it otherwise, the State could nullify parents' First Amendment
3    rights simply by saturating public schools' core curricula with
     material that undermines 'family decisions in the area of
4    religious training.' The 'Framers intended' for 'free exercise of
5    religion to flourish.'

6  *Mahmoud,* 145 S. Ct. at 2381 (Thomas, J, concurring) (citations omitted). The *Mahmoud*

7  majority reminds public school administrators that they "cannot escape its obligation to

8  honor parents' free exercise rights by deliberately designing its curriculum to make

9  parental opt outs more cumbersome." *Id*. at 2362-63. Moreover, government cannot be

10  excused based on its desire to welcome and protect transgender students from those who

11  believe gender is fixed. A public school, "cannot purport to rescue one group of students

12  from stigma and isolation by stigmatizing and isolating another," based on *Mahmoud*. *Id*.

13  at 2363. "A classroom environment that is welcoming to all students is something to be

14  commended, but such an environment cannot be achieved through hostility toward the

15  religious beliefs of students and their parents." *Id*. at 2363.

16      Previously, this Court applied standard free exercise analysis to similar gender-

17  secrecy polices adopted by the Escondido Union School District and concluded that strict

18  scrutiny applied and the policies failed strict scrutiny. The same analysis would yield the

19  same outcome today concerning the parents free exercise claim against the State

20  Defendants' policies. But that analysis may be bypassed when the burden is of the same

21  character as was the burden in *Yoder*. Here, compared to the religious burden in

22  *Mahmoud*, the California policies impose a similar, if not greater, burden on free exercise

23  rights.

24      Consequently, *Mahmoud* leads the way by skipping the ordinary two-step inquiry

25  and moving directly to the application of strict scrutiny. "Thus, when a law imposes a

26  burden of the same character as that in *Yoder*, strict scrutiny is appropriate regardless of

27  whether the law is neutral or generally applicable." *Id*. and n.14. To survive strict

28

1    scrutiny, a state must demonstrate that its policy *both* advances interests of the highest

2    order and is narrowly tailored.  *Id.* (citing *Fulton v. Philadelphia*, 593 U. S. 522, 541

3    (2021)).

4          The State Defendants argue that *Mahmoud* does not apply.  They argue that a

5    parent "does not possess a religious exercise right to dictate that a school reject their

6    child's gender identity."  State Defendants Oppo. at 16.  They argue that Plaintiffs "lack

7    an underlying constitutional basis for altering any school policy respecting the gender

8    identities of students."  *Id.*  They argue that "there is no constitutional need for

9    notification when their child comes within the scope of such policy."  *Id.*  Nevertheless,

10   this Court disagrees.

11                        3. ***Not Interests of the Highest Order***

12         For the State Defendants' policies to survive strict scrutiny, they must first advance

13   an interest of the highest order.  The State Defendants identify a general interest in

14   providing a "safe" learning environment, but the interest is too broadly stated.  Overly

15   broad formulations of compelling government interests are insufficient.  *See Green v.*

16   *Miss United States of Am., LLC*, 52 F.4th 773, 791-92 (9th Cir. 2022) (citation omitted)

17   (identifying the issue as "not whether [the government] has a compelling interest in

18   enforcing its non-discrimination policies generally, but whether it has such an interest in

19   denying an exception to [plaintiff].").  They describe an interest in safeguarding a minor

20   school student's individual's privacy.  Their reasoning here, however, is something of a

21   tautology when they say, "California maintains a strong interest in safeguarding the

22   individual's privacy precisely because there is no compelling safety rationale for

23   overriding that constitutional right."  State Defendants Oppo. at 22.[12]  More importantly,

24

25   [12]    The State Defendants also argue in vague terms that, "[c]ommon sense dictates,

26   thankfully, that the instances in which a student's circumstances will reflect a compelling

27   health or safety need for nonconsensual disclosure will be rare.  Though instances of
     bullying, depression, and even suicidal ideation in California's transgender student

28   population have been documented, there is nothing before the Court demonstrating that a

1  in articulating their interest the State Defendants completely ignore the fact that parents

2  of students possess a free exercise right to direct a child's religious teaching.

3       The most articulate statement of the government's interest is found at page twenty-

4  five of its brief: "The State has a legitimate, and even compelling, interest in protecting

5  transgender and gender-nonconforming students from bullying and harassment, and in

6  fostering a safe and supportive school environment where students can learn without fear

7  of being outed to their parents before they are ready.  This includes an interest in

8  protecting these students from the harms, such as a heightened risk of suicide, that can

9  result when school staff 'forcibly out' students without their consent and before they are

10  ready." State Defendants Oppo., at 25 (citing Al-Shamma MSJ Decl. at ¶¶25, 31-34).

11  The weakness of this articulation of the government interest is that the notion of a

12  learning environment where students are insulated from their parents' discovery of a non-

13  conforming gender identity is somehow better for a child, is yet to be proven.

14       Ironically, it is often other student peers and school staff that are not supportive,

15  according to the State Defendants' expert Al-Shamma.  Decl .of Al-Shamma, Dkt 256-4,

16  at ¶25 ("Even in the best-case scenarios when a youth comes out to their family as

17  transgender or nonbinary and their family is loving and accepting, the life of a

18  transgender youth is often very difficult.  The harassment and bullying they receive at

19  school from peers and even at times from staff can be incredibly harmful.").

20       The State Defendants also identify what they describe as "a compelling

21  governmental interest in protecting students' privacy as to their bodily autonomy, even

22  with respect to their parents."  State Defendants Oppo., at 25 (citations omitted).  Yet, the

23  State Defendants do not offer to explain how the stated government interest is furthered

24

25  _____

26  compelling need for disclosure that overrides a transgender student's fundamental
   autonomy right to privacy is or will be a common occurrence.  But that is not the case
27  with Plaintiffs' expansive request for a religious exemption to state privacy rights."  State
   Defendants Oppo. at 23.
28

1  by their parental exclusion policies; the policies address gender identity rather than bodily

2  autonomy.

3      Certainly, the State Defendants have a compelling interest in providing a safe

4  learning environment.  It is a legitimate purpose for schools to try to protect student

5  safety and well-being, and even to try to eliminate discrimination on the basis of sex or

6  transgender status.  *Parents for Privacy v. Barr*, 949 F.3d 1210, 1238 (9th Cir. 2020).

7  For example, in approving a prohibition on child pornography, the Supreme Court noted

8  that, "[i]t is evident beyond the need for elaboration that a State's interest in

9  'safeguarding the physical and psychological well-being of a minor' is 'compelling.'"

10  *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) ("The prevention of sexual exploitation

11  and abuse of children constitutes a government objective of surpassing importance.").

12      Nevertheless, the State Defendants have not made the case that non-disclosure of a

13  child's gender identity to the child's parents is a state interest of the highest order.  Nor is

14  there binding precedent.  The medical experts agree that parental support is necessary for

15  the best outcomes and constitutional principles rest on the premise that parents attempt to

16  act in the best interests of their child.

17                4. ***Not narrowly tailored***

18      Even assuming, for the sake of argument, that the State Defendants identified an

19  interest of the highest order in the form of the parental exclusion policies, the policies

20  remain constitutionally defective because they are not narrowly tailored.  The State

21  Defendants concede that parents "may find notification that their child is expressing a

22  transgender identity at school helpful in the general exercise of their right to direct a

23  religious upbringing for that child." *Id*.  So, the State Defendants are aware that

24  notification would be *helpful* to religious parents, but provide no room for those parents'

25  to exercise those federal constitutional rights.  Just like in the case in *Mahmoud*, the

26  California state education parental exclusion policies provide no exceptions for religious

27  parents.

28

23-cv-00768-BEN-WVG

## 5. *Tailoring Twice Declined*

At the hearing, the Court proposed two methods to more narrowly tailor the gender parental exclusion policies. The first method is currently in use at Escondido Union School District (as a result of this Court's preliminary injunction). There, if a child wants to use a different name or pronouns, the school says, "we understand," but explains that it will have to talk to the child's parents. If the child objects to informing his or her parents, then the school responds that it cannot respect the request. Hearing Transcript (Nov. 24, 2025), Dkt. 303 at 89-90. When asked if the state policies could offer that form of tailoring, the deputy attorney general representing the State Defendants declined to take a position.

The second method of tailoring this Court proposed is an annual school district questionnaire. The questionnaire would ask parents *if they want to be informed* in the event their child is observed to be experiencing gender incongruity or asking to go by a new name. If the parents said "yes," then the school would inform the parents during the year. If the parents said "no," then the school would not inform the parents during the year. The deputy attorney general suggested such a policy would violate privacy protections for students. Hearing Transcript (Nov. 24, 2025), Dkt. 303 at 92-93.

In other words, the State Defendants gender secrecy policies do not attempt in any way to tailor policies so as to respect the free exercise rights of parents. They do not provide for an opt-out from school recognition and propagation of gender incongruent names. They do not provide notice to parents who need or ask for notice. They do not even acknowledge a parent's constitutional right to direct their child's religious upbringing. *Mahmoud* rejected such a vision of the power of the state to strip away the critical right of parents to guide the religious development of their children, calling it "chilling." *Mahmoud*, 145 S. Ct. at 2358.

The State Defendants have articulated an overly broad state interest. The State Defendants have not demonstrated a narrowly tailored policy. A blanket prohibition on accurate communications, in all instances, with all parents, regarding all public school

41

23-cv-00768-BEN-WVG

1 students, does not fit the notion of narrow tailoring.  As such, the State Defendants'

2 parental exclusion policies fail the narrow tailoring prong of the strict scrutiny test.

3   In the end, the plaintiff class of parents face an unlawful choice along the lines of

4 "lose your faith and keep your child in public school, or keep your faith but lose public

5 schooling."  *Mahmoud*, 145 S. Ct. at 2359 (when the government chooses to provide

6 public benefits, it may not condition the availability of those benefits upon a recipient's

7 willingness to surrender his religion).  "Respect for religious expressions is indispensable

8 to life in a free and diverse Republic."  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507,

9 543 (2022).

10   The only meaningful justification the State Defendants offer for their insistence

11 that the plaintiffs have no choice in the matter about their own children rests on a

12 mistaken view that the State Defendants bear a duty to place a child's right to privacy

13 above, and in derogation of, the rights of a child's parents.  The Supremacy Clause of the

14 federal Constitution does not sanction that kind of rights misbalancing imposed by a

15 state.  The plaintiffs have proven the merits of their free exercise claim, as a matter of

16 law.  Because there are no genuine issues of material fact, they are entitled to judgment as

17 a matter of law and a permanent injunction.

18   C. **Teachers' First Amendment Free Exercise Rights (Claims 2 & 3)**

19   The subclass of public school teachers seek a declaration that the state parental

20 exclusion policies violate their own First Amendment rights to the free exercise of

21 religion.  The teachers seek to enjoin the state policies which prevent them from

22 communicating accurately with the parents of their gender-nonconforming students.

23 (Claims 2 & 3).

24   At the outset of this case, two public school teachers who sincerely hold religious

25 beliefs sought protection for their First Amendment Free Exercise rights.  At that time,

26 the State Defendants' parent exclusion policies had been adopted by its local educational

27 agency, the Escondido Union School District.  The teacher plaintiffs were severely

28 burdened by the policies that required teachers to deceive parents concerning gender-

1  nonconforming students under their tutelage.  The local school district threatened adverse

2  employment action.

3        Since then, two additional public school teachers have joined as plaintiffs (both

4  proceeding under pseudonyms for fear of reprisals at their schools).  These teachers also

5  sincerely hold religious beliefs that are severely burdened by being forced to stand mute

6  or deceive the parents about gender non-conforming students in their classrooms.  For

7  these teachers, as is likely the case state-wide, the local school communicated a "no-

8  exceptions" stance due to n the mandatory nature of the State Defendants' policies.

9                    1. *Jane Roe's Story*

10       One teacher, Jane Roe, says that she is a devout Christian.  She explains, "As a

11  Christian, I believe that God made man and woman in his image, specifically male and

12  female.  I believe that it is impossible to change our sex and that our sex was given to us

13  by God for a reason.  I also believe that we are fearfully and wonderfully made, and God

14  doesn't make mistakes."  Decl of Roe, Dkt 247-5, at ¶4-5.  Roe continues,  "Because of

15  this I believe it would violate my religious beliefs to mislead a parent about his or her

16  child's gender transition at school.  I understand that California requires me and all other

17  school staff to accept a student's statement of their gender identity and immediately begin

18  treating them as a member of the opposite-sex, regardless of whether their parents

19  consent or even know.  And, if the child tells me that he does not want his parents to

20  know about this, then I must keep it from them.  As a requirement for employment by the

21  California school system, this is a severe burden on my religious beliefs."  Decl of Roe,

22  Dkt 247-5, at ¶7.

23       This is not a hypothetical burden.  "I had two transgender students in my classes

24  during the 2024-2025 school year," relates Roe.  "Additionally, there were two

25  transgender students in my classes during the 2023-2024 school year, and a larger cohort

26  of approximately six the year before 2022-2023 school year.  This has created a lot of

27  stress for me because I would normally be very open and communicative with their

28  parents, sending instant messages whenever I see anything off with their child."  *Id.* at

                                    43

1   ¶12.  Roe declares that it is "my understanding that no one has been granted a religious

2   accommodation exempting them from these policies.  Instead, I have witnessed first-hand

3   the retaliation and harassment against my colleague and friend, Elizabeth Mirabelli." *Id.*

4   at ¶19.  "Administrators made it clear to me," reports Roe, "that failing to adhere to the

5   policy would result in termination." *Id.*  Roe has witnessed negative repercussions

6   suffered by others.  "I am proceeding anonymously in this case to avoid any personal

7   retaliation at work.  I understand that Elizabeth Mirabelli and Lori Ann West were on

8   administrative leave for much of 2023, and were both essentially run out of school." *Id.*

9   at ¶22.

10           2.  ***Jane Boe's Story***

11      Plaintiff teacher Jane Boe describes a similar employment experience.  She

12   describes herself as a devout Christian.  Decl of Boe, Dkt 247-4, at ¶3.  Boe states, "I

13   believe that God made man and woman in his image, both male and female.  I believe

14   that it is impossible to change our sex and that our sex was given to us by God for a

15   reason.  I also believe that Scripture teaches that parents have a moral responsibility to

16   guide their children and that children have a moral responsibility to obey their parents.

17   This is a sacred relationship that it is immoral for me to interfere with." *Id.* at ¶4-5.  Boe

18   explains, "I believe it would violate my religious beliefs to deceive parents about their

19   child's gender transition at school." *Id.* at ¶7.

20      When she sought to discuss the burden placed on her with a school administrator

21   she was rebuked.  Boe recounts, "I approached the Assistant Principal to explain my

22   issues with the policy—that I had sincerely held religious convictions that prevented me

23   from complying.  In response, the Assistant Principal stated, 'If you're not able to follow

24   this policy, you may have to find a different job.'  I was shocked and extremely distressed

25   by his comment and perceived it as a threat." *Id.* at ¶9.  According to Boe, little has

26   changed since the entry of the preliminary injunction.  Boe says, "While I understand that

27   the CDE has removed the legal advisory and FAQ page from their website, I also

28   understand that the CDE continues to assert that they accurately described the law that

1  school districts must follow. I also understand that EUSD has tried to change its policies

2  to come into compliance with this Court's understanding of the law, but that the State has

3  taken the position that EUSD's new policies are illegal. So I still feel bound by the

4  training and instruction I received from school leadership, and under threat to abide by

5  these policies or 'find a different job.'" *Id*. at ¶16.

6      California public schools may be gun-free zones, but they are not First

7  Amendment-free zones. "To hold differently would be to treat religious expression as

8  second-class speech and eviscerate this Court's repeated promise that teachers do not

9  "shed their constitutional rights to freedom of speech or expression at the schoolhouse

10 gate." *Kennedy v. Bremerton*, 597 U.S. 507, 531 (2024) (quoting *Tinker*, 393 U. S., at

11 506).

12      The four teacher Plaintiffs and class representatives sincerely hold religious beliefs

13 that that are being severely burdened by the imposition of the parental exclusion policies.

14 Their sincerity is undisputed. Compelling teacher Plaintiffs to observe the State's

15 parental exclusion policies or leave their employment in any of the California Department

16 of Educations's local educational agencies and school districts works a substantial burden

17 on the teacher plaintiffs' First Amendment rights to free exercise. As the policies remain

18 the same and the State Defendants intend to continue enforcement of the policies in their

19 local schools, the same legal analysis used for the preliminary injunction of Escondido

20 Union School District's local policy applies here -- which yields the same conclusion.

21 The antithetical policies severely burden the free exercise rights of teachers with religious

22 convictions, the policies are neither generally applicable[13] nor narrowly tailored. The

23

24

_____

25 [13] Under the policies, informing parents about a student's gender incongruity (without the
consent of the student) is deemed unlawful discrimination or harassment when
26 administrators decide that the parent lacks a legitimate need for the information. There
are no standards written in the policies for determining when a parent has a "legitimate
27 need" of the information, only that it requires a case-by-case decision by administrators.
28 This means whether disciplinary action is taken against a teacher who informs a parent

23-cv-00768-BEN-WVG

1  policies burden a great deal more than is necessary for any compelling interest the State

2  Defendants have.[14]  "If you're not able to follow this policy, you may have to find a

3  different job," is not an example of a narrowly tailored infringement on a core federal

4  constitutional right.

5       The State Defendants are aware that the free exercise burden on its teaching staff is

6  widely felt.  "These statistics paint a clear picture.  A religious-exercise exemption that

7  allows California school staff to disclose a student's gender identity without their consent

8

9  _____

10  depends on an undefined *ad hoc* determination.  This is the very definition of a
   discretionary exemption.  "A law is not generally applicable if it 'invite[s]' the

11  government to consider the particular reasons for a person's conduct by providing 'a
   mechanism for individualized exemptions.'"  *Fulton v. City of Philadelphia*, 593 U.S.

12  522, 533 (2021).  Under the *Fulton* framework, a law is not generally applicable "if it

13  invites the government to consider the particular reasons for a person's conduct by
   providing a mechanism for individualized exemptions."  *Fellowship of Christian*

14  *Athletes v. San Jose Unified Sch. Dist. Bd. Of Educ.*, 82 F.4th 664, 687 (9th Cir. 2023) (*en*

15  *banc*) (quoting *Fulton*).  The authority to find or not find that a parent has a good enough
   need to know about their child's gender incongruity is retained by the State Defendants

16  local educational agency administrators.  The retention of this authority to decide when a

17  teacher may properly inform a parent creates a not-generally applicable policy.  That, in
   turn, means it must satisfy strict constitutional scrutiny.  "This authority 'to decide which

18  reasons for not complying with the policy are worthy of solicitude' on an ad hoc basis

19  renders the policy not 'generally applicable' and requires the application of strict

20  scrutiny."  *Id*. at 687 (citing *Fulton*).

21  [14] The State Defendants have no compelling interest in creating safe and inclusive

22  campuses through deceiving parents about their children because "there is a
   presumption that fit parents act in the best interests of their children."  *Troxel v.*

23  *Granville*, 530 U.S. 57, 68 (2000).  Moreover, the State Defendants have no compelling
   interest in enforcing their parental exclusion policies against teachers to comply with

24  California or federal law because their policies are not required by California or federal

25  law, or—if required by California law—must yield to federal constitutional law.

26       "While inclusiveness is a worthy pursuit, it does not justify uncertain exemptions or
   exceptions from the broad non-discrimination policies, which undermine their neutrality

27  and general applicability and burden Free Exercise."  *Fellowship of Christian Athlete v.*

28  *San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 687 (9th Cir. 2023).

23-cv-00768-BEN-WVG

1 will be utilized by thousands and thousands of employees." State Defendants Oppo, Dkt
2 247, at 23-24. Although aware of the burden on free exercise rights, the State Defendants
3 offer no exemptions or other attempts at narrow tailoring. Instead, they say in essence
4 narrow tailoring is too cumbersome.

5       However, this is a problem of the State Defendants' own making. It is not a
6 defense justifying broad-based trenching on individual rights. When the State drops an
7 elephant in the middle of its classrooms, it is not a defense to say that the elephants are
8 too heavy to move. The school district defendant in *Mahmoud* made a similar argument
9 that *if* it granted opt-outs from the LGBTQ+-inclusive storybooks, it would be too
10 cumbersome and unworkable because the number of absent students would be
11 unsustainably high. The *Mohmoud* court brushed the argument away because the
12 school's concern was self-inflicted. 145 S. Ct. at 2362-63. Justice Thomas explains,
13 "[t]he [school] Board may not insulate itself from First Amendment liability by
14 'weaving' religiously offensive material throughout its curriculum and thereby
15 significantly increase the difficulty and complexity of remedying parent's constitutional
16 injuries." Id. at 2381 (Thomas, J., concurring).

17       In the end, under the State Defendants parental exclusion policies and anti-
18 discrimination laws, the subclass of religious teachers face an unlawful choice between
19 sacrificing their faith and sacrificing their teaching position. *Cf. Keene v. City & Cnty. of*
20 *San Francisco*, 2023 U.S. App. LEXIS 11807, *6 (9th Cir. May 15, 2023) (mem. disp.)
21 ("lose your faith and keep your job, or keep your faith and lose your job."). The only
22 meaningful justification the State Defendants offer for its policies' insistence -- that the
23 plaintiffs not reveal to parents gender information about their own children -- rests on a
24 mistaken view that the State's public schools hold a duty to place a child's right to
25 privacy above and in derogation of the rights of parents. As mentioned previously, the
26 Supremacy Clause of the U.S. Constitution requires the opposite. *Martin v. United*
27 *States*, 605 U.S 395, 409 (2025) ("[W]hen a regulated party cannot comply with both

28

23-cv-00768-BEN-WVG

1  federal and state directives, the Supremacy Clause tells us the state law must yield.")

2  (citation omitted).

3       The teacher plaintiffs have proven the merits of their free exercise claim and are

4  entitled as a matter of law to a declaration and a permanent injunction.

5              D.  **Teachers' First Amendment Free Speech Rights (Claim 1)**

6       The subclass of public school teachers also seek a declaration that the state privacy

7  policies violate their First Amendment rights to free speech (Claim 1).  The State

8  Defendants contend that teachers are hired to deliver government-approved curricular

9  speech.  Communicating with parents about student school progress is part of that speech

10 for which they are hired.  The plaintiffs' argument that teachers may speak freely

11 whatever is on their own mind on matters of curricular speech is foreclosed by *Johnson v.*

12 *Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011).  There, the Ninth Circuit

13 "recognize[d] that 'expression is a teacher's stock in trade, the commodity she sells to her

14 employer in exchange for a salary.'"  *Id.* at 967.  "Certainly, Johnson did not act as a

15 citizen when he went to school and taught class, took attendance, supervised students, or

16 regulated their comings-and-goings; he acted as a teacher—a government employee,"

17 according to *Johnson. Id.  Johnson* concluded, "[a]ll the speech of which Johnson

18 complains belongs to the government, and the government has the right to 'speak for

19 itself.'  When it does, 'it is entitled to say what it wishes,' 'and to select the views that it

20 wants to express.'"  *Id.* at 975.

21      Here, like *Johnson,* the teacher plaintiffs are public school government teachers.

22 Teaching, taking attendance, supervising students, and regulating their comings-and-

23 goings are activities that are part of their employee duties.  Included among their duties as

24 teachers is the duty to communicate with a student's parents from time to time about the

25 student's school performance.  It is difficult to say that their classroom speech during the

26 school day as teachers is their own, rather than the school district's.  Consequently, at

27 least where the teachers' compelled speech takes place during the school day on

28

1  curricular matters, *Johnson* forecloses a generic freedom of speech claim.  But while this
2  is generally true, the drawing of lines in this case requires more nuance.

3       The defense position is that everything a teacher speaks while on the job is subject
4  to that which the government decides should be spoken.  Yet, teachers retain at least
5  some speech of their own inside the schoolhouse gate.  After all, "[i]t has long been
6  established that *teachers* and students have First Amendment rights."  *Eagle Point Educ.*
7  *Ass'n/SOBC/OEA v. Jackson Cty. Sch. Dist. No. 9*, 880 F.3d 1097, 1105 (9th Cir. 2018)
8  (emphasis added).  Consequently, the State Defendants are correct that the current state
9  of constitutional law holds that "if the speech in question is part of an employee's official
10 duties, the employer may insist that the employee deliver any lawful message." *Janus v.*
11 *AFSCME, Council 31*, 585 U.S. 878, 908 (2018) (citing *Garcetti*, 547 U. S., at 421-422,
12 425-426).  At the same time, the Supreme Court has said, "however, it is not easy to
13 imagine a situation in which a public employer has a legitimate need to demand that its
14 employees recite words with which they disagree." *Janus,* 585 U.S. at 908.

15      The case presented here lies somewhere between the two extremes.  The teacher
16 plaintiffs have a direct disagreement with the parental exclusion policy that they may not
17 inform a student's parent about the student's expressions of gender incongruity, absent
18 consent from the student.  The problem is that when a parent asks directly, the teachers
19 are compelled to avoid answering.  Purposeful avoidance, or worse, purposeful deception
20 by a teacher or staff member, directly undermines a parent's Fourteenth Amendment
21 right to care for their child in every case and may undermine a religious parent's First
22 Amendment right to direct their child's religious upbringing.

23      The teachers successfully make out a First Amendment freedom of speech claim
24 when they are compelled to speak in violation of the law or to deliberately convey an
25 illegal message.  In this case, because the State Defendants' parental exclusion policies
26 (like Escondido's AR 5145.3) demand that teachers communicate misrepresentations or
27 deceptively avoidant responses to parental questions, which, in turn, violate the

28

23-cv-00768-BEN-WVG

1  constitutional rights of parents, this type of government speech may not be forced upon
2  teachers who conscientiously disagree.

3  **V.  ARTICLE III STANDING**

4  The State Defendants assert that neither the parents nor the teachers enjoy Article
5  III standing.  This Court disagrees as it explained in its earlier Order.  *See* Order (dated
6  January 7, 2025), Dkt 194.  In opposition to the motion for summary judgment, the State
7  Defendants re-urge the same arguments.  However, the more recent arguments have been
8  drained of any new vigor by virtue of the State Defendants withdrawing their mootness
9  claims.  *See* Notice of Withdrawal of Mootness Argument Pertaining to Plaintiffs' Motion
10 for Summary Judgment (Nov. 14, 2025), Dkt. 298.

11 **VI.  MOOTNESS**

12 The State Defendants initially argued that the parental exclusion policies had been
13 withdrawn and were (by implication) no longer in effect.  The State Defendants have now
14 withdrawn this argument in view of the California Department of Education's newly
15 distributed PRISM "cultural competency training" required of teachers and certificated
16 staff in 7th through 12th grades mandated by California Education Code §218.3(c).  *Id;*
17 *see also* Order (dated Apr. 10, 2025), Dkt. 236.

18 **VII.  PERMANENT INJUNCTION**

19 "According to well-established principles of equity, a plaintiff seeking a permanent
20 injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff
21 must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies
22 available at law, such as monetary damages, are inadequate to compensate for that injury;
23 (3) that, considering the balance of hardships between the plaintiff and defendant, a
24 remedy in equity is warranted; and (4) that the public interest would not be disserved by a
25 permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).
26 For elements (3) and (4), "[w]hen the government is a party, the balance of equities and
27 public interest factors merge."  *Galvez v. Jaddou,* 52 F.4th 821, 831 (9th Cir. 2022) (citing
28 *Nken v. Holder,* 556 U.S. 418, 435 (2009)).

23-cv-00768-BEN-WVG

1    All four factors are satisfied in this case.  The parent plaintiffs have succeeded on

2  the merits of their motion for summary judgment on their Substantive Due Process and

3  Free Exercise Clause claims and therefore satisfy the four-factor test entitling them to

4  permanent injunctive relief on this claim.  This is also true for the teacher plaintiffs in

5  regards to their First Amendment Free Exercise and Free Speech claims.

6    First, both the parents and teachers have established irreparable injury by showing

7  the State Defendants are violating their rights.  "The loss of First Amendment freedoms,

8  for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v.*

9  *Burns*, 427 U.S. 347, 373 (1976).  Second, the only relief plaintiffs request that is

10  available against the State Defendants and appropriate for these unconstitutional

11  violations is injunctive relief.  Third, the balance of hardships between the plaintiff class

12  of parents and teachers versus the State Defendants warrants injunctive relief.  The First

13  and Fourteenth Amendment rights are core constitutional rights.  The state's competing

14  interests are less substantial and light in comparison and must yield. The fourth factor, the

15  public interest, would not be disserved by a permanent injunction.  As noted above, this

16  element merges with the third when the government is a party.  Together, "it is always in

17  the public interest to prevent the violation of a party's constitutional rights." *Am.*

18  *Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019);

19  *Foothill Church v. Watanabe*, 654 F. Supp. 3d 1054, 1058-59 (E.D. Cal. 2023).

20    **VIII.  CONCLUSION**

21    Parental involvement in essential to the healthy maturation of schoolchildren.

22  California's public school system parental exclusion policies place a communication

23  barrier between parents and teachers.  Some parents who do not want such barriers may

24  have the wherewithal to place their children in private schools or homeschool, or to move

25  to a different public school district.  Families in middle or lower socio-economic

26  circumstances have no such options.  For these parents, the new policy appears to

27  undermine their own constitutional rights while it conflicts with knowledgeable medical

28  opinion.  The State Defendants are, in essence, asking this Court to limit, and restrict a

1  common-sense and legally sound description by the United States Supreme Court of
2  parental rights.  That, this Court will not do.

3      Although, as stated previously, the State's desire to protect vulnerable children
4  from harassment and discrimination is laudable, the parental exclusion policies create a
5  trifecta of harm: they harm the child who needs parental guidance and possibly mental
6  health intervention to determine if the incongruence is organic or whether it is the result
7  of bullying, peer pressure, or a fleeting impulse.  They harm the parents by depriving
8  them of the long-recognized Fourteenth Amendment right to care, guide, and make health
9  care decisions for their children, and by substantially burdening many parents' First
10 Amendment right to train their children in their sincerely held religious beliefs  And
11 finally, they harm teachers who are compelled to violate the sincerely held beliefs and the
12 parent's rights by forcing them to conceal information they feel is critical for the welfare
13 of their students.

14     A permanent injunction against announcing, repeating, or enforcing the parental
15 exclusion policies will issue in a separate Order.

18  Dated:  December 22, 2025

19                                  ROGER T. BENITEZ
                                   UNITED STATES DISTRICT JUDGE

52

23-cv-00768-BEN-WVG

(77a)

1

2

3

4              UNITED STATES DISTRICT COURT

5              SOUTHERN DISTRICT OF CALIFORNIA

6

7  ELIZABETH MIRABELLI, and LORI          Case No.:  3:23-cv-768-BEN-WVG
   ANN WEST, individually and on behalf
8  of herself and all others similarly situated,
   et al.,
9
10              Plaintiffs,
                                            **ORDER GRANTING CLASS
11 v.                                       CERTIFICATION**

12 MARK OLSON, in his official capacity as
   President of the EUSD Board of
13 Education, et al.,                       **[Dkt. 244]**

14              Defendants.

15

16       Plaintiffs seek to certify this civil rights action as a class action under Federal Rule

17 of Civil Procedure 23(b)(2) and (b)(1)(A).  They seek certification of a plaintiff class

18 with four subclasses and to appoint the plaintiffs as class representatives and counsel as

19 counsel for the class.  The Defendants oppose class certification focusing on factual

20 differences among the putative class members and policy variations among the state

21 public school system's many local arms.  The motion is granted.

22       While business litigation has been the main domain for class actions over the past

23 several decades, the Rule 23(b)(2) type of class action was specifically designed for civil

24 rights cases.  *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) ("[T]he claims raised

25 by the plaintiffs in this action are precisely the sorts of claims that Rule 23(b)(2) was

26 designed to facilitate. . . . 23(b)(2) was adopted in order to permit the prosecution of civil

27 rights actions.").  "As Wright and Miller have explained:

28

                                          1

> 'Subdivision (b)(2) was added to Rule 23 in 1966 in part to make it clear that civil-rights suits for injunctive or declaratory relief can be brought as class actions ... [T]he class suit is a uniquely appropriate procedure in civil-rights cases . . . .  By their very nature, civil-rights class actions almost invariably involve a plaintiff class . . . .'

*Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014) (quoting Wright & Miller, 7AA *Fed. Prac. & Proc. Civ.* § 1776 (3d ed.)).   As the court in *Parsons* observed, "[a]lthough we have certified many different kinds of Rule 23(b)(2) classes, the primary role of this provision has always been the certification of civil rights class actions."  754 F.3d at 686 (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).

There are four requirements.  "'Under Rule 23, a class action may be maintained if the four prerequisites of Rule 23(a) are met, and the action meets one of the three kinds of actions listed in Rule 23(b).'"  *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1191–92 (9th Cir. 2024) (citation omitted).   The four threshold requirements are:

(1) numerosity—the class is so large that joinder of all members is impracticable;

(2) commonality—one or more questions of law or fact is common to the class;

(3) typicality—the named parties' claims are typical of the class; and

(4) adequate representation—the class representatives will fairly and adequately protect the interests of other class members.

Fed. R. Civ. P. 23(a).  Once Rule 23(a) is satisfied, a plaintiff class action may be maintained under Rule 23(b)(2) where the defendant "has acted ... on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).   The requirements of Rule 23(b)(2) "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies . . . that are generally applicable to the class as a whole."  *Parsons*, 754 F.3d at 688 (citation omitted).

Plaintiffs seek to represent a class of adults who teach in, or have children in, California public schools and are adversely affected by school system policies that

1  prevent teachers from informing parents about their child's gender identification while at

2  school.  Specifically, Plaintiffs propose a plaintiff class and four permissive subclasses[1]

3  as follows:

> **All individuals who are participating or will
> participate in California's public education system, whether
> as employees or parents/guardians of students, without
> having to subject themselves to Parental Exclusion Policies,
> and**
>
> **(1) Are employees who object to complying with
> Parental Exclusion Policies[2];**
>
> **(2) Are employees who submit a request for a
> religious exemption or opt-out to complying with Parental
> Exclusion Policies[3];**
>
> **(3) Are legal guardians who object to having Parental
> Exclusion Policies applied against them and have children
> who are attending California public schools[4]; or**
>
> **(4) Are legal guardians who submit a request for a
> religious exemption or opt-out to having Parental Exclusion
> Policies applied against them and have children who are
> attending California public schools.[5]**

In the class definition, Plaintiffs use the term "Parental Exclusion Policies" to

mean the policies that exclude parents from being informed about their child's gender

---

[1] A class may be divided into subclasses that are each treated as a class.  *See* Rule
23(c)(5).   Where, as here, subclasses are permissive, they do not need to be separately
evaluated for commonality, numerosity, typicality or adequacy.  *Aldapa v. Fowler
Packing Co., Inc.,* 323 F.R.D. 316, 326 (E.D. Cal. 2018) (citing Rule 23(c)(5)); *Am.
Timber & Trading Co. v. First Nat'l Bank of Oreg*., 690 F.2d 781, 787 n.5 (9th Cir.
1982).  A prospective class representative can represent multiple subclasses.  Subclasses
are appropriate where class members have separate and discrete legal claims which raise
a concern that adjudication of a single class' claims is impractical or undermines
effective representation of the class.
[2] (Claim for Relief #1 [Teacher Free Speech]).
[3] (Claims for Relief #2-3 [Teacher Free Exercise]).
[4] (Claim for Relief #7 [Parent Substantive Due Process]).
[5] Claims for Relief #6, 8 [Parent Free Exercise]).

3

23-cv-00768-BEN-WVG

1    identification or expression which are the "result of the interplay of three aspects of

2    California law: (1) the prohibition on gender identity discrimination, Cal. Educ. Code, §§

3    200, 220; (2) the definition of gender identity as whatever a child claims, regardless of

4    any contrary statement by a parent, Cal. Health & Saf. Code § 1439.50(b); and (3)

5    minors' privacy rights with respect to their gender identity, even as against their parents,

6    Cal. Const. art. I, § 1." *See* Plaintiffs' Renewed Motion for Class Certification, Dkt 244-

7    1 at 5-6.  These policies are evidenced, *inter alia*, by the California Department of

8    Education's former FAQ page and its linked model AR 5145.3, the February 2022 EUSD

9    staff wide training, the Attorney General's "State of Pride" webpage, the Attorney

10   General's "Know Your Rights" webpage, and the California Department of Education's

11   new webpage describing student rights under newly-enacted AB 1955.  *See* Plaintiffs'

12   Memorandum in Support of Plaintiffs' Renewed Motion for Summary Judgment, *et al*,

13   Dkt 247 at 6-10.

14        The State Defendants protest that there is no statewide policy.[6]  However, whether

15   such a policy persists is a question to be decided on the merits in later proceedings, rather

16   than at the class certification stage.  The State Defendants also assert that there are 1,000

17   separate public school districts and each school district sets its own policy.[7]  Yet, the

18   Ninth Circuit has found that the every-school-is-a-policy-island concept is not entirely

19   accurate.  California local school districts are ultimately state agents under state control.

20   *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 933 (9th Cir. 2017) ("We therefore

21   find that . . . AB 97 did not disturb our longstanding precedent that California law treats

22

23

24   _____

24   [6] "Plaintiffs' definition relies wholly on a nonexistent webpage that contained non-
25   binding guidance in a withdrawn FAQ, formerly issued by the California Department of
     Education."  State Defs' Oppo, Dkt 257, at 5.
26   [7] "There are over 1,000 unique school districts in California, each free to establish its
27   own local policy (written or ad hoc) regarding gender-identity disclosure, so long as it
     complies with state and federal law, including Assembly Bill No. 1955."  State Defs'
28   Oppo, Dkt 257, at 5.

23-cv-00768-BEN-WVG

1    public schooling as a statewide or central governmental function. . . . that the state itself

2    has decided to give its local agents more autonomy does not change the fact that the

3    school districts remain state agents under state control.") (citations omitted).  This

4    structure is also recognized by the California Supreme Court.  *Butt v. State of California*,

5    4 Cal. 4th 668, 681 (1992) ("Management and control of the public schools is a matter of

6    state, not local, care and supervision. . . . Local districts are the State's agents for local

7    operation of the common school system and the State's ultimate responsibility for public

8    education cannot be delegated to any other entity.") (citations omitted).  And the State

9    Board of Education "is responsible for approving and overseeing statewide curriculum

10    content, creating the curriculum framework for kindergarten through twelfth grade, and

11    adopting instructional materials for kindergarten through eighth grade."  *Cal. Parents for*

12    *the Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218, 1222 (N.D. Cal.

13    2017).  Thus, while there are many local school districts, they all must march to the beat

14    of the State Defendants' drums.  Consequently, the potential for declaratory or injunctive

15    relief against the State Defendants on matters of statewide policy make the class action

16    structure superior to numerous individual actions by individual parents and teachers.

17        **1.  Numerosity**

18        Numerosity requires a showing that "the class is so numerous that joinder of all

19    members is impracticable."  Fed. R. Civ. P. 23(a)(1).  This requirement is not a fixed

20    numerical threshold.  *General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 330

21    (1980) (numerosity requirement demands examines facts of each case).  "Plaintiffs must

22    show some evidence of or reasonably estimate the number of class members," as opposed

23    to relying on mere speculation, impression, or extrapolation from cursory allegations.

24    *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 681 (S.D. Cal. 1999).  Generally, courts

25    presume numerosity is satisfied when there are forty or more members in the proposed

26    class, *Rannis v. Recchia*, (380 F. App'x 646, 650-51 (9th Cir. 2010)), while a class of

27    fifteen would likely be too small.  *General Tel. Co.*, 446 U.S. at 330 (numerosity has "no

28    absolute limitations").

5

23-cv-00768-BEN-WVG

1    Here, for purposes of estimating the number of class members, Plaintiffs rely on

2    the deposition of Richard Barrera.  Barrera was designated by the California Department

3    of Education as its most knowledgeable person in response to Plaintiffs' deposition

4    subpoena.  Barrera testified that there are approximately 5,837,690 students enrolled in

5    California public schools.  *See* Dkt. 244-1, Ex 1, at 23.  California public school teachers

6    number approximately 319,000.  *Id*.  Plaintiffs also look to polling that suggests large

7    numbers of the parents of California's 5,837,690 public school students hold the opinion

8    that parents should be notified if their child identifies as transgender in school – 72.1%

9    according to a November 2023 poll by the Women's Liberation Front.  *See* Dkt. 244-1,

10   Ex 5.  And 62% of California voters would support a law requiring parents be notified of

11   a child's gender transition, according to a March 2023 Rasmussen poll.  *See* Dkt. 244-1,

12   Ex 4.  Based on the poll numbers, general knowledge, and common sense, it is clear that

13   putative parent class members and teacher class members number in the thousands.

14   Thus, joinder would be impracticable and the numerosity requirement is easily met.  In

15   fact, the State Defendants do not contest the question.  *See* State Defendants' Oppo., Dkt

16   257, at n.1; 7-8 ("These issues are not even contested.").

17       **2.  Commonality**

18       Commonality requires the plaintiffs "to show that there are questions of law or fact

19   common to the class."  *Wal-Mart*, 564 U.S. at 349.  The Supreme Court says that

20   commonality requires the plaintiffs to "demonstrate that the class members have suffered

21   the same injury."  *Id.* at 349-50.  "What matters to class certification is not the raising of

22   common questions ... but rather, the capacity of a class-wide proceeding to generate

23   common answers apt to drive the resolution of the litigation."  *Id*. at 350 (quotations,

24   ellipses omitted).  The plaintiffs' claims must "depend upon a common contention."

25   *Parsons*, 754 F.3d at 675 (quotation omitted).  The plaintiffs "need not show, however,

26   that every question in the case, or even a preponderance of questions, is capable of class-

27   wide resolution.  So long as there is even a single common question, a would-be class can

28   satisfy the commonality requirement."  *Id*. (quotation omitted); *Mazza v. Am. Honda*

1  *Motor Co., Inc.* 666 F.3d 581, 589 (9th Cir. 2012) (commonality "only requires a single

2  significant question of law or fact.").

3      Here, Plaintiffs ask for a legal declaration that the Parental Exclusion Policies

4  violate the Fourteenth Amendment right of parents to direct the healthcare and

5  upbringing of one's own children and parents' FERPA rights to school records.  They

6  also seek to enjoin the Defendants from continuing to violate their rights or enforcement

7  of the defective policies.  If their requests are meritorious, a ruling would dispose of most

8  of the four subclass claims.  Accordingly, Plaintiffs have provisionally shown

9  commonality.

10     **3.  Typicality**

11     Considerations underlying commonality and typicality often overlap considerably,

12 such that they "tend to merge."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13

13 (1982).  Rule 23(a)(3) provides that one or more class members may sue as a

14 representative of all the members if the representative's claims are typical of the

15 members' claims.  The named representative's claims are typical if they are "reasonably

16 coextensive with those of absent class members."  *Parsons*, 754 F.3d at 685.  The

17 typicality element focuses on the claim rather than the specific facts underlying the claim.

18 *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017).  For Rule 23(b)(2) classes,

19 typicality requires little more than that the main relief sought is declaratory or injunctive.

20 *Does 1-10 v. Univ. of Wash.*, 326 F.R.D. 669, 683 (W.D. Wash. 2018) (citation omitted).

21     Here, the representatives' claims are typical of the class members.  They all seek

22 similar relief from the application and enforcement of the Parent Exclusion Policies

23 against them.  Thus, the typicality requirement is met.

24     **4.  Adequacy**

25     Rule 23(a)(4) requires that the class representatives "fairly and adequately protect

26 the interests of the class."  This requirement aims to "uncover conflicts of interest

27 between the named parties and the class they seek to represent" and ensure the

28 "competency . . . of class counsel."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-

23-cv-00768-BEN-WVG

1   26 n.20 (1997).  The adequacy test asks two questions: "(1) do the named plaintiffs and

2   their counsel have any conflicts of interest with other class members and (2) will the

3   named plaintiffs and their counsel prosecute the action vigorously on behalf of the

4   class?" *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (quotations and internal

5   citation omitted).  Certification requires only one proper class representative.  *See*

6   *Rodriguez v. West Publ'g Corp*., 563 F.3d 948, 961 (9th Cir. 2009).

7        In appointing counsel for the class, one asks about: (1) "the work counsel has done

8   in identifying or investigating potential claims in the action"; (2) "counsel's experience in

9   handling class actions, other complex litigation, and the types of claims asserted in the

10   action"; (3) "counsel's knowledge of the applicable law"; (4) "the resources that counsel

11   will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  As to class counsel,

12   Plaintiffs' current counsel is certainly adequate for the task and the Defendants do not

13   contest the question.  *See* State Defendants' Oppo., Dkt 257, at n.1; 7-8 ("These issues

14   are not even contested.").

15        Defendants do not directly challenge Plaintiffs as adequate representatives.   Being

16   familiar with the allegations in the Amended Complaint and associated declarations, it is

17   clear that the plaintiff parents and the plaintiff teachers do not have conflicting interests

18   and are adequate to represent the proposed class and subclasses.

19        **5.  Certification**

20        The plaintiffs have affirmatively demonstrated their compliance with Rule 23 by a

21   preponderance of the evidence.  Plaintiffs have proved and not simply pleaded that their

22   proposed class satisfies each requirement of Rule 23(a) and meets the type of action listed

23   in Rule 23(b)(2).  *White v. Symetra Assigned Benefits Serv. Co.,* 104 F.4th 1182, 1191–92

24   (9th Cir. 2024) ("Under Rule 23, a class action may be maintained if the four

25   prerequisites of Rule 23(a) are met, and the action meets one of the three kinds of actions

26   listed in Rule 23(b).").

27        The State Defendants' principal objection is that the proposed class cannot be

28   certified because it lacks "acertainability."  Put differently, the State Defendants assert

23-cv-00768-BEN-WVG

1    that it would be "administratively impractical" to manage such a class. *See e.g.,* State

2    Defs' Oppo., Dkt 257, at 2 ("Because it would be *administratively impractical* for the

3    Court to *ascertain* whether an individual is a member of the Class, the Class should not

4    be certified."); at 7 ("definition must also set forth a class that is *ascertainable*"); at 8

5    ("courts require that a class's membership be readily *ascertainable*"); at 9 ("Courts

6    within the Ninth Circuit have held that putative classes fail to present *ascertainable*

7    membership when …"); at 10 ("class definition must be definite enough so that it is

8    *administratively feasible* for the court to *ascertain* whether an individual is a member");

9    at 11 ("courts have held fast to the *ascertainability* requirement"); at 12 ("This makes the

10   Class fail the *ascertainability* test"); at 13 ("*ascertainability* is necessary for

11   certification"); at 15 ("Plaintiffs propose no method for these determinations to be made,

12   let alone an *administratively feasible* means"); at 17 ("because the Class is not

13   *ascertainable* . . . it also lacks commonality"); at 19 ("because the class is not

14   *ascertainable*, Plaintiffs also lack typicality") (italics added in each excerpt).

15      In essence, the State Defendants argue that there is an ascertainability test.  And the

16   State Defendants argues that if the test is not met then that also undermines findings of

17   class typicality and commonality. *Id*. at 17, 19.  Why the State Defendants would oppose

18   class certification on the basis of an ascertainability requirement is not altogether clear.

19   What is clear is that the Ninth Circuit does not impose an "acertainability" requirement or

20   an "administrative feasibility" requirement for class certification.  *See Briseno v.*

21   *ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).  *Briseno* held that, "[i]n sum, the

22   language of Rule 23 does not impose a freestanding administrative feasibility prerequisite

23   to class certification . . . we decline to interpose an additional hurdle into the class

24   certification process delineated in the enacted Rule." *Id*. at 1126.  "We therefore join the

25   Sixth, Seventh, and Eighth Circuits in declining to adopt an administrative feasibility

26   requirement." *Id.* at 1133.

27      Similarly, regarding the State Defendants' notion that there is some kind of

28   "acertainability" requirement for class certification, *Briseno* has not embraced one. *Id.* at

9

23-cv-00768-BEN-WVG

(86a)

1  1125 & n.4 ("[Defendant] cites no other precedent to support the notion that our court has

2  adopted an 'ascertainability' requirement.  This is not surprising because we have not.");

3  s*ee also, In re Lidoderm Antitrust Litig.*, 2017 U.S. Dist. LEXIS 24097*12 (N.D. Cal.

4  2017) ("As the Ninth Circuit recently explained, acertainability (much less

5  'administrative ascertainability') is not a requirement under Rule 23.") (citing *Briseno*,

6  844 F.3d at 1125).

7      Ascertainability is not required at the certification stage and other judicial

8  management tools are available.  *Briseno*, 844 F.3d at 1129-31 (mentioning tools such as

9  claim administrators, auditing processes, sampling for fraud detection, notice by

10  publication, follow-up notices, *cy pres* awards, etc.).  *Briseno* is binding law in this

11  circuit and *Briseno* holds that "the language of Rule 23 neither provides nor implies that

12  demonstrating an administratively feasible way to identify class members is a

13  prerequisite to class certification," and a district court did not err in declining to require

14  such a condition for certification.  *Id*. at 1133; *see also Walters v. Reno*, 145 F.3d 1032,

15  1047 (9th Cir. 1998) ("We note that with respect to 23(b)(2) in particular, the

16  government's dogged focus on the factual differences among the class members appears

17  to demonstrate a fundamental misunderstanding of the rule.").

18      In the end, after setting aside the acertainability argument that was rejected by

19  *Briseno*,[8] there is every reason to certify Plaintiffs' proposed class to prosecute the

20

21  _____

22  [8] How did the State Defendants find themselves asserting a now-discarded argument?
   Perhaps by looking to a bevy of out-of-circuit cases and decisions pre-dating *Briseno*.

23  *See e.g.,* State Defs' Oppo, Dkt 257, at 7, *Martinez v. Brown*, No. 08-cv-565 BEN
   (CAB), 2011WL 1130458, *24 (S.D. Cal. Mar. 25, 2011) (pre-*Briseno*); at 8-9, *Romberio*

24  *v. Unumprovident Corp*., 385 Fed.Appx. 423, 431–33 (6th Cir. 2009) (out of circuit); at

25  9, *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 934-35 (5th Cir. 2023) (out of circuit);
   at 9, *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (out of circuit); at 9,

26  *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495 (7th Cir. 2012) (out of circuit); at 9,

27  *Crosby v. Soc. Sec. Admin. of U.S*., 796 F.2d 576, 580 (1st Cir. 1986) (out of circuit); at
   9, *Xavier v. Philip Morris USA Inc*., 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) (pre-

28  *Briseno*); at 10, *Chua v. City of Los Angeles*, No. LACV1600237JAKGJSX, 2017 WL

23-cv-00768-BEN-WVG

1    alleged civil rights violations, as Rule 23(b)(2) was designed to do.  *See Parsons*, 754

2    F.3d at 688 (ruling Rule 23(b)(2) requirements "are unquestionably satisfied when

3    members of a putative class seek uniform injunctive or declaratory relief from policies or

4    practices that are generally applicable to the class as a whole").

5          The Court has conducted a rigorous analysis and is satisfied that the Rule 23

6    requirements are met.  *Noohi v. Johnson & Johnson Consumer Inc*., 146 F.4th 854, 862

7    (9th Cir. 2025) ("Before it can certify a class, a district court must conduct a "rigorous

8    analysis" to ensure that the requirements of Federal Rule of Civil Procedure 23 are

9    satisfied.") (citations omitted).  Plaintiffs' claims depend upon a common contention, and

10   the contention is capable of class-wide resolution[9] and that determination will resolve one

11

12

13   10776036  (C.D. Cal. May 25, 2017) (pre-*Briseno*); at 11, *Kosta v. Del Monte Foods,*

14   *Inc*., 308 F.R.D. 217, 223 (N.D. Cal. 2015) (pre-*Briseno*); at 19, *In re Principal U.S.*
     *Prop. Acct. ERISA Litig.*, No. 4:10-CV-00198-JEG, 2013 WL 7218827, at *32 (S.D.

15   Iowa Sept. 30, 2013) (pre-*Briseno*); at 19, *Mckinnon v. Dollar Thrifty Auto. Grp., Inc.*,
     No. 12-CV-04457-YGR, 2016 WL 879784, at *8 (N.D. Cal. Mar. 8, 2016) (pre-*Briseno*);

16   at 20, *Shook v. Bd. of Cnty. Commissioners of Cnty. of El Paso*, 543 F.3d 597, 604 (10th

17   Cir. 2008) (out of circuit); at 20, *Hernandez v. Grisham*, 494 F. Supp. 3d 1044, 1140 (D.
     New Mexico 2020) (out of circuit); at 20, *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832,

18   847 (5th Cir. 2012) (out of circuit); at 21 C.G.B. v. Wolf, 464 F.Supp.3d 174, 206

19   (D.D.C. 2020) (out of circuit).

20         Although the State Defendants do not mention *Briseno* directly, they do
     acknowledge what they call a loosening of the so-called ascertainability requirement in

21   cases such as *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 833 (9th Cir. 2022)

22   (certifying Rule 23(b)(2) class to end systemic discrimination) and *Rodriguez v. Hayes*,
     591 F.3d 1105, 1113 (9th Cir. 2010) (affirming Rule 23(b)(2) certification of class of all

23   detainees held pursuant to three immigration statutes).  State Defs' Oppo, Dkt 257, at 10.

24   [9] Here, the class as a whole seeks resolution of the issue of whether "Parental Exclusion
     Policies" violate parental rights under the Fourteenth Amendment or the Family

25   Educational Rights and Privacy Act (FERPA) or teachers' rights under the First

26   Amendment.  As alleged by the Plaintiffs, "Parental Exclusion Policies" is a term of art
     referring to the argument of both the California Attorney General and CDE that the

27   privacy rights of minor students require schools to deceive parents about their children's

28   gender orientation.  *See* Second Amend. Compl., ¶¶2-5, 22, 256-63, 308-27 (citing Cal.
     Const. art. I, § 1).

23-cv-00768-BEN-WVG

1   or more issues that are central to the validity of each one of the claims in one stroke.[10]

2   Injunctive relief on behalf of the proposed class would achieve systemic changes to the

3   California Department of Education that would obviate the need for future lawsuits

4   seeking similar relief.  *See e.g., Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1333 (W.D.

5   Wash. 2015) ("If the putative class members were to proceed on an individual basis, they

6   might obtain the individual services they seek without obtaining systemic changes to

7   DHHS's conduct that would benefit the class as a whole, a result that could lead to

8   countless individual claims seeking the exact same relief."). Accordingly, the proposed

9   Class fits squarely within Rule 23(b)(2) and is appropriate for certification.

10      Plaintiffs alternatively seek certification under Rule 23(b)(1)(A), which applies

11  when prosecuting separate actions by or against individual class members would create a

12  risk of inconsistent adjudications with respect to individual class members or would

13  establish incompatible standards of conduct for the party opposing the class.  While it

14  appears at first blush that (b)(1)(A) would be a sufficient ground for certification, because

15  the Court certifies a (b)(2) class, it need not decide whether plaintiffs can proceed under

16  (b)(1)(A).

17      **6.  Conclusion**

18      Plaintiffs' motion is granted.  The following class and subclasses are certified in

19  accordance with Rule 23(b)(2):

20      **All individuals who are participating or will**
       **participate in California's public education system, whether**
21     **as employees or parents/guardians of students, without**
       **having to subject themselves to Parental Exclusion Policies,**
22     **and**

23          **(1) Are employees who object to complying with**
24         **Parental Exclusion Policies;**

25

26  _____

[10] The inquiry at the class certification stage differs from that at summary judgment.  In

27  certifying a class, courts merely decide a suitable method of adjudicating the case and do

28  not turn class certification into a mini trial on the merits.

23-cv-00768-BEN-WVG

1           **(2) Are employees who submit a request for a**
2    **religious exemption or opt-out to complying with Parental**
    **Exclusion Policies;**
3           **(3) Are parents/guardians who object to having**
4    **Parental Exclusion Policies applied against them and have**
    **children who are attending California public schools; or**
5           **(4) Are parents/guardians who submit a request for a**
6    **religious exemption or opt-out to having Parental Exclusion**
    **Policies applied against them and have children who are**
7    **attending California public schools.**

8

9    Dated:  October 15, 2025

10                           ROGER T. BENITEZ
11                           UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23-cv-00768-BEN-WVG

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                 FOR THE SOUTHERN DISTRICT OF CALIFORNIA

8

9   **ELIZABETH MIRABELLI, an**          23-cv-0768-BEN-VET
    **individual, et al.,**
10
                            Plaintiffs,
11
                                         **ORDER DENYING SPI / SBE'S**
12      v.                               **MOTION TO DISMISS**

13  **MARK OLSON, in his official**
    **capacity as President of the EUSD**
14  **Board of Education, et al.,**

15                          Defendants.

16

17

        On August 13, 2024. Plaintiffs filed their Amended Complaint.  On August 27
18
    and 28, 2024, California's Superintendent of Public Instruction ("SPI") and the
19
    members of the California State Board of Education ("SBE") filed a motion to
20
    dismiss asserting Plaintiffs lacked Article III standing and for failure to state a
21
    claim.  Those motions were denied on January 7, 2025.  On January 14, 2025, SPI
22
    and SBE filed a second motion to dismiss; this time the motion suggests Plaintiffs'
23
    claims are moot.  The motion is denied.
24
        **I.    Background**
25
        Prior to this year, the California Department of Education ("CDE") maintained
26
    a page on its website titled *Frequently Asked Questions about the School Success*
27
    *and Opportunity Act (Assembly Bill 1266).*  All parties have referred to this
28

                                        1

                                                        23-cv-00768-BEN-VET

1  guidance as the "FAQs." At its core, the FAQs describe a policy that mandated

2  non-disclosure by teachers when parents asked if their child was displaying signs of

3  gender dysphoria. California Assembly Bill 1955 went into effect on January 1,

4  2025. AB 1955 takes a different direction and prohibits school districts from

5  requiring teachers to always make disclosures to parents about a student's gender

6  identity or expression. SPI and SBE say that "accordingly on January 2, 2025 the

7  California Department of Education replaced the FAQs and Legal Advisory at issue

8  here with updated guidance." Today, the FAQs page cannot be found on the CDE

9  website. Today, the CDE website has a new policy page entitled *Protections for*

10  *LGBTQ+ Students: AB 1955*[1] ("Protections"). SPI and CBE argue that because the

11  guidance that Plaintiffs sought to enjoin has been replaced, Plaintiffs' case as to the

12  FAQs policy is now moot and the court lacks subject matter jurisdiction.

13  **II.   Discussion**

14       "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for

15  purposes of Article III—'when the issues presented are no longer live or the parties

16  lack a legally cognizable interest in the outcome.'" *Planned Parenthood Great*

17  *Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 840–41 (9th

18  Cir. 2024) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). However,

19  "[a] defendant's voluntary cessation of a challenged practice will moot a case only

20  if the defendant can show that the practice cannot reasonably be expected to recur."

21  *Id*. at 841 (quoting *F.B.I. v. Fikre*, 601 U.S. 234, 241 (2024)) (cleaned up). This is

22  no easy burden. Quite the opposite, the burden is formidable. *Id.* (citing *Friends of*

23  ───────────────
     [1] The SPI / CBE motion states,

24       "On January 2, 2025, as a result of AB 1955 going into effect, the CDE
     posted updated guidance at https://www.cde.ca.gov/ci/pl/ab-1955-sum-of-prov.asp.

25  The guidance indicated that it replaced (1) Frequently Asked Questions: School
     Success and Opportunity Act (Assembly Bill 1266) and (2) Legal Advisory re:
     application of California's antidiscrimination statutes to transgender youth in

26  schools -- that is, the FAQs and Legal Advisory at issue here. Thus, those two
     documents are no longer posted as of January 2, 2025. Also on January 2, 2025,

27  the CDE notified all school district and county superintendents, and all charter
     school administrators, that the new guidance had been posted, and that it replaced

28  the FAQs and Legal Advisory." Mot. at 2-3.

1   *the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc*., 528 U.S. 167, 190 (2000)).  The

2   Ninth Circuit explains, "[w]ere the rule more forgiving, a defendant might suspend

3   its challenged conduct after being sued, win dismissal, and later pick up where it

4   left off."  *Id.*  Consequently, to prove that a case is really moot, defendants must

5   show that "no reasonable expectation remains that it will return to its old ways."  *Id*.

6   (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33 (1953)) (cleaned

7   up).

8         "[W]hile a statutory change 'is usually enough to render a case moot,' an

9   executive action that is not governed by any clear or codified procedures cannot

10   moot a claim."  *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015).  That

11   is the case in this proceeding.  Prior to January 1, 2025, there was no specific state

12   law addressing the question of student gender identity and the permissibility of

13   teacher disclosure to parents.  There existed only the CDE FAQs policy mandating

14   teacher non-disclosure.  The CDE FAQs policy was based on California

15   Constitution Article 1, Section 1, and other generally applicable state anti-

16   discrimination laws.  While AB 1955 is a new law, Plaintiffs are not challenging

17   AB 1955.  Moreover, AB 1955 states that its prohibition on mandatory teacher

18   disclosure is not a change in the law.  For example, AB 1955 adds Education Code

19   § 220.3(b) which states, "[s]ubdivision (a) *does not constitute a change in, but is*

20   *declaratory of, existing law*."  (Emphasis added.)

21         Shortly after the effective date of AB 1955, the CDE removed its FAQs

22   webpage and published its "Protections" webpage.  The new "Protections" webpage

23   speaks only to the effect of AB 1955 while observing that the new *law* does not

24   mandate non-disclosure and does not address whether a teacher may voluntarily

25   disclose to parents information about their child's gender expression.  The new

26   webpage does not say the CDE has changed its previous policy.  It does not say that

27   the new policy permits a teacher to voluntarily disclose gender information to a

28   parent.

3

1        SPI / CBE argues in its briefs that the act of removing the FAQs webpage and

2    posting the new "Protections" webpage constitutes a change in policy that moots

3    the action.  In *Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014), the Ninth

4    Circuit provided guidance to district courts considering whether a change in

5    government policy might moot a pending case.  Since the CDE website change was

6    not statutory or regulatory, the factors set out in *Rosebrock* govern.  The factors are

7    used to analyze whether a defendants' policy may reasonably be expected to recur

8    such that the case is not moot.  *Riley's Am. Heritage Farms v. Elsasser*, No. 23-

9    55516, 2024 WL 1756101, at *2 (9th Cir. Apr. 24, 2024).  *Rosebrock* said,

10

11        "We have not set forth a definitive test for
12    determining whether a voluntary cessation of this last
    type—one not reflected in statutory changes or even in
13    changes in ordinances or regulations—has rendered a case
    moot.  But we have indicated that mootness is more likely
14    if (1) the policy change is evidenced by language that is
    broad in scope and unequivocal in tone, (2) the policy
15    change fully addresses all of the objectionable measures
    that the Government officials took against the plaintiffs in
16    the case, (3) the case in question was the catalyst for the
    agency's adoption of the new policy, ; (4) the policy has
17    been in place for a long time when we consider
    mootness,;  and (5) since the policy's implementation the
18    agency's officials have not engaged in conduct similar to
    that challenged by the plaintiff.  On the other hand, we are
19    less inclined to find mootness where the new policy could
    be easily abandoned or altered in the future.  Ultimately,
20    the question remains whether the party asserting mootness
    has met its heavy burden of proving that the challenged
21    conduct cannot reasonably be expected to recur.

22

23

24

25    745 F.3d at 972 (citations omitted) (cleaned up).  Applying the factors to this case

26    yields the following.  Factor (1): is the CDE's policy change evidenced by language

27    that is broad in scope and unequivocal in tone?  No.  The CDE's policy change uses

28

1   narrow language restricting its guidance to the effect of AB 1955 and omitting

2   direct language saying that the FAQs policy has been abandoned.  Factor (2): does

3   the policy change fully addresses all of the objectionable measures that the

4   Government officials took against the plaintiffs in the case?  No.  The new policy

5   avoids answering the question about whether teachers may now voluntarily inform

6   parents about their child's gender identity in school.  Factor (3): is this case the

7   catalyst for the agency's adoption of the new policy?  No.  The catalyst for whatever

8   change in policy SPI /CBE has implemented was the legislature's passage of AB

9   1955.  Factor (4):  has the policy been in place for a long time?  No.  The policy in

10  *Rosebrock* had been in place for 40 years.  The FAQs webpage had been posted for

11  only a few years.  Factor (5): since the policy's implementation have the agency's

12  officials engaged in conduct similar to that challenged by the plaintiff?  Unknown.

13  The alleged change in policy is too new to observe effects.

14          In this case, the *Rosebrock* factors suggest a continuing live controversy.  To

15  the extent the CDE policy has been changed, the new policy could be easily

16  abandoned or altered in the future.  Where that is the case, the Ninth Circuit has

17  been less inclined to find mootness.  *Rosebrock*, 745 F.3d at 972 (citing *Bell v. City*

18  *of Boise*, 709 F.3d 890, 901 (9th Cir. 2013); *Bell*, 709 F.3d at 901 ("the authority to

19  establish policy for the Boise Police Department is vested entirely in the Chief of

20  Police, such that the new policy regarding enforcement of the Ordinances could be

21  easily abandoned or altered in the future.").  Moreover, "'an executive action that is

22  not governed by any clear or codified procedure cannot moot a claim.'"  *Planned*

23  *Parenthood,* 122 F.4th at 841 (quoting *McCormack,* 788 F.3d at 1025).  SPI /

24  CBE's taking down of the FAQs webpage on the CDE website is an executive

25  action that does not appear to be governed by any clear or codified procedure and

26  under Ninth Circuit precedent would not moot the Plaintiff parents' claims.  The

27  CDE website changes reflect, at best, a limited change of policy that likely

28  continues to cause harm and could be changed again to cause additional harm in the

5

1    future.  The CDE webpage changes hardly make it absolutely clear that the

2    allegedly wrongful policy could not reasonably be expected to recur.  *Cf. Riley's*

3    *Am. Heritage Farms v. Elsasser*, No. 23-55516, 2024 WL 1756101, at *2–3 (9th

4    Cir. Apr. 24, 2024) ("Further, no procedural protections would prevent CUSD from

5    blacklisting Riley's Farms again in the future in the face of parental complaints. . . .

6    In short, there was a dispute of fact . . . about whether there was an unconstitutional

7    policy.  That dispute remains—despite CUSD's attempts to moot it out and thereby

8    claim immunity.").

9        Given the CDE's lack of policy formality and how easily it can be reversed,

10   together with a lack of procedural safeguards to protect teachers and local school

11   districts from arbitrary enforcement action, neither SPI nor CBE have carried their

12   heavy burden to show that the FAQs policy enforcement against a teacher's

13   voluntary disclosure cannot reasonably be expected to recur.  Thus, the dispute

14   about the existence of an ongoing policy remains live.

15   **III.  Conclusion**

16       If the Defendants made a commitment to not enforcing the FAQs policy

17   against voluntary teacher disclosure and entered into a consent judgment binding

18   themselves and their successors in office, that would likely moot Plaintiffs' case.

19   In the meantime, the actual chilling effect of the FAQs policy on Plaintiffs'

20   constitutional rights remains.  Therefore, the case is not moot.  The motion to

21   dismiss is denied.

22       IT IS SO ORDERED.

23   Dated:  April 10, 2025

24                                      HON. ROGER T. BENITEZ
                                       United States District Court

25

26

27

28

6

1

2

3

4

5

6

7

8

9

10                    UNITED STATES DISTRICT COURT

11                  SOUTHERN DISTRICT OF CALIFORNIA

12

13   ELIZABETH MIRABELLI, an          Case No.:  3:23-cv-0768-BEN (VET)
     individual, et al.,
14
                    Plaintiffs,
15
     v.
16
                                      **ORDER DENYING DEFENDANTS'**
17   MARK OLSON, in his official capacity as   **MOTIONS TO DISMISS**
     President of the EUSD Board of
18   Education, et al.,               **[ECF Nos. 146, 147, 149, 150, 156, 157]**
                    Defendants.
19

20

21          Plaintiffs are teachers in the Escondido Union School District ("EUSD") and

22   parents of students in other California school districts.[1]  In their recently filed Second

23   Amended Complaint ("Complaint") the Plaintiffs bring claims against members of the

24   California State Board of Education and the California Superintendent of Public

25   _____

26   [1] Plaintiffs John and Jane Doe and John and Jane Poe are parents of school-age students.
     Plaintiffs Elizabeth Mirabelli, Lori Ann West, Jane Boe, and Jane Roe are teachers in
27   EUSD.  EUSD is a California public school district with approximately 16,000 students
     in kindergarten through eighth grades.
28

                                    1
                                                          23-cv-00768-BEN-VET

1  Instruction, members of the EUSD Board of Education and administrative staff
2  (collectively, "EUSD Defendants"), as well as the Attorney General of California.  The
3  Plaintiffs contend that a state policy promulgated by the California Department of
4  Education and adopted by local school districts violate their rights under the First and
5  Fourteenth Amendments to the United States Constitution and they seek relief under 42
6  U.S.C. § 1983.  The gravamen of the state policy is that public school teachers are not to
7  reveal to parents a student's announced change of gender identity in order to maintain the
8  student's privacy, except where the student consents to disclosure.

9        The local school district Defendants say that the state forced it to adopt the policy.
10  The Defendant State Superintendent of Public Instruction has issued at least one
11  threatening letters to a school district demanding the policy be followed.[2]  The Defendant
12  Department of Education has filed suit against a school district in Rocklin, California to
13  enforce the policy.  Complaint at ¶3, ¶320; *see Cal. Dep't of Educ. v. Rocklin Unified*
14  *Sch. Dist.*, No. S-CV-0052605 (Cal. Super. Ct., Placer Cnty., Apr. 10, 2024).  The
15  Defendant Attorney General has sued a school district in Chino Valley, California
16  contending the school district's parental notice approach violates the state's policy.  *Id.,*
17  ¶320-21; Exhibit 38 at 375.

18        Here, the State Defendants say the Plaintiffs lack standing because there is no harm
19  to parents or teachers because the policy is just a suggestion.  Because it is just a
20  suggestion, the Plaintiffs have not been injured, and because there is no injury, the
21  Plaintiffs lack Article III standing to bring suit, according to the State Defendants.
22  Alternatively, the State Defendants argue that even if Plaintiffs do have Article III
23  standing, parents lose much of their federal constitutional rights at the schoolhouse door
24  and whatever parental rights remain are subordinate to the child's newly state-created

25

26

27  [2] See Letter from Tony Thurmond, Superintendent of Public Instruction, California
    Department of Education, to Roger Stock, Superintendent Rocklin Unified School
28  District (dated Mar. 27, 2024), Dkt. 112, at 37-39.

23-cv-00768-BEN-VET

1  right to privacy and the child's right to be free from gender discrimination.  All

2  Defendants move to dismiss.[3]  The motions to dismiss are denied.

3  **I. BACKGROUND**

4        A serious health condition of a child is a matter over which parents have a federal

5  constitutional right and duty to decide how to treat, or whether to treat at all, at any given

6  time.  Parents' rights to make decisions concerning the care, custody, control, and

7  medical care of their children is one of the oldest of the fundamental liberty interests that

8  Americans enjoy.  However, under California state policy and EUSD policy, if a school

9  student expresses words or actions during class that are visible signs that the child is

10  dealing with gender incongruity or possibly gender dysphoria[4], teachers are ordered not

11  to inform the parents.

12

13

---

14  [3] The State Defendants also move to dismiss some of the claims under Rule 12(c).

15  However, their arguments are undifferentiated and are better considered on a motion for
   summary judgment.  *See* Rule 12(d).

16  [4] Gender dysphoria is a clinically diagnosed incongruence between one's gender identity

17  and assigned gender.  Put differently, "[g]ender dysphoria is the diagnostic term for the
   distress a person may feel in response to believing their gender identity does not match

18  their sex."  *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604,

19  610 (7th Cir. 2024) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of
   Mental Disorders, 511 (5th ed. text revision 2022) (Untreated gender incongruity may

20  progress into adverse social-emotional health consequences, including, but not limited to,
   gender dysphoria, depression, or suicidal ideation.).  There are different psychological

21  and medical treatments for children experiencing gender incongruity.  According to

22  DSM-5, the criteria for Gender Dysphoria is:

23        A marked incongruence between one's experienced/expressed gender and natal
   gender of at least 6 months in duration, as *manifested by at least two of the following*:

24  A.   A marked incongruence between one's experienced/expressed gender and primary

25  and/or secondary sex characteristics (or in young adolescents, the anticipated secondary
   sex characteristics)

26  B.   A strong desire to be rid of one's primary and/or secondary sex characteristics

27  because of a marked incongruence with one's experienced/expressed gender (or in young
   adolescents, a desire to prevent the development of the anticipated secondary sex

28  characteristics)

3

1   All Plaintiffs allege that the State Department of Education has promulgated a new

2   policy that local school districts must adopt.  EUSD adopted the policy.  The policy

3   requires: (1) teachers to recognize and utilize a student's newly expressed gender

4   identification, and (2) teachers to not disclose to a parent a student's newly expressed

5   gender identification.[5]  The EUSD policy is known as AR 5145.3.  The EUSD policy is

6   based on guidance from the State Department of Education's official internet web page.[6]

7   A teacher who knowingly fails to comply is considered to have engaged in discriminatory

8   harassment and is subject to adverse employment action.

9

10   _____

11

12   C.   A strong desire for the primary and/or secondary sex characteristics of the other gender

13   D.   A strong desire to be of the other gender (or some alternative gender different from one's designated gender)

14   E.   A strong desire to be treated as the other gender (or some alternative gender different from one's designated gender)

15   F.   A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's designated gender)

16   The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

17   [5] The California Education Code recognizes parents' rights to be informed and involved in their student's schooling – rights that are consistent with parents' federal constitutional rights but in tension with the new policy restrictions.  For example, California Education Code §51101(a) and (b) recognizes that parents play an integral part in the successful education of a child in the public schools and specifies a variety of ways in which parents have a right to information about their child including sitting in on classes and communicating with teachers.

18   [6] EUSD has other formal policies that are consistent with existing law but are in tension with the new policy.  For example, BP 0100(7) states that, "Parents/guardians have a right and an obligation to be engaged in their child's education and to be involved in the intellectual, physical, emotional, and social development and well-being of their child."  Complaint, Exh. 15(7).  And BP 4119.21(9) states that, "Being dishonest with students, parents/guardians, staff, or members of the public, including . . . falsifying information in . . . school records" is inappropriate employee conduct.  Complaint Exh. 14(9).  Both policies are consistent with federal constitutional rights but appear to be at odds with AR 5145.3.

23-cv-00768-BEN-VET

1    The Plaintiff parents allege that they have been harmed by the State Department of

2    Education policy imposed on local school districts.  The Plaintiff parents allege that they

3    have children who expressed gender incongruence while attending public schools.  Each

4    of the Plaintiff parents allege that they asked questions about their child and

5    schoolteachers and administrators intentionally deceived them and did not disclose the

6    truth about their child's gender incongruence.  The Plaintiff parents allege that they are

7    likely to be deceived in the future by public school teachers and administrators due to the

8    State Department of Education non-disclosure policy.

9        The Plaintiff teachers maintain sincere religious beliefs that communications with

10    a parent about a student should be accurate; communications should not be calculated to

11    deceive or mislead a student's parent.  The teachers also maintain that parents enjoy a

12    federal constitutional right to make decisions about the healthcare and upbringing of their

13    children.  The teachers allege they hold a well-founded fear of adverse employment

14    action if they were to violate the EUSD gender identification confidentiality policy by

15    communicating accurately to a student's parents her own observations or concerns about

16    a student's gender incongruence.

17    **II.  LEGAL STANDARDS**

18        Rule 12 of the Federal Rules of Civil Procedure governs motions to dismiss.  Some

19    Defendants contend that Plaintiffs have failed to state a claim for relief.  Rule 12(b)(6)

20    permits dismissal for failure to state a claim upon which relief can be granted.  Dismissal

21    under Rule 12(b)(6) may occur where the complaint lacks a cognizable legal theory or

22    sufficient facts to support a cognizable, plausible claim.  In contrast, a complaint may

23    survive a motion to dismiss if, taking all well pled factual allegations as true, it contains

24    enough facts to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

25    U.S. 662, 678 (2009).

26        Some Defendants claim that Plaintiffs lack Article III standing to bring their

27    claims.  A party may move to dismiss an action for lack of subject matter jurisdiction

28    pursuant to Rule 12(b)(1).  Because Article III standing is a necessary component of

23-cv-00768-BEN-VET

subject matter jurisdiction, "[w]hen a plaintiff lacks standing, dismissal under Rule 12(b)(1) is appropriate." *Doe & Roe v. Teachers Council, Inc.*, No. 3:23-cv-1747-AN, 2024 WL 4794293, at *2 (D. Or. Nov. 14, 2024) (citations omitted).  To have standing, a plaintiff must have an injury-in-fact that is fairly traceable to the challenged action of the defendant.[7]

> Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."
> . . .
> A proper case or controversy exists only when at least one plaintiff "establishes that she has standing to sue."  She must show that she has suffered, or will suffer, an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  These requirements help ensure that the plaintiff has "such a personal stake in the outcome of the controversy as to warrant her invocation of federal-court jurisdiction."

*Murthy v. Missouri,* 603 U.S. 43, 56–57 (2024) (citations omitted).  "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'  If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury.  So the two key questions in most standing disputes are injury in fact and causation." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (citations omitted).  "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy

---

[7] That a suit may be a class action does little to the question of standing.  Named plaintiffs who purport to represent a class must allege that they personally have been injured.  Injury that has been suffered only by unidentified members of the class to which they belong may be insufficient to satisfy Article III standing.  *Martinez v. Newsom*, 46 F.4th 965, 970-72 (9th Cir. 2022); *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976); *Warth v. Seldin,* 422 U.S. 490, 502 (1975).

23-cv-00768-BEN-VET

1   both the injury in fact and causation requirements.  So in those cases, standing is usually

2   easy to establish." *Id.* at 382 (citations omitted).

3       At the pleading stage, a plaintiff must allege facts demonstrating each element of

4   Article III standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  But a plaintiff

5   need not satisfy the *Iqbal/Twombly* plausibility standard.  An Article III standing inquiry

6   does not touch directly on the merits of the case.

> 7   *Twombly* and *Iqbal* are ill-suited to application in the
> 8   constitutional standing context because in determining whether
>     plaintiff states a claim under 12(b)(6), the court necessarily
> 9   assesses the merits of plaintiff's case.  But the threshold
>     question of whether plaintiff has standing (and the court has
> 10  jurisdiction) is distinct from the merits of his claim.  Rather,
>     "the jurisdictional question of standing precedes, and does not
> 11  require, analysis of the merits."
> 12

13  *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Equity Lifestyle*

14  *Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir.2008));

15  *Catholic League for Religious and Civil Rights v. City & Cnty. of San Francisco*, 624

16  F.3d 1043, 1049 (9th Cir.2010) (*en banc*) ("Standing is emphatically not a doctrine for

17  shutting the courthouse door to those whose causes we do not like.  Nor can standing

18  analysis, which prevents a claim from being adjudicated for lack of jurisdiction, be used

19  to disguise merits analysis, which determines whether a claim is one for which relief can

20  be granted if factually true.").

21  **III.  DISCUSSION**

22      During the COVID-19 pandemic it is alleged that EUSD adopted Administrative

23  Regulation 5145.3.  AR 5145.3 gives definition to what EUSD defines as discriminatory

24  harassment.  AR 5145.3 is not sui generis.  According to the allegations of the Complaint,

25  it is the progeny of a statewide policy promulgated by the California Department of

26  Education.  Details of the policy and how it is intended to work in parent-teacher

27  communications were described in greater detail in earlier orders of this Court and are not

28  vigorously contested at this point in the proceedings.  Thus, it is briefly described next.

7

23-cv-00768-BEN-VET

1    Plaintiffs contend that local school district policies like EUSD's AR 5415.3 are

2   required by California law as explained and communicated through the California

3   Department of Education's publication titled *Frequently Asked Questions* about the

4   School Success and Opportunity Act (Assembly Bill 1266) ("FAQs").   Complaint ¶ 308-

5   15.  Page 5 of the FAQs provides an answer to the question: "May a student's gender

6   identity be shared with the student's parents, other students, or members of the public?"

7   It says,

8           A transgender or gender nonconforming student may not
9           express their gender identity openly in all contexts, including at
            home.  Revealing a student's gender identity or expression to
10          others may compromise the student's safety.  Thus, preserving
            a student's privacy is of the utmost importance.  The right of
11          transgender students to keep their transgender status private is
12          grounded in California's antidiscrimination laws as well as
            federal and state laws.  Disclosing that a student is transgender
13          without the student's permission may violate California's
            antidiscrimination law by increasing the student's vulnerability
14          to harassment and may violate the student's right to privacy.
15

16   FAQs page 7 explains that if a student chooses to be addressed by a new name or

17   pronoun all school district personnel are required to use said chosen new name/pronoun.

18   The student's age is not a factor.  "[C]hildren as early as age two are expressing a

19   different gender identity."

20         Per the policies of the State Department of Education and EUSD, once a student

21   expresses a desire to be publicly called by a new gender incongruent name or pronoun,

22   school faculty and staff are to refer to that student by the incongruent name.  From that

23   point forward, the student may go through each school day with the faculty and staff

24   addressing the student according to the changed moniker.

25         However, under the antidiscrimination policy, a teacher is not permitted to inform

26   the parents of this name change without the student's consent.  FAQs page 6 instructs,

27   "schools must consult with a transgender student to determine who can or will be

28

23-cv-00768-BEN-VET

informed of the student's transgender status, if anyone, including the student's family. With rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents."

## IV. MOTIONS TO DISMISS[8]

### A. Article III Standing

#### 1. Superintendent of Public Instruction Tony Thurmond

Defendant Superintendent of Public Instruction Tony Thurmond argues that the Plaintiffs lack Article III standing.

#### a. Parents

Defendant Thurmond begins by contending that the parents have no standing because they have not alleged an injury-in-fact. But the Poes have alleged a substantial injury. The Poes allege that their daughter entered seventh grade at a public school in Fresno. Complaint ¶117. It is alleged that while at school, the child began self-identifying as a male and adopted a new male name and pronouns for the teachers to use. *Id.* The child became president of her school's LGBTQ club. *Id.* However, it is alleged that the Poes were unaware of their child's gender nonconformity at school. *Id.* When their child entered eighth grade, the Poes attended a back-to-school night and met with their child's teachers. *Id.* at ¶118. The Poes allege that none of the teachers said anything about their child presenting as a different gender at school, wanting to use a different name or pronoun, or that their child was president of the school LGBTQ club. *Id.* It is alleged that the teachers referred to the Poes' child by her legal name and her birth gender biological pronouns, not the new name and pronouns being used in school. *Id.* It is alleged that only after their child attempted suicide did a physician tell the Poes that their daughter was identifying as a boy. *Id.* at ¶119. When the Poes contacted the

---

[8] For purposes of a motion to dismiss, facts pled in a complaint are assumed to be true. *Mazarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

1  school to ask if their child was being called by a different name, it is alleged that the

2  school said, "no."  *Id*. at ¶121.  The Poes allege that the school's answer was not truthful

3  because teachers' written letters and emails revealed otherwise.  *Id*.  Upon moving their

4  child to a new (public charter) school, the Poes inquired whether their child was

5  presenting as a male.  It is alleged that a school administrator responded by informing the

6  Poes that the school was not permitted to disclose their child's gender identity at school

7  due to the State Department of Education's FAQs guidance and quoted from the FAQs.

8  *Id*. at ¶125.  The Poes allege they have other school age children but are afraid to place

9  the children in the public schools because of their experience of teachers and

10  administrators withholding information about gender expression.  *Id*. at ¶126-27.  It is

11  alleged that the Poes cannot afford to place their children in private schools.

12      Like the Poe parents, the Doe parents have a child who attends public schools.  The

13  Does allege that their child has repeatedly transitioned to and desisted from a transgender

14  identity.  Complaint at ¶128-29.  The Does allege that their child's public school "has

15  repeatedly directly lied to them and refused to answer their questions," citing to the State

16  Department of Education's FAQ guidance on gender identity.  *Id*. at ¶129, ¶146-48.

17      These allegations sufficiently describe facts that the Poes and the Does have

18  suffered an actual injury that is concrete and particularized, fairly traceable to the

19  Department of Education FAQs on gender identity, and that is redressable by a favorable

20  ruling.  *Murthy,* 603 U.S. at 56–57.  This suffices to demonstrate the parents' Article III

21  standing.[9]

22

23

24

25

_____

26  [9] The Plaintiff Parents may also enjoy standing under the "juridical link" doctrine.  *See*
27  *Martinez v. Newsom*, 46 F.4th 965, 970-72 (9th Cir. 2022) (describing the juridical link
    exception to cases where plaintiffs sue "officials of a single state and its subordinate units
28  of government" who apply a "common rule").

### b. New Plaintiff Teachers' Standing

Defendant Thurmond contends that the newly added Plaintiff teachers have no standing because they have not alleged an injury-in-fact. More specifically, he contends that their alleged injuries are too speculative. However, teachers Boe and Roe have had transgender students in their classes in past years. Complaint at ¶112-13. The new plaintiff teachers allege that in the future they are likely to have middle school students who express gender incongruity in the classroom and announce non-conforming names and pronouns by which they wish to be called. The likelihood Boe or Roe being assigned future students to which the new policies apply is plausibly high. When that occurs, teachers Boe and Roe will be faced with the Department of Education FAQs policy as adopted by EUSD. That policy, it is alleged, will require Boe or Roe to deceive and mislead any parents who ask them about whether their child has expressed gender incongruency. That, in turn, it is alleged will violate their sincerely held religious beliefs or expose them to adverse employment actions.[10]  *Id*.

These allegations sufficiently articulate that new teacher Plaintiffs Boe and Roe are likely to suffer an actual injury that is concrete and particularized, fairly traceable to the Department of Education FAQs and EUSD's policy on gender identity, that is redressable by a favorable ruling. *Murthy,* 603 U.S. at 56–57. This suffices for Article III standing.

---

[10] Should a teacher fail to abide by state law their teaching credential could be revoked. *Steinmetz v. California State Board of Education*, 44 Cal.2d 816 (1955) (state board has authority to call teacher before it to answer questions or revoke certificate); *Atwater Elementary Sch. Dist. v. California Dep't of Gen. Servs.*, 41 Cal. 4th 227, 236, (2007) (Kennard, J., dissenting) ("The Legislature has established two separate but interrelated systems for addressing misconduct by a credentialed teacher. The first grants school boards the authority to suspend or dismiss a teacher. (Ed. Code, § 44932 *et seq*.) The second authorizes the Commission to admonish a teacher, to publicly reprove a teacher, or to suspend or revoke a teacher's credential. (*Id*., § 44242.5 *et seq*.)")*.*

11

23-cv-00768-BEN-VET

(107a)

### c.  Teachers Mirabelli's and West's Standing

Lastly, Defendant Thurmond contends that the teachers Mirabelli and West no longer have standing because they are not currently teaching.  But Mirabelli and West have allegedly suffered past injuries as teachers due to the policies and allege that they intend to teach in the future where the same policies will likely impose similar injuries.  Thus, teachers Mirabelli and West enjoy Article III standing because they have alleged the suffering of an actual injury that is concrete and particularized and is likely to reoccur and that is fairly traceable to the Department of Education FAQs and EUSD's policies on gender identity.  The alleged injury and is redressable by a favorable ruling.  Moreover, because other teacher Plaintiffs (Boe and Roe) have standing, the suit by teachers Mirabelli and West may also proceed.  *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) ("If at least one plaintiff has standing, the suit may proceed.") (citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52, n. 2 (2006)).

### d.  The FAQs

The Superintendent also objects that there is no formal policy – that the Department of Education has merely published a suggested way to comply with discrimination law.  That is a merits argument that is better left for later proceedings, rather than an Iqbal/Twombly or Article III standing argument.  *Maya*, 658 F.3d at 1068.

### 2. *Members of the California Board of Education*

The Defendant Members of the California Board of Education make arguments similar to those of the State Superintendent of Public Instruction, Tony Thurmond.  However, the Board of Education Members also distance themselves from responsibility for the Department of Education's FAQs and their enforcement.  For example, the Defendant Members argue that it is a policy-making body while the Superintendent of Public Instruction is responsible for the administration and implementation of policies.  The Members offer that they are not responsible for the content of the California Department of Education's website.  As a result, they argue that they are entitled to be dismissed.  But the separation between the State Defendants is indistinct.

12

23-cv-00768-BEN-VET

(108a)

1    "The California State Board of Education ('SBE') drafts and oversees the policies

2    implemented by the California Department of Education ('CDE').  The SBE is

3    responsible for approving and overseeing statewide curriculum content, creating the

4    curriculum framework for kindergarten through twelfth grade, and adopting instructional

5    materials for kindergarten through eighth grade."  *Cal. Parents for the Equalization of*

6    *Educ. Materials v. Torlakson,* 267 F. Supp. 3d 1218, 1222 (N.D. Cal. 2017).  As

7    California courts describe it, "[t]he Legislature . . . delegated certain powers to the Board

8    and Superintendent.  Pursuant to section 33030, 'the board shall determine all questions

9    of policy within its powers.'  The Board is authorized to 'adopt rules and regulations not

10    inconsistent with the laws of this state (a) for its own government, (b) for the government

11    of its appointees and employees,' and the government of the various schools which

12    receive state funds. (§ 33031)."  *State Bd. of Educ. v. Honig*, 13 Cal. App. 4th 720, 753

13    (1993).  *Honig* explains that at the same time, "[t]he Legislature delegated to the

14    Superintendent the power to 'execute, under direction of the State Board of Education,

15    the policies which have  been decided upon by the board and shall direct, under general

16    rules and regulations adopted by the State Board of Education, the work of all appointees

17    and employees of the board.' (§ 33111)."  *Id*.[11]  Put another way, "'the Board is

18    authorized under section 33031 to adopt rules and regulations ... for its own government

19    and for the government of its appointees ....'  The Superintendent must execute policies

20    decided by the Board."  *Honig*, 13 Cal. App. 4th at 758.

21

22

23

---

24    [11]  "[S]ection 33301 describes how the appointed Board and elected Superintendent

25    should divide responsibilities for administration of the Department: 'The Department of
Education shall be administered through: (a) The State Board of Education which shall be

26    the governing and policy determining body of the department; (b) The Director of

27    Education [Superintendent] in whom all executive and administrative functions of the
department are vested and who is the executive officer of the State Board of Education."

28    Id.

1      Consequently, while the Members of the Board of Education disclaim
2  responsibility for the policies promulgated by the Department of Education, state law
3  gives the Members of the Board authority to decide policies to be implemented by the
4  Department of Education and adopted by school districts throughout the state, under
5  Education Code §33031.  It is under the direction of the State Board of Education that the
6  Superintendent has the power to execute the policies which have been decided upon by
7  the Board, under Education Code §33111.  *Id*.  At the pleading stage, the Complaint is
8  sufficient to demonstrate that the injuries are fairly traceable to the Defendant Members
9  of the Board of Education and that therefore the Plaintiffs enjoy Article III standing.

10                   *3.  The Attorney General*

11      The Attorney General of California also seeks dismissal contending the Plaintiffs
12  lack standing.  In his present motion the Attorney General maintains his disavowal of
13  enforcement against EUSD.  He argues that the EUSD teacher Plaintiffs lack a threat of
14  actual injury as a result.  His disavowal sufficed previously when EUSD teachers were
15  the sole Plaintiffs.  *See* Order, Dkt. 114 (filed May 10, 2024).  However, there are now
16  parent Plaintiffs who are suffering, or are likely to suffer, injury in other school districts
17  for which the Attorney General has not disavowed enforcement.  Although the Attorney
18  General contends that as a matter of law school non-disclosure to parents "will not
19  tangibly interfere" with their constitutionally grounded parental rights to care for their
20  children, this Court disagrees.

21      "In a pre-enforcement challenge, a litigant 'satisfies the injury-in-fact requirement
22  by alleging 'an intention to engage in a course of conduct arguably affected with a
23  constitutional interest, but proscribed by a statute, and there exists a credible threat of
24  prosecution thereunder.'"  *Matsumoto v. Labrador*, 2024 WL 4927266, at *4 (9th Cir.
25  Dec. 2, 2024) (citation omitted).  The Attorney General contends that there is no threat of
26  prosecution.  The State gender non-disclosure policies are fairly new.  "In challenging a
27  new law whose history of enforcement is negligible or nonexistent, either a 'general
28  warning of enforcement' or a 'failure to disavow enforcement' is sufficient to establish a

1   credible threat of prosecution in pre-enforcement challenges on First Amendment

2   grounds." *Id.* At the hearing, the Attorney General did not disavow enforcement against

3   any other school districts. In fact, the Attorney General has not sat silent. The Attorney

4   General has actually taken past enforcement action against the Chino Valley Unified

5   School District (*see People v. Chino Valley Unified School District*, Superior Court of

6   San Bernardino Case No. CIV SB 2317301 (filed Aug 28, 2023)). The Chino Valley

7   action underscores the alleged threat of enforcement by the Attorney General. In

8   response, the Attorney General insists that enforcement turns on a school district's

9   approach to disclosure. "Mandatory disclosure is the dividing line," says the Attorney

10  General. In other words, a school district that adopts a policy of mandatory disclosure to

11  parents when a student displays gender incongruity or dysphoria faces a threat of

12  enforcement. He implies that a school district that requires something less than

13  mandatory disclosure will not be prosecuted. This distinction draws too fine a line

14  between the credible threat of enforcement and non-enforcement to undercut the parent

15  Plaintiff's standing.

16      According to the Complaint, the Plaintiff Parents have suffered actual injuries, and

17  are likely to suffer future injuries traceable to the State Defendants' policies requiring

18  non-disclosure and an injunction against the Attorney General's enforcement of those

19  policies against any California school district will accord relief. Therefore, the Attorney

20  General's motion to dismiss based on standing is denied.[12]

21                  *4.  Escondido Union School District Defendants*

22      The EUSD Defendants also move to dismiss contending the new teacher Plaintiffs

23  lack standing because the application of AR 5145.3 to teachers Boe and Roe is too

24  speculative. EUSD argues that neither teacher has a transgender student assigned to their

25

26  _____

27      [12] The Attorney General does not move to dismiss any particular claim for relief

28  under Rule 12(b)(6).

23-cv-00768-BEN-VET

(111a)

1  class right now.  However, the Complaint alleges that Boe and Roe are currently teaching

2  at EUSD.  The Complaint plausibly alleges that AR 5145.3 will require their non-

3  disclosure to parents of any student they observe experiencing gender dysphoria or

4  gender non-conformity.  It is plausible that whether assigned to their classes, or observed

5  at other times during the school environment, Boe or Roe may observe students and

6  parents may ask questions of Boe or Roe.  Even more likely, it is sufficiently alleged that

7  Boe or Roe will be assigned students who prefer names or dress that suggests gender

8  dysphoria or incongruence and Boe or Roe will have to participate in parent-teacher

9  meetings.  This is sufficient for purposes of establishing Article III standing against

10  EUSD.

11        B.  **Failure to State a Claim**

12        In the new Complaint, Plaintiffs advance eight claims for relief.  The teachers

13  assert two claims under the First Amendment's Freedom of Speech Clause and one claim

14  under the Free Exercise of Religion Clause (Claims 1, 2, and 3).  West individually

15  advances two claims under Title VII of the Civil Rights Act of 1964 (Claims 4 and 5).

16  The parents assert a single claim for violation of their substantive due process rights

17  under the Fourteenth Amendment (Claim 7) and two claims for violations of their rights

18  under the First Amendment's Free Exercise of Religion Clause (Claims 6 and 8).

19        The teachers' claims are similar to those asserted in prior versions of the

20  Complaint and this Court adopts its prior reasoning and rulings concerning these claims.

21  The parents' claims expand the reach of the case beyond EUSD to the State Defendants

22  who are adopting and implementing policies animating EUSD's problematic AR 5145.3.

23  The parents' claims have not been addressed before and there is no binding case authority

24  on point.  Teacher West's Title VII claims are garden variety employment claims.

25        **1.**  *Superintendent of Public Instruction Tony Thurmond and the*

26  *Members of the State Board of Education*

27        The Superintendent of Public Instruction Tony Thurmond and the Members of the

28  State Board of Education make similar arguments.  Both argue that the teachers fail to

1    state claims for relief under the First Amendment Free Speech Clause and the First

2    Amendment's Free Exercise Clause.  As to the parents, they fail to state claims for relief

3    under the Free Exercise Clause or the Substantive Due Process Clause.

4          As to the first assertion, the State Defendants argue that the teacher Plaintiffs "are

5    not entitled to First Amendment free speech clause protection in this circumstance." *See*

6    *e.g.*, Superintendent's Motion to Dismiss, Dkt. 150 at 9.  That is an overstatement.  The

7    State Defendants' strongest authority may be *Johnson v. Poway Unified School District,*

8    658 F.3d 954 (9th Cir. 2011).  Yet, while *Johnson* stands for the proposition that a

9    teacher's curricular speech is government hired speech, to say that teachers lose their free

10   speech rights at the schoolhouse door carries *Johnson* too far.  Here, the teacher Plaintiffs

11   do not complain about curricular speech.  Instead, they allege that the state and EUSD

12   non-disclosure policies place a pre-speech gag on them by prohibiting disclosure of a

13   child's evident gender incongruity including truthful answers to questions asked by

14   parents about their child's gender identity.  Complaint at ¶351.  According to the

15   Complaint, the policies compel teachers to deceive parents and by such deception

16   interfere both with their own free speech rights and with parents' federal constitutional

17   rights to raise their children.  *Id*. at ¶356.

18         While the government may hire teachers to deliver prescribed curricular speech, it

19   may not compel its employees to do so in a way that intentionally abridges parental

20   constitutional rights or in a manner that is unlawful.  The teacher Plaintiffs allege that the

21   state and EUSD policies compel them to abridge parental constitutional rights and to do

22   so in a manner that is intentionally deceptive and unlawful.  These allegations fairly state

23   a plausible claim for relief that the policies infringe on the teachers' own constitutional

24   rights under the First Amendment Free Speech Clause.

25         The arguments by the State Defendants against both the teachers' claims, and later

26   the parents' claims, rely on legal suppositions which this Court rejects.  For example, in

27   arguing that the teachers fail to state a claim, the State Defendants contend that "parents

28   do not have a constitutional right to be informed of their child's transgender identity."

23-cv-00768-BEN-VET

1   Superintendent's Motion to Dismiss, Dkt. 150 at 10; Board's Motion to Dismiss, Dkt.

2   149, at 12.  Likewise, in arguing that the parents fail to state a substantive due process

3   claim, the State Defendants assert that parents do not enjoy a fundamental right to be

4   informed about their student.  Specifically, the State Defendants assert, that parents "do

5   not have a fundamental right to be informed of their students' gender identity at school,

6   and accommodating a student's social transition at school is not medical care triggering

7   any right to parental involvement." *Id.* at 21; 23.

8       This cramped definition of parental rights is conclusory and requires the

9   suspension of disbelief.  Constitutional rights of parents to bring up a child and decide

10   how to handle health care issues are some of America's oldest foundational rights.  "The

11   liberty interest at issue in this case—the interest of parents in the care, custody, and

12   control of their children—is perhaps the oldest of the fundamental liberty interests

13   recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  This is

14   especially true with regard to issues of health.

15      "Surely, [a parent's right] includes a 'high duty' to recognize symptoms of illness

16   and to seek and follow medical advice." *Parham v. J. R.*, 442 U.S. 584, 602 (1979).  A

17   child's gender incongruity is a matter of health.  Matters of a child's health are matters

18   over which parents have the highest right and duty of care.  Parental rights over matters

19   of health continue to be preeminent even where the government may worry about a

20   general possibility of abuse or parental non-acceptance due to their child's exhibition of

21   gender incongruity.  The Supreme Court took this approach in *Parham,*

22          Appellees argue that the constitutional rights of the child

23   are of such magnitude and the likelihood of parental abuse is so
       great that the parents' traditional interests in and responsibility

24   for the upbringing of their child must be subordinated at least to
       the extent of providing a formal adversary hearing prior to a

25   voluntary commitment.

26          Our jurisprudence historically has reflected Western
       civilization concepts of the family as a unit with broad parental

27   authority over minor children.  Our cases have consistently
       followed that course; our constitutional system long ago

28

18

rejected any notion that a child is "the mere creature of the
State" and, on the contrary, asserted that parents generally
"have the right, coupled with the high duty, to recognize and
prepare [their children] for additional obligations."

. . . .

The law's concept of the family rests on a presumption
that parents possess what a child lacks in maturity, experience,
and capacity for judgment required for making life's difficult
decisions.  More important, historically it has recognized that
natural bonds of affection lead parents to act in the best
interests of their children.

. . . .

Simply because the decision of a parent is not agreeable
to a child or because it involves risks does not automatically
transfer the power to make that decision from the parents to
some agency or officer of the state. . . .  Most children, even in
adolescence, simply are not able to make sound judgments
concerning many decisions, including their need for medical
care or treatment.  Parents can and must make those judgments.

442 U.S. at 602-603 (citations omitted).  And although the State Defendants

disagree[13], it easily follows that parents *do* have a constitutional right to be accurately

informed by public school teachers about their student's gender incongruity that could

progress to gender dysphoria, depression, or suicidal ideation, because it is a matter of

health.  *Cf. John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 636

(4th Cir. 2023) (Niemeyer, C.J., dissenting) ("The issue of whether and how grade school

and high school students choose to pursue gender transition is a family matter, not one to

be addressed initially and exclusively by public schools without the knowledge and

consent of parents.  Yet, the Montgomery County Board of Education . . . preempts the

issue to the exclusion of parents with the adoption of its "Guidelines for Student Gender

Identity," which invite all students in the Montgomery County public schools to engage

---

[13] The State Defendants do agree that parents have specific rights with respect to
directing their child's medical care.  Superintendent's Mot. to Dism., at 11; Board Mot. to
Dism., at 13.

19

1   in gender transition plans with school Principals without the knowledge and consent of

2   their parents.  This policy implicates the heartland of parental protection under the

3   substantive Due Process Clause of the Fourteenth Amendment.).  Even *Regino v. Staley,*

4   upon which the State Defendants rely, acknowledges that the parents' constitutional

5   claim is substantial.  *Regino v. Staley,* 2023 WL 4464845 at *4 (E.D. Cal. 2023)

6   ("Plaintiff has raised serious questions that go to the merits of her case, namely what the

7   bounds of the parental right are to direct the upbringing of one's children as they pertain

8   to a child's gender identity and expression in school.").

9          The Defendants' policies do little to protect a parent's interests in their child's

10  health.  On the contrary, when on occasion these interests collide, the Defendants'

11  policies promote the ascendancy of a child's rights over the child's parents.  The

12  Supreme Court's precedents point the other way toward "permit[ting] the parents to

13  retain a substantial, if not the dominant, role" in a health care decision.  *Id*. at 604.  For

14  example, the Supreme Court points out that "[t]he fact that a child may balk at

15  hospitalization or complain about a parental refusal to provide cosmetic surgery does not

16  diminish the parent's authority to decide what is best for the child."  *Id*.

17         There are no controlling decisions for this Court to follow in this case.  This case

18  presents the question of whether the constitutional rights of parents may be subordinated

19  by a state's imposition of policies that elevate a child's state created and unprecedented

20  rights above or beyond the rights of their parents.  At least as far as decisions on

21  healthcare in school settings are concerned, the long-recognized federal constitutional

22  rights of parents must preponderate and a claim that school policies trench on parents'

23  rights states a plausible claim for relief.  Because this is a lynchpin argument for the State

24  Defendants, an argument with which the Court disagrees, the State Defendants' motion to

25  dismiss the parent Plaintiffs' claim for violation their substantive due process rights

26  (Claim 7) is also denied.

27         The State Defendants also argue for dismissal of the teachers' and the parents'

28  First Amendment Free Exercise Clause claims (Claims 2 and 3; Claims 6 and 8).  The

23-cv-00768-BEN-VET

1   gravamen of the defense argument is that neither the teachers nor the parents are

2   suffering, or will suffer, a substantial burden on their exercise of religion.[14] However, the

3   contentions set out in the Complaint allege the burdens placed by the polices on the

4   Plaintiffs are substantial.

5       The teachers allege that they risk adverse employment consequences up to and

6   including termination. *See e.g.*, Complaint, Exhibits 33-36. They plausibly allege that

7   having to choose between violating their sincerely held religious beliefs by deceiving

8   parents and facing substantial adverse employment consequences is a substantial burden

9   on their free exercise rights. The parents allege that allowing California schools to

10  socially transition their children to a new gender without their knowledge, or

11  involvement, or be forced to withdraw their children from a public school, is a substantial

12  burden on their free exercise of religion. Complaint ¶443-44. The parents allege that the

13  policies must undergo strict scrutiny but that the state has no compelling interest in

14  requiring school staff to deceive parents about their children's incongruent gender

15  expression. *Id*. at ¶453-57. In short, both the teachers and the parents have adequately

16  stated claims upon which relief can be granted in asserting that the non-disclosure

17  policies substantially burden their First Amendment right to the free exercise of religion.

18      The State Defendants also argue that their policies do not force the parents to act

19  contrary to their religious beliefs. According to the Complaint, the policies force parents

20  to accede to a school's plan to neither acknowledge nor disclose information about their

21  child's gender dysphoria. By concealing a child's gender health issues from the parents,

22  parents are precluded from exercising their religious obligations to raise and care for their

23  child at a time when it may be highly significant, because they are kept uninformed of the

24  need for their child's religious guidance. "Families entrust public schools with the

25  education of their children, but condition their trust on the understanding that the

26

27  _____

28  [14] Superintendent's Mot. to Dism., at 15; Board Mot. to Dism., at 17.

23-cv-00768-BEN-VET

1   classroom will not purposely be used to advance religious views that may conflict with

2   the private beliefs of the student and his or her family.  Students in such institutions are

3   impressionable and their attendance is involuntary." *Edwards v. Aguillard*, 482 U.S. 578,

4   584 (1987).  For parents who are not rich and have limited financial resources to choose

5   private schooling or homeschooling for their child, there remains only public school

6   placement for satisfying the state truancy law obligation of school attendance.

7        Whether the teachers and parents can prove their allegations may remain for

8   summary judgment or trial but they have adequately stated plausible free exercise claims.

9   Therefore, the State Defendants' motions to dismiss Claims 2 and 3 (teachers) and

10  Claims 6 and 8 (parents) are denied.

11       2. *EUSD*

12       EUSD moves to dismiss the teachers' claims.  EUSD argues that the teachers fail

13  to state free speech or free exercise claims.  EUSD separately argues that West has not

14  stated Title VII claims.  EUSD's arguments concerning the teacher's First Amendment

15  claims largely parallel the arguments of the State Defendants and fare no better.  EUSD

16  makes similar arguments that the teachers fail to state a claim for violations of their right

17  to free speech.  EUSD argues (as it did before) that only curricular speech is at issue and

18  that it may control the curriculum.  But as discussed above, the allegations in the

19  Complaint go beyond garden-variety curricular speech.  Teachers do not completely

20  forfeit their First Amendment rights in exchange for public school employment.  To the

21  extent that teachers allege (as they do here) that EUSD has hired their speech to speak

22  falsely or deceptively to parents of students, the teachers make out a plausible claim for

23  relief under the First Amendment's Free Speech Clause.  Likewise, to the extent teachers

24  allege (as they do here) that EUSD's curriculum includes what the teachers sincerely

25  believe to be lies and deceptions for communications with school parents and that such

26  prevarications are religiously or morally offensive, the teachers make out a plausible

27  claim for relief under the First Amendment's Free Exercise Clause.  EUSD contends that

28  it is not a lie to not answer a question.  That the teachers sincerely held religious beliefs

1   to the contrary cannot be simply dismissed.  It is the allegations of the Complaint that

2   dictate the claim for relief.  Here, Plaintiffs sufficiently allege plausible free exercise

3   claims.  EUSD makes additional arguments for dismissal, but they are in the nature of

4   summary judgment or trial arguments going to the merits and are not suitable for

5   consideration on a motion to dismiss.  Therefore, EUSD' motion to dismiss the teachers'

6   First Amendment claims (Claims 1, 2, and 3) are denied.

7       EUSD also argues for dismissal of West's Title VII claims.  West asserts a

8   religious discrimination claim based on a failure to accommodate (Claim 4)  and a

9   retaliation claim (Claim 5).  Concerning the failure to accommodate claim, EUSD argues

10  facts to prove that it has engaged in sufficient efforts to accommodate West.  For

11  example, it says "EUSD initiated good food [sic] efforts to accommodate West's

12  religious beliefs through meetings. . . ."  EUSD Mem. of Points and Auth., Dkt. 157, at

13  10.  And EUSD says, "During this process, EUSD came to an agreement with Mirabelli

14  and West. . . ."  *Id*.  EUSD may be able to prevail on its defenses at summary judgment or

15  trial, but its arguments here are premature.  After all, "[a]n employer who fails to provide

16  an accommodation has a defense only if the hardship [on the employer] is 'undue,' and a

17  hardship that is attributable to employee animosity to a particular religion, to religion in

18  general, or to the very notion of accommodating religious practice cannot be considered

19  'undue.'" *Groff v. DeJoy*, 600 U.S. 447, 472 (2023).

20      Similarly, for the retaliation claim, EUSD remonstrates that West's allegations

21  have "no supporting factual basis," and then goes on to describe what it sees as favorable

22  facts.  EUSD Mem. of Points and Auth., Dkt. 157, at 11.  EUSD also argues that West is

23  required to allege the "when and what" of actions that her principal should have protected

24  West from.  But the Complaint sufficiently gives notice of the types of retaliation that

25  West alleges EUSD was aware and alleges EUSD took no action.  "To establish a prima

26  facie claim for retaliation under Title VII, the plaintiff must demonstrate that: (1) she

27  engaged in a protected activity; (2) she was subjected to an adverse employment action,

28  and (3) a causal link exists between the protected activity and the adverse action." *Perez*

1    *v. McDonough*, No. 23-CV-06713-JST, 2024 WL 4844383, at *7 (N.D. Cal. Nov. 20,

2    2024) (citing *Manatt v. Bank of Am., NA*, 339 F.3d 792, 800 (9th Cir. 2003)).  West

3    satisfies this standard.  The Complaint alleges EUSD placed her on administrative leave

4    and did not permit her to teach.  This suffices to state a claim.  *Dahlia v. Rodriguez*, 735

5    F.3d 1060, 1078 (9th Cir. 2013) ("The district court dismissed Dahlia's suit on the

6    alternative ground that placement on administrative leave is not an adverse employment

7    action.  We disagree.  We conclude that, under some circumstances, placement on

8    administrative leave can constitute an adverse employment action.").  The Complaint also

9    alleges instances of co-worker hostility to West's religious stance.  This also suffices to

10   state a claim as Title VII protects an employee from religious hostility by co-workers of

11   whom the employer is aware.  *Groff*, 600 U.S. at 472.  Ultimately, West has succeeded in

12   stating claims for relief under Title VII (Claims 4 and 5).  EUSD's motion to dismiss the

13   West claims is denied.

14           **C.  Indispensable Parties**

15           The State Defendants also argue that the Complaint should be dismissed because

16   the Plaintiffs have not named other indispensable parties as defendants.  Specifically, it is

17   argued that the local school districts of the Poe and Doe children must be named as

18   defendants.  The Court disagrees.  California local school districts are ultimately state

19   agents under state control.  *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 933 (9th

20   Cir. 2017) ("We therefore find that the passage of AB 97 did not disturb our longstanding

21   precedent that California law treats public schooling as a statewide or central

22   governmental function. . . . that the state itself has decided to give its local agents more

23   autonomy does not change the fact that the school districts remain state agents under state

24   control.") (citations omitted); *Butt v. State of California*, 4 Cal. 4th 668, 681 (1992)

25   ("Management and control of the public schools is a matter of state, not local, care and

26   supervision. . . . Local districts are the State's agents for local operation of the common

27   school system and the State's ultimate responsibility for public education cannot be

28   delegated to any other entity.") (citations omitted).  Consequently, the State Defendants

1  are able to protect a local district's interests and complete relief can be afforded among

2  the existing parties.  Thus, other local school districts need not be joined as defendants

3  under Federal Rule of Civil Procedure 19.  *Cf. Everett H v. Dry Creek Joint Elementary*

4  *Sch. Dist.*, No. 2:13-CV-00889-MCE-DB, 2016 WL 5661775, at *7 (E.D. Cal. Sept. 30,

5  2016) ("The CDE's [indispensable party] argument ignores the fact that the CDE has an

6  independent obligation to ensure compliance with the IDEA.").

7  **VI.  CONCLUSION**

8        It is still true that a request to change one's own name and pronouns may be the

9  first visible sign that a child or adolescent may be dealing with issues that could lead to

10  gender dysphoria or related health issues.  Yet, for teachers, communicating to a parent

11  the social transition of a school student to a new gender — by using preferred pronouns

12  or incongruent dress — is not generally permitted under EUSD's and the State

13  Defendants' policies.  The Supreme Court has long recognized that parents hold a federal

14  constitutional Due Process right to direct the health care and education of their children.

15  The Defendants stand on unprecedented and more recently created state law child rights

16  to privacy and to be free from gender discrimination.  These rights may compete when it

17  comes to information about a child's expressed gender incongruence in a public school.

18  Parents have a right to know about their child gender expression at school.  And a child

19  has a right to keep gender expressions private and to be protected from discrimination.

20        The Supreme Court and the Ninth Circuit have clearly and unambiguously

21  declared parents' rights as they relate to their children.  *Parham*, 442 U.S. at 602-604;

22  *Mann v. County of San Diego*, 907 F.3d 1154, 1156 (9th Cir. 2018) ("We have long

23  recognized the potential conflict between the state's interest in protecting children from

24  abusive or neglectful conditions and the right of the families it seeks to protect to be free

25  of unconstitutional intrusion into the family unit, *which can have its own potentially*

26  *devastating and long lasting effects.*") (emphasis added).  There are no controlling

27  decisions that would compel this Court to limit or infringe parental rights,

28  notwithstanding the State's laudable goals of protecting children.  This Court concludes

25

1    that, in a collision of rights as between parents and child, the long-recognized federal

2    constitutional rights of parents must eclipse the state rights of the child.  Therefore, the

3    Court finds that the Plaintiffs have stated plausible claims upon which relief can be

4    granted and the motions to dismiss are denied.

5    **THEREFORE, IT IS ORDERED THAT:**

6         All Plaintiffs enjoy Article III standing.  The motion to dismiss of the

7    Superintendent of Public Instruction (Dkt. 150) is denied.  The motion to dismiss of the

8    members of the Board of Education (Dkt. 149) is denied.  The Attorney General's motion

9    to dismiss (Dkt. 156) is denied.  The motion to dismiss of the EUSD Defendants (Dkt.

10   157) is denied.

11   **IT IS SO ORDERED.**

12        Dated: January 7, 2025

13                                                                **HON. ROGER T. BENITEZ**
                                                                  United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26

1

2

3

4

5

6

7

8

9

10                        UNITED STATES DISTRICT COURT

11                       SOUTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| 13   ELIZABETH MIRABELLI, an <br> 14   individual, and LORI ANN WEST, an <br> individual, | Case No.:  3:23-cv-00768-BEN-WVG |
| 15                 Plaintiffs, | **ORDER:** |
| 16   v. | **(1) GRANTING MOTION FOR PRELIMINARY INJUNCTION;** |
| 17 <br> 18   MARK OLSON, in his official capacity as <br> President of the EUSD Board of <br> 19   Education, et al., | **(2) DENYING MOTIONS TO DISMISS** |
| 20               Defendants. | **[ECF Nos. 5, 7, 17, 25]** |

21

22       Plaintiffs Elizabeth Mirabelli and Lori Ann West ("Plaintiffs") are teachers with

23  fifty-five years of experience between them in the Escondido Union School District

24  ("EUSD").  They bring claims against members of the EUSD Board of Education and

25  certain members of the EUSD administrative staff (collectively, "EUSD Defendants"), as

26  well as members of the California State Board of Education and the State Superintendent

27  (collectively, "State Defendants") for school district policies that violate the First

28  Amendment to the United States Constitution, under 42 U.S.C. § 1983.  Plaintiffs move

(123a)

1    for a preliminary injunction and the EUSD Defendants and the State Defendants move to

2    dismiss the claims.  A hearing was held on August 30, 2023.

3    **I. BACKGROUND**

4         If a school student suffers a life-threatening concussion while playing soccer

5    during a class on physical fitness, and the child expresses his feelings that he does not

6    want his parents to find out, would it be lawful for the school to require its instructor to

7    hide the event from the parents?  Of course not.  What if the child at school suffers a

8    sexual assault, or expresses suicidal thoughts, or expresses aggressive and threatening

9    thoughts or behavior?  Would it be acceptable not to inform the parents?  No.  These

10    would be serious medical conditions to which parents have a legal and federal

11    constitutional right to be informed of and to direct decisions on medical treatment.  A

12    parent's right to make decisions concerning the care, custody, control, and medical care

13    of their children is one of the oldest of the fundamental liberty interests that Americans

14    enjoy.  However, if a school student expresses words or actions during class that may be

15    the first visible sign that the child is dealing with gender incongruity or possibly gender

16    dysphoria, conditions that may (or may not) progress into significant, adverse, life-long

17    social-emotional health consequences, would it be lawful for the school to require

18    teachers to hide the event from the parents?

19         Plaintiffs Elizabeth Mirabelli and Lori Ann West are two teachers at Rincon

20    Middle School, which is part of EUSD.  Mrs. Mirabelli teaches English, and Mrs. West

21    teaches physical education.  According to the Complaint, both have been named "Teacher

22    of the Year" at different times while teaching for EUSD.  The district is a public school

23    district with approximately 16,000 students in kindergarten through eighth grades.  As a

24    government-created entity it is obligated to follow the laws of the State of California and

25    the California Constitution as well as the laws of the United States and the U.S.

26    Constitution.  Local school districts have traditionally been guided by local school boards

27    familiar with the needs and opportunities of the local community.  In the process of

28    providing a public education for Escondido's school-age children, EUSD hires, trains,

1  and supervises teachers and as part of their duties its teachers must communicate from

2  time to time with the parents of students.

3       One current subject that EUSD faces in its community is how to address changing

4  concepts of gender identification, gender diversity, gender dysphoria, gender

5  incongruence, and self-transitioning among its student body.  Gender dysphoria[1] is a

6  clinically diagnosed incongruence between one's gender identity and assigned gender.  If

7  untreated, gender dysphoria may lead to anxiety, depression, eating disorders, substance

8  abuse, self-harm, and suicide.  *Eknes-Tucker v. Marshall*, No. 2:22-cv-184-LCB, 2022

9  WL 1521889, at *1 (M.D. Ala. May 13, 2022).  Plaintiffs allege in their Complaint that

10 EUSD has a newly adopted policy of: (1) school-wide recognition of a student's newly

11 expressed gender identification, and (2) when communicating with a student's parents, an

12 enforced requirement of faculty confidentiality and non-disclosure regarding a student's

13 newly expressed gender identification.  The policy is known as AR 5145.3.

14

---

15

16 [1] According to DSM-5, the criteria for Gender Dysphoria is:
A marked incongruence between one's experienced/expressed gender and natal gender of

17 at least 6 months in duration, as *manifested by at least two of the following*:

18 A.   A marked incongruence between one's experienced/expressed gender and primary
and/or secondary sex characteristics (or in young adolescents, the anticipated secondary

19 sex characteristics)

20 B.   A strong desire to be rid of one's primary and/or secondary sex characteristics
because of a marked incongruence with one's experienced/expressed gender (or in young

21 adolescents, a desire to prevent the development of the anticipated secondary sex
characteristics)

22 C.   A strong desire for the primary and/or secondary sex characteristics of the other

23 gender

24 D.   A strong desire to be of the other gender (or some alternative gender different from
one's designated gender)

25 E.   A strong desire to be treated as the other gender (or some alternative gender different
from one's designated gender)

26 F.   A strong conviction that one has the typical feelings and reactions of the other

27 gender (or some alternative gender different from one's designated gender)
The condition is associated with clinically significant distress or impairment in social,

28 occupational, or other important areas of functioning.

3

1    The result of the new EUSD policy is that a teacher ordinarily may not disclose to
2    a parent the fact that a student identifies as a new gender, or wants to be addressed by a
3    new name or new pronouns during the school day – names, genders, or pronouns that are
4    different from the birth name and birth gender of the student.  Under the policy at issue,
5    accurate communication with parents is permitted *only if* the child first gives its consent
6    to the school.  A teacher who knowingly fails to comply is considered to have engaged in
7    discriminatory harassment and is subject to adverse employment actions.

8    EUSD has other formal policies that are consistent with existing law but are in
9    tension with the new policy.  For example, BP 0100(7) states that, "Parents/guardians
10   have a right and an obligation to be engaged in their child's education and to be involved
11   in the intellectual, physical, emotional, and social development and well-being of their
12   child."  Compl. Exh. 15(7).  And BP 4119.21(9) states that, "Being dishonest with
13   students, parents/guardians, staff, or members of the public, including . . . falsifying
14   information in  . . . school records" is inappropriate employee conduct.  Compl. Exh. 14
15   (9).  Both existing policies BP 0100(7) and BP 4119.21(9) are consistent with federal
16   constitutional rights but appear to be at odds with AR 5145.3.

17   The plaintiffs in this action are two experienced, well-qualified, teachers.  The
18   teachers maintain sincere religious beliefs that communications with a parent about a
19   student should be accurate; communications should not be calculated to deceive or
20   mislead a student's parent.  The teachers also maintain that parents enjoy a federal
21   constitutional right to make decisions about the care and upbringing of their children.
22   The teachers allege a well-founded fear of adverse employment action should they violate
23   the EUSD gender identification confidentiality policy by communicating accurately to a
24   student's parents her own observations or concerns, as a teacher, about the student's
25   gender incongruence.

26   The plaintiffs bring a facial and as-applied challenge to the EUSD policy, and seek
27   a preliminary injunction to enjoin the defendants from taking any adverse employment
28   action against them in the event that they violate the gender identification confidentiality

1 policy.  Because the plaintiffs have shown a likelihood of success on the merits as applied

2 to them, a preliminary injunction would restore the status quo ante, and the other

3 preliminary injunction factors tip in the plaintiffs' favor, the motion for preliminary

4 injunction is granted.

5 **II. LEGAL STANDARDS**

6       Federal Rule of Civil Procedure 65 governs the issuance of preliminary

7 injunctions.  Plaintiffs seeking injunctive relief must show that: (1) they are likely to

8 succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of

9 preliminary relief; (3) the balance of equities tips in their favor; and (4) that an injunction

10 is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008);

11 *Baird v. Bonta*, __F.4th __, 2023 WL 5763345, *2 (9th Cir. Sept. 7, 2023).  "It is well-

12 established that the first factor is especially important when a plaintiff alleges a

13 constitutional violation and injury.  If a plaintiff in such a case shows he is likely to

14 prevail on the merits, that showing usually demonstrates he is suffering irreparable harm

15 no matter how brief the violation." *Id.* at *3 (citations omitted).  "And his likelihood of

16 succeeding on the merits also tips the public interest sharply in his favor because it is

17 'always in the public interest to prevent the violation of a party's constitutional rights.'"

18 *Id.* (citations omitted).  The Ninth Circuit evaluates "these factors on a sliding scale, such

19 'that a stronger showing of one element may offset a weaker showing of another.' When

20 the balance of equities 'tips sharply in the plaintiff's favor,' the plaintiff must raise only

21 'serious questions' on the merits—a lesser showing than likelihood of success."

22 *Fellowship of Christian Athletes v. San Jose Unified School District et al*, No. 22-15827,

23 2023 WL 5946036, at *35 (9th Cir. Sept. 13, 2023) (en banc) (citations omitted).

24 **III. DISCUSSION**

25       Since 2003, EUSD has maintained a nondiscrimination policy and a policy against

26 discriminatory harassment that prohibits, *inter alia,* harassment based on a student's

27 actual or perceived gender identity.  *See* BP 0410 and BP 5145.3.  Those policies are not

28 questioned here.  However, on August 13, 2020, during the COVID-19 pandemic and

5

1   related school shutdowns, it is alleged that EUSD adopted Administrative Regulation

2   ("AR") 5145.3.  AR 5145.3 gives definition to what is considered discriminatory

3   harassment under BP 5145.3.  Compl. at ¶¶ 115-116.  It is this regulation (AR 5145.3)

4   and its application that is at the center of this controversy.

5          It is alleged that AR 5145.3 was not discussed at a public school board meeting.  It

6   is alleged that AR 5145.3 was not passed upon by the EUSD Board of Trustees.  It is

7   alleged that AR 5145.3 was not widely circulated to all staff.  Rather, it is alleged that AR

8   5145.3 was adopted by school district administrative staff, without fanfare, and without

9   opportunity for parental or public input.  In fact, apparently few even knew of its

10  existence or significance until February 3, 2022.  On that day it is alleged that EUSD held

11  a district-wide video conference meeting for certificated staff (*i.e.*, teachers) regarding the

12  rights of gender diverse students under the newly adopted AR 5145.3, *et al*.  Compl. at ¶¶

13  118 and Exh. 4.

14         Among the policy points discussed was an instruction that a teacher who knew of a

15  student's transgender status and revealed that status to "individuals who do not have a

16  legitimate need for the information," the teacher's communication would be considered

17  discriminatory harassment.  *Parents* were specifically identified as individuals who do

18  not have a legitimate need for the information.  And the presentation made it clear that a

19  student's consent to reveal gender information is required, regardless of the age of the

20  student.  Compl. at ¶ 129.

21         According to the Complaint, the February 2022, training presentation was

22  conducted by Defendant Tracy Schmidt, Director for Integrated Student Supports, and

23  introduced by Albert Ngo, Director of Certificated Human Resources.  In the

24  presentation, Schmidt describes the rights of "protected students."  Schmidt says,

25              "So, now, lets go through what these rights [of protected
26          students] are.  And this is taken from our own adopted EUSD
            policy on discrimination and harassment.  So, first off,
27          determining gender identity.  The school or District shall accept
            the student[']s assertion of their gender identity and begin to
28

23-cv-00768-BEN-WVG

1
2
3
4
5
6
7
8
9
10
11

> treat the student immediately, consistently with that gender identity.  The student's assertion is enough.  There is no need for a formal declaration.  There's no requirement for *parent or caretaker agreement or even for knowledge* for us to begin treating that student consistent with their gender identity. Students also have a right to privacy.  A student's status is their private information, and the District shall only disclose the information to others with the student's prior consent.  When disclosure of a student's gender identity is made to a District employee by a student, that employee shall seek the student's permission to share with others including *parents* or . . . caretakers.  The main take away is this: It always comes back to the student's comfort.  If one wants to take any action to share a student's status, they must be granted that permission, and *that includes parents*, caretakers, other teachers, administrators, even support staff.  You have to seek out permission first."

12
13
14
15
16
17
18
19

Compl. at Exh. 4, p 3-4 (emphasis added).  Schmidt then describes actions deemed to be discrimination or harassment -- which includes revealing a student's gender diverse status to people without a legitimate need for the information.  Schmidt says that parents are included among those who do not have a legitimate need to know.  Schmidt instructs that discrimination/harassment includes, "revealing a student's transgender status or gender diverse status to individuals who do not have a legitimate need for the information without the student's consent, and *this includes parents* or caretakers."  Compl. at Exh. 4, p 7 (emphasis added).

20
21
22
23
24
25
26

In August 2022, at the outset of the new school year, the plaintiffs received emails from school staff with a list of students with student-preferred names and pronouns.  The list included directions on whether or not said names and pronouns were to be disclosed to the students' parents.  Compl. at ¶¶ 163-164; Exh. 23.  For example, Mirabelli received an email with a list of students and entries such as: "[student name]: Preferred name is [redacted] (pronouns are he/him).  Dad and stepmom are NOT aware, please use [redacted] and she/her when calling home."

27
28

23-cv-00768-BEN-WVG

1       Both plaintiffs sought relief from EUSD in the form of a religious accommodation.

2  Although it did not contest the sincerity of their religious convictions, EUSD did not

3  extend that accommodation to the plaintiffs for communications with parents.  *See e.g.,*

4  Compl. Exh. 7 (Letter from attorney for EUSD, dated Feb. 8, 2023) ("Finally, (4)

5  teachers are required to follow the 'privacy' policy that requires them to not share a

6  student's gender identity status with their parent or guardian without the student's

7  permission."); Compl. Exh. 9 (Letter from attorney for EUSD, dated Mar 10, 2023)

8  ("Question (1): What if a parent directly asks [the teachers] to reveal a student's gender

9  identity?  Clarification.  Your clients should respond that that [sic] the inquiry is outside

10  the scope of the intent of their interaction and state that the intent of the communication,

11  may involve behavior as it relates to school and class rules, assignments, etc.  If your

12  clients have questions about questions from parents related to gender identification or

13  equity laws/regulations, they should contact the principal, who will provide the necessary

14  guidance.").

15       Consequently, when it comes to communicating with parents, the plaintiffs have

16  been told by EUSD through its attorneys that they can say only: "*the inquiry is outside*

17  *the scope of the intent of [my] interaction and state that the intent of the communication,*

18  *may involve behavior as it relates to school and class rules, assignments, etc*."  Teachers

19  may refer the parent to the school principal, but the principal will not disclose more

20  information either, without the student's consent.  Without a student's consent (regardless

21  of the student's age), the school district operates within a veritable cone of silence.

22  Parents are left outside.  This was explained at the hearing.

23          EUSD Attorney:  Yes.  So ultimately, though, to go back

24          to your question, if a child went through this whole process,
           and then we get to a parent, and the teacher is not being told

25          to lie but saying this is beyond my purview; they speak to an

26          administrator; ultimately, an administrator would respect the
           child's wishes not to disclose and respect their privacy.

27

28

8

1   Hearing Transcript, at 98.  It is alleged that neither plaintiff Mirabelli nor plaintiff West

2   have a desire to telephone parents to specifically report a child's gender identification; on

3   the other hand, to be consistent with their sincerely-held religious beliefs, they cannot

4   conceal pertinent information that can impact the health and well-being of a student or

5   affirmatively mislead a student's parent.  Compl. at ¶ 212.

6         EUSD responds in part, that AR 5415.3 is required by California law as explained

7   and communicated through the California Department of Education's publication titled

8   *Frequently Asked Questions* about the School Success and Opportunity Act (Assembly

9   Bill 1266) (hereinafter "FAQs").  Compl. Exh. 4; Hearing Transcript at 26.  Page 5 of the

10  FAQs provides an answer to the question, "May a student's gender identity be shared

11  with the student's parents, other students, or members of the public?"  It says,

12      A transgender or gender nonconforming student may not
13      express their gender identity openly in all contexts, including at
    home.  Revealing a student's gender identity or expression to
14      others may compromise the student's safety.  Thus, preserving
    a student's privacy is of the utmost importance.  The right of
15      transgender students to keep their transgender status private is
    grounded in California's antidiscrimination laws as well as
16      federal and state laws.  Disclosing that a student is transgender
17      without the student's permission may violate California's
    antidiscrimination law by increasing the student's vulnerability
18      to harassment and may violate the student's right to privacy.
19

20  FAQs page 7 explains that if a student chooses to be addressed by a name or pronoun all

21  school district personnel are required to use said chosen name/pronoun.  The student's

22  age is not a factor, "as children as early as age two are expressing a different gender

23  identity."

24        To this end, the state Department of Education's FAQs contemplate a sort of

25  double set of books to be kept by a school district – specifically for transgender or gender

26  nonconforming students.  For example, FAQs page 6 says, "it is strongly recommended

27  that schools keep records that reflect a transgender student's birth name and assigned sex

28

1  (e.g., copy of the birth certificate) apart from the student's school records.  Schools

2  should consider placing physical documents in a locked file cabinet in the principal's or

3  nurse's office."  And at FAQs page 7, "[i]f the school district has not received

4  documentation supporting a legal name or gender change, the school should nonetheless

5  update all unofficial school records (e.g. attendance sheets, school IDs, report cards) to

6  reflect the student's name and gender marker that is consistent with the student's gender

7  identity."

8      The upshot of the Board of Education direction seems to be that once a student,

9  whether in kindergarten, eighth grade, or somewhere in between, expresses a desire to be

10  called by a new name or new pronouns, school faculty and staff are to refer to that

11  student by the newly preferred indicators.  "Unofficial" school records such as attendance

12  sheets, school IDs, and report cards are to be changed.  From that point forward, the

13  student may go through each school day with the faculty and staff addressing the student

14  in person and on records according to the changed moniker.

15      However, under the antidiscrimination policy, a teacher is not permitted to inform

16  the parents of this change without the student's consent.  Classroom teachers who are in

17  the best position to observe the student and forms the opinion that the intellectual or

18  social health and well-being of the student may be at risk related to gender

19  nonconformance or dysphoria, under the antidiscrimination policy, is not permitted to

20  inform the parents without the student's consent.  Regarding gender confidentiality and

21  nondisclosure, FAQs page 6 says, "schools must consult with a transgender student to

22  determine who can or will be informed of the student's transgender status, if anyone,

23  including the student's family.  With rare exceptions, schools are required to respect the

24  limitations that a student places on the disclosure of their transgender status, *including*

25  *not sharing that information with the student's parents*."  (Emphasis added.)

26  **A.  Medical Opinion**

27      The government approach articulated in AR 5145.3 is dramatically inconsistent

28  with respected medical opinions.  The plaintiffs in this case provide a declaration from an

1  expert in the field of children and adolescents dealing with gender-identity related issues.

2  *See* Declaration of Dr. Erica E. Anderson, Dkt. 5-2.  Dr. Erica E. Anderson, is a well-

3  credentialed clinical psychologist with forty years of experience.  As part of her clinical

4  practice, Anderson has seen and supported hundreds of children and adolescents for

5  gender-identity-related issues, many of which have transitioned socially, medically, or

6  both, to a gender identity that differs from their natal sex.  *Id*. at ¶ 3.  Anderson describes

7  herself as a transgender woman.  *Id.* at ¶ 5.  Anderson's testimony is summarized in the

8  following excerpts:

9  "A child or adolescent who exhibits a desire to change name and pronouns should

10  receive a careful professional assessment prior to transitioning;" "A request to change

11  name and pronouns may be the first visible sign that the child or adolescent may be

12  dealing with gender dysphoria or related coexisting mental-health issues;" "Parental

13  involvement is necessary to obtain professional assistance for a child or adolescent

14  experiencing gender incongruence, to provide accurate diagnosis, and to treat any gender

15  dysphoria or other coexisting conditions;" "A school-facilitated transition without

16  parental consent interferes with parents' ability to pursue a careful assessment and/or

17  therapeutic approach prior to transitioning, prevents parents from making the decision

18  about whether a transition will be best for their child, and creates unnecessary tension in

19  the parent-child relationship.  Nor is facilitating a double life for some children, in which

20  they present as transgender in some contexts but cisgender in other contexts, in their

21  best interests."  *Id*. at ¶ 8.

22  Anderson opines, "a social transition represents one of the most difficult

23  psychological changes a person can experience.  [And] embarking upon

24  a social transition based solely upon the self-attestation of the youth without

25  consultation with parents and appropriate professionals is unwise."  *Id*. at ¶ 42.  Opining

26  directly on the point of concern for the plaintiffs/teachers, Anderson says, "to place

27  teachers in the position of accepting without question the preference of a minor and

28  further direct such teachers to withhold the information from parents concerning their

1   minor children is hugely problematic." *Id*. at ¶ 43.  Anderson continues, "it can be

2   appropriate for parents to say 'no' to a social transition (whether at school or elsewhere)

3   to, among other things, allow time for assessment and exploration with the help of a

4   mental health professional before making such a significant change.  Part of parents' job

5   is to help their children avoid making bad decisions." *Id*. at ¶ 60.  Concerning medical

6   standards, the World Professional Association for Transgender Health's ("WPATH")

7   Standards of Care ("SOC") 7 and 8 recognize, "it is appropriate for parents to decide

8   whether to 'allow' a social transition for their children.   Neither SOC 7 nor SOC 8

9   suggest that school personnel should decide whether a minor should socially transition,

10  let alone doing so and hiding this information from parents." *Id.* at ¶ 60.

11       Parental involvement is not optional for correct medical diagnosis of gender

12  incongruence.  After all, "Parents are often the only people who have frequently and

13  regularly interacted with a child or adolescent throughout the child's or adolescent's

14  entire life, and therefore they have a unique view of the child's development over time.

15  Indeed, parents often have more knowledge than even the child or adolescent does of

16  whether their child or adolescent exhibited any signs of gender incongruence or gender

17  dysphoria during the earliest years of life." *Id*. at ¶ 65.  Consequently, as Anderson

18  explains, "parental involvement is a critical part of the diagnostic process to evaluate how

19  long the child or adolescent has been experiencing gender incongruence, whether there

20  might be any external cause of those feelings, and a prediction of how likely those

21  feelings are to persist." *Id*. at ¶ 66.  Anderson continues,

22            And, as WPATH notes, "a parent/caregiver report may
           provide critical context in situations in which a young person
23         experiences very recent or sudden self-awareness of gender
           diversity and a corresponding gender treatment request, or
24         when there is concern for possible excessive peer and social
           media influence on a young person's current self-gender
25         concept."
26         . . .
27         Indeed, WPATH's SOC 8 recommends "involving parent(s) or
28         primary caregiver(s) in the assessment process … in almost all

12

(134a)

> situations," and adds that "including parent(s)/caregiver(s) in the assessment process to encourage and facilitate increased parental understanding and support of the adolescent may be one of the most helpful practices available."

*Id*. at ¶¶ 68-69.  Concealing from a parent the fact of a student's transitioning at school is not in the best medical interests of a student, according to Anderson.  "By facilitating a social transition at school over the parents' objection, a school would drive a wedge between the parent and child.  Similarly, facilitating a double life for some children, in which they present as transgender in some contexts but cisgender in other contexts, is not in their best interest."  *Id*. at ¶¶ 77-78.  After all, "[c]ircumventing, bypassing, or excluding parents from decisions about a social transition undermines the main support structure for a child or adolescent who desperately needs support."  *Id*. at ¶ 80.

Anderson's opinion regarding EUSD's confidentiality and parental exclusion policies is,

> contrary to widely accepted mental health principles and practice.  I am not aware of any professional body that would endorse EUSD's policies which envision adult personnel socially transitioning a child or adolescent without evaluation of mental health professionals and without the consent of parents or over their objection.
>
> Rather, when a child presents with a desire to use a new name or pronouns, the very first step should be a careful professional assessment by a mental health professional with expertise in child gender incongruence.  The first step should not be, as EUSD's policies provide, the immediate and unhesitating affirmance of the child's request without parental involvement or knowledge.

*Id*. at ¶¶ 82-83.  Anderson concludes,

> EUSD's policies are contrary to best practices regarding maintaining the relationship between parents and their children.  Best mental health practices abhor activity that drives a wedge between parents and children, creating distrust and tension.  In all cases, parental consent is required to provide medical and

23-cv-00768-BEN-WVG

> psychological treatment to minors.  In part, this is because the
> science of mental health recognizes that the best evidence
> regarding a minor's mental and emotional well-being comes
> from first-hand accounts by parents, rather than biased accounts
> from immature children.

*Id.* at ¶85.

To sum up, the plaintiffs correctly understand that the EUSD policy of confidentiality and non-disclosure to parents explicated by AR 5414.3 is not conducive to the health of their gender incongruent students.  Anderson's expert opinion is unrebutted. As such, for purposes of a motion for preliminary injunction, it is entitled to substantial weight.

**B.  Youthful Impetuosity**

Though it does not require the wisdom of a Supreme Court Justice to see, the Supreme Court recognizes that youth tend to make impetuous and ill-considered life decisions.  "First, as any parent knows and as the scientific and sociological studies . . . tend to confirm, 'a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.'" *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (citations omitted).  In the same vein, and perhaps especially true in the school setting, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* And "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at 570 (citation omitted).  "Indeed, notes the Court, "the relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Id.*

**C.  Federal Constitutional Rights of Parents**

Although the plaintiffs ultimately seek a declaration that EUSD's AR 5415.3 policy violates state law, a decision on that claim need not be made in order to grant

14

1    preliminary injunctive relief.  This is because the plaintiffs also correctly understand that

2    EUSD's policies are in direct tension with the federal constitutional rights of parents to

3    direct the upbringing and education of their children.  The interpretation of federal

4    constitutional rights is plainly committed to both state and federal courts and is a subject

5    upon which federal courts may decide legal questions with authority.  Indeed, it is the

6    duty of federal courts to do so.

7         The United States Supreme Court has historically and repeatedly declared that

8    parents have a right, grounded in the Constitution, to direct the education, health, and

9    upbringing, and to maintain the well-being of, their children.  In *Troxel v. Granville*, 530

10   U.S. 57, 67-68 (2000), the Court remarked, "the custodial parent has a constitutional right

11   to determine, without undue interference by the state, how best to raise, nurture, and

12   educate the child.  The parental right stems from the liberty protected by the Due Process

13   Clause of the Fourteenth Amendment."  The Court commented that the principle, first

14   formulated in *Myer* and *Pierce*, "long ha[s] been interpreted to have found in Fourteenth

15   Amendment concepts of liberty an independent right of the parent in the 'custody, care

16   and nurture of the child,' free from state intervention."

17        Beginning with *Myer v. Nebraska*, 262 U.S 390, 400 (1923), the Court said, "[t]he

18   American people have always regarded education and acquisition of knowledge as

19   matters of supreme importance which should be diligently promoted. . . . Corresponding

20   to the right of control, it is the natural duty of the parent to give his children education

21   suitable to their station in life."

22        In *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925), the Court acknowledged

23   "the liberty of parents and guardians to direct the upbringing and education of children

24   under their control," and said, "[t]he child is not the mere creature of the State; those who

25   nurture him and direct his destiny have the right, coupled with the high duty, to recognize

26   and prepare him for additional obligations."

27        In *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), the Court pointed out that

28   "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the

1  parents, whose primary function and freedom include preparation for obligations the state

2  can neither supply nor hinder."

3       In *Stanley v. Illinois*, 405 U.S. 645 (1972), the Court recounted that it "has

4  frequently emphasized the importance of the family, and explained, "[t]he rights to

5  conceive and to raise one's children have been deemed 'essential.'"

6       In *Parham v. J.R.*, 442 U.S. 584, 604 (1979), the Court declared, "[o]ur

7  jurisprudence historically has reflected Western civilization concepts of the family as a

8  unit with broad parental authority over minor children.  Our cases have consistently

9  followed that course; our constitutional system long ago rejected any notion that a child is

10  'the mere creature of the State' and, on the contrary, asserted that parents generally 'have

11  the right, coupled with the high duty, to recognize and prepare their children for

12  additional obligations.'"  The Court continued, "[t]he law's concept of the family rests on

13  a presumption that parents possess what a child lacks in maturity, experience, and

14  capacity for judgment required for making life's difficult decisions.  More important,

15  historically it has recognized that natural bonds of affection lead parents to act in the best

16  interests of their children."  *Id.* (citations omitted). "The statist notion that governmental

17  power should supersede parental authority in all cases because some parents abuse and

18  neglect children is repugnant to American tradition."  *Id*. at 603.  The *Parham* court

19  recognized the parental right to be involved in -- and even override their child's opinion

20  on -- the need for medical care or treatment.

21  
22         Simply because the decision of a parent is not agreeable to a
       child or because it involves risks does not automatically transfer
23         the power to make that decision from the parents to some
       agency or officer of the state.  The same characterizations can
24         be made for a tonsillectomy, appendectomy, or other medical
       procedure.  Most children, even in adolescence, simply are not
25         able to make sound judgments concerning many decisions,
       including their need for medical care or treatment.  Parents can
26         and must make those judgments.

27  

28  

16

1  *Parham*, 442 U.S. at 603-04 ("The fact that a child may balk at hospitalization or

2  complain about a parental refusal to provide cosmetic surgery does not diminish the

3  parents' authority to decide what is best for the child.").

4       In *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), the Court recognized that "[t]he

5  fundamental liberty interest of natural parents in the care, custody, and management of

6  their child does not evaporate simply because they have not been model parents . . . ."

7       In *Hodgson v. Minnesota*, 497 U.S 417, 447 (1990) (plurality), the Court said, "[a]

8  natural parent who has demonstrated sufficient commitment to his or her children is

9  thereafter entitled to raise the children free from undue state interference."

10       In *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 529 (2007), the Court said,

11  "it is not a novel proposition to say that parents have a recognized legal interest in the

12  education and upbringing of their child."

13       These are not strange or novel notions.  The United States Court of Appeals for the

14  Ninth Circuit recently acknowledged, yet again, the continuing vitality of a parent's

15  constitutionally protected interest in raising a child.  In *David v. Kaulukukui*, 38 F.4th

16  792, 799 (2022), the court observed, "[t]he interest of parents in the care, custody, and

17  control of their children — is perhaps the oldest of the fundamental liberty interests

18  recognized by the Supreme Court.  Our caselaw has long recognized this right for parents

19  and children under the Fourth and Fourteenth Amendments."  (citations omitted).

20       The constitutional right of parents to direct their child's education is further

21  protected through Congressional policy, as exemplified by the Family Educational Rights

22  and Privacy Act ("FERPA") (20 U.S.C. § 1232g; 34 CFR part 99).  FERPA requires

23  schools to provide parents the opportunity and the right to inspect and review their child's

24  education records (34 CFR 99.10 - 99.12).  FERPA speaks to the Congressional elevation

25  of the importance of parents being involved in their child's education.  That involvement

26  includes more than academics and extends to matters of health.  The privacy right of a

27  child, according to FERPA, takes second place to his or her parents' right to know.

28

23-cv-00768-BEN-WVG

1    In the end, EUSD's policy of elevating a child's gender-related choices to that of

2    paramount importance, while excluding a parent from knowing of, or participating in,

3    that kind of choice, is as foreign to federal constitutional and statutory law as it is

4    medically unwise.

5         **D.  State Law Right to Privacy**

6    EUSD responds that the policy is required by state law.  AR 5145.3 is not a state

7    statute.  Rather, the argument goes that AR 5145.3 gives meaning to a child's state right

8    to privacy as applied to the school setting.  A state's highest court is the final arbiter of

9    the meaning of state law and federal courts look to decisions of a state's highest court for

10   binding interpretations.  *Hewitt v. Joyner*, 940 F.2d 1565 (9th Cir. 1995).  Where there

11   are none, federal courts look to decisions from state appellate courts for guidance in

12   predicting the decision of the state's highest court.  In *American Academy of Pediatrics v.*

13   *Lungren*, 16 Cal.4th 307, 315 (1997), California's Supreme Court observed that the

14   "requirement that medical care be provided to a minor only *with the consent of the*

15   *minor's parent or guardian* remains the general rule, both in California and throughout

16   the United States."  (Emphasis added.)  It did note the existence of several statutory

17   exceptions to the general rule (*i.e.*, "medical emancipation" statutes)[2] permitting minors

18   to obtain specific types of medical services without a parent's consent, however gender

19   transitioning is not among the exceptions.

20        Concerning the California's state constitutional right to privacy for minors and

21   regulations like AR 5415.3, the state's highest court has not had occasion to issue a

22   binding interpretation, and no state appellate court decisions have been identified.

23   Whether a child's state law right to privacy includes a right of confidentiality from their

24   own parents after the child has expressed a desire to be publicly (at school) known by a

25

26

27   [2] These are described as "statutes that authorize minors, without parental consent, to
     obtain medical care only for specific, designated conditions, without authorizing the
28   minor to consent to medical care for other medical needs."  *Id*. at 316.

23-cv-00768-BEN-WVG

1   new name and referred to by new pronouns, seems unlikely.  After all, one element of a

2   right to privacy is a reasonable expectation of privacy.  A student who announces the

3   desire to be publicly known in school by a new name, gender, or pronoun and is referred

4   to by teachers and students and others by said new name, gender, or pronoun, can hardly

5   be said to have a reasonable expectation of privacy or expect non-disclosure.

6          While the Court is unaware of state appellate court decisions recognizing a child's

7   right to quasi-privacy about their gender identity expressions, and none placing such a

8   right above a parent's right to know, there are decisions describing parents' rights and

9   obligations.  For example, in *Brekke v. Wills*, 125 Cal.App.4th 1400 (Cal. App. 2005), a

10  California court of appeal made clear that a parent's rights are superior to a child's rights.

11  "We categorically reject the absurd suggestion that defendant's freedom of association

12  trumps a parent's right to direct and control the activities of a minor child, including with

13  whom the child may associate.  *Id*. at 1410 (citations omitted).  "The liberty interest ... of

14  parents in the care, custody, and control of their children ... is perhaps the oldest of the

15  fundamental liberty interests recognized by the United States Supreme Court."  *Id.*

16  (quoting *Troxel*, 530 U.S. at 65).  *Brekke* continues, "[w]hether a child likes it or not,

17  parents have broad authority over their minor children."  *Id.  Brekke* then lays out

18  parents' obligations regarding children.  "Not only do parents have a constitutional right

19  to exercise lawful control over the activities of their minor children, the law requires

20  parents to do so."  *Id.* at 1410-11 (citing Cal. Penal Code, § 272, subd. (a)(1), (a)(2)

21  [parents of a child "under the age of 18 years shall have the duty to exercise reasonable

22  care, supervision, protection, and control over their minor child" so as not to "encourage"

23  or "cause" the child to "become or to remain a person within the provisions of Section

24  300 [juvenile dependency], 601 [habitually disobedient or truant], or 602 [juvenile

25  delinquency] of the Welfare and Institutions Code" and are subject to criminal

26  punishment for a violation of that duty]; Ed.Code, §§ 48260.5, subds. (b), (c); 48293

27  [parents who fail to compel their child's attendance at school are subject to criminal

28  prosecution]; *see also* Civ.Code, § 1714.1 [parents may be liable for the torts of their

19

1  minor child]; Gov.Code, § 38772, subd. (b) [parents are jointly and severally liable with

2  their minor child for the child's defacement of property by graffiti]; Ed.Code, § 48904,

3  subd. (a) [parents are liable for damages caused by the willful misconduct of their minor

4  child in injuring or killing a pupil or school employee or volunteer, or in damaging

5  property belonging to a school or school employee]; Pen.Code, § 490.5, subd. (b)

6  [parents may be liable for petty theft committed by a minor child under their custody and

7  control].)

8        Another California court of appeal made it clear that, in a similar Fourth

9  Amendment context, a child's right to privacy and to object to a warrantless search of his

10  room must give way to a parent's superior right to consent.  *See In re D.C.*, 188

11  Cal.App.4th 978 (Cal.App. 2010).  The appellate court wrote,

12       [The minor] Appellant argues the officers' failure to honor his
13       objection to their entry constituted a violation of his
     constitutional rights, noting minors are entitled to the
14       protections of the Constitution and, in particular, the search and
     seizure provisions of the Fourth Amendment.  While there is no
15       question minors are entitled to the protection of the Fourth
16       Amendment, adults and minors are not necessarily entitled to
     the same degree of constitutional protection.
17

18  *Id.* at 989-90 (citations omitted).  *In re D.C.* explains why.  "To fulfill their duty of

19  supervision, parents must be empowered to authorize police to search the family home,

20  even over the objection of their minor children."  *Id.* at 990.  A child's right to privacy

21  may be superior to other, unrelated individuals.  Nevertheless, California appellate courts

22  recognize that parents have constitutional rights and legal responsibilities and that

23  generally a parent's rights are superior to a right of privacy belonging to their child.[3]

24  _____

25
26  [3] In the case of a child's home bedroom, where a child ordinarily has a high expectation
of privacy as to others, parents have the stronger case to authorize a search over the
27  child's objection.
28       "When the child is a minor, there is an even stronger case for
     apparent authority in a parent to consent to the search of the

23-cv-00768-BEN-WVG

## IV.  LIKELIHOOD OF SUCCESS ON THE MERITS

In their motion for preliminary injunction, plaintiffs claim their First Amendment rights to free speech and the free exercise of religion are being violated.  Tangentially, plaintiffs claim that the federal constitutional rights of parents of school district students are being violated.  As an initial impression, it would seem so.  However, no parents have joined as plaintiffs at this time.  Moreover, at least for purposes of their preliminary injunction motion, plaintiffs are not claiming to stand in the place of parents.  Consequently, the issue is not resolved here.

### A.  Section 1983 liability

Local government units such as public school districts are included among those persons to whom 42 U.S.C. § 1983 applies.  "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  The language of § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights."  *Id*. at 692; *cf. United States v. Town of Colo. City*, 935 F.3d 804, 808 (9th Cir. 2019) (same).

### B.  Freedom Speech Clause

Plaintiffs first claim for relief asserts that EUSD's policy conflicts with their own constitutional right to freedom of speech.  They argue that their right to speak freely on

---

child's bedroom.  Unlike the parents of adult children, the parents of minor children have legal rights and obligations that both permit and, in essence, require them to exercise common authority over their child's bedroom… Most fundamentally, parents have the "responsibility" to support their minor children (Fam. Code, § 3900) and must "exercise reasonable care, supervision, protection, and control" over their conduct."
*In re D.C.,* 188 Cal.App.4th at 984 (quoting *Brekke*, 125 Cal.App.4th at 1410).

21

1   matters of public concern do not end at the schoolhouse door and that the policy forces

2   them to adhere to an ideological orthodoxy (with which they directly disagree), as a

3   condition of their employment.  *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393

4   U.S. 503, 506 (1969).

5          It is clear from the supporting documents that plaintiffs have a direct disagreement

6   with the policy.  However, the argument that they may speak freely on matters of

7   curricular speech is foreclosed by *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th

8   Cir. 2011).  *Johnson* considered the speech of a high school math teacher whose

9   expression took the form of posters about history on his classroom walls.  There, the

10  court "recognize[d] that 'expression is a teacher's stock in trade, the commodity she sells

11  to her employer in exchange for a salary.'"  *Id*. at 967.  "Certainly, Johnson did not act as

12  a citizen when he went to school and taught class, took attendance, supervised students,

13  or regulated their comings-and-goings; he acted as a teacher—a government employee,"

14  according to *Johnson*.  *Id.*  The court explained that because the speech was that of a

15  school teacher, the speech belonged not to the teacher, but to the school district.

16  "Because the speech at issue owes its existence to Johnson's position as a teacher, Poway

17  acted well within constitutional limits in ordering Johnson not to speak in a manner it did

18  not desire."  *Id.* at 970.  *Johnson* concluded, "[a]ll the speech of which Johnson

19  complains belongs to the government, and the government has the right to 'speak for

20  itself.'  When it does, 'it is entitled to say what it wishes,' 'and to select the views that it

21  wants to express.'"  *Id.* at 975.

22         Here, like *Johnson,* the plaintiffs are public school government teachers.  The

23  plaintiffs are not asserting that they are simply acting ad hoc as citizens when they go to

24  school and teach class, take attendance, supervise students, or regulate their comings-and-

25  goings, as employees.  These activities are part of their employee duties.  Included among

26  their duties as teachers is the duty to communicate with a student's parents from time to

27  time about the student's school performance.  It is difficult to say that their speech during

28  the school day as teachers is their own and not the school district's during the regular

1course of their employment duties.  Consequently, at least where the teachers' compelled

2speech takes place during the school day on curricular matters in carrying out the duties

3of their positions, *Johnson* appears to foreclose a freedom of speech claim.[4]

4The teachers could make out a freedom of speech claim if they are compelled to

5speak in accordance with the school policy in casual, non-school contexts.  Here, neither

6plaintiff has said that they have been conversing with parents in casual, non-school

7settings where the AR 5145.3 policy stifled their speech.  The teachers could also make

8out a freedom of speech claim if the policy compels them to violate the law or

9deliberately convey an illegal message.  Here, the plaintiffs' come closest to making out a

10successful freedom of speech claim on the merits.  This is because the policy of AR

115145.3, as presented to faculty, and EUSD's response to the plaintiffs' request for

12accommodations, appears to demand that these teachers communicate misrepresentations

13to parents about the names and pronouns adopted by their students.  As discussed above,

14that would *likely* be unlawful and in derogation of the constitutional rights of parents.

15The merits of the first claim for relief for violation of the Free Speech Clause can be

16decided later, however, because the teachers' second and third claims for relief are

17sufficiently clear to be entitled to preliminary injunctive relief.

18**C. Free Exercise Clause**

19The plaintiffs' second and third claims for relief assert that EUSD's policy

20requiring non-disclosure (or parental exclusion) violates their right to the free exercise of

21religion as guaranteed by the First Amendment.  Both Mirabelli and West hold sincere

22religious beliefs.  Their beliefs are well-articulated, integrated, and comprehensive.  Their

23beliefs are better described and developed than mentioned in the limited space here.  In

24

25

26[4] Plaintiffs argue that *Johnson* is no longer controlling law, citing to *Demers v. Austin*,

27746 F.3d 402 (9th Cir. 2014) and *Oyama v. University of Hawaii*, 813 F.3d 850 (9th Cir.

282015).  However, these cases address issues of "academic freedom" in the post-secondary
education context, which the Court is not convinced apply in this instance.

1   short, Mirabelli believes that the relationship between parents and children is an
2   inherently sacred and life-long bond, ordained by God, in which the parents have the
3   ultimate right and responsibility to care for and guide their children.  Compl. at 257.  In a
4   similar vein, West believes that the relationship between parents and their child is created
5   by God with the intent that the parents have the ultimate responsibility to raise and guide
6   their child.  Both Mirabelli and West believe that God forbids lying and deceit.  Compl.
7   at 269-70.

8          EUSD preliminarily argues that AR 5145.3 does not infringe on plaintiffs'
9   religious beliefs at all because the policy does not require plaintiffs to "lie" to parents.
10  But that cannot be fairly said when the policy requires plaintiffs to conceal from parents,
11  by misdirection and substitution, accurate information about their child's use of a new
12  name, gender, or pronouns at school.  It is one thing if the policy merely delegated the
13  task of talking with parents about a student's gender incongruence to dedicated, trained
14  personnel.  It is quite another to require teachers to withhold this information with the
15  knowledge that the information will be *impossible for the parents to obtain* from the
16  school.  It is that aspect which infringes on the plaintiffs' free exercise of their religious
17  beliefs.  *See* Hearing Transcript, at 100.

18         "The Free Exercise Clause of the First Amendment, applicable to the States under
19  the Fourteenth Amendment, provides that 'Congress shall make no law . . . prohibiting
20  the free exercise' of religion.'"  *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876
21  (2021); C*hurch of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993)
22  (same).  "Nor may the government 'act in a manner that passes judgment upon or
23  presupposes the illegitimacy of religious beliefs and practices.'"  *Fellowship of Christian*
24  *Athletes,* 2023 WL 5946036, at *38 (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civ.*
25  *Rts. Comm'n*, 138 S. Ct. 1719, 1731 (2018)).  To avoid violating the Constitution, "the
26  government must demonstrate that 'a law restrictive of religious practice must advance
27  interests of the highest order and must be narrowly tailored in pursuit of those interests.'"
28  *Id*. (quoting *Lukumi*, 508 U.S. at 546).  And while "religious beliefs need not be

1    acceptable, logical, consistent, or comprehensible to others in order to merit First

2    Amendment protection,"[5] in this case Mirabelli's and West's beliefs are logical,

3    acceptable, consistent, and align with federal constitutional principles, state law, and

4    EUSD policies BP 4119.21(9) (required honesty) and BP 0100(7) (right to parental

5    involvement).

6       "Distilled, Supreme Court authority sets forth three bedrock requirements of the

7    Free Exercise Clause that the government may not transgress, absent a showing that

8    satisfies strict scrutiny. First, a purportedly neutral 'generally applicable' policy may not

9    have 'a mechanism for individualized exemptions.' Second, the government may not

10    'treat . . . comparable secular activity more favorably than religious exercise.' Third, the

11    government may not act in a manner 'hostile to . . . religious beliefs' or inconsistent with

12    the Free Exercise Clause's bar on even 'subtle departures from neutrality.' The failure to

13    meet any one of these requirements subjects a governmental regulation to review under

14    strict scrutiny." *Fellowship of Christian Athletes*, 2023 WL 5946036, at *40-41 (citations

15    omitted).

16       Under the First Amendment, a plaintiff makes out her case if she shows "that a

17    government entity has burdened her sincere religious practice pursuant to a policy that is

18    not 'neutral' or 'generally applicable.'" *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159

19    (9th Cir. 2022) (quoting *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022)).

20    General applicability requires, among other things, that the laws be enforced in an

21    evenhanded manner. *Id*. (citations omitted). "A government policy will fail the general

22    applicability requirement if it 'prohibits religious conduct while permitting secular

23    conduct that undermines the government's asserted interests in a similar way,' or if it

24    provides 'a mechanism for individualized exemptions.' Failing either the neutrality or

25

26 ─────────────

27

28    [5] *Fulton,* 141 S. Ct. at 1876 (quoting *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U. S. 707, 714 (1981)).

1  general applicability test is sufficient to trigger strict scrutiny." *Kennedy,* 142 S. Ct. at
2  2422 (citations omitted).

3         1. <u>General Applicability</u>.

4      "A law is not generally applicable if it 'invites' the government to consider the
5  particular reasons for a person's conduct by providing 'a mechanism for individualized
6  exemptions.'" *Fulton*, 141 S. Ct. at 1877 (citations omitted).  Moreover, "[t]he creation of
7  a formal mechanism for granting exceptions renders a policy not generally applicable,
8  regardless whether any exceptions have been given." *Id.* at 1879 (citations omitted).
9  That is so because such a policy "'invites' the government to decide which reasons for
10  not complying with the policy are worthy of solicitude." *Id.*

11      *Categorical exemptions*.  EUSD argues the policy is generally applicable because
12  it provided training on the policy to all staff – not just to teachers.  However, this does not
13  appear to be wholly accurate.  EUSD cites the declaration of its trainer, Tracy Schmidt.
14  EUSD Oppo. Dkt 16 at 16.  But Schmidt declares that she trained all certificated staff in
15  January 2018 and classified staff in June 2018.  *See* Declaration of Schmidt, Dkt 16-1 at
16  ¶2.  Yet, AR 5145.3 was adopted two years later (in 2020), and the first training on AR
17  5145.3 specifically took place in 2022.  To date, the only evidence presented supports the
18  teachers claim: that training regarding AR 5145.3 was limited to full-time teachers.
19  Evidence is lacking showing the policy is being applied to instructional aides, substitute
20  teachers, office staff, or non-teaching administrators.

21      *Discretionary exemption*.  EUSD next asserts that the policy is generally applicable
22  because the only exceptions in the policy are "exceptions to discipline" for teachers who
23  violate the policy.  EUSD Oppo at 17.  Not only is potential disciplinary action exactly
24  the harm plaintiffs seek to prevent, but this argument tends to prove the plaintiffs' point.
25  Under the policy, communications to parents are deemed discrimination/harassment
26  when EUSD decides that the parent lacks a legitimate need for the information.  There
27  are no standards written in the policy for determining what is a "legitimate need[,]" only
28  that it requires a case-by-case decision.  This means whether disciplinary action is taken

1   by EUSD depends on an undefined *ad hoc* determination of whether the parent receiving

2   gender-related information has a legitimate reason to be informed.  This is the very

3   definition of a discretionary exemption.  "A law is not generally applicable if it invites

4   the government to consider the particular reasons for a person's conduct by providing a

5   mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877.  "Properly

6   interpreted, *Fulton* counsels that the mere existence of a discretionary mechanism to

7   grant exemptions can be sufficient to render a policy not generally applicable, regardless

8   of the actual exercise." *Fellowship of Christian Athletes*, 2023 WL 5946036, at *43

9   (citation omitted).

10                 2. Scrutiny.

11        The reasons proffered by the defendants for the policy pass neither the strict

12   scrutiny nor the rational basis tests.  "A law burdening religious practice that is not

13   neutral or not of general application must undergo the most rigorous of scrutiny."

14   *Lukumi*, 508 U.S. at 546.

15        EUSD contends that the government purpose of protecting gender diverse students

16   from (an undefined) harm is a compelling governmental interest and the policy of non-

17   disclosure to parents is narrowly tailored.  EUSD Oppo at 17.  This argument is

18   unconvincing.  First, both the Ninth Circuit and the Supreme Court have found overly

19   broad formulations of compelling government interests unavailing.  *See Green v. Miss*

20   *United States of Am., LLC*, 52 F.4th 773, 791-92 (9th Cir. 2022) (citation omitted)

21   (identifying the issue as "not whether [the government] has a compelling interest in

22   enforcing its non-discrimination policies generally, but whether it has such an interest in

23   denying an exception to [plaintiff].")  Second, keeping parents uninformed and unaware

24   of significant events that beg for medical and psychological experts to evaluate a child,

25   like hiding a gym student's soccer concussion, is precisely the type of inaction that is

26   likely to cause greater harm and is not narrowly tailored.

27        The record includes an instance where a substitute teacher, unaware of a student's

28   preferred name, referred to the student by the student's official name, which was met

23-cv-00768-BEN-WVG

1    with laughter by the class.  One would think that a teacher would want to inform the

2    parents about such an event.  If the child really does have gender incongruence, then

3    being the subject of laughter and potential ridicule could have profound effects.  If

4    informed, the parents could do something, whether it be arranging counseling or holding

5    at home discussions.  On the other hand, if the child is acting to amuse himself or herself,

6    or others, or to be disruptive and discourteous, the parents could also do something to

7    approach the problem.  Either way, ignoring the issue or concealing it within the school

8    universe disregards plaintiffs' right to free exercise in particular, and parents'

9    constitutional rights in general.  Ignoring a problem is seldom an appropriate solution.

10         EUSD has at best articulated an overly broad state interest, as applied to these

11   plaintiffs.  EUSD has not demonstrated a narrowly tailored policy, tailored so as not to

12   unnecessarily impinge on the plaintiffs' free exercise rights.  EUSD's blanket prohibition

13   on the plaintiffs' (and any EUSD employee's) accurate communications, in all instances,

14   with all parents, of all of their assigned students, does not fit the notion of narrow

15   tailoring.  EUSD has not offered any showing that it has genuinely considered less

16   restrictive measures than those implemented here, although plaintiffs offered at least  six

17   different potential accommodations.  As such, EUSD's policy as applied to the plaintiffs

18   fails at least the tailoring prong of the strict scrutiny test.  *Cf. Fellowship of Christian*

19   *Athletes*, 2023 WL 5946036, at *56.

20         In the end, Mirabelli and West face an unlawful choice along the lines of: "lose

21   your faith and keep your job, or keep your faith and lose your job."  *Cf. Keene v. City &*

22   *Cnty. of San Francisco*, U.S. App. LEXIS 11807, *6 (9th Cir. May 15, 2023).  Yet,

23   "[r]espect for religious expressions is indispensable to life in a free and diverse

24   Republic."  *Kennedy*, 142 S. Ct. at 2432-33.  The only meaningful justification the

25   District offers for its insistence that the plaintiffs not reveal to parents gender information

26   about their own children rests on a mistaken view that the District bears a duty to place a

27   child's right to privacy above, and in derogation of, the rights of a child's parents.  The

28   Constitution neither mandates nor tolerates that kind of discrimination.  The plaintiffs

23-cv-00768-BEN-WVG

1   have demonstrated a strong likelihood of success on the merits for their free exercise

2   claim against EUSD.

3       In their opposition briefing, the state defendants do not argue the merits of

4   plaintiffs' First Amendment claims for relief.  Instead, the state defendants argue the

5   plaintiffs lack Article III standing and that state defendants enjoy Eleventh Amendment

6   immunity.  These are addressed *infra* in the discussion on the motions to dismiss.

7      **D. Remaining *Winter* Factors**

8       The plaintiffs have succeeded in demonstrating a likelihood of success on the

9   merits, which is the first and most important factor for awarding a preliminary injunction.

10   "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

11   the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

12   that the balance of equities tips in his favor, and that an injunction is in the public

13   interest." *Winter*, 555 U.S. at 20.  The remaining factors easily tip towards the plaintiffs,

14   as well.

15      "[A] finding that the plaintiff is likely to succeed on the merits of [a constitutional]

16   claim sharply tilts in the plaintiff's favor both the irreparable harm factor and the merged

17   public interest and balance of harms factors." *Baird v. Bonta*, 2023 U.S. App. LEXIS

18   23760, *15 (citations omitted).  It is black letter law that the deprivation of constitutional

19   rights "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373

20   (1976); *see also Fellowship of Christian Athletes*, 2023 WL 5946036, at *56 (describing

21   the principle as "axiomatic").  Moreover, "'irreparable harm is relatively easy to establish

22   in a First Amendment case' because the party seeking the injunction 'need only

23   demonstrate the existence of a colorable First Amendment claim.'" *Id*. (citation omitted).

24   Plaintiffs have accomplished that in this case.  Under 42 U.S.C. § 1983, the plaintiffs may

25   be entitled to an award of money damages for past mental anguish, cancellation of

26   summer teaching contracts, and constitutional damages, after proof at trial.  These are

27   reparable harms.  However, without an injunction, it is certain that plaintiffs will continue

28   to suffer present and future irreparable constitutional harm due to the existence of the

1  state and EUSD policies and the fact that plaintiffs have involuntarily been placed on

2  administrative leave from their teaching positions.

3  When the nonmovant is the government, the last two *Winter* factors merge.  *Nken*

4  *v. Holder*, 556 U.S. 418, 435 (2009); *Fellowship of Christian Athletes*, 2023 WL

5  5946036, at *57 ("Where, as here, the party opposing injunctive relief is a government

6  entity, the third and fourth factors—the balance of equities and the public interest—

7  "merge.").  Here, the balance of the equities favor issuance of a preliminary injunction as

8  the defendants have not established that they will be harmed if an injunction preserving

9  the status quo ante stands while further proceedings take place for a final judgment on the

10  merits.  Finally, the public interest is always furthered by enjoining unconstitutional

11  policies.  *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) ("it

12  is always in the public interest to prevent the violation of a party's constitutional rights.").

13  **V.  MOTIONS TO DISMISS[6]**

14  Both groups of defendants move to dismiss the Complaint.

15  **A.  *State Defendants***

16  In their motion to dismiss and opposition to plaintiffs' motion for preliminary

17  injunction, the state defendants do not argue the merits of AR 5145.3.  Instead, the state

18  defendants argue the plaintiffs lack Article III standing and that state defendants enjoy

19  Eleventh Amendment immunity.  The briefing makes fair arguments.  However,

20  statements at the hearing and subsequent litigation by the state against another school

21  district seriously undercut their arguments.

22  The state defendants argue that plaintiffs lack standing because the FAQs page at

23  issue does not directly affect the plaintiffs.  Counsel for EUSD at the hearing, in contrast,

24  twice said that EUSD adopted AR 5145.3 precisely because of the state's FAQs page.

25

26

27  [6] For purposes of a motion to dismiss, the Court assumes the facts pled in the complaint
are true.  *Mazarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir.

28  2008).

23-cv-00768-BEN-WVG

1  First, at the outset of the hearing counsel was asked, "Is the school district's position that

2  this rule that you've adopted that says that parents are not entitled to notice, that that rule

3  is mandated by the state?"  Counsel responded, "Yes, we are taking that position."

4  Hearing Transcript at 3.  Later, a similar question was asked and the same answer was

5  given.  "The Court: Okay.  So to cut to the chase, you're telling me that this rule exists

6  because the state is telling the school board that they must do this; am I correct?  EUSD

7  Attorney: Yes, your honor."  Hearing Transcript at 37.

8        The state defendants maintain that the State Board of Education FAQs publication

9  is not a state law but only attempts to describe state law.  EUSD, on the other hand,

10 considers itself bound by the statements in the FAQs publication as a matter of law.

11 Suggesting that EUSD is correct in its characterization, the Attorney General for the State

12 of California recently relied on the FAQs publication in suing a school district for

13 violating state law.

14       The Attorney General filed a lawsuit against another California public school

15 district and obtained a temporary restraining order stopping school employees from

16 disclosing gender identification information to the parents of students.  *See People v.*

17 *Chino Valley Unified School Dist.*, San Bernardino Superior Court Case No. CIV SB

18 2317301 (filed Aug. 28, 2023).  In its Complaint, the Attorney General asserts that the

19 school district is violating state law by adopting a policy of notifying parents whenever a

20 student requests to be identified as a gender other than the student's biological sex or

21 gender listed on a birth certificate.  Complaint, ¶67.  As part of the Complaint filed

22 against the Chino Valley Unified School District, the Attorney General specifically refers

23 to the same FAQs publication identified in this proceeding.  The Complaint asserts, "the

24 California Department of Education has issued statewide guidance since at least 2014,

25 generally recommending that school officials and staff members not 'out' student to their

26 parents or guardians against the student's wishes.  (Cal. Dept. of Ed., Frequently Asked

27 Questions, https://www.cde.ca.gov/re/di/eo/faqs.asp.)."  Complaint, ¶ 37 (emphasis

28 added).

23-cv-00768-BEN-WVG

1    The state Board of Education, the state Department of Education, the
2    Superintendent of Public Instruction and the Attorney General are all arms of the State of
3    California.  The state defendants do not argue otherwise.  They agree that "[i]n
4    California, the 'State' includes state offices, officers, departments, boards and agencies."
5    *See* State-Level Defendants Mot., Dkt. 25 at 9 (citing Cal. Govt. Code § 900.6).  The
6    attorney for EUSD asserts that the District is compelled by the State to adopt and enforce
7    AR 5145.3 based on the State's FAQs page.  The Attorney General, another arm of the
8    state, is currently suing another school district for not following the State's FAQs page
9    and its rationale.  With no evidence to the contrary at this point, it must be concluded that
10   the State is the driving force behind EUSD's alleged violations of plaintiffs'
11   constitutional rights.  If the plaintiffs succeed in proving their case, a permanent
12   injunction against the state defendants will be necessary to accord full relief.  Therefore,
13   plaintiffs have Article III standing.

14        The state defendants also assert that they enjoy Eleventh Amendment immunity
15   from suit.  Insofar as the defendants are sued in their official capacities they are treated as
16   arms of the State of California, and because the state has not waived its immunity from
17   suit, the state defendants are correct.  However, to the extent that plaintiffs seek only
18   prospective injunctive relief to remedy an ongoing violation of federal or constitutional
19   law, there is no immunity.  *See Ex parte Young*, 209 U. S. 123, 159-160 (1908).

20        Here, the state defendants named are not arbitrarily chosen governmental officers
21   with only general responsibilities but are the officers and board members responsible for
22   and empowered to change state education policy.  "A plaintiff seeking injunctive relief in
23   a § 1983 action against the government 'is not required to allege a named official's
24   personal involvement in the acts or omissions constituting the alleged constitutional
25   violation.'  Instead, 'a plaintiff need only identify the law or policy challenged as a
26   constitutional violation and name the official within the entity who can appropriately
27   respond to injunctive relief.'"  *Riley's Am. Heritage Farms*, 32 F.4th at 732 (citation
28   omitted).  Therefore, the *Ex parte Young* exception applies and the motion to dismiss on

23-cv-00768-BEN-WVG

1   the basis of Eleventh Amendment immunity is denied.  *Berger v. N.C. State Conf. of the*

2   *NAACP*, 142 S. Ct. 2191, 2197 (2022) ("So usually a plaintiff will sue the individual state

3   officials most responsible for enforcing the law in question and seek injunctive or

4   declaratory relief against them." (citation omitted)); *Pennhurst State School & Hospital v.*

5   *Halderman,* 456 U.S. 265, 275 (1986).

6            **B. *Escondido Union School District Defendants***

7         The EUSD defendants also move to dismiss for failure to state a claim.

8   Additionally, they seek qualified immunity.  Rule 12(b)(6) permits dismissal for "failure

9   to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Dismissal

10   under Rule 12(b)(6) may occur where the complaint lacks a cognizable legal theory or

11   sufficient facts to support a cognizable, plausible claim.  In contrast, a complaint may

12   survive a motion to dismiss if, taking all well pled factual allegations as true, it contains

13   enough facts to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

14   U.S. 662, 678 (2009).

15        The EUSD defendants repeat their arguments regarding the merits from the

16   preliminary injunction briefing, claiming that EUSD's policies are consistent with state

17   and federal law.  As a preliminary matter, that is not wholly accurate, but the question is

18   to be fully and finally determined later in the case.  These are issues of law and fact that

19   are to be decided later on a fuller record.  The claims as articulated in the Complaint, at

20   the time the Complaint was filed, describe plausible claims of violations of constitutional

21   rights of free speech and free exercise sufficient to merit further proceedings.  There is a

22   sufficient question to raise plausible claims for relief and permit the claims to proceed.

23   *See* generally discussion on likelihood of success on the merits, *supra*.  The EUSD

24   defendants will have the opportunity to assert their defenses more forcefully and

25   completely on summary judgment or at trial.  However, at this juncture, the motion to

26   dismiss for failure to state a claim is denied.

27        Finally, the EUSD defendants ask for a ruling that they are entitled to qualified

28   immunity.  Certainly, "a plaintiff seeking injunctive relief for an ongoing First

23-cv-00768-BEN-WVG

1  Amendment violation (e.g., a retaliatory policy) may sue individual board members of a

2  public school system in their official capacities to correct the violation." *Riley's Am.*

3  *Heritage Farms*, 32 F.4th at 732. The EUSD defendants posit that "[t]here is no

4  possibility that the school employees could have known that complying with their

5  employer's policy could have violated the Plaintiffs' right to free speech or religion."

6  *See* School Employee Defendants' Mot., Dkt 17 at 18-19. There is no evidence presented

7  with the motion to support this factual assertion. The EUSD defendants, or some of

8  them, may be entitled to qualified immunity after a motion for summary judgment or a

9  trial on the merits. Without testimony on a full record, however, qualified immunity in

10  this case is unwarranted. Therefore, the motion to dismiss and for qualified immunity is

11  denied.

12        **C.  *Objections to judicial notice of miscellaneous documents***

13        All parties make objections to miscellaneous documents attached to, or made

14  supplements to, their pleadings. The objections are overruled.

15  **VI.  CONCLUSION**

16        A request to change one's own name and pronouns may be the first visible sign

17  that a child or adolescent may be dealing with issues that could lead to gender dysphoria

18  or related coexisting mental-health issues. Communicating to a parent the social

19  transition of a school student to a new gender — by using preferred pronouns and non-

20  conforming dress — is called discrimination/harassment by the defendants, despite

21  having little medical or factual connection to actual discrimination or harassment.

22  Plaintiffs Elizabeth Mirabelli and Lori Ann West have represented in their pleadings that

23  they are committed to treating all transgender or gender diverse children with kindness,

24  respect, and love. They are entitled to preliminary injunctive relief from what the

25  defendants are requiring them to do here, which is to subjugate their sincerely-held

26  religious beliefs that parents of schoolchildren have a God-ordained right to know of

27  significant gender identity-related events. There are, no doubt, some teachers that have

28

1   no disagreement with AR 5145.3.  This injunction does no violence to their constitutional

2   rights.

3          Parental involvement in essential to the healthy maturation of schoolchildren. The

4   Escondido Union School District has adopted a policy without parent input that places a

5   communication barrier between parents and teachers.  Some parents who do not want

6   such barriers may have the wherewithal to place their children in private schools or

7   homeschool, or to move to a different public school district.  Families in middle or lower

8   socio-economic circumstances have no such options.  For these parents, the new policy

9   appears to undermine their own constitutional rights while it conflicts with

10  knowledgeable medical opinion.  An order enjoining the new district policy is in the

11  better interests of the entire community, as well as the plaintiff teachers.

12         The school's policy is a trifecta of harm: it harms the child who needs parental

13  guidance and possibly mental health intervention to determine if the incongruence is

14  organic or whether it is the result of bullying, peer pressure, or a fleeting impulse.  It

15  harms the parents by depriving them of the long recognized Fourteenth Amendment right

16  to care, guide, and make health care decisions for their children.  And finally, it harms

17  plaintiffs who are compelled to violate the parent's rights by forcing plaintiffs to conceal

18  information they feel is critical for the welfare of their students -- violating plaintiffs'

19  religious beliefs.

20

21         **THEREFORE, IT IS ORDERED THAT:**

22         1. The Plaintiffs' Motion for Preliminary Injunction is GRANTED.  The

23  Escondido Union School District Defendants, the State Defendants, and their officers,

24  agents, servants, employees, and attorneys, and those persons in active concert or

25  participation with them, and those who gain knowledge of this injunction order, or know

26  of the existence of this injunction order, are enjoined from enforcing against Plaintiffs

27  Mirabelli or West, EUSD AR 5145.3 or the associated official policy described in the

28  California Department of Education's FAQs page on gender identity-related disclosures

23-cv-00768-BEN-WVG

(157a)

1  by teachers to parents, and are to restrain any governmental employee or entity from

2  taking any adverse employment actions thereupon against Plaintiffs Mirabelli or West,

3  until further Order of this Court.

4       2. The EUSD Defendants' Motion to Dismiss is DENIED (Dkt Nos. 7 & 17).

5       3. The State-Level Defendants' Motion to Dismiss is DENIED  (Dkt No. 25).

6  **IT IS SO ORDERED.**

7       Dated: September 14, 2023

8                                **HON. ROGER T. BENITEZ**
                               United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28