No. 25-8056

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

ELIZABETH MIRABELLI, *et al*.,
*Plaintiffs-Appellees*,

V.

ROB BONTA, *et al*.,
*Defendants-Appellants*.

————————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:23-cv-0768-BEN-VET
The Honorable Roger T. Benitez, Judge

————————————

**REPLY IN SUPPORT OF EMERGENCY MOTION UNDER CIRCUIT
RULE 27-3 FOR MODIFICATION OF THE STAY ORDER**

**RELIEF REQUESTED BY MARCH 11, 2026**

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy Solicitor General*
CHERYL L. FEINER
  *Senior Assistant Attorney General*
JOSHUA A. KLEIN
  *Supervising Deputy Solicitor General*

JULIE VEROFF
  *Deputy Solicitor General*
DARRELL W. SPENCE
  *Supervising Deputy Attorney General*
JENNIFER A. BUNSHOFT
KEVIN L. QUADE
  *Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3776
Julie.Veroff@doj.ca.gov
  *Attorneys for Defendants-Appellants*

March 11, 2026

## INTRODUCTION

Last week, the Supreme Court granted in part and denied in part plaintiffs' application to vacate this Court's stay, and this Court issued an order vacating the stay as to the parents' claims and retaining the stay as to the remaining claims. Neither the Supreme Court nor this Court parsed the terms of the injunction and spelled out which are now in effect and which remain stayed. In the interest of clarity and consistency, the State requested that the Court modify its stay order in two narrow respects: (1) confirm that the injunction is stayed insofar as it would require school officials to disclose a child's transgender status to parents who would abuse their child; and (2) confirm that the notice requirement set forth in Item 3 of the injunction is stayed pending appeal. Plaintiffs' objections to the State's targeted requests are unfounded. This Court has authority to modify its own interlocutory orders, and the requested clarifications follow directly from the reasoning in the Supreme Court's interim decision. The Court should grant the State's request or, at a minimum, deny the motion without prejudice to refiling under Federal Rule of Civil Procedure 62(d) in district court.

## ARGUMENT

1. Plaintiffs concede that "this Court has authority to modify its own interlocutory orders." C.A.Dkt. 27 (Opp.) 2. That concession should end any jurisdictional dispute. Contrary to plaintiffs' suggestion, *see* Opp. 4, the State is

not asking this Court to modify or ignore an order of the Supreme Court. Rather, following the Supreme Court's resolution of plaintiffs' emergency application and this Court's order, the State is respectfully asking this Court "to clarify the terms of the permanent injunction that are now in effect and the terms that remain stayed pending appeal." C.A.Dkt. 24 (Mot.) 1; *see* C.A.Dkt. 19 (confirming stay remains in place as to "remaining claims" (citing C.A.Dkt. 13)). Nothing in the Supreme Court's per curiam opinion displaced or called into question this Court's authority to clarify or "modify its own interlocutory orders." Opp. 2.

To be sure, in seeking relief here, the State has pointed to the reasoning in the Supreme Court's interim decision. *See* Mot. 3-5. That is not because the State is asking this Court to reject that reasoning at this juncture or to "partially re-stay an injunction that the Supreme Court un-stayed." Opp. 5. It is because the State believes that the Supreme Court's reasoning is relevant to the question at hand: which aspects of the injunction should be understood to follow from the Supreme Court's order, and which do not. The clarifications that the State seeks in its motion do not "contradict a ruling of the Supreme Court," Opp. 5; they follow directly from it. *See* Mot. 3-5.

To the extent this Court has any doubt as to its jurisdiction to entertain the State's motion, however, the Court should construe it in a way that would support jurisdiction. *Cf., e.g., United States v. Johnson*, 988 F.2d 941, 943 (9th Cir. 1993)

(construing filing "as a timely notice of appeal" in support of appellate jurisdiction). Plaintiffs agree that "the district court can modify its injunction under Federal Rule of Civil Procedure 62(d)." Opp. 6. And this Court would have jurisdiction over an appeal from the denial of a motion to modify an injunction. *See* 28 U.S.C. § 1292(a)(1). Because the district court has already informed the parties that it will not modify the injunction as the State has requested here, *see infra* p.4, the district court already effectively refused to modify its injunction. This Court could construe the State's motion as an appeal from that denial and a request for emergency relief pending appeal. At a minimum, the Court should deny the emergency motion without prejudice to the State moving for similar relief in the district court under Rule 62(d).

2. The State asks that the Court modify its stay order "to confirm that the permanent injunction is stayed insofar as it would compel disclosure 'to parents who would engage in abuse.'" Mot. 3-4. That request follows from the Supreme Court's decision, which explained that the parents' claims do not require disclosure for which the consequence would be abuse. *Id.* (citing *Mirabelli v. Bonta*, 607 U.S. __, 2026 WL 57049, at *3 (U.S. Mar. 2, 2026)). For the reasons discussed below, the district court's proposed modification to the permanent injunction, while a step in the right direction, does not fully resolve the State's concern. And

plaintiffs' opposition rests on highly technical arguments that fail to engage with the reasoning in the Supreme Court's interim opinion.

Plaintiffs first contend that the district court has proposed a modification to the injunction that would fully address any concerns about abuse. *See* Mot. 12-13. That is incorrect. Earlier this week, during a hearing on plaintiffs' motion for attorney fees, the district court suggested a possible modification to the permanent injunction and requested the parties' input. *See* D.Ct.Dkt. 349; Add.3-16.[1] The district court proposed adding a final paragraph to the injunction that states: "This injunction is intended to promote child safety by guaranteeing fit parents a role in some of the most consequential decisions of their children's lives while permitting the state to shield children from unfit parents by enforcing child abuse laws in cases of compelling need." Add.10. That language largely tracks the Supreme Court's brief explanation of its conclusion that the balance of equities did not support vacating the injunction as to the parents, *see* 2026 WL 575049, at *3, but narrows it by adding the "in cases of compelling need" qualifier.

The State remains concerned that the proposed language would not allow school officials to withhold or delay disclosure where child abuse would otherwise result. And the State is concerned that the proposed language could be read by school officials to *require* them to disclose a transgender student's status even

_____

[1] An excerpted hearing transcript is included as an addendum.

4

when they know that doing so will result in child abuse, and allow them only the ability to report such abuse after it happens. Indeed, the district court's injunction bars the State from enforcing "any . . . provision of California law" that would "in any way interfere with a" school employee "from communicating to parents that his, her, or their child has manifested a form of gender incongruity," D.Ct.Dkt. 308 at 1-2—broad language that would appear to extend to any laws that would otherwise allow or require school employees to withhold disclosure based on the threat of abuse. In light of that concern, the State informed the district court that it was not prepared to withdraw its pending emergency motion. D.Ct.Dkt. 52.

Plaintiffs' opposition brief only confirms the State's concerns. They suggest that in vacating the stay as to the parents' claims, the Supreme Court intended to *require* school officials to disclose a student's gender identity even if they know it will result in child abuse. Mot. 9-10. That cruel result does not follow from—and indeed, is anathema to—the Supreme Court's interim opinion. In granting in part plaintiffs' emergency application to vacate the stay, the Supreme Court explained that the parents' constitutional claims do not require school officials to disclose a student's transgender status "to parents who would engage in abuse." 2026 WL 57049, at *3.[2] Rather, States may, consistent with strict scrutiny's narrow tailoring

---

[2] The Supreme Court's express acknowledgment that there exist some parents who would abuse their children upon learning that they are transgender

(continued…)

requirement, "preclude[e] gender-identity disclosure to parents who would engage in abuse." *Id.*

Plaintiffs contend that because this language appears in the Supreme Court's discussion of narrow tailoring, rather than its discussion of the equities, it has no relevance to scope of relief question at hand. Opp. 10. But plaintiffs fail to grasp the State's point: If a law that forbids disclosure to parents who would engage in abuse would satisfy strict scrutiny, then the parents' claims here cannot support an injunction prohibiting the State from restricting disclosure in exactly that circumstance. And because the stay this Court entered has been vacated only "as to the parents' claims," C.A.Dkt. 19 at 3, the injunction now in effect should not be understood to compel what the parents' claims do not require on the merits. That is why the State has asked this Court to clarify that, to the extent the injunction requires relief that goes beyond the parents' claims (*i.e.*, disclosure to parents who would abuse their children), that relief is stayed pending appeal.

The Supreme Court's discussion of the equities is not at odds with the State's request. *Contra* Opp. 10. In that section of the opinion, the Supreme Court explained that "[e]veryone agrees that children's safety is the overriding equity"

---

belies plaintiffs' contention that the Court "definitively rejected" any argument otherwise. Opp. 6. Indeed, even plaintiffs acknowledge that some children "fac[e] genuinely abusive parents." Opp. 10.

and "[t]he injunction here promotes child safety by guaranteeing *fit* parents a role" while also "permit[ting] the State *to shield children from unfit parents* by enforcing child-abuse laws and removing children from parental custody in appropriate cases." 2026 WL 57049, at *3 (emphasis added). Requiring school officials to take action they know will result in child abuse, and leaving them able only to report that abuse after it occurs, is no shield from harm inflicted at the hand of unfit parents. The Supreme Court's brief reference to child-abuse and custody laws does not suggest that the State is precluded from protecting children who would suffer abuse *in all other ways*—including the very way the Supreme Court identified earlier in its opinion.

Plaintiffs contend that the clarification the State seeks would result in the introduction of a "new standardless 'abuse' exception." Opp. 2. But the State's request follows directly from the Supreme Court's language—"parents who would engage in abuse." 2026 WL 57049, at *3. And as plaintiffs elsewhere acknowledge, *see, e.g.*, Opp. 18, school employees are mandated reporters of known and suspected child abuse, *see* Cal. Penal Code § 11165.7. As mandatory reporters, school employees are required to receive training on "what constitutes child abuse" and "how to identify potential signs." Cal. Dep't of Educ., *Child Abuse Identification & Reporting Guidelines* (last reviewed Nov. 4, 2024), https://www.cde.ca.gov/ls/ss/ap/childabusereportingguide.asp; *see also, e.g.*, Cal.

Educ. Code § 44691.  The clarification with respect to abuse that the State seeks—namely, that the injunction is stayed insofar as it would require school officials to disclose a student's transgender status to parents who would engage in abuse as a result—is intended to incorporate the same definition of child abuse that school employees look to for purposes of their mandatory reporter obligations, and the State would have no concern about the Court making that understanding express in its order granting the State's motion.  That meaning of "abuse" should be unobjectionable to plaintiffs given their repeated embrace of mandatory reporter laws as an important source of protection for children.  *See* Opp. 8, 10, 18.[3]

Notably, plaintiffs do not expressly discuss a more nuanced proposal that the district court appears to have suggested during Monday's hearing.  During the court's colloquy with the parties about the court's proposed amendment, the district court articulated its view that "in the event that there's abuse . . . there's a compelling reason to not disclose."  Add.5.  The district court offered "a hypothetical":  "the child goes to the schoolteacher and says, 'Teacher, my parents said that they're going to kill me if I ever express any gender incongruity,' at that point in time – the teachers, by California law, are mandated reporters – . . . would

---

[3] Mandatory-reporter laws do not, on their own, address the State's concern that, in extraordinary circumstances, disclosure to parents will lead to child abuse. Mandatory-reporter laws do not relax the terms of the injunction, which requires disclosure.

have a process . . . to turn the parents over to CPS.  And then there would be a judicial determination as to whether or not this is true; . . . this is really a danger to the child."  Add.10-11.  Although the transcript is not wholly clear, the State understands the district court to have expressed a willingness to modify the injunction to provide that if a school official reasonably suspects that a parent will abuse a child upon learning of their transgender status, the school official is not obligated to disclose the information to the parent in the moment, but instead must exercise their responsibilities as a mandatory reporter, at which point the relevant law enforcement or child welfare process would unfold.  The assumption implicit in this approach is that if the parents learn of the student's transgender status during the ensuing process (as they almost certainly will), the process will be sufficient to protect the child from ultimately suffering any threatened abuse.

The State believes that its proposed modification to the stay order best serves the interests of clarity and compliance with the Court's order to retain the stay only as to the parents' claims, and has concerns about the harms that could still result to students (and their parents) through the alternative approach just described.  But to the extent the Court is not inclined to grant the State exactly the relief requested in its motion, the State would not object to an order clarifying (or directing the district court to clarify) that the injunction does not obligate a school official to disclose information to a parent they reasonably suspect would abuse their child as a result

9

where the school official instead reports the possible future abuse to the relevant authorities.

3. Plaintiffs also offer no persuasive reason to deny the State's request to clarify that Item 3 of the injunction is subject to the stay that remains in place. They proffer that if the Supreme Court "believed that Item 3's language exceeded the scope of its holdings, it would have said so." Opp. 13. But the Supreme Court did not go through the injunction item-by-item and specify which provisions remain stayed and which are now in effect. It vacated the stay as to the parents' claims and otherwise denied the application, leaving it to this Court and the parties to operationalize the result.

As to the content of the required notice, plaintiffs deny that the second sentence has anything to do with the rights of teachers. Opp. 14. The language is superfluous, they say, as it simply "describes the corollary of the parents' right." *Id.* If it were really true that the sentence does no independent work, it is unclear why plaintiffs object to deeming it stayed pending appeal. But it is not true. The sentence in question plainly refers to "a federal constitutional right" of "[t]eachers and school staff," not a constitutional right of parents. D.Ct.Dkt. 308 at 3. Because this Court's stay as to the teachers' claims remains in effect, *see* C.A.Dkt. 19, there should be no doubt that the second sentence of the notice requirement is

stayed as a result.  In the interest of avoiding confusion, the State merely asks this Court to clarify that obvious result.

As to the first sentence required to be included in the notice, plaintiffs acknowledge that the language about parents' rights does not track the injunction's substantive requirements set out in Item 1.  *See* Opp. 15.  They agree that those terms do not require public school officials to affirmatively inform parents whenever they observe a student's expression of gender incongruence.  *Id.*  In other words, all parties agree that the Supreme Court's reasoning does not impose or support a "see something, say something" approach.  *See id.*  Plaintiffs also seem to agree that the language in the notice does not provide practical guidance to school employees as to what they must do and not do.  *See id.*

Given the acknowledged disconnect between the operation of the injunction's substantive terms and the content of the notice, the State maintains that a clarification confirming that the first sentence of the notice requirement is stayed pending appeal is important to avoid the misimpression that school officials must now "inform parents whenever they observe a student's expression of 'gender incongruence.'"  Mot. 5.  Alternatively, the Court could clarify that the injunction is stayed insofar as it requires the particular language in the district court's notice, as opposed to the alternative language proposed in the State's motion.  *Id.* at 5-6.  To the extent that the Court has concerns about the specific alternative language,

the State is not wedded to that particular proposal.  Its bottom-line concern about the notice is absolved so long as the Court makes clear to school officials that no "see something, say something" mandate is currently in effect—and that public school employees need not make disclosures to parents if doing so would result in abuse. *See id.* at 4-6.

## CONCLUSION

The Court's stay pending appeal should be clarified as requested in the State's motion.

Dated:  March 11, 2026

Respectfully submitted,

*s/Julie Veroff*

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy Solicitor General*
CHERYL L. FEINER
  *Senior Assistant Attorney General*
JOSHUA A. KLEIN
  *Supervising Deputy Solicitor General*
JULIE VEROFF
  *Deputy Solicitor General*
DARRELL W. SPENCE
  *Supervising Deputy Attorney General*
JENNIFER A. BUNSHOFT
KEVIN L. QUADE
  *Deputy Attorneys General*

  *Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(C) and Local Rules 27-1(d) and 32-3 because it contains 2,798 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font.


Dated: March 11, 2026          *s/* Julie Veroff
                               Julie Veroff

# Addendum

1

```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   ELIZABETH MIRABELLI, an          )
     individual, et al.,              )  No. 3:23-cv-00768-BEN-VET
 4                                     )
                     Plaintiffs,       )
 5                                     )  March 9, 2026
          v.                           )
 6                                     )  1:01 p.m.
     MARK OLSON, in his official       )
 7   capacity as President of the EUSD )
     Board of Education, et al.,       )
 8                                     )  Courtroom 5A
                     Defendants.       )
 9   _____)  San Diego, California

10

11

12                  TRANSCRIPT OF MOTION HEARING

13      BEFORE THE HONORABLE ROGER T. BENITEZ, DISTRICT JUDGE

14

15

16

17

18
     COURT REPORTER:           ADRIAN DALE BAULE, RMR, CRR, CSR
19                             United States District Court
                               333 West Broadway, Suite 420
20                             San Diego, California 92101
                               adrian_baule@casd.uscourts.gov
21
     Reported by Stenotype; Transcribed by Computer.
22

23

24

25
```

2

```
1

2    APPEARANCES:

3    For Plaintiffs:           LiMANDRI & JONNA LLP
                               BY:  PAUL M. JONNA, ESQ.
4                                   JEFFREY M. TRISSELL, ESQ.
                               P.O. Box 9120
5                              Rancho Santa Fe, California 92067
                               (858)759-9930; (858)759-9948
6                              pjonna@limandri.com;
                               jtrissell@limandri.com
7
                               THOMAS MORE SOCIETY
8                              BY:  PETER BREEN, ESQ.
                               309 W. Washington St., Ste. 1250
9                              Chicago, Illinois 60606
                               (312)782-1680
10                             pbreen@thomasmoresociety.org

11
     For State Defendants:     ROB BONTA
12                             Attorney General of California
                               BY:  DARRELL W. SPENCE, ESQ.
13                                  Supervising Deputy Attorney
                                    General
14                             1300 I Street, Suite 125
                               Sacramento, California 95814
15                             (916)210-6089
                               darrell.spence@doj.ca.gov
16
                               BY:  KATHERINE BRUCK, ESQ.
17                                  JENNIFER ANN BUNSHOFT, ESQ.
                                    Deputy Attorneys General
18                             455 Golden Gate Avenue, Suite 11000
                               San Francisco, California 94102
19                             (415)229-0125; (415)510-3377
                               katherine.bruck@doj.ca.gov;
20                             jennifer.bunshoft@doj.ca.gov

21

22

23

24

25
```

1        THE COURT:  Two o'clock.  So let's plan to be back

2  here at 2:30.  Okay?  Thank you.

3        MR. JONNA:  Thank you, Your Honor.

4    (Recess taken from 1:59 p.m. to 2:42 p.m.)

5        THE CLERK:  Remain seated and come to order.  This

6  court is once again in session.

7        THE COURT:  Okay.  We're back.  Did you folks make

8  any progress?

9        MR. JONNA:  Your Honor, we did have a good

10  conversation.  I think the conclusion is we're going to need

11  the Court to make an order.  We're going to continue to discuss

12  in good faith whether not only the fees can be negotiated but

13  also the entire case, and we're going to have discussions,

14  Mr. Spence and I and his team.  We couldn't agree on a number

15  today.  They don't -- they couldn't reach out to everybody with

16  authority.  We also didn't come back with a firm counter.

17        So I think we -- the process was useful and

18  productive, but we're going to require an order from the Court

19  on the fees.

20        THE COURT:  All right.  Well, listen, while you folks

21  were doing that, I prepared an amendment to my injunction,

22  which I'm going to -- I'm just going to hand you the last page

23  which is where the -- so my injunction would continue as

24  originally issued, but I've added that last paragraph, which I

25  think is consistent with what the Supreme Court has said, and

1  which I think is consistent with what I understand you have

2  asked the Ninth Circuit to do to modify the injunction, I

3  think.  If that is agreeable with you, then I will be more than

4  happy to amend my injunction in order to save the Ninth Circuit

5  some time and effort and to save some litigation.

6       (Pause.)

7       MR. SPENCE:  Your Honor, so to be clear, paragraph 5

8  is what you added?

9       THE COURT:  Yes.

10      MR. SPENCE:  And so I don't -- I don't see a

11  provision that expressly mentions kind of the ability to

12  disclose -- not disclose the information in certain cases.

13  This looks -- this doesn't -- at least from me reading it as I

14  sit here today, I don't see anything expressly saying how

15  exactly this intent can be effectuated.

16      MR. JONNA:  Your Honor, I think the Court's proposed

17  addition perfectly tracks the Supreme Court's language that I

18  read in the record, and there's no need for the Court to fully

19  enunciate the existing legal process for enforcing child abuse

20  laws.  I think the state is familiar with that process, and I

21  think the language is sufficient.

22      THE COURT:  Yeah.  My language is taken right out of

23  the Supreme Court's opinion, so -- and I think, basically, that

24  details what a compelling interest is.

25           So the -- so the guidance, for example, that the

1  state has does not define what is a compelling interest where

2  disclosure would occur.  Right?  It doesn't say that.  And

3  neither does the Supreme Court.  What the Supreme Court says,

4  and which is what I said, is that in the -- in the event that

5  there's abuse, right, then the state has the ability.  There's

6  a compelling -- there's a compelling reason to not disclose.

7  And what you would have to do -- what the state would have to

8  do is to follow the child abuse laws that are currently on the

9  books in the state of California.  And so that's what I tried

10 to do.

11        Now, maybe that's not enough for you, and if that's

12 not enough for you, I understand.  That's fine.  I'm just

13 offering it as a way of trying to make life easier for

14 everyone.  So ...

15        MR. SPENCE:  Thank you, Your Honor.

16        MS. BUNSHOFT:  Your Honor, in the -- I think the

17 Supreme Court language that was focused on in the submission to

18 the Ninth Circuit for clarification --

19     (Court reporter interruption.)

20        The -- in the filing with the Ninth Circuit, the

21 language that was focused on from the Supreme Court decision

22 was that school employees may, quote, "preclude gender identity

23 disclosure to parents who would engage in abuse," which is a

24 little different than saying they can enforce -- you know,

25 call, like, Child Protective Services or shield by enforcing

1    child abuse laws.  Because it seems like just enforcing child

2    abuse laws may require, you know, telling the parents.

3              THE COURT:  It would?

4              MS. BUNSHOFT:  Yeah.  The parents would become aware

5    of -- of it because of the calling Child Protective Services --

6    information.

7              THE COURT:  Just a second.  Just a second.

8              So if I understand, what you're saying is that you

9    would want there to be a provision that says that disclosure

10   would not occur -- the parents -- let me put it in plain

11   language.  The parents would not be told about the child's

12   expressed gender incongruity if the state or the school

13   district felt that there was a compelling need to do so without

14   resorting to the state's child abuse laws.  Is that what you're

15   saying?

16             MS. BUNSHOFT:  Yes.  That -- that you could preclude

17   gender identity to -- disclosure to parents who would engage in

18   abuse.  That's the Supreme Court's language, which does suggest

19   that you wouldn't have to disclose and then call Child

20   Protective Services, but rather not disclose if there was a

21   fear -- a real fear that the parents would be abusive if the

22   disclosure was made.  There's a difference there.

23        (Pause.)

24             THE COURT:  Who would -- who would make the

25   determination as to whether or not there's a compelling need to

1   disclose?

2          MS. BUNSHOFT:  The -- the school would.  Just as they

3   would with any, you know, child abuse laws, there would be some

4   information or evidence that would make it apparent to the

5   school that disclosure of this information would put that child

6   in harm of potential abuse.  Otherwise, sort of, the cat's out

7   of the bag if you have to disclose in the process of making the

8   referral for -- you know, through Child Protective Services.

9   At that point you've -- you know, you've -- you're disclosing.

10         Yes.  The --

11         THE COURT:  But -- so let me -- let me very

12  quickly -- maybe we'll get back to the attorney fee issue, but

13  let me just point out this.

14         So remember in the *Parham* case, for example, in the

15  *Parham* case, the Supreme Court talked about the fact that there

16  was a judicial process by which it could be determined whether

17  or not the child would be hospitalized.  Remember that?

18         MS. BUNSHOFT:  Yes.

19         THE COURT:  Okay.

20         So in essence, what the Supreme Court was saying was,

21  Look, you parents have the right to make health care decisions

22  for your children.  Right?  You can hospitalize your child, but

23  there will be a judicial process, there will be a determine

24  process by which we can decide whether or not you have

25  exercised your right judiciously.  If, after that process is

46

1    concluded, we conclude that no, you did not exercise your right

2    judiciously, then the child would not be hospitalized.

3           So I think what I got out of *Parham* -- again, I'm not

4    the sharpest knife in the drawer -- was that there's this

5    overriding process that allows for, say, for example, a

6    judicial determination of whether or not the parents' rights

7    could be curtailed.

8           And the way, I think, you're telling me that you want

9    the right to be curtailed is by simply a determination without

10   any judicial process or any overview by anyone other than the

11   school or the state that, Yeah, we, the school, we, the state,

12   believe that there's a compelling need not to disclose, so

13   we're not going to disclose.  And there's no judicial process,

14   there's no other process by which we can decide whether or not

15   the parents' rights were rightfully curtailed.

16          You follow what I'm saying?

17          MS. BUNSHOFT:  I do.

18          I have two points.  One, I just wanted to point to

19   you in the -- in the Supreme Court's per curiam decision, the

20   full quote on page 5 is -- it says:

21          "The state's interest in safety could be served by a

22          policy that allows religious exemptions while

23          precluding gender identity disclosure to parents who

24          would engage in abuse."

25          So it talks about precluding the disclosure, and

1   that's what's different from *Parham*. Here we're talking about

2   the harm -- the potential harm is the disclosure itself. So if

3   you have to disclose in order to engage in the process, you've

4   already caused the harm by virtue of the disclosure, which the

5   Supreme Court has said you could preclude gender identity

6   disclosure in those cases.

7         So that is the point that we're making. It's

8   different from the *Parham* case where there was no information

9   that wasn't known. This was, you know, the child, the parents,

10   the hospital's question about whether they should be

11   hospitalized, but there wasn't any sort of privacy information

12   or potential harm that would cause by some release of

13   information, because, you know, that was quite a different

14   scenario from here where it's -- it is, in fact, the knowledge,

15   the information that, in and of itself, at that moment could

16   cause the harm.

17         THE COURT: But who would -- who would -- so if I'm

18   right, and if, I think, the Supreme Court has said that the

19   primary right to determining whether or not a child's care,

20   custody, and control, including making health care decisions,

21   rests with the parents, right, if that is true, by allowing the

22   state and/or the school districts to make that decision, you

23   would once again be turning the right on its head, because you

24   would be saying that it is now the state and the school

25   district that have the right to decide whether or not

1   disclosure would occur.  And there's no review, there's no --

2   there's no way for anyone to -- for the parents to ever have

3   any input into that.

4          So you would have, say, for example -- I'm just going

5   to throw you a hypothetical -- say, the Poe girl.  So the Poe

6   girl is experiencing some gender incongruity, maybe some

7   depression, some anxiety.  She goes and talks to her counselor.

8   The counselor then forms the opinion that, you know, there's a

9   compelling need not to disclose to the parents.  There's no

10  disclosure.  The girl then goes and attempts to commit suicide.

11  We really haven't solved anything, have we?

12         So my paragraph No. 5 -- and I'm not going to spend

13  much more time on this -- but my paragraph No. 5 is essentially

14  a direct quote from the Supreme Court.  That's what the Supreme

15  Court said.  It's a direct quote.  It said:

16             "The injunction is intended to promote child safety

17             by guaranteeing the parents a role in some of the

18             most consequential decisions in children's lives

19             while permitting the state to shield children from

20             unfit parents by enforcing child abuse laws in cases

21             of a compelling need."

22         In other words, if, in fact -- I'll just throw a

23  hypothetical at you -- the child goes to the schoolteacher and

24  says, "Teacher, my parents said that they're going to kill me

25  if I ever express any gender incongruity," at that point in

1  time -- the teachers, by California law, are mandated

2  reporters -- at that point in time, the teachers would have a

3  process, and the process would be to turn the parents over to

4  CPS.  And then there would be a judicial determination as to

5  whether or not this is true; this is a -- this is really a

6  danger to the child.  All right?

7          And I say that only because, you know -- I mean, I

8  don't know if you have kids or if you -- you know, if you

9  remember, but sometimes parents say things, you know.  They

10 don't really mean it.  You know, they just -- right?  So maybe

11 somebody -- not the school district, not the state, not the

12 parents -- has to decide whether or not there's a real danger

13 to the child.  Right?  And I think that's what the Supreme

14 Court was referring to in that quote.  That is basically just a

15 direct quote right out of the Supreme Court.

16         Now, if you can't agree to that, that's fine.  I

17 understand.  You go to the Ninth Circuit.  I'm sure the Ninth

18 Circuit will give you -- you know, will do whatever it is they

19 think is necessary.  But I think this is a reasonable

20 compromise that protects the child.  It protects the state and

21 the school district.  It protects the parents.

22         So anyway.  That's what I'm proffering.

23         So let's get back to the attorneys' fees.  You've got

24 a little time.  You can talk to your cocounsel there while

25 Mr. Spence is telling me about his position on the attorneys'

1    fees and costs.  And then at the end of this hearing, I'm going

2    to ask you, "Do you agree to this or not?"  If you don't, so be

3    it.  Okay?

4              All right.  Mr. Spence, the floor is yours.

5              MS. BUNSHOFT:  Your Honor, I don't think, sitting

6    here today, we would be able to agree or not agree if the

7    implication is, by agreeing to this, the pending emergency

8    motion before the Ninth Circuit would be withdrawn.  We would

9    have to speak with the clients before being able to make that

10   decision.  So perhaps we could have, you know, a day to

11   respond.

12             THE COURT:  I'll give you a day.

13             MS. BUNSHOFT:  Thank you.

14             THE COURT:  I'll give you a day.  You folks let me

15   know.

16             MS. BUNSHOFT:  Thank you, Your Honor.

17             THE COURT:  And by the way, Mr. Jonna, I did not ask

18   you.  I'm sorry.  I got so focused on them.  I forgot to ask

19   you.  You looked at the language.

20             MR. JONNA:  Yes.

21             THE COURT:  Is the language agreeable with you?

22             MR. JONNA:  Your Hon -- Your Honor, they would need

23   to withdraw the motion, but yes.  Obviously, the Supreme Court

24   found that language appropriate for its thorough order that it

25   considered for multiple weeks.  And if the Court wants to

1   repeat the language in this -- in this Court's order, we

2   certainly don't have an objection to that if that addresses

3   their concern.

4          I will say, just as a side note -- and I think the

5   Court already alluded to this -- that one of the issues with

6   these policies has been that there's sort of a loose definition

7   of abusive parents.  And so what happens -- what we've seen --

8   our clients have told us this -- and what would -- happens is

9   that a kid just is afraid of what their -- how their parents

10  may react.

11         THE COURT:  Sure.

12         MR. JONNA:  And if they're not immediately

13  affirming --

14         THE COURT:  I believe it was Ms. Tando and Dr. Brady

15  said that, very often, this happens.  But then again, you have

16  to agree that there may be cases --

17         MR. JONNA:  Right.

18         THE COURT:  -- right, where a parent says, "If you

19  express gender incongruity, I'm going to kick you out of the

20  house.  You're going to go out and live on the street."

21         MR. JONNA:  Yeah.  And there's a process for that,

22  and that's --

23         THE COURT:  And there's a process for that.

24         MR. JONNA:  Yes.

25         THE COURT:  That's what -- that's what I thought I

1   was alluding to in my order for summary judgment.  I think

2   that's what the Supreme Court understood.

3          MR. JONNA:  Yes.

4          THE COURT:  And that provides for a process.  Right?

5   Because again, the parents may say, "You know, I overreacted.

6   I" -- "You know, I was" -- "I was out of my mind."  I mean --

7          MR. JONNA:  Yeah.

8          THE COURT:  You know, having been a perfect parent

9   myself, I'm sure I never said anything that I wished that I

10  could take back.  It happens.  It happens.

11         But this provides for a process for, if there's a

12  real threat to the child, for the threat to be dealt with.

13  Either they counsel the parent and make the parent come around,

14  or they decide, no, this is a real danger to the child, and so

15  we have to remove the child.  That's a better way.

16         You know, I'm thinking about the *Regino* case.

17  Remember the *Regino* case.  Here was a case where the child was

18  suffering from depression and anxiety because her -- her

19  grandfather had just passed away.  The mother was recovering

20  from, I think it was breast cancer.  So the child is suffering

21  from depression and anxiety.  Somehow or another, she's talking

22  to a counselor.  The discussion, for however it happened,

23  turned into a gender discussion.  And then, of course, the

24  mother was not told.  And, fortunately, as it turned out, the

25  grandmother was told, and the grandmother told the mother, and

1   the child was taken to counseling.  And in that case -- I'm not

2   saying it's going to happen in every case, of course -- but in

3   that case, it turned out that the child really was not

4   transgender.

5           So we saved the child from a lifetime of possible --

6   as I think it was Dr. Brady or maybe it was Ms. Tando

7   testified -- being a transgender is not a life -- easy life for

8   anyone.  So whether we like it or not, that's just the way it

9   is.  So that child was spared the lifetime of living a life

10  that she wouldn't otherwise have lived.  And the parents were

11  spared having to deal with a lifetime that they would not have

12  lived with otherwise.

13          I think the same is true for the child -- I think I

14  mentioned in my order the child who thought that because he

15  liked pink, he was a girl.  Well, fortunately, somehow, that

16  child wound up in counseling and found out that, Hey, just

17  because I like pink, doesn't mean I'm a girl.  So we spared

18  that child a lifetime of being confused thinking that he was a

19  girl, and we saved the parents the lifetime as well.

20          So I think the Supreme Court understands it the way I

21  understood it, which is, look, if there really is a danger to

22  the child, there's a process.  California has a process.

23  Follow the process.  It's that simple.  Otherwise, we're just

24  leaving it to some undisclosed people with maybe some agendas

25  or some lack of training or whatever to make decisions

54

1  depriving a parent of the right to make decisions for the

2  child.

3          And as Forrest Gump said, that's all I'm going to say

4  about that.

5          MR. JONNA:  Your Honor, may I?

6          THE COURT:  But --

7          MR. JONNA:  I'm sorry to interrupt you.  May I say

8  one more thing before we turn it back to Mr. Spence on the

9  subject of this Ninth Circuit motion that they filed?

10          THE COURT:  It's -- the motion is not before me.

11          MR. JONNA:  Okay.

12          THE COURT:  I'm offering them a solution, a possible

13  solution.  If they want go along with it, great.  If they

14  don't, you can deal with the Ninth Circuit.  You can argue it

15  before the Ninth Circuit, and the Ninth Circuit will do

16  whatever it is that they think they need to do.  It's not for

17  me to tell them how to do what they do.  So, you know, just

18  save it.

19          But I -- but I do get your point.  Your point is that

20  here's another example of where something could be resolved,

21  they're not willing to resolve it, and it's made the litigation

22  that much more difficult and complex.  I got that point when

23  you first got up to speak.

24          Mr. Spence, the floor is yours.

25          MR. SPENCE:  Thank you, Your Honor.

MIRABELLI, ET AL. V. OLSON, ET AL. - 03/09/2026

1

2                     C E R T I F I C A T E

3          I, Adrian Dale Baule, certify that I am a duly
   qualified and acting Official Court Reporter for the United
4  States District Court; that the foregoing is a true and
   accurate transcript of the proceedings as taken by me in the
5  above-entitled matter on March 9, 2026; and that the format
   used complies with the rules and requirements of the United
6  States Judicial Conference.

7

8          Date:  March 11, 2026

9

10     Adrian Dale Baule, RMR, CRR, CSR
   U.S. Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25