Nos. 25-8056, 26-2337

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————————

ELIZABETH MIRABELLI, *et al.*,
*Plaintiffs-Appellees*,

V.

ROB BONTA, *et al.*,
*Defendants-Appellants*.

———————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:23-cv-0768-BAS-VET
The Honorable Cynthia Bashant, Judge

———————————

## DEFENDANTS-APPELLANTS' OPENING BRIEF

———————————

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy Solicitor General*
CHERYL L. FEINER
  *Senior Assistant Attorney General*
JOSHUA A. KLEIN
  *Supervising Deputy
   Solicitor General*

JULIE VEROFF
  *Deputy Solicitor General*
DARRELL W. SPENCE
  *Supervising Deputy Attorney General*
JENNIFER A. BUNSHOFT
KEVIN L. QUADE
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
 (415) 510-3776
Julie.Veroff@doj.ca.gov
  *Attorneys for Defendants-Appellants*

May 26, 2026

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................... 1

Jurisdictional statement .................................................................. 4

Statement of the issues .................................................................. 4

Statement of the case ..................................................................... 4

    A.    Legal background ................................................................ 4

        1.    The California Department of Education's nonbinding guidance to school districts .......................... 5

        2.    State enforcement action against discriminatory forced disclosure policies ................................................ 6

        3.    The Attorney General's legal alert on "forced disclosure policies" ......................................................... 8

        4.    Assembly Bill 1955 .......................................................... 9

    B.    Procedural history ............................................................. 11

Summary of argument .................................................................... 18

Argument ....................................................................................... 21

I.    The parent plaintiffs' claims fail on the merits in substantial part .... 22

    A.    In light of the Supreme Court's ruling, the State does not appeal the district court's principal ruling regarding disclosure to parents ............................................................. 23

    B.    Parent plaintiffs have not demonstrated that the State's nondiscrimination law violates their substantive due process or free exercise rights ............................................. 27

        1.    California law requires school officials to use the names and pronouns that reflect a student's gender identity ............................................................................. 28

        2.    Parents do not have a constitutional right to compel school officials to use names and pronouns at odds with a student's gender identity .................................... 29

i

## TABLE OF CONTENTS
### (continued)

**Page**

      a.    Substantive due process ..................................... 30

      b.    Free exercise ...................................................... 40

II.    The teacher plaintiffs' claims fail on the merits ............................... 47

III.   The Court should vacate the permanent injunction and direct the district court to narrow and clarify it on remand ............................. 51

    A.    The permanent injunction conflicts with the reasoning in the Supreme Court's preliminary ruling ................................ 52

    B.    The injunction is overbroad and unclear in other ways .......... 56

Conclusion ...................................................................................... 59

# TABLE OF AUTHORITIES

**Page**

CASES

*ACF Industries Inc. v. Cal. State Bd. of Equalization*
42 F.3d 1286 (9th Cir. 1984) ........................................................52

*Alexander v. Carrington Mortg. Servs., LLC*
23 F.4th 370 (4th Cir. 2022) .........................................................57

*Anspach ex rel. Anspach v. City of Phila. Dep't of Pub. Health*
503 F.3d 256 (3d Cir. 2007) .........................................................32

*Arce v. Douglas*
793 F.3d 968 (9th Cir. 2015) ........................................................28

*Armstrong v. Schwarzenegger*
622 F.3d 1058 (9th Cir. 2010) ......................................................45

*Baz v. Walters*
782 F.2d 701 (7th Cir. 1986) ........................................................49

*Berry v. Dep't of Soc. Servs.*
447 F.3d 642 (9th Cir. 2006) ........................................................49

*Brown v. Polk Cnty., Iowa*
61 F.3d 650 (8th Cir. 1995) ..........................................................49

*City of Huntington Beach v. Newsom*
2025 WL 3169324 (9th Cir. Sep. 12, 2025) ................................11

*Collins v. City of Harker Heights, Tex.*
503 U.S. 115 (1992)......................................................................26

*Comes v. Edmonds Sch. Dist. No. 15*
816 F.3d 1255 (9th Cir. 2016) ......................................................49

*Copeland v. Ga. Dep't of Corr.*
97 F.4th 766 (11th Cir. 2024) .......................................................29

iii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Del Webb Communities, Inc. v. Partington*
652 F.3d 1145 (9th Cir. 2011) ........................................................59

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*
489 U.S. 189 (1989)........................................................................32

*Doe by & through Doe v. Boyertown Area Sch. Dist.*
897 F.3d 518 (7th Cir. 2018) ..........................................................38

*Donovan v. Poway Unified Sch. Dist.*
167 Cal.App.4th 567 (2008) ...........................................................28

*Fields v. Palmdale Sch. Dist.*
427 F.3d 1197 (9th Cir. 2005) .........................................................34

*Foote v. Ludlow Sch. Comm.*
128 F.4th 336 (1st Cir. 2025)......................................................37, 38

*Fortyune v. Am. Multi-Cinema, Inc.*
364 F.3d 1075 (9th Cir. 2004) .....................................................21, 56

*Fulton v. City of Philadelphia*
593 U.S. 522 (2021)........................................................................50

*Galvez v. Jaddou͵*
52 F.4th 821 (9th Cir. 2022) ...........................................................52

*Garcetti v. Ceballos*
547 U.S. 410 (2006)........................................................................49

*Grimm v. Gloucester Cnty. Sch. Bd.*
972 F.3d 586 (4th Cir. 2020) ......................................................34, 38

*Haitian Refugee Ctr., Inc. v. Baker*
953 F.2d 1498 (11th Cir. 1992) .......................................................32

*Jackson v. Birmingham Bd. of Educ.*
544 U.S. 167 (2005).......................................................................28

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*
   585 U.S. 878 (2018)..................................................49

*Johnson v. Poway Unified Sch. Dist.*
   658 F.3d 954 (9th Cir. 2011) ...............................48, 49

*Kennedy v. Bremerton Sch. Dist.*
   597 U.S. 507 (2022)..............................................40, 49

*Knight v. Conn. Dep't of Pub. Health*
   275 F.3d 156 (2d Cir. 2001) ....................................49

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*
   941 F.2d 970 (9th Cir. 1991) .........................56, 57, 58

*Lyall v. City of Los Angeles*
   807 F.3d 1178 (9th Cir. 2015) ..................................24

*Mahmoud v. Taylor*
   606 U.S. 522 (2025)....................40, 41, 42, 43, 44, 45, 46, 47

*Mirabelli v. Bonta*
   146 S. Ct. 797 (2026)..................... 16, 17, 21, 23, 27, 31-37, 45, 48, 54, 55

*Murillo v. Wal-Mart Assoc.*
   2026 WL 372886 (C.D. Cal. Jan. 16, 2026)...............................29

*New York v. Ferber*
   458 U.S. 747 (1982)...............................................37

*Parents for Priv. v. Barr*
   949 F.3d 1210 (9th Cir. 2020) ........................34, 35, 38

*People v. Chino Valley Unified Sch. Dist.*
   2024 WL 5442638 (Cal. Super. Sept. 9, 2024) ........................6, 7

*Perry v. Marteney*
   172 F.4th 315 (4th Cir. 2026) ..................................41

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Pickering v. Bd. of Educ.*
391 U.S. 563 (1968)..................................................................48, 49

*Pickern v. Holiday Quality Foods Inc.*
293 F.3d 1133 (9th Cir. 2002) ...........................................................24

*Polk v. Montgomery Cnty. Pub. Sch.*
166 F.4th 400 (4th Cir. 2026) .............................................................49

*Prescott v. Rady Children's Hospital-San Diego*
265 F. Supp. 3d 1090 (S.D. Cal. 2017).................................................29

*Prince v. Massachusetts*
321 U.S. 158 (1944).............................................................................46

*Regino v. Staley*
133 F.4th 951 (9th Cir. 2025) .......................................26, 30, 31, 35, 58

*Roberts v. U.S. Jaycees*
468 U.S. 609 (1984).............................................................................37

*Runyon v. McCrary*
427 U.S. 160 (1976).............................................................................31

*Scarbrough v. Morgan Cnty. Bd. of Educ.*
470 F.3d 250 (6th Cir. 2006) ..............................................................48

*Taking Offense v. State*
18 Cal. 5th 891 (2025) .........................................................................28

*Thomas v. Cnty. of Los Angeles*
978 F.2d 504 (9th Cir. 1992) ..............................................................57

*Tingley v. Ferguson*
47 F.4th 1055 (9th Cir. 2022) .............................................................38

*Troxel v. Granville*
530 U.S. 57 (2000)...............................................................................31

vi

## TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Skrmetti*
 605 U.S. 495 (2025)..................................................................33

*Vlaming v. W. Point Sch. Bd.*
 302 Va. 504 (2023) .................................................................29

*Wisconsin v. Yoder*
 406 U.S. 205 (1972)..............................................31, 40, 43, 44, 46

**STATUTES AND REGULATIONS**

5 U.S.C. § 552a ..........................................................................51

18 U.S.C. § 1905 ........................................................................51

34 C.F.R. § 300.30 .....................................................................55

Assembly Bill No. 1955, 2023-2024 Reg. Sess. (Cal. 2024), Cal.
 Stat., ch. 95............................................................................9

Cal. Educ. Code
 § 200......................................................................................29
 § 217......................................................................................11
 § 220..........................................................................28, 47, 50
 § 220.3(a) ..............................................................................11
 § 220.5(a) ..............................................................................11
 § 49602..................................................................................56
 § 72621..................................................................................56

**OTHER AUTHORITIES**

Cal. Assemb. Comm. on Educ., Report for June 26, 2024 Hearing
 on AB 1955 ...........................................................................10

Fed. R. Civ. P. 65(d) .................................................................57

Fed. R. Crim. P. 6(e) .................................................................51

**INTRODUCTION**

Like many States and school districts, California has endeavored to support the important role that parents play in their children's lives, and at the same time to protect transgender young people from discriminatory treatment and harm. In service of those goals, California has interpreted state constitutional privacy protections to generally prevent school employees from disclosing a student's gender identity to others, including their parents, without the student's consent (unless another law required it or the disclosure was necessary to protect the child's well-being). California has also interpreted its nondiscrimination law to prohibit school employees from addressing students with names and pronouns that do not reflect their asserted gender identity.

The parent and teacher plaintiffs here challenged that approach, alleging that parents have a right to know and consent before school employees honor their child's request to use a name and pronouns that reflect their gender identity. This Court already has some familiarity with those claims, having stayed the district court's permanent injunction pending appeal—a stay the Supreme Court then vacated as to the parents and maintained as to the teachers. Although the Supreme Court's ruling was preliminary, the State has carefully reevaluated its approach to this litigation in light of the Supreme Court's reasoning. Two aspects of that reasoning have principally informed the State's determination about how to

1

proceed in this appeal:  first, the Supreme Court's recognition that the parents' constitutional rights do not prevent the State from restraining disclosure to prevent abuse, and second, the Court's confirmation that the injunction provides relief only to parents who object to the State's policies, not to *all* parents.  Nothing in the Supreme Court's ruling supports requiring notification to parents who would engage in abuse as a result, or who do not ask for the relevant information.

In light of those important limits, the State has opted not to contest on appeal the principal portion of the district court's holding regarding disclosure:  that the State may not generally prohibit school employees from informing parents, upon the parent's request, about the names or pronouns that school employees are using for their child.[1]  The State maintains its appeal, however, as to plaintiffs' remaining claims.  Neither substantive due process nor free exercise doctrine entitles the parent plaintiffs to compel school employees to violate state nondiscrimination law by disregarding a student's request to use a name or pronouns consistent with their gender identity.  Nor does the First Amendment give teachers a right to violate state nondiscrimination laws based on their personal views when operating in their professional capacity as public employees.  Affirming the district court on any of these claims would have far-reaching, harmful consequences for students and

---

[1] The precise contours of the State's position on disclosure are discussed in greater detail below.  *See infra* pp. 23-27.

school employees.  Indeed, if parents have a right to compel teachers to address a student with a name and pronouns that do not reflect the student's gender identity, parents could effectively require teachers to enforce all manner of parental philosophies or religious beliefs in the classroom—such as controlling what students eat, what they wear, and who they associate with.

Regardless of how the Court resolves the merits, it should vacate the district court's overbroad, ambiguous, and unworkable injunction and remand for narrowing and clarification.  By its terms, the injunction does not allow the State to enforce any laws restraining disclosure to prevent abuse, even though the Supreme Court stated such laws would likely survive strict scrutiny and the district court subsequently explained during a hearing that it did not intend the injunction to constrain the State in this way.  The injunction also fails to specify exactly which laws and policies it enjoins.  And it requires the State to post a notice about parent and teacher rights that does not conform to the reasoning in the Supreme Court's ruling and is ripe for confusion.  Moreover, the injunction's vague terminology threatens to transform school employees into a gender-identity police force, surveilling students for any subjective sign of deviation from gender stereotypes. Vacatur and remand are necessary to remedy these and other defects and avoid unnecessary harm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. On December 22, 2025, the district court entered a final judgment and permanent injunction. 1-ER-73–128. The State timely noticed an appeal on December 23, 2025. 2-ER-351–355. On March 30, 2026, the district court denied the State's motion to modify the injunction order. 1-ER-2–72. The State timely noticed an appeal on April 10, 2025. 2-ER-346–350. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1). The Court consolidated the appeals. C.A. Dkt. 42.

## STATEMENT OF THE ISSUES

1. Whether parent plaintiffs are entitled to summary judgment on their substantive due process and free exercise claims regarding notification and consent.

2. Whether teacher plaintiffs are entitled to summary judgment on their free speech and free exercise claims.

3. Whether the permanent injunction should be vacated and remanded so that it can be narrowed and clarified.

## STATEMENT OF THE CASE

### A.   Legal Background

In recent years, California—like many States and school districts across the country—has endeavored to protect transgender students from discriminatory treatment and harm, while also respecting the important role that parents play in a

4

child's life.  The State's approach has evolved over time, and the section that follows focuses on actions highlighted in plaintiffs' complaint.

### 1. The California Department of Education's Nonbinding Guidance to School Districts

In 2016, the California Department of Education (CDE) issued a nonbinding Legal Advisory and accompanying Frequently Asked Questions (FAQs) document regarding the application of state law to transgender students.  2-ER-178–179, 2-ER-311–324.  Those documents remained posted on CDE's website until early 2025, when they were rescinded and replaced following the enactment of new legislation.  *Infra* p. 11.

As relevant here, the FAQs advised on how to protect a transgender student's right "to keep their transgender status private" in light of concerns that "[r]evealing a student's gender identity or expression to others may compromise the student's safety."  2-ER-317.  The FAQs provided:  "[S]chools must consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, including the student's family.  With rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents."  2-ER-318–319.  "In those very rare circumstances where a school believes there is a specific and compelling 'need to know,'" the FAQs continued, "the school should inform the student that the school intends to disclose

5

the student's transgender status, giving the student the opportunity to make that disclosure her or himself." 2-ER-318–319.

The FAQs also discussed how to address a student whose gender identity differs from "the gender marker in the school's . . . official records." 2-ER-319. "If a student so chooses, district personnel shall be required to address the student by a name and the pronouns consistent with the student's gender identity[.]" 2-ER-319. "[I]ntentionally us[ing] a student's incorrect name and pronoun, or persistently refus[ing] to respect a student's chosen name and pronouns . . . should be treated as harassment," and "[d]epending on the circumstances, the school's failure to address known incidents of that type of harassment may violate California's antidiscrimination laws." 2-ER-320.

### 2. State Enforcement Action Against Discriminatory Forced Disclosure Policies

In 2023, Chino Valley Unified School District adopted a policy that, among other things, categorically required school officials to notify a student's parents within three days—regardless of whether the parents requested disclosure, and regardless of any risk of abuse—whenever the student requested "to be identified or treated[] as a gender" different from the one listed on their official records, including by using a different name or pronouns, or accessed sex-segregated school programs, activities, or facilities "that do not align with" the sex listed on the student's official records. *People v. Chino Valley Unified Sch. Dist.*, 2024 WL

6

5442638, at *1 (Cal. Super. Sept. 9, 2024).  The Attorney General filed suit for injunctive relief in state court, alleging violations of state nondiscrimination and privacy law.  *Id.*

The trial court held that the challenged policy provisions violated state nondiscrimination law because they facially discriminated against transgender students based on their gender identity; rested on "overbroad generalizations" about the mental health of transgender students; and were not narrowly tailored. 2024 WL 5442638, at *1-2, 6-8.  The school district could have, for example, adopted a policy that "directly focuse[d]" on problems like "mental health [or] psychological distress," "instead of focusing on the protected group itself."  *Id.* at *8.  But the trial court rejected the State's privacy argument as to minor students, holding that minors do not have a reasonable expectation of privacy in a request they make to school officials or in actions they take openly at school.  *Id.* at *14-18.  No party appealed.[2]

---

[2] CDE filed a civil action against Rocklin Unified School District after it adopted a similar policy.  *See Cal. Dep't of Educ. v. Rocklin Unified Sch. Dist.*, No. S-CV-0052605 (Cal. Super. Ct., Placer Cnty., Apr. 10, 2024).  The district has to date refused to comply with the corrective actions assigned to it by CDE, and CDE's enforcement action remains pending.

### 3. The Attorney General's Legal Alert on "Forced Disclosure Policies"

In January 2024, after the Attorney General obtained a preliminary injunction against Chino Valley Unified School District's policy, *supra* pp. 6-7, the Attorney General issued a legal alert to school boards and superintendents regarding "forced disclosure policies"—*i.e.*, "policies that require schools to inform parents and guardians, with minimal exceptions, whenever a student requests to use a name or pronoun different from that on their birth certificate or official records" or "requests to use facilities or participate in school programs that do not align with their sex or gender on official records." 2-ER-325. The legal alert set forth the Attorney General's position that such policies violate the state Equal Protection Clause, statutory prohibitions on discrimination, and the state constitutional right to privacy. 2-ER-325–328.

Beginning with the state Equal Protection Clause, Cal. Const. art. I, § 7, the legal alert explained that policies that "single[] out transgender and gender nonconforming students for disfavorable treatment vis-à-vis cisgender students" are a form of sex discrimination and trigger strict equal protection scrutiny. 2-ER-325–326. Forced gender-identity disclosure policies fail strict scrutiny, the legal alert explained, because they are often based on "'outdated social stereotypes'" that all transgender people are "mentally ill or otherwise 'disordered'"; are not narrowly tailored to achieve non-discriminatory interests; and risk harm to

8

students. 2-ER-326–327. In particular, forced disclosure policies "that do not create any exception for children who may face emotional, physical, or psychological abuse at home as a result of the school's disclosure . . . cannot satisfy" narrow tailoring. 2-ER-327 (collecting research documenting such abuse). The legal alert noted that there are "numerous feasible and effective alternatives" to forced disclosure policies that would "promote parental involvement by informing parents of concerns about a student's well-being." 2-ER-326. For example, in lieu of singling out transgender students based only on their gender identity, a school could adopt "a policy informing parents when any student—cisgender or transgender—is exhibiting symptoms of depression or other significant mental health issues." 2-ER-326. A school could also "encourage students to inform their parents" and "provide counseling and other support tools to help students initiate these conversations." 2-ER-326. Turning to the state constitutional right to privacy, Cal. Const. art. I, § 1, the legal alert explained that adults and minors have a constitutionally protected privacy interest in their gender identity and that forced disclosure policies unconstitutionally invade that interest. 2-ER-327–328.

### 4. Assembly Bill 1955

In July 2024, the California Legislature enacted AB 1955 in response to concern about forced disclosure policies. *See* Assembly Bill No. 1955, 2023-2024

9

Reg. Sess. (Cal. 2024), 2024 Cal. Stat., ch. 95, https://tinyurl.com/yy6ku2rv.[3] The Legislature found that parents play an important role in students' lives; that LGBTQ youth thrive when they are able to share their sexual orientation and gender identity with others—including their parents—when they are ready; and that forced disclosure policies deprive LGBTQ youth and their families of the opportunity to build trust with one another. *Id.* § 2. The Legislature also found that forced disclosure policies put many LGBTQ students at risk of serious harm. *Id.* The Legislature reviewed research finding that "57% of LGBTQ youth reported . . . parental rejection," ranging from "mocking" to "physical abuse and being kicked out of the home"; that such rejection is associated with heightened risks of depression, suicide, substance abuse, and homelessness; and that forced disclosure policies deter LGBTQ students from seeking needed support at school when they experience harassment and bullying. Cal. Assemb. Comm. on Educ., Report for June 26, 2024 Hearing on AB 1955 at 4, https://tinyurl.com/bde763zh.

AB 1955 prohibits school policies that categorically *require* school employees to disclose the sexual orientation, gender identity, or gender expression of students without their consent—unless the disclosure is "otherwise required by

---

[3] This Court is considering challenges to AB 1955 in two pending appeals: *City of Huntington Beach v. Newsom*, No. 25-3826, and *Chino Valley Unified Sch. Dist. v. Newsom*, No. 25-3686.

state or federal law." Cal. Educ. Code §§ 220.3(a), 220.5(a). That prohibition prevents school districts from adopting policies like Chino Valley's—policies that categorically require disclosure to parents, regardless of whether a parent has asked for the information, would prefer to learn their child's gender identity from their child and not a school employee, or would abuse their child as a result. *Supra* p. 6. But AB 1955 does not mandate that schools adopt nondisclosure policies or restrain a teacher's decision to disclose information to parents. Nor does it "forbid a school district from adopting a policy that employees *may* elect to make such disclosures." *City of Huntington Beach v. Newsom*, 2025 WL 3169324, at *2 (9th Cir. Sep. 12, 2025).

AB 1955 also instructed CDE to update its resources for schools in this area. Cal. Educ. Code § 217. Accordingly, in January 2025, CDE withdrew its 2016 Legal Advisory and FAQs document, *supra* pp. 5-6, and replaced them with guidance that tracks AB 1955, *see* 2-ER-182–189.

## B. Procedural History

**1.** This case began in 2023, when two teachers alleged that their school district's policy on transgender students violated their free speech and free exercise rights. 2-ER-332–333. Pursuant to that policy, a transgender student's status was to be disclosed only with the student's consent, unless disclosure was otherwise required by law or there was "compelling evidence that disclosure is necessary to

11

preserve the student's physical or mental well-being." 2-ER-344. School employees were also required to accept a "student's assertion of gender identity" and "treat the student consistent with that gender identity." 2-ER-344.

In addition to suing district officials, the teachers sued members of the State Board of Education and the State Superintendent of Public Instruction because the district had suggested its policy "may be required" by CDE's 2016 FAQs. 2-ER-338; *see also* 2-ER-335–337. But the complaint acknowledged that CDE's FAQs were "not a formal agency interpretation," 2-ER-338, and expressly disclaimed any argument that state law "violates the U.S. Constitution." 2-ER-339. The district court granted a preliminary injunction preventing the defendants from enforcing the district's policy and the "policy described in" CDE's FAQs against the two teachers. 2-ER-330–331. No party appealed.

Plaintiffs later filed an amended class action complaint, which added two more teachers and two sets of parents as named plaintiffs and added the Attorney General as a defendant. 2-ER-200–206. Whereas the original complaint focused on the teachers' district's policy, the operative complaint focused on what plaintiffs called "the State's Parental Exclusion Policies." 2-ER-193. According to plaintiffs, those policies required schools to "lie to parents about a child's mental health or personal circumstances," "revert to using biological pronouns and legal names when speaking with parents in order to actively hide information about

12

their child's gender identity from them," and "us[e] any pronouns or a gender-specific name requested by the student during school." 2-ER-193. Plaintiffs alleged that the State believed those policies to be "required by the Privacy Clause of the California Constitution," and that schools that failed to comply were vulnerable to suit by the State. 2-ER-193.

Plaintiffs maintained that the State's policies violated the right of parents to know and consent before "teachers participat[e] in the social transition of their children," 2-ER-231, and the right of teachers to refrain from excluding parents "from any decision-making regarding a child's 'social transition,'" 2-ER-197. They asserted substantive due process and free exercise claims on behalf of the parents and free exercise and free speech claims on behalf of the teachers, and sought declaratory and injunctive relief. 2-ER-276–310.

**2.** The district court denied the State's motions to dismiss for lack of standing and failure to state claims for relief. 2-ER-391. It certified a Rule 23(b)(2) class of public-school parents and employees who "object" to the "Parental Exclusion Policies." 1-ER-140–141. And in December 2025, the district court granted summary judgment to plaintiffs on their claims against the State and entered a permanent injunction. 1-ER-73–128.[4] In so doing, the district court made clear

---

[4] Plaintiffs' claims against the school district defendants were severed and stayed. 1-ER-82.

that the policies being challenged—and as to which it was granting summary judgment—did not include "California Assembly Bill 1955," which "prohibits forced disclosure by teachers" but not "a teacher's voluntary disclosure." 1-ER-84. Instead, the district court focused on what it described as the State's policy of "prohibiting public school teachers from informing parents." 1-ER-79.

The focus of the district court's order was substantive due process. 1-ER-88–106. Despite "an absence of precedential rulings," 1-ER-91, the district court concluded that parents have a due process right "to be informed about the gender identity expressed within the schoolhouse gate of one's child." 1-ER-106; *see also* 1-ER-99 ("right to be informed . . . when gender incongruence is observed") (emphasis omitted); 1-ER-79 (right to be "informed early on . . . after a student says or dresses in a way that suggests a non-conforming gender identity"). And based on its view that the State generally prohibited public-school employees from informing parents absent the child's consent, 1-ER-79, 1-ER-95, 1-ER-117–118, the district court held that the "policies" infringed the Due Process Clause and failed strict scrutiny, 1-ER-114–118.

The district court similarly held that the challenged policies violated the parents' free exercise rights. The court stated that the State "keep[s] [parents] in the dark about things their schools are doing in conflict with their sincerely-held religious beliefs." 1-ER-108. As to the teachers' claims, the district court held that

14

the challenged policies were "neither generally applicable nor narrowly tailored," 1-ER-121, and "compelled" teachers "to speak in violation of the law or to deliberately convey an illegal message," 1-ER-125.

The district court also entered a sweeping permanent injunction. 1-ER-73–76. The injunction contains a number of components, but in the main, it bars the State from enforcing "the Privacy Provision of the California Constitution . . . [and] any other provision of California law," as well as "any regulations or guidance," in ways that "permit or require any" public-school employee to:

- (1) "mislead[]" a parent "about their child's gender presentation at school," including by "using a different set of preferred pronouns/names when speaking with the parents than is being used at school"; or

- (2) refer to a child with a name or pronouns "that do not match the child's legal name and natal pronouns, where a child's parent . . . has communicated their objection to such use." 1-ER-74–75.

The injunction also bars the enforcement of any state law that would "in any way interfere with" a school employee "communicating to parents that . . . their child has manifested a form of gender incongruity such as changing preferred names or pronouns." 1-ER-74–75. And it mandates that the State include in any "gender-related" training materials a statement that "[p]arents and guardians have a

15

federal constitutional right to be informed if their public school student child expresses gender incongruence" and "[t]eachers and school staff have a federal constitutional right to accurately inform the parent or guardian of their student when the student expresses gender incongruence." 1-ER-75–76. The injunction does not, by its terms, provide an exception to prevent child abuse.

**3.** This Court stayed the injunction pending appeal. C.A. Dkt. 13. The panel held that the State had shown "a substantial case for relief on the merits based on the sweeping nature of the district court's injunction, the dubious class certification, and the weakness of plaintiffs' claims." *Id.* at 10. Plaintiffs then sought emergency relief from the Supreme Court, which vacated the stay as to the parent plaintiffs and maintained the stay as to the teacher plaintiffs. *Mirabelli v. Bonta*, 146 S. Ct. 797 (2026). The Court explained that the parent plaintiffs are likely to succeed in showing that California's alleged policies unconstitutionally infringe their free exercise right "'to guide the religious development of their children,'" *id.* at 802, and their substantive due process right "not to be shut out of participation in decisions regarding their children's mental health," *id.* at 803. The Court recognized, however, that the State could serve its "interest in safety" by "precluding gender-identity disclosure to parents who would engage in abuse." *Id.* And it confirmed that the injunction provided relief "only for those parents who

16

object to the challenged policies or seek religious exemptions," not "all" parents. *Id.*

Justice Barrett, joined by the Chief Justice and Justice Kavanaugh, wrote separately to emphasize that the Court's "assessment is preliminary" and does not "conclusively resolve [the merits]," which will "continue to [be] litigate[d] in the Ninth Circuit." *Id.* at 805 (Barrett, J., concurring). Justices Sotomayor, Kagan, and Jackson dissented. *Id.* at 803, 806-809.[5]

Following the Supreme Court's ruling, the State asked this Court to clarify that the injunction is stayed insofar as it would compel disclosure to parents who would engage in abuse as a result, and with respect to the mandated statement for training materials. C.A. Dkt. 24. The panel acknowledged the State's "important concerns," but directed the State to seek clarification or modification from the district court in the first instance. C.A. Dkt. 33. The State then sought similar relief in the district court, which denied the motion from the bench. 1-ER-72. Shortly thereafter, Judge Benitez announced his retirement from judicial service, and the case was reassigned to Chief District Judge Bashant. 2-ER-374.

---

[5] The Supreme Court has since denied certiorari in three cases presenting similar parental substantive due process questions: *Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, No. 25-259, 2026 WL 1127219 (U.S. Apr. 27, 2026) (cert. denied); *Foote v. Ludlow Sch. Comm.*, No. 25-77, 2026 WL 1052101 (U.S. Apr. 20, 2026) (cert. denied); *Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, No. 25-759, 2026 WL 858415 (U.S. Mar. 30, 2026) (cert. denied).

**SUMMARY OF ARGUMENT**

Plaintiffs' claims, the district court's reasoning, and the Supreme Court's preliminary ruling all make the same assumption about the scope of California policy: that the State prohibits school employees from telling parents which names and pronouns they are using to address the parents' child at school, unless the child consents. The State has never interpreted its law that categorically; among other things, it has always maintained that disclosure is appropriate when in service of a child's well-being. But in light of the Supreme Court's preliminary ruling in this case, the State has elected to streamline the issues on appeal to focus on those of greatest concern. Although the State strongly disagrees with much of the reasoning and rhetoric of the district court's summary judgment order, it has opted not to appeal the portion of the district court's decision holding that a nondisclosure policy as alleged by plaintiffs—*i.e.*, a policy that generally prohibits school employees from telling parents, on request, about the name and pronouns they are using for the parents' child at school—unconstitutionally burdens the parent plaintiffs' substantive due process and free exercise rights.

Reversal is still warranted, however, because the district court's summary judgment order and award of permanent injunctive relief sweep much more broadly. The court held that parental due process and free exercise rights entitle parents to force teachers and other school employees to violate state

18

nondiscrimination law by using the *parents'* requested name and pronouns for a child despite the student's request to be referred to by a different name and pronouns consistent with their gender identity. Nothing in the due process or free exercise precedent of this Court or the Supreme Court—including the Supreme Court's preliminary ruling in this case—supports such a far-reaching limit on state nondiscrimination protections. The core principle recognized in the Supreme Court's preliminary ruling is that parents may not be "shut out" of participation in decisions regarding their child's mental health or religious upbringing. Respecting a child's gender identity at school in no way "shuts out" parents from those important decisions. Indeed, because the State has opted not to appeal the district court's core holding as to disclosure, so long as there is no threat of abuse, the State will not stand in the way of parents' ability to obtain the relevant information from schools. There is no basis for going a step further and allowing parents to override important nondiscrimination protections that their children have sought out—protections that have demonstrated psychological, social, and academic benefits for transgender students.

Reversal is also warranted with respect to the teacher plaintiffs' free exercise and free speech claims. The Supreme Court rightly left this Court's stay in place with respect to those claims. It has long been settled that public employees, including teachers, have limited First Amendment rights when they speak and act

19

in their capacity as public employees, rather than private citizens. When teachers adhere to school policies regarding the equal treatment of their students, they are acting in a public capacity. Plaintiffs have never identified any serious basis for subjecting the teachers' claims to strict scrutiny, let alone for invalidating state laws or policies as applied to teachers.

Regardless of how the Court rules on the constitutional merits, it should vacate the district court's overbroad, ambiguous injunction so that it can be narrowed and clarified on remand. Among other defects, the injunction is contrary to the Supreme Court's reasoning in two critical ways: First, its express terms do not allow the State to restrain disclosures to parents where abuse of a child would otherwise result. Second, the injunction compels the State to post a statement about parents' and teachers' alleged constitutional rights that does not track the Supreme Court's analysis and will create confusion among school employees. Indeed, the required notice gives the misimpression that school employees must always notify parents whenever their child identifies as transgender, even if the parent has not asked for that information or does not want it to come from school employees, and even if abuse would result. For those reasons, and because the injunction is also unclear and overbroad in additional respects, the judgment of the district court should be reversed in part and vacated and remanded in part.

20

## ARGUMENT

When this case first came before this Court, the State sought a stay of the district court's permanent injunction on multiple grounds, including Article III standing, Rule 23's class-certification requirements, and the merits. C.A. Dkt. 7. Although this Court granted a stay pending appeal, the Supreme Court vacated it in part. *Mirabelli*, 146 S. Ct. at 802-803. In light of that ruling, the State has opted not to press its Article III and Rule 23 arguments on appeal. The State has also opted not to appeal the district court's principal holding regarding disclosure: that the State cannot, consistent with parents' constitutional rights, generally prohibit school employees from telling parents, on request, about the names and pronouns school employees use to refer to their children at school. The precise contours of the State's position on disclosure are discussed in greater detail below. Critically, however, the State continues to advance the remainder of its merits arguments as to both the parent plaintiffs and teacher plaintiffs. And regardless of how the Court rules on the merits, the district court's injunction should be vacated and remanded so that it can be clarified and narrowed. Nothing in the Supreme Court's preliminary ruling forecloses such sensible relief. *See, e.g.*, 146 S. Ct. at 805 (Barrett, J., concurring) ("our assessment is preliminary").[6]

---

[6] *See, e.g.*, *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1079 (9th Cir. 2004) (reviewing summary judgment decision de novo, and issuance and scope of injunction for abuse of discretion).

21

## I. THE PARENT PLAINTIFFS' CLAIMS FAIL ON THE MERITS IN SUBSTANTIAL PART

The district court granted summary judgment and permanent injunctive relief to the class of parent plaintiffs as to two alleged state policies: first, a policy generally prohibiting disclosure of information to parents of the names and pronouns school employees are using to address their child, and second, a policy requiring school employees to refer to students with the names and pronouns that reflect their gender identity. As to the first, in light of the Supreme Court's ruling, the State does not appeal the district court's holding that such a policy would violate the parent plaintiffs' rights. But for the reasons detailed below, vacatur and remand are still warranted to address those aspects of the district court's summary judgment and injunction orders regarding disclosure that do not conform with the reasoning in the Supreme Court's provisional ruling, stray beyond the claims that plaintiffs actually pled, and are otherwise imprecise and unworkable. As to the second, the State continues to press its arguments for reversal. Nothing in the precedent of this Court or the U.S. Supreme Court—including the provisional ruling in this case—justifies requiring teachers to discriminate against transgender students by refusing to use the names and pronouns that reflect their gender identity.

### A. In Light of the Supreme Court's Ruling, the State Does Not Appeal the District Court's Principal Ruling Regarding Disclosure to Parents

The State's efforts in this area—including its legal advisories, enforcement actions, and legislation—have always been motivated, first and foremost, by its desire to protect vulnerable transgender youth from abuse and discrimination. *See, e.g.*, *supra* pp. 5-11. The State has also been concerned about the harm of forcing teachers to make disclosures to *all* parents, even those who do not want school employees to interfere in their family's relationships and prefer to allow their child to come out as transgender on their own terms. *See, e.g.*, *supra* pp. 6, 10. The Supreme Court's preliminary ruling recognized these important concerns.

First, the Supreme Court held that a state law "precluding gender-identity disclosure to parents who would engage in abuse" would likely satisfy strict scrutiny, because it would be narrowly tailored to serve "[t]he State's interest in safety." *Mirabelli*, 146 S. Ct. at 802-803. Second, the Court confirmed that the injunction in this case covers only "those parents *who object* to the challenged policies or seek religious exemptions," not "all the parents of California public school students." *Id.* at 803 (emphasis added). Accordingly, the State is not compelled to impose affirmative "see something, say something" disclosure obligations on school employees—obligations that would require school

23

employees to disclose information about a student's gender identity to parents, even when parents do not ask for, or do not wish to receive, that information.

Given the Supreme Court's recognition of these two key principles, the State does not contest for purposes of this appeal that a policy violates parental rights insofar as it generally prohibits school employees from informing parents who ask about the names and pronouns school employees are using for the parents' minor child at school. Because the State does not appeal on this issue, there is no need for this Court to consider the merits of parent plaintiffs' substantive due process and free exercise challenges to the State's alleged disclosure policy. *See, e.g.*, *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1190 n.11 (9th Cir. 2015) ("Because the parties have not argued this issue on appeal, we do not reach it."); *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1137 n.2 (9th Cir. 2002) (similar).

Portions of the district court's summary judgment order and injunction, however, describe the State's obligations with respect to disclosure in overbroad ways. The State *does* continue to contest those aspects of the district court's orders. The parent plaintiffs brought this suit on the theory that they have substantive due process and free exercise rights to be informed, upon request, when "teachers participat[e] in the social transition of their children"—that is, when teachers use a name and pronouns to address the child that reflects the child's gender identity. 2-ER-231; *see also* 2-ER-299, 2-ER-305, 2-ER-309; 2-

24

ER-193 (defining "social transition" as "the use of a new name and pronouns to 'validate' a gender identity that is not consistent with the person's sex"); 2-ER-229–230 (similar); 2-ER-193 (alleging California requires teachers to "assist in a student's 'social transition' by using any pronouns or a gender-specific name requested by the student during school"). The district court incorporated plaintiffs' definition of social transition into its summary judgment order, which focused heavily on name and pronoun use. 1-ER-96 ("The policy of acknowledging and perpetuating a child's gender incongruent name and pronouns is known as social transitioning."); 1-ER-95–97; 1-ER-109–112. And the district court enjoined the State from enforcing any state law or policy that "permit[s] or require[s]" a public-school employee to "us[e] a different set of preferred pronouns/names when speaking with the parents than is being used at school." 1-ER-75.

But the district court also used broader language—language that extends beyond name and pronoun use—that does not track the right that the parent plaintiffs asserted. In its order granting summary judgment, the district court concluded that the parents have a substantive due process right "to be informed about the gender identity expressed within the schoolhouse gate of one's child," 1-ER-106, including when "a student says or dresses in a way that suggests a non-conforming gender identity," 1-ER-79. The court also held that parents have a similar right under the Free Exercise Clause. 1-ER-113. And it barred the State

25

from enforcing any aspects of state law that "in any way interfere with a teacher or other school administrator, counselor or staff from communicating to parents that his, her, or their child has manifested a form of gender incongruity *such as*," but not limited to, "changing preferred names or pronouns." 1-ER-75 (emphasis added).

This Court should vacate the aspects of the district court's orders that extend beyond plaintiffs' "articulation of the fundamental right." *Regino v. Staley*, 133 F.4th 951, 964 (9th Cir. 2025); *see also Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) ("It is important . . . to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake[.]"). Absent vacatur, these aspects of the district court's orders could cause significant confusion. Although plaintiffs' overwhelming focus has been disclosure of information about students' names and pronouns, the district court's use of phrases like "suggests a non-conforming gender identity" could be read to encompass a much broader range of information. And for the reasons detailed below, *infra* pp. 52-59, the district court's injunction order is overbroad and unworkable in multiple other respects. Assuming the overbroad portions of the summary judgment order and injunction are vacated, however, the State no longer contests on appeal the district court's holding as to laws or policies that generally

26

prohibit disclosure upon request to parents of the names and pronouns school employees are using to address their child.

### B. Parent Plaintiffs Have Not Demonstrated That the State's Nondiscrimination Law Violates Their Substantive Due Process or Free Exercise Rights

In light of the State's decision not to contest the core of the district court's order regarding disclosure, nothing in California law "shut[s] out" parents from "decisions regarding their children's mental health," *Mirabelli*, 146 S. Ct. at 803, or "substantially interfere[s] with the 'right of parents to guide the religious development of their children,'" *id.* at 802. Yet the district court's injunction also blocks state laws insofar as they "permit or require" any public-school employee "to use a name or pronoun to refer to that child that [does] not match the child's legal name and natal pronouns, where a child's parent" has objected "to such use." 1-ER-75. In other words, the injunction effectively requires school employees to engage in conduct—using names and pronouns that are inconsistent with a student's asserted gender identity—that state law treats as discriminatory, any time that parents request they do so. That goes too far. Although the Supreme Court preliminarily decided to leave that portion of the injunction in place during this appeal, the Supreme Court's legal reasoning, as well as the decisions of this Court and other courts, provide no support for that unprecedented expansion of parental rights.

27

### 1. California law requires school officials to use the names and pronouns that reflect a student's gender identity

The first step in assessing this aspect of the district court's injunction is ascertaining the scope of the challenged state laws, "as 'it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.'" *E.g.*, *Arce v. Douglas*, 793 F.3d 968, 984 (9th Cir. 2015). Relevant here, section 220 of the California Education Code provides that "[n]o person shall be subjected to discrimination on the basis of . . . gender, gender identity, [or] gender expression" in any state-funded educational program. Although neither that law nor any other state law directly addresses name or pronoun usage in the school setting, *compare Taking Offense v. State*, 18 Cal. 5th 891 (2025) (case concerning law governing name and pronoun use in long-term care facilities), the State's view is that addressing a student with names or pronouns that do not correspond to the student's asserted gender identity is discrimination under section 220.

"'Discrimination' is a term that covers a wide range of intentional unequal treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005); *see Donovan v. Poway Unified Sch. Dist.*, 167 Cal.App.4th 567, 581 (2008). When school officials address cisgender students with names and pronouns that reflect their gender identity but refuse to do the same for transgender students, they subject transgender students to discrimination based on a protected characteristic. To conclude otherwise would undermine the ability of transgender students to

28

enjoy "equal rights[] and opportunities" in public school—the very purpose of section 220. *See* Cal. Educ. Code § 200. Indeed, a number of courts have treated the intentional use of names and pronouns that do not correspond to an individual's gender identity as a form of sex or gender identity-based discrimination. *See, e.g.*, *Murillo v. Wal-Mart Assoc.*, 2026 WL 372886, at \*11 (C.D. Cal. Jan. 16, 2026); *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 775 (11th Cir. 2024); *Prescott v. Rady Children's Hospital-San Diego*, 265 F. Supp. 3d 1090, 1099-1100 (S.D. Cal. 2017).[7]

### 2. Parents do not have a constitutional right to compel school officials to use names and pronouns at odds with a student's gender identity

Because the State does not appeal the district court's core determination regarding disclosure, *supra* pp. 23-27, the principal merits question in this appeal is whether the State may lawfully require school employees to refer to students using the name and pronouns that reflect the student's gender identity. The answer is yes. The State has compelling interests in eliminating discrimination against transgender students and promoting a safe and inclusive learning environment. So

---

[7] In some instances, teachers have attempted to avoid using transgender students' proper pronouns by instead using only students' names and avoiding third-person pronouns altogether. *See, e.g.*, *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 521 (2023). But that approach threatens to single out transgender students and cause many of the same harms as using the wrong pronouns. *See id.* at 618-622 (Mann, J., concurring in part and dissenting in part).

29

long as the State does not prohibit parents from being informed upon request about how the school is addressing their child, neither substantive due process doctrine nor the Free Exercise Clause provides any right to go a step further and force school employees to deny a student's request to use a name and pronouns consistent with their gender identity. A decision to the contrary would have far-reaching implications for school administration, effectively transforming public schools into agents of parents by requiring them to impose parenting choices on students over the objections of both the student and the school. That result has no basis in our Nation's history or constitutional tradition.

### a. Substantive due process

**i.** To assess whether state action has interfered with a fundamental right in violation of substantive due process, a court "begin[s] with 'a careful description of the asserted fundamental liberty interests'" and then "decide[s] whether the asserted interest" qualifies as "fundamental." *Regino*, 133 F.4th at 960 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). If it does, a court asks whether the fundamental right has been infringed by the challenged law. *Id.* at 962. If it has, the court asks whether "'the infringement is narrowly tailored to serve a compelling state interest.'" *Id.* "'Laws that do not infringe a fundamental

30

right survive substantive-due-process scrutiny so long as they are 'rationally related to legitimate government interests.'"" *Id.*[8]

Here, the district court described the fundamental right at issue in far-reaching terms: the "right to be informed about the gender identity expressed within the schoolhouse gate of one's child." 1-ER-106; *see also supra* pp. 14, 25. Appropriately, the Supreme Court did not accept that unduly broad formulation. It also did not hold that the interest plaintiffs set forth—"knowledge [and] consent" before "teachers participat[e] in the social transition of their children," 2-ER-231—is a fundamental right deeply rooted in history and tradition. Instead, the Court described "[t]he right protected by" its substantive due process precedents as including "the right not to be shut out of participation in decisions regarding their children's mental health." *Mirabelli*, 146 S. Ct. at 803.

The Supreme Court's formulation, which the State does not contest for purposes of this appeal, is limited in several important respects. To begin with, the

---

[8] Although this Court has identified strict scrutiny as the appropriate inquiry when the State burdens a parental substantive due process right, *see Regino*, 133 F.4th at 960, the Supreme Court has not generally applied so high a bar. *See, e.g.,* *Troxel v. Granville*, 530 U.S. 57, 69 (2000) (requiring lower courts to give parent's decision "special weight"); *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) ("balancing process"); *Runyon v. McCrary*, 427 U.S. 160, 178-179 (1976) (requiring "reasonable government regulation"). The Supreme Court's preliminary ruling in this case identified strict scrutiny as the appropriate standard for the parents' free exercise claim, but did not specify the appropriate standard of review for their substantive due process claim. *Mirabelli*, 146 S. Ct. at 802-803.

31

Supreme Court did not recognize an unqualified parental right to unilaterally dictate the outcome of "decisions regarding their children's mental health"—it preliminarily discussed a "right not to be *shut out* of participation in" such decisions. *Mirabelli*, 146 S. Ct. at 803 (emphasis added). The Supreme Court also did not suggest that school officials have a constitutional obligation to provide information to parents who have not asked to (and may not want to) receive it. To the contrary, the Court upheld the scope of the injunction on the understanding that it provided relief only to "those parents who object to the challenged policies or seek religious exemptions," not "all the parents of California public school students." *Id.* That makes sense: the Constitution "does not require the Government to assist the holder of a constitutional right in the exercise of that right." *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1513 (11th Cir. 1992); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) ("[The Due Process Clause] cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means."); *Anspach ex rel. Anspach v. City of Phila. Dep't of Pub. Health*, 503 F.3d 256, 262 (3d Cir. 2007) ("familial liberty interest protected under the Constitution" does not "impose a *constitutional* obligation on state actors to contact parents of a minor or to encourage minors to contact their parents").

32

And finally, the Supreme Court specifically tethered the parental right to a child's mental health, not their gender identity or gender expression more generally. In applying its articulation of the right to the issues at hand, the Supreme Court explained: "Gender dysphoria is a condition that has an important bearing on a child's mental health," and "when a child exhibits symptoms of gender dysphoria at school," the parental substantive due process right "not to be shut out of participation in decisions regarding their children's mental health" is likely violated to the extent state laws "conceal that information from parents and facilitate a degree of gender transitioning during school hours" without informing parents. *Mirabelli*, 146 S. Ct. at 803.

That right will not be implicated every time a student expresses a transgender identity because merely being transgender is not a "symptom[] of gender dysphoria." *Mirabelli*, 146 S. Ct. at 803. As the Supreme Court recently observed, gender dysphoria is "a medical condition" from which "*[s]ome* transgender individuals suffer" that is "characterized by persistent, clinically significant distress resulting from an incongruence between gender identity and biological sex." *United States v. Skrmetti*, 605 U.S. 495, 502-503 (2025) (emphasis added); *see also id.* at 519 ("there is a 'lack of identity' between transgender status and . . . medical diagnoses" of "gender dysphoria"). "Being transgender is also not a psychiatric condition, and 'implies no impairment in judgment, stability, reliability,

33

or general social or vocational capabilities.'" *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020).

The Supreme Court's specific focus on mental health leaves intact this Court's precedent—and the many similar decisions from other courts of appeals— holding that parents lack a substantive due process right "to direct the curriculum that is taught to their children" and "to direct school administration more generally." *Parents for Priv. v. Barr*, 949 F.3d 1210, 1231 (9th Cir. 2020), *cert. denied* 141 S. Ct. 894 (2020); *see also, e.g.*, *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204-1205 (9th Cir. 2005) (collecting cases). So long as laws and policies do not concern symptoms that have an "important bearing on a child's mental health"—and so long as school policies do not "shut out" parents from participating in decisions regarding students' mental health—the limited right discussed on a preliminary basis in the Supreme Court's per curiam is not burdened. 146 S. Ct. at 803.

Construing the right discussed in the preliminary ruling more expansively would threaten vast implications that the Supreme Court did not have the opportunity to consider. An overbroad understanding of the ruling could, for example, threaten to require school officials to regulate what children wear (or elect not to wear) at school, such as a head covering or other form of religious dress, or to stop teens of different races (or the same sex) from dancing together at

the school prom due to their parents' objections. Public schools have never been forced to assume those responsibilities, *see, e.g.*, *Parents for Privacy*, 949 F.3d at 1231, and the Supreme Court's preliminary ruling here does not change that.

**ii.** The relevant state law obligations do not burden any right of parents "not to be shut out of participation in decisions regarding their children's mental health." *Mirabelli*, 146 S. Ct. at 803; *see Regino*, 133 F.4th at 961 ("'identifying a general parental right is far different than concluding that it has been infringed'"). As discussed above, California nondiscrimination law—in particular, section 220 of the State's Education Code—requires school employees to use names and pronouns that correspond to a student's gender identity. But as explained, *supra* pp. 23-27, the State does not contest on appeal that it cannot generally prohibit school employees from informing parents, on request, about how they are addressing a child at school. Accordingly, state law will not cause parents to be "shut out" of decisions regarding name or pronoun use if they wish to obtain that information. *Mirabelli*, 146 S. Ct. at 803.

The State acknowledges, of course, that the Supreme Court opted to leave the injunction in place pending appeal insofar as it granted relief to the parent plaintiffs, including the component of the injunction regarding the use of students' names and pronouns where parents object. But the Court's assessment was "preliminary," *Mirabelli*, 146 S. Ct. at 805 (Barrett, J., concurring), and addressed

35

plaintiffs' likelihood of success with reference to "California's policies" as a whole, without differentiating plaintiffs' likelihood of success regarding the aspects of state law regulating *disclosure* from those governing *name and pronoun usage*, *see, e.g.*, *id.* at 803 (majority). The Court thus had no opportunity to consider any challenge to a state law that, on the one hand, allows disclosure to parents who seek information about how school officials are addressing their child, while on the other hand, does not go so far as to entitle parents to compel school officials to refer to students with names and pronouns that are at odds with their gender identity.

Now that the scope of the appeal has been narrowed, *supra* pp. 23-27, this Court has the opportunity to consider a more focused challenge. And there is no sensible reason to invalidate California nondiscrimination law as applied to the manner in which school employees address students at school. State law does not deny parents the role described by the Supreme Court—"a role in some of the most consequential decisions in their children's lives." *Mirabelli*, 146 S. Ct. at 803. Because of the State's decision not to appeal the district court's principal ruling as to disclosure, state law will not impose a barrier to parent plaintiffs obtaining the information they have alleged they need to be able to have conversations with their children about gender identity and expression, be in dialogue with their children's teachers about their experience at school, and obtain medical care for their

36

children, including care "regarding their children's mental health." *Id.* If their children continue to request that teachers and school officials use certain names or pronouns for them at school, parents who object can counsel their children not to do so—in much the same way that parents can counsel their children on many other important subjects. But neither the district court nor plaintiffs have identified any precedent suggesting that a school's decision not to carry out parents' wishes in these circumstances—where the student objects and where compliance with the parents' demands would force school officials to violate state nondiscrimination law—cognizably burdens parents' substantive due process rights. And for the reasons detailed above, *supra* pp. 34-35, any such precedent would have far-reaching implications that the Supreme Court nowhere considered or embraced.

But even if the challenged laws did burden parents' substantive due process rights—and even if such a burden required application of strict scrutiny, *but see supra* p. 31 n.8—there would be no basis to strike down the challenged laws and uphold the district court's sweeping injunction. The State indisputably has a compelling interest in "eradicating discrimination," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984), and "'safeguarding the physical and psychological well-being of a minor,'" *New York v. Ferber*, 458 U.S. 747, 756-757 (1982). "That interest is at its apex when a school . . . seeks to protect children who are particularly vulnerable, such as transgender minors." *Foote v. Ludlow Sch.*

37

*Comm.*, 128 F.4th 336, 357 (1st Cir. 2025), *cert. denied*, No. 25-77 (U.S. Apr. 20, 2026).  Even the district court acknowledged that the State has a "compelling interest in providing a safe learning environment" and that "[i]t is a legitimate purpose for schools to try to protect student safety and well-being, and even to try to eliminate discrimination on the basis of sex or transgender status."  1-ER-116.[9]

Several circuits have recognized the mental health and educational benefits of respecting a student's gender identity at school.  *See, e.g.*, *Boyertown*, 897 F.3d at 523 ("[W]hen transgender students are addressed with gender appropriate pronouns . . . , those students 'reflect the same, healthy psychological profile as their peers.'"); *Grimm*, 972 F.3d at 597 ("transgender students have better mental health outcomes when their gender identity is affirmed"); *Foote*, 128 F.4th at 357 (enabling students to "express[] their gender identity" helps "remove psychological barriers for transgender students and equalizes educational opportunities").  Here, too, the record shows that California's nondiscrimination protection regarding name and pronoun usage is necessary to serve its compelling interests.

---

[9] *See also Tingley v. Ferguson*, 47 F.4th 1055, 1078 (9th Cir. 2022) (compelling interest in "affirming the equal 'dignity and worth' of LGBT people"); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528-529 (7th Cir. 2018) (compelling interest in protecting transgender students against discrimination); *cf. Parents for Priv.*, 949 F.3d at 1238 ("legitimate purpose of protecting student safety and well-being, and eliminating discrimination on the basis of sex and transgender status").

Serious and irreparable harm can result from a school's refusal to address a student with the name and pronouns that reflect their gender identity.  As the State's experts testified, when a student's gender identity is respected at school, the student feels safe and less anxious, is better able to focus on academic work, and enjoys improved mental health outcomes, including higher self-esteem and a lower risk of depression and suicidality.  2-ER-148–149; 2-ER-161; 2-ER-169–175.  By contrast, calling students by names and pronouns that do not correspond to their gender identity can harm them mentally, socially, and academically.  2-ER-154–155.  Under prevailing professional standards, moreover, it is not harmful for minors to express their transgender identity at school but not at home:  having one's identity respected in *one* setting is more beneficial than having one's identity denied in *all* settings.  2-ER-159; 2-ER-171–172.  Indeed, researchers found that "adding" even "one context" in which a transgender young person's identity is consistently respected "decreased suicidal behavior by 56%."  2-ER-147.  The State's experts further testified that respecting a transgender student's gender identity does not intensify the extent to which they identify as transgender or affect the likelihood they will continue to identify as transgender in the long-term.  2-ER-162–165; 2-ER-171; 2-ER-176–177.[10]  In light of this compelling record evidence,

---

[10] The district court did not make any factual findings regarding the harm that students suffer when their teachers refuse to use the name and pronouns that

(continued…)

the Court should uphold the State's nondiscrimination law as applied to name and pronoun use at school and reverse the district court's judgment otherwise.

### b. Free exercise

**i.** Ordinarily, laws that are neutral and generally applicable are constitutionally permissible and not subject to heightened scrutiny under the Free Exercise Clause. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). In *Mahmoud v. Taylor*, 606 U.S. 522, 564 (2025), the Supreme Court explained that the analysis "proceed[s] differently" if "the burden imposed [on free exercise] is of the same character as that imposed in" *Wisconsin v. Yoder*, 406 U.S. 205 (1972). In such circumstances, a court "need not ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny." *Mahmoud*, 606 U.S. at 564.

In this case, the Supreme Court preliminarily determined that "California's policies"—as the Court understood them—"likely trigger strict scrutiny under [*Yoder* and *Mahmoud*] because they substantially interfere with the 'right of parents to guide the religious development of their children.'" 146 S. Ct. at 802 (quoting *Mahmoud*, 606 U.S. at 559). As the Court explained, "parents who assert a free exercise claim have sincere religious beliefs about sex and gender, and they

---

reflect their gender identity. Rather, it reviewed the parties' experts' testimony, *see* 1-ER-99–105, and then concluded that there were "no genuine issues of material fact," 1-ER-105.

40

feel a religious obligation to raise their children in accordance with those beliefs."
*Id.* The Court's preliminary assessment was that "California's policies violate [parents'] beliefs and 'impos[e] the kind of burden on religious exercise that *Yoder* found unacceptable." *Id.*

**ii.** Nothing in the relevant state law triggers strict scrutiny under the Free Exercise Clause. The parent plaintiffs have never argued that Education Code section 220 is not neutral or generally applicable. And the Court should reject the argument that the law's application to name and pronoun use at school triggers strict scrutiny under *Mahmoud*.

The core teaching of *Mahmoud* is that States cannot substantially interfere with the "right of parents to guide the religious development of their children." 606 U.S. at 559; *see, e.g.*, *Perry v. Marteney*, 172 F.4th 315, 326-327 (4th Cir. 2026) (rejecting parents' free exercise challenge to school vaccination policy). In *Mahmoud*, a school district unduly interfered with parental rights by requiring curriculum and modes of instruction on LGBTQ inclusion that pressured young children to embrace a set of values at odds with their parents' religious beliefs, while at the same time denying parents information about the instruction and the ability to opt out. *See* 606 U.S. at 550. Specifically, the district compelled "very young" children, *id.* at 551, to submit to instruction with "unmistakably normative" books about same-sex marriage and gender identity, *id.* at 550. If children

41

"disagree[d]" with the books' messages, the school district encouraged teachers "to reprimand" them, *id.* at 556, and to "correct" any children who "express[ed] a degree of religious confusion" and "accuse them of being 'hurtful,'" *id.* at 555. The result was "psychological 'pressure to conform' to [the books'] specific viewpoints." *Id.* at 554. The district refused to tell parents when the books would be used and did not allow parents to opt out their children. *Id.* at 550. The Supreme Court held that the "introduction of the 'LGBTQ+-inclusive' storybooks *combined with* [the district's] decision to withhold notice to parents *and* to forbid opt outs" triggered strict scrutiny. *Id.* at 550 (emphasis added).

The Supreme Court here preliminarily held that California unconstitutionally interfered with the ability of parents to guide their children's religious development because, as the Court understood California's policies, the State "cut out the primary protectors of children's best interests: their parents." 146 S. Ct. at 802. Whatever the scope of state law and policy at the time of the Court's ruling, in light of the State's decision not to appeal the district court's core holding as to disclosure, *supra* pp. 23-27, there can be no question that, going forward, California law does not "cut out" or "shut out" parents from anything. Other than in situations where school employees confront a risk of abuse, California law does not restrain teachers and other employees from informing parents, upon request, that school employees are using the child's requested name and pronouns. *Supra*

42

pp. 23-27; *compare Mahmoud*, 606 U.S. at 550.  Nor does state law require or pressure students to deviate from their parents' beliefs and preferences.  *Compare Mahmoud*, 606 U.S. at 550-556; *Yoder*, 406 U.S. at 211-212.  It merely provides that, if a student decides to ask school employees to use a name and pronouns consistent with the student's gender identity, school employees must honor the student's request.  *Supra* pp. 28-29.

Plaintiffs' challenge is also fundamentally different from that in *Yoder*, which did not involve "any actual conflict between the wishes of parents and children." 406 U.S. at 232.  In *Yoder*—the case to which *Mahmoud* points as setting the benchmark for a burden that triggers strict scrutiny, *see* 606 U.S. at 554—a state law compelled parents, "under threat of criminal sanction," to send their children to school (public or private) until age sixteen.  *Yoder*, 406 U.S. at 218; *see id.* at 207.  The record "strongly show[ed]," *id.* at 217, that Amish children in formal secondary school would face "pressure to conform" to the other students' "styles, manners, and ways," *id.* at 211, and that their attendance would "interpose[] a serious barrier to the integration of the Amish children in the Amish religious community," *id.* at 211-212, creating "a very real threat of undermining the Amish community and religious practice as they exist today," *id.* at 218.  Notably, Wisconsin "at no point tried [the] case on the theory that [the parents] were preventing their children from attending school against their expressed desires, and

43

indeed the record [was] to the contrary." *Id.* at 231. The Supreme Court in *Yoder* accordingly explained that its "holding in no way determines the proper resolution of possible competing interests of parents, children, and the State[.]" *Id.*

Here, by contrast, the premise of parent plaintiffs' free exercise claim is that they can "prevent[] their children from" having their gender identity respected at school, "against their expressed desires." *Yoder*, 406 U.S. at 231. The challenged state law comes into play *only* in response to the voluntary decision of a student to request that school employees use a certain name or pronouns to reflect their gender identity. *Supra* pp. 28-29. Nothing in *Yoder* or *Mahmoud* supports the application of strict scrutiny in those circumstances. And plaintiffs provide no other support for the view that the Free Exercise Clause not only protects parents' right to guide the religious development of their children, but also requires school employees *to assist* in such religious development—here, by refusing to address a student with the name and pronouns that reflect their gender identity—despite the student's objection and the State's determination that such conduct is discriminatory and harmful. *Supra* pp. 28-29, 39-40.

Construing *Yoder* and *Mahmoud* to automatically require strict scrutiny whenever school officials respect the voluntary decision of a student that is at odds with their parents' religious views would risk subjecting an extraordinarily broad swath of every-day school interactions to strict scrutiny: a librarian allowing a

student to check out a book that contains content at odds with the parents' faith; a teacher allowing a student to remove her hijab and store it on the classroom coatrack; a cafeteria worker serving a student, upon their request, certain lunch items that the student's parents' religion forbids; a school allowing a student who has converted to Christianity against his parents' wishes to join with other students as part of an on-campus, after-school Bible study group. The list goes on. The Court should reject any suggestion that the Supreme Court invited such a sweeping expansion of free exercise doctrine in *Mahmoud* or its preliminary *Mirabelli* ruling.

The state law in question, moreover, applies to all students, up through their senior year of high school. That further confirms plaintiffs cannot show a burden akin to *Yoder* and *Mahmoud*—and certainly not in all applications covered by the district court's injunction, which applies to parents across the board, regardless of their child's age. 1-ER-73–76; *see Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1072 (9th Cir. 2010) ("scope of injunctive relief" should be "dictated by the extent of the violation established"). *Mahmoud* emphasized that "the age of the children involved is highly relevant in any assessment of the likely effect of instruction on the subjects in question." 606 U.S. at 555 n.8 (differentiating "young children" from "high school students"); *see also id.* at 549. There is no factual basis in the record here from which to conclude that the relevant state law burdens anyone in

45

ways that trigger strict scrutiny under *Mahmoud*, and certainly not teenagers in high school, who are old enough to be able to develop their own views about their gender identity without being unduly coerced by school "authority figures," *id.* at 554.

**iii.** Even if strict scrutiny applied here, California's nondiscrimination laws would satisfy that standard. As explained, *supra* pp. 38-40, when school officials refuse to address a student with the name and pronouns that reflect their gender identity, the student suffers mentally, socially, and academically. Requiring school officials to respect a student's gender identity, even over their parents' objection, advances multiple compelling state interests, including combatting discrimination, protecting student well-being, and fostering an inclusive learning environment. *See, e.g., Prince v. Massachusetts*, 321 U.S. 158, 167 (1944) ("the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare"); *Yoder*, 406 U.S. at 230 (distinguishing case from "one in which any harm to the physical or mental health of the child . . . has been demonstrated or may be properly inferred").

The Supreme Court's decision that the curricular policy in *Mahmoud* failed strict scrutiny focused primarily on narrow tailoring and the availability of opt-outs. 606 U.S. at 565-569. The Court emphasized that the school district allowed "opt outs in a variety of other circumstances," including a "'Family Life and

46

Human Sexuality'" curriculum, and so could not justify refusing to provide an opt-out to the challenged curriculum. 606 U.S. at 565-566.

There is no comparable inconsistency here; the nondiscrimination law at issue contains no exceptions. *See* Cal. Educ. Code § 220. And unlike in *Mahmoud*, opting out of the State's antidiscrimination law is not feasible. The names and pronouns teachers use when addressing a student is not "a particular educational requirement," *Mahmoud*, 606 U.S. at 568; it is an action that pervades every aspect of the school day. It is also an action necessarily done in front of, and in dialogue with, other students. Forcing teachers to address transgender children by names and pronouns that do not reflect their gender identity unquestionably alters the learning environment not just for those children but also for their peers, who must listen to their teacher deny their fellow student's asserted identity. The district court's injunction thus requires teachers to send an unmistakable message of discrimination against transgender people to *all students* who hear the names and pronouns used by the teacher. That is wholly unlike the opt-out in *Mahmoud*, which gave "the parents no substantive control over the curriculum itself." *Id.*

## II. THE TEACHER PLAINTIFFS' CLAIMS FAIL ON THE MERITS

The teacher plaintiffs assert free exercise and free speech rights (i) to refrain from using names and pronouns that correspond to a student's gender identity where a parent objects and (ii) to disclose information to parents about a student's

gender expression at school. 2-ER-87–291.[11] This Court properly stayed the portions of the district court's injunction pertaining to the teacher plaintiffs. C.A. Dkt. 13. And the Supreme Court left that aspect of the stay in place pending appeal. *Mirabelli*, 146 S. Ct. at 803. Now that the merits of those claims are before the Court, it should reverse the district court's grant of summary judgment to the teacher plaintiffs and vacate the teacher-focused portions of the injunction.

The teachers' claims fail under the *Pickering* framework. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). First developed in the free speech context, *Pickering* requires courts to balance "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568. Doing so involves evaluating, among other things, "'whether the plaintiff spoke as a private citizen or public employee.'" *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011). Several circuits, including this one, have since extended *Pickering* to free exercise claims by public employees. *See, e.g., Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 649-650 (9th Cir. 2006); *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260

---

[11] As discussed above, *supra* pp. 23-27, the State has opted not to appeal aspects of the *parents'* claims regarding disclosure. But the State explains here why the *teachers'* claims regarding disclosure fail in any event.

(6th Cir. 2006); *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001); *Brown v. Polk Cnty., Iowa*, 61 F.3d 650, 658 (8th Cir. 1995) (en banc); *Baz v. Walters*, 782 F.2d 701, 708 (7th Cir. 1986).

Under *Pickering*, the teachers' free exercise and free speech claims fail because they rest on speech that teachers make in their capacity as public employees, not private citizens—specifically, addressing a student in the course of teacher-student interactions at school and discussing with parents a child's expression and behavior as a student at school. This Court has previously held that a teacher's communications with their students at school are part of the teacher's official duties. *See Poway*, 658 F.3d at 967-968. It has likewise held that communicating with parents about students is "part and parcel" of a teacher's job. *Comes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1264 (9th Cir. 2016). Other circuits agree. *See, e.g.*, *Polk v. Montgomery Cnty. Pub. Sch.*, 166 F.4th 400, 418 (4th Cir. 2026) ("how a teacher addresses a particular student" and "communicates with a student's parent is merely a part of that teacher's job description"); *see also Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *Kennedy*, 597 U.S. at 528-529; *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 905 (2018).

Even if the *Pickering* framework were inapplicable to the teachers' free exercise claims, their arguments still would not trigger any form of heightened

49

scrutiny. Laws that are neutral and generally applicable comport with the Free Exercise Clause so long as they satisfy highly deferential rational basis review. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 533-534 (2021). And here, plaintiffs do not challenge the neutrality of the relevant state laws and have not provided any colorable reason to view them as anything other than generally applicable. For example, the Education Code's nondiscrimination requirement— the main provision at issue—in no way targets or discriminates against religious expression or beliefs, and does not provide any exceptions to its command that all students be treated equally. *See* Cal. Educ. Code § 220. And that nondiscrimination requirement easily satisfies rational basis review. *Supra* pp. 37-40.

The consequences of accepting the teacher plaintiffs' argument here are vast. Exempting teachers from compliance with nondiscrimination laws based on their religious beliefs would have far-reaching consequences for the learning environment and student well-being. On plaintiffs' theory, a teacher could, for example, invoke their religious beliefs to justify seating girls in the back of the classroom, away from and behind boys; denying students admission to a school dance if they bring a same-sex date; or declining to teach certain groups of students or certain subjects. No precedent countenances that result.

The teachers also assert a right to disclose information even if their public employers have concluded that the information is private or confidential. Many laws require government employees to maintain, subject to specific exceptions, the privacy of information that they learn in their employment. *See, e.g.,* 5 U.S.C. § 552a; 18 U.S.C. § 1905; Fed. R. Crim. P. 6(e). Plaintiffs cite no case holding that strict scrutiny applies whenever such a law allows disclosure in *some* circumstance without also exempting employees based on their religious objections. *See also, e.g.*, C.A. Dkt. 7 at 20-21; C.A. Dkt. 12 at 8-9. And as a general matter, giving employees the ability to opt-out based on their individual religious views would often pose a significant obstacle to any scheme whose purpose is confidentiality. At the very least, the existence of such opt-out rights would make the confidentiality of information unpredictable and unreliable—discouraging individuals from sharing sensitive information and making it difficult or impossible for the government to collect information that policymakers believe deserves protection.

## III. THE COURT SHOULD VACATE THE PERMANENT INJUNCTION AND DIRECT THE DISTRICT COURT TO NARROW AND CLARIFY IT ON REMAND

Given the State's decision not to appeal the principal aspect of the district court's summary judgment order regarding disclosure to parents, *supra* pp. 23-27, the State has no objection to the entry in this case of an appropriate injunction

51

narrowly focused on the parent plaintiffs' claims regarding disclosure. But that is not the injunction issued by the district court here, which is inconsistent with the Supreme Court's reasoning and overbroad and unclear in multiple respects. Accordingly, regardless of how the Court rules on the merits, it should vacate and remand to the district court with instructions to clarify and narrow the injunction.

### A. The Permanent Injunction Conflicts with the Reasoning in the Supreme Court's Preliminary Ruling

In two critical ways, the injunction issued by the district court sweeps beyond what is supported by the Supreme Court's ruling. This Court previously considered these arguments, noting that the State had raised "important concerns." C.A. Dkt. 33. The Court should now hold that the injunction is overbroad.[12] First, the injunction's text does not allow for any exceptions to its broad prohibition on the implementation and enforcement of state law and policy. But in discussing plaintiffs' likelihood of success on the merits, the Supreme Court held that "[t]he

---

[12] As this Court directed, *see* C.A. Dkt. 33, the State raised these concerns with the district court, which denied the State's motion to modify the injunction. 1-ER-2–72. That denial is now on appeal before this Court. 2-ER-346–347. The Court could either consider the State's request to remand for narrowing and clarification of the injunction as part of the appeal from the denial of the motion to modify, or as part of the State's original appeal of the injunction. Either way, vacatur and remand is warranted. *See, e.g.*, *ACF Industries Inc. v. Cal. State Bd. of Equalization*, 42 F.3d 1286 (9th Cir. 1984) (refusal to modify injunction reviewed for abuse of discretion or application of erroneous legal standard), *with Galvez v. Jaddou¸* 52 F.4th 821, 829 (9th Cir. 2022) (same for review of injunction's terms and scope).

State's interest in safety could be served by a policy that allows religious exemptions while precluding gender-identity disclosure to parents who would engage in abuse." 146 S. Ct. at 802-03. If a law that "preclude[s] gender-identity disclosure to parents who would engage in abuse" would satisfy strict scrutiny, *id.*, then the parents' claims here cannot support an injunction prohibiting the State from restricting disclosure in exactly that circumstance. Put another way, the injunction cannot compel what the parents' claims do not require on the merits.

In denying the State's modification motion, the district court explained that it did not intend the injunction to "prohibit[] a teacher from pursuing lawful approaches to either avoiding or resolving possible abuse." 1-ER-9. The misalignment between that intent and the injunction's expansive terms makes it all the more important to clarify the issue on remand. On its face, the injunction restrains the State's enforcement of "*any*" state law or policy that would "*in any way* interfere" with a school official communicating with a parent about their child's "gender incongruity." 1-ER-74–75. It also restrains the State's enforcement of "any" state law or policy that would "permit or require" a public school employee to "us[e] a different set of preferred pronouns/names when speaking with the parents than is being used at school." 1-ER-74–75. The injunction contains no exception for the prevention of abuse. Absent clarification,

53

then, its sweeping language threatens to restrain operation of a state law or policy restricting disclosure to prevent abuse.

The second way in which the injunction conflicts with the Supreme Court's reasoning is with respect to its requirement that the State include a statement "in a prominent place" in "state-created or approved instruction on the gender-related rights of student[s] and faculty." 1-ER-75. The statement crafted by the district court does not track the Supreme Court's reasoning, which defined the relevant parental due process right as "the right not to be shut out of participation in decisions regarding their children's mental health," *Mirabelli*, 146 S. Ct. at 803, and the relevant free exercise right as requiring certain specific sincere religious beliefs, *id.* at 802. The district court's statement, by contrast, refers to a general parental right to be informed—and a teacher's right to do the informing—if a "student child expresses gender incongruity." 1-ER-75–76. In other words, the district court's statement is not limited to circumstances involving a child's mental health, as the Supreme Court instructed in the context of due process, or circumstances in which a parent has a particular set of religious beliefs, as is required for a free exercise claim.

The statement could also give the misimpression that school officials must affirmatively provide information to all parents, even those who have not asked for

it.[13]  But the Supreme Court agreed to leave the injunction in place on the understanding that the district court "provide[d] relief . . . *only* for those parents *who object* to the challenged policies or seek religious exemptions." *Mirabelli*, 146 S. Ct. at 803 (emphasis added).  And indeed, the district court appears not to have intended to impose a mandatory, affirmative disclosure requirement that would apply regardless of whether parents have sought information about their child.  In denying the State's motion to modify the injunction, the district court stated that it did not understand the injunction to require disclosure to parents who do not ask for the information.  1-ER-68–69.  But again, unless the terms of the injunction are narrowed and clarified, this critical ambiguity will persist and may result in school officials revealing a transgender student's identity to parents who do not want to know until their child is ready to share it with them.[14]

---

[13] The disclosure provisions of the injunction could give the same misimpression.  They bar the State from preventing a school employee from "using a different set of preferred pronouns/names when speaking with the parents than is being used at school"—regardless of whether a parent has requested that information.  1-ER-74–75.

[14] The injunction also risks being read to require disclosure to parents whose educational rights have been limited by a court.  *See, e.g.*, 34 C.F.R. § 300.30.  The district court should clarify on remand that the injunction does not relieve school officials of their duty to ensure that a child's information is not provided to a parent who lacks the right to receive it.

55

### B.     The Injunction Is Overbroad and Unclear in Other Ways

Apart from the defects discussed above, the injunction is ambiguous, overbroad, and unworkable in several other respects.  Individually and collectively, these problems require vacatur and remand so that the district court can narrow and clarify any injunctive relief.  *See, e.g.*, *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("An overbroad injunction is an abuse of discretion.").  *Fortyune*, 364 F.3d at 1086-1087 ("[The] basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits.").

For one, it is not clear exactly which state laws and policies the district court has enjoined.  The injunction applies to the State's implementation or enforcement of "any . . . provision of California law" and "any regulations or guidance."  1-ER-74.  But plaintiffs' claims and prayer for relief are not nearly so broad; they focus chiefly on the State's interpretation of the Privacy Clause, as well as certain specific statutory provisions.  *Supra* pp. 12-13, 24-25.  Plaintiffs did not, for example, challenge the state law providing that information disclosed by a student aged 12 or older in the course of school counseling is generally confidential, *see* Cal. Educ. Code §§ 49602, 72621, even though that law arguably "interfere[s] with a . . . counselor . . . communicating to parents that . . . their child has manifested a form of gender incongruity."  1-ER-75.  Nor, as the district court emphasized in its

summary judgment order, did plaintiffs challenge AB 1955.  1-ER-85.  But the plain terms of the injunction could be read to sweep in that law, too.  *See* 1-ER-74–75.  Any injunction entered against the State should be recrafted so that the State has clear notice of exactly which laws and policies it is restrained from enforcing.  *See, e.g.*, *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 509 (9th Cir. 1992).

The injunction also provides no explanation of what it means for state officials to "*permit* or require any employee in the California state-wide education system" to undertake any of the enumerated actions.  1-ER-75 (emphasis added).  "Permit" is a highly ambiguous term.  *See, e.g.*, *Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 377 (4th Cir. 2022).  Here, for example, does it mean that covered state officials violate the injunction if they merely "allow"—*i.e.*, fail to oppose or proscribe, *id.*—the teacher conduct covered by the injunction?  Or do they violate the injunction only if they formally consent to, expressly authorize, or compel the conduct?  *See id.*  The district court did not say.  Vacatur and remand would allow the district court to craft an injunction that uses clearer terms that state officials can more readily understand and implement.  *See* Fed. R. Civ. P. 65(d) (injunction order must "state its terms specifically").

Compounding these ambiguities, the injunction is also not "tailored to remedy the specific harm alleged." *Lamb-Weston*, 941 F.2d at 974.  Plaintiffs alleged that parents have substantive due process and free exercise rights to know about and

consent when "teachers participat[e] in the social transition of their children"—that is, when teachers use a different name and pronouns to address their child to reflect their child's asserted gender identity. 2-ER-231; *see also* 2-ER-193 (defining "social transition" as "the use of a new name and pronouns to 'validate' a gender identity that is not consistent with the person's sex"); *supra* pp. 12-13, 24-25. But the district court did not limit its injunction to alleged state laws or policies limiting disclosure of name and pronoun usage. Section 1(d) of the injunction bars the State from enforcing any state laws that "in any way interfere with a teacher or other school administrator, counselor or staff from communicating to parents that his, her, or their child has manifested a form of gender incongruity *such as*"—but not limited to—"changing preferred names or pronouns." 1-ER-75 (emphasis added). The Court should vacate Section 1(d) and any other aspects of the district court's orders that extend beyond plaintiffs' "articulation of the particular fundamental right," *Regino*, 133 F.4th at 964, and are not "tailored to remedy the specific harm alleged," *Lamb-Weston*, 941 F.2d at 974.[15]

Remand for further clarification as to the precise scope of the State's obligations under the injunction is also necessary to avoid significant confusion

---

[15] The injunction also exceeds the scope of the teachers' claims by granting relief to those with a "conscientious," not merely "religious," objection. 1-ER-75; *but see* 1-ER-141 (defining relevant subclass as school employees who request "a religious exemption").

among school employees and harm to students and the broader school environment. That is especially critical with respect to Section 1(d), because it is far from clear what "manifest[ing] a form of gender incongruity," 1-ER-75, would encompass. *See, e.g.*, *Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145, 1150 & n.3 (9th Cir. 2011) (vacating injunction for failing to "sufficiently define what additional future conduct will be covered"). The phrase could be read to extend to observations of a whole swath student behavior in which a school official has no direct involvement, such as what a student wears to school, what hobbies or interests they reveal or discuss, or how they identify themselves when in conversation with their peers. Vacatur and remand are warranted to ensure that the district court's injunction does not effectively transform teachers and other school employees into a "gender incongruity" police force, monitoring and scrutinizing students based on subjective assessments of gender norms and behavior.

## CONCLUSION

The judgment of the district court should be reversed in part and vacated and remanded in part.

59

Dated: May 26, 2026

Respectfully submitted,

*s/ Julie Veroff*

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy Solicitor General*
CHERYL L. FEINER
  *Senior Assistant Attorney General*
JOSHUA A. KLEIN
  *Supervising Deputy Solicitor General*
JULIE VEROFF
  *Deputy Solicitor General*
DARRELL W. SPENCE
  *Supervising Deputy Attorney General*
JENNIFER A. BUNSHOFT
KEVIN L. QUADE
  *Deputy Attorneys General*

  *Attorneys for Defendants-Appellants*

60

## STATEMENT OF RELATED CASES

The following related cases are pending: *City of Huntington Beach v. Newsom*, No. 25-3826; *Chino Valley Unified Sch. Dist. v. Newsom*, No. 25-3686; *Regino v. Blake*, No. 26-475; *Ramirez v. Oakland Unified Sch. Dist.*, No. 25-7232; *Mirabelli v. Bonta*, No. 26-2334.

61

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-8056

I am the attorney or self-represented party.

**This brief contains 13,984 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Julie Veroff        **Date** 05/26/2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*