**No. 25-8056**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

ELIZABETH MIRABELLI, *et al.*,
*Plaintiffs-Appellees,*
v.
ROB BONTA, *et al.*,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of California
No. 3:23-cv-0768-BAS-VET
Hon. Cynthia Bashant, Chief Judge

# BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION, ACLU OF NORTHERN CALIFORNIA, ACLU OF SAN DIEGO AND IMPERIAL COUNTIES, ACLU OF SOUTHERN CALIFORNIA, AND AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE IN SUPPORT OF DEFENDANTS-APPELLANTS FOR REVERSAL

Alexandra R. Johnson
Emerson Sykes
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
a.johnson@aclu.org
esykes@aclu.org

Elizabeth O. Gill
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0779

Amanda C. Goad
Christine Parker
Ariana Rodriguez
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, CA 90081
(213) 977-9500
agoad@aclusocal.org
cparker@aclusocal.org
arodriguez@aclusocal.org

*Counsel for Amici Curiae*

*(Additional Counsel on Subsequent Page)*

egill@aclu.org
Daniel Mach
Heather L. Weaver
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 675-2330
dmach@aclu.org
hweaver@aclu.org

Jess Zalph
Amy Tai*
Jenny Samuels
AMERICANS UNITED FOR SEPARATION
OF CHURCH AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
(771) 244-2404
zalph@au.org
tai@au.org
samuels@au.org

*Admitted to practice in New York; not a member of the D.C. bar.

Chessie Thacher
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
cthacher@aclunc.org

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form34instructions.pdf*

**9th Cir. Case Number(s)** 25-8056

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

American Civil Liberties Union Foundation, American Civil Liberties Union Foundation of Northern California, American Civil Liberties Union Foundation of Southern California, Americans United for Separation of Church and State

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.

      ○ Yes ◉ No

      If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?

      ○ Yes ◉ No

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."

[2] To the extent it can be obtained through due diligence.

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?
   ○ Yes ● No

   If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

I certify that *(select only one)*:

● this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

○ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** s/Alexandra Johnson **Date** June 2, 2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......... 3
TABLE OF CONTENTS .......... 4
TABLE OF AUTHORITIES .......... 5
STATEMENT OF INTEREST .......... 10
ARGUMENT .......... 12
Background .......... 14
I. The Parental Right to Disclosure of a Student's Requested Name/Pronoun Change Is Not Unlimited. .......... 17
II. Teachers Do Not Have a Free Speech Right To "Out" Students... 21
*A. Government Employees' Speech Uttered Pursuant to Their Official Duties Is Not Personal Speech.* .......... *22*
*B. Use of Students' Names and Pronouns and Communications with Parents Are Part of Public-School Teachers' Official Duties.* .......... *24*
III. Teachers Do Not Have a Free-Exercise Right to "Out" Students. 29
*A. The Name-Pronoun Policy Is Religiously Neutral and Generally Applicable.* .......... *29*
*B. The Name-Pronoun Policy Survives Rational-Basis Review*...... *37*
CONCLUSION .......... 44

## TABLE OF AUTHORITIES

**Cases** ........................................................................................ **Page(s)**

*Alive Church of the Nazarene v. Prince William Cnty.*,
59 F.4th 92 (4th Cir. 2023)........................................................................29

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ......................................................................................30

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ......................................................................................37

*Doe v. San Diego Unified Sch. Dist.*,
19 F.4th 1173 (9th Cir. 2021)......................................................................36

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith*,
494 U.S. 872 (1990) ......................................................................................37

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
98 F.4th 1180 (9th Cir. 2024)......................................................................16

*Foote v. Ludlow School Committee*,
128 F.4th 336 (1st Cir. 2025) ......................................................................43

*Foothills Christian Ministries v. Johnson*,
148 F.4th 1040 (9th Cir. 2025)....................................................................30

*Fulton v. City of Phila.*,
593 U.S. 522 (2021) ...................................................................... 30, 31, 35

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ................................................................................ *passim*

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018) ......................................................................................23

*Johnson v. Poway Unified Sch. Dist.*,
658 F.3d 954 (9th Cir. 2011) .................................................................. 22, 26

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ...................................................................... 22, 27, 28

*Lee v. York Cnty. Sch. Div.*,
484 F.3d 687 (4th Cir. 2007) ..................................................................22

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ................................................................ 20, 29, 30

*Mayer v. Monroe Cnty. Cmty. Sch. Corp.*,
474 F.3d 477 (7th Cir. 2007) ..................................................................23

*Mead v. Rockford Pub. Sch. Dist.*,
800 F. Supp. 3d 836 (W.D. Mich. 2025) ..................................................32

*Mirabelli v. Bonta*,
146 S. Ct. 797 (2026) .......................................................................*passim*

*Mirabelli v. Bonta*,
No. 25-8056, 2026 WL 44874, (9th Cir. Jan. 5, 2026) ....... 14, 15, 19, 35

*Mirabelli v. Olson*,
761 F. Supp. 3d 1317 (S.D. Cal. 2025) ....................................................15

*Mirabelli v. Olson*,
No. 3:23-CV-0768-BEN-VET, 2025 WL 3712993 (S.D. Cal. Dec. 22, 2025) ................................................................................ 13, 14, 16

*Nat'l Res. Def. Council, Inc. v. Winter*,
508 F.3d 885 (9th Cir. 2007) ..................................................................19

*Parents for Priv. v. Barr*,
141 S. Ct. 894 (2020) ..............................................................................31

*Parents for Priv. v. Barr*,
949 F.3d 1210 (9th Cir. 2020) ........................................... 31, 32, 37, 38

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*,
391 U.S. 563 (1968) ................................................................................23

*Platkin v. Middletown Twp. Bd. of Educ.*,
No. A-0037-23, 2025 WL 440132 (N.J. Super. Ct. App. Div. Feb. 10, 2025) ...................................................................................................40

*Polk v. Montgomery Cnty. Pub. Schs.*,
No. DLB-24-1487, 2025 WL 240996, (D. Md. Jan. 17, 2025) .............27

*Polk v. Montgomery County Public Schools*,
166 F.4th 400 (4th Cir. 2026)................................................... *passim*

*Tandon v. Newsom*,
593 U.S. 61 (2021) ........................................................................ 34, 35

*Thomas v. Cnty. of Los Angeles*,
978 F.2d 504 (9th Cir. 1992) ..........................................................16

*Tinker v. Des Moines Ind. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ........................................................................22

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021) ..........................................................34

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ........................................................................29

**Statutes ...................................................................................... Page(s)**

Cal. Educ. Code § 201.......................................................................18

Cal. Educ. Code § 234.1....................................................................18

Cal. Educ. Code § 49602...................................................................35

Cal. Educ. Code § 49602(e)................................................................18

Cal. Educ. Code. § 220 .....................................................................18

**Regulations .............................................................................. Page(s)**

34 C.F.R. § 99.36(a) ........................................................................33

**Other Authorities........................................................................ Page(s)**

*2022 National Survey on LGBTQ Youth Ment*al HEALTH, TREvor Proj.
(2022), https://perma.cc/MU*59-JBBT*..................................................38

*2025 National Survey on LGBTQ Youth Mental Health*, TREVOR PROJ. (2025), https://perma.cc/M4KH-KY6Y ....................................................38

Andrea Roberts et al., *Childhood Gender Nonconformity: A Risk Indicator for Childhood Abuse and Posttraumatic Stress in Youth*, 129 PEDIATRICS 410, 413-14 (2012),https://perma.cc/3CK2-AK2D ............40

Arnold Grossman et al., *Parental Responses to Transgender and Gender Nonconforming Youth: Associations with Parent Support, Parental Abuse, and Youths' Psychological Adjustment*, 68(8) J. HOMOSEX. 1260 (2021), https://perma.cc/47TT-RNBC....................................................40

Brian Thoma *et al., Disparities in Childhood Abuse Between Transgender and Cisgender Ad*olescents, 148(2) Pediatrics e2020016907 (2021), https://publications.aap.org/pediatrics/article/148/2/e2020016907/179762/Disparities-in-Childhood-Abuse-Between-Transg..........................40

*Homelessness and Housing Instability Among LGBTQ Youth*, TREVOR PROJ. (Feb. 3, 2022),https://perma.cc/6JQH-QSMQ ............................41

Jenavieve Hatch, *Bill Banning Parent Notification Policies in California Schools Gains Momentum Amid Protest*, SACRAMENTO BEE (June 27, 2024), https://perma.cc/CLN6-5M4K ....................................39

Joseph Kosciw et al., *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, GLSEN (2022), https://perma.cc/HNK5-995N ....................................................42

Kasey Jackman et al., *Suicidality Among Gender Minority Youth: Analysis of 2017 YRBS Data*, 25 ARCH. SUICIDE RSCH. 208 (2019),https://perma.cc/TXV2-HRVN....................................................42

Nicolas Suarez *et al., Disparities in School Connectedness, Unstable Housing, Experiences of Violence, Mental Health, and Suicidal Thoughts and Behaviors Among Transgender and Cisgender High School Students — Youth Risk Behavior Survey, United States*, 20 ..41

Peter McCauley et al., *Stress of Being Outed to Parents, LGBTQ Family Support, and Depressive Symptoms Among Sexual and Gender*

*Diverse Youth*, 34 J. RSCH. ADOLESC. 205 (2024), https://onlinelibrary.wiley.com/doi/abs/10.1111/jora.12912 .......... 40, 41

THE TREVOR PROJECT, *Issues Impacting LGBTQ Youth*, p. 16 (Jan. 2023), https://perma.cc/N6JQ-YL7C ............................................. 39, 41

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, nonprofit organization with more than six million members, supporters, and activists. Since its founding in 1920, the ACLU has been dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. The American Civil Liberties Union of Northern California, the American Civil Liberties Union of San Diego and Imperial Counties, and the American Civil Liberties Union of Southern California are regional affiliates of the national ACLU (collectively referred to here as "the ACLU").

Americans United for Separation of Church and State is a national, nonpartisan organization that, for over seventy-five years, has brought together people of all faiths and the nonreligious who share a deep commitment to religious freedom as a shield to protect but never a sword to harm others. Americans United has long fought to uphold the

[1] *Amici* submit this brief pursuant to Federal Rule of Appellate Procedure Rule 29(a)(2) and certify that all parties have consented to its timely filing. Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), *amici* also certify that no person or entity, other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.

guarantees of the First Amendment's Religion Clauses and also believes that their protections are designed to safeguard religious liberty, not to undermine the security of vulnerable public-school children.

## ARGUMENT

Transgender and nonbinary students, who are uniquely at risk of discrimination and family rejection, often only feel safe to be themselves at school. California public schools can and should continue to implement policies that affirm these students and protect their safety. The Supreme Court's opinion partially reversing this Court's stay of the district court's permanent injunction does not change that. This Court should clarify that the per curiam opinion does not create an unlimited parental right that puts students at risk and should reverse the district court's ruling on the teacher-Plaintiffs' claims.

As to the parent-Plaintiffs, the Supreme Court's ruling is narrow. California's policies protect the privacy of students who request that their school use different names or pronouns in accordance with their gender identity. While the Supreme Court held that parents are likely entitled to an exemption from the protective policies at issue here, it did not define this exemption's parameters . Consistent with the per curiam opinion, this Court should make clear that schools remain obligated to consider student safety in determining when disclosure of a student's request for different names and/or pronouns is appropriate. Moreover, this Court

should hold that schools are required to disclose such information only to those parents who affirmatively seek exemption from such a policy.

By contrast, the Supreme Court did not authorize even a narrow exemption for teachers,[2] and the First Amendment does not demand one. The policies at issue here pertain only to teachers' speech uttered in the course of their official duties, and teachers, therefore, do not have a free-speech right to disclose to parents a student's request for the use of different names and pronouns at school.

Nor are teachers entitled to disclose this information under the Free Exercise Clause. Not only are teachers acting pursuant to their official duties, but the policies barring disclosure are religiously neutral and generally applicable to all teachers and thus subject to rational-basis scrutiny—a threshold the State easily meets given its legitimate, and indeed compelling, interest in student safety and well-being. To "out" students without their consent by revealing to parents that they are transgender or nonbinary raises the risk of family rejection, abuse, and

---

[2] *Amici* use the term "teacher" as shorthand to encompass "any employee in the California state-wide education system," as outlined in the district court's order. *See Mirabelli v. Olson*, No. 3:23-CV-0768-BEN-VET, 2025 WL 3712993, at *1-2 (S.D. Cal. Dec. 22, 2025) ("*Mirabelli Inj.*").

other harms. This Court should reverse the district court's rulings that teachers have both free-speech and religious-freedom rights to do so.

## BACKGROUND

While it is unclear exactly which policies are at issue in this appeal,[3] the district court's opinions and Plaintiffs-Appellees' pleadings reference the following policies and allege that, when taken together, the policies prevent public schools from disclosing to parents—without a student's consent—a student's request for, and the school's use of, a different name and/or pronouns for the student in accordance with that student's gender identity (hereinafter referred to as "the Name-Pronoun Policy"):

- **2016 Legal Advisory & FAQs**: Plaintiffs primarily referenced an informal 2016 Legal Advisory and FAQ page posted on the California Department of Education's ("CA DOE") website in their Complaint, and "[t]he district court's injunction appears largely premised on" those materials. *Mirabelli v. Bonta*, No. 25-8056, 2026 WL 44874, at *3 n.2 (9th Cir. Jan. 5, 2026) ("*Mirabelli Stay*"); *see also Mirabelli Inj.*, 2025 WL 3712993, at *1. The FAQs provided

[3] As Defendants-Appellants have explained, the district court "fail[ed] to specify exactly which laws and policies it enjoin[ed]" and on which it granted summary judgment. Dkt. 45.1 at 11; *accord id.* at 64; *see also* Opp. to Emergency Appl. to Vacate Interlocutory Stay Order at 10, 19, 41-42, No. 25A810 (U.S. Jan. 21, 2026) ("Opp. to Emergency Appl.") (noting injunction's implementation "would inject substantial confusion into the administration of California's schools" given its "vague terms" and failure to "define which government officials are subject to" it).

that "once a student expresses a desire to be publicly called by a new gender incongruent name or pronoun, . . . a teacher is not permitted to inform the parents of this name change without the student's consent." *Mirabelli v. Olson*, 761 F. Supp. 3d 1317, 1325 (S.D. Cal. 2025). That guidance "has been removed," *Mirabelli Stay*, 2026 WL 44874, at *3 n.2, and has since been superseded by new guidance—from which none of Plaintiffs' alleged harms stem. *See* Opp. to Emergency Appl. at 8 (citing *Protections for LGBTQ+ Students: AB 1955*, CAL. DEP'T EDUC. (Jan. 2, 2025), https://tinyurl.com/hc4jwxnk).

- **2024 Attorney General Legal Alert**: Plaintiffs also referenced Defendant Bonta's January 10, 2024, press release and "Legal Alert," which they allege adopted a similar policy. *See* 2d Amended Compl., Dkt. 133 ¶ 323. The Legal Alert warned that "[f]orced disclosure policies," which "require schools to inform parents whenever a student requests to use a name or pronoun different from that on their birth certificate or official records, even without the student's permission or when doing so would put them at risk of physical, emotional, or psychological harm[,] . . . violate the California Constitution and state laws safeguarding students' civil rights." *Id.* at Ex. 39.

- **Rocklin & Chino Valley Enforcement Actions**: Plaintiffs finally pointed to actions by Defendants CA DOE and Bonta against school districts in Rocklin and Chino Valley. Plaintiffs allege the actions were initiated to challenge the districts' "Parental Notification Policy," which "requir[ed] school officials to notify a child's parents anytime a child 'asks to be identified or treated as a gender other than the student's biological sex or gender listed on the student's birth certificate or any other official records.'" *Id.* ¶¶ 3, 317, 320, 322; *see also Olson*, 761 F. Supp. 3d at 1321.

Accordingly, the district court's injunction, though overbroad,[4] was primarily focused on parental disclosure regarding students' requests for different names and pronouns at school. *See Mirabelli Inj.*, 2025 WL 3712993, at *1-2 (enjoining, *inter alia*, implementing or enforcing state law, regulations, or guidance as to "permit or require any employee in the California state-wide education system [to] . . . *us[e] a different set of preferred pronouns/names* when speaking with the parents than is being used at school" or that "in any way interfere with a teacher . . . from communicating to parents that his, her, or their child has manifested a form of gender incongruity such as *changing preferred names or pronouns*") (emphasis added).[5]

---

[4] Its lack of clarity, *see supra* n.2, independently counsels in favor of reversal, as "[i]t is an abuse of discretion to issue an overly broad injunction." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1188 (9th Cir. 2024); *see also, e.g.*, *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 510 (9th Cir. 1992), *as amended* (Feb. 12, 1993) (striking down "overbroad" injunction where "broader than the scope of plaintiffs' complaint").

[5] Although the injunction also referred to the more general concepts of "gender incongruity," "gender presentation," and "gender transition," *Mirabelli Inj.*, 2025 WL 3712993, at *1-2, the district court never defined those terms and focused primarily on changed names and pronouns. *Id.*; *see also Mirabelli v. Bonta*, 146 S. Ct. 797, 800-02 (2026) (referring to "gender transition" without defining it).

## I. THE PARENTAL RIGHT TO DISCLOSURE OF A STUDENT'S REQUESTED NAME/PRONOUN CHANGE IS NOT UNLIMITED.

The Supreme Court's per curiam order, issued on the emergency docket without full briefing or argument, leaves open several questions. Most obviously, it declined to rule on any of the claims raised by teachers, over which this Court retains full authority to reverse the district court's holdings. *See infra* Parts II and III. But also, due to its abridged nature, the per curiam order did not define the contours of the parental rights it did address. This Court should make clear that the scope of these parental rights is not without limits.

First, as the per curiam order emphasized, student safety is of the utmost importance at school, and schools remain obligated to protect the safety of their students—including their privacy when a student's safety so requires. The Supreme Court specifically noted that "[t]he State's interest in [students'] safety could be served by a policy that allows religious exemptions *while precluding gender-identity disclosure to parents who would engage in abuse*." *Bonta*, 146 S. Ct. at 802-03 (emphasis added). Thus, schools are permitted to—and, in fact, must—assess the safety of disclosing to parents a student's requested name/pronoun change before doing so. This Court should clarify that

denying a requested exemption for these safety reasons does not violate parents' rights.

Indeed, schools are legally obligated to affirm and protect transgender and nonbinary students in a range of ways. California law protects transgender students from discrimination and harassment in schools, requires schools to affirm students' gender identities and to permit their participation in sex-separated activities best aligned with their gender identities, and prohibits school counselors from disclosing information to parents where disclosure would endanger the student. *See* Cal. Educ. Code. §§ 220, 201, 234.1, 49602(e). Schools retain the authority to adopt policies like the Name-Pronoun Policy in line with their statutory and regulatory obligations under California law. As the per curiam order makes clear, schools can still prohibit "outing" students to their parents—regardless of some parents' entitlement to religious exemptions—where dangers to students, such as risk of abuse, might result. This Court should clarify that the exemption to which parents may be entitled does not reach so far as to prevent schools from fulfilling their legal obligations to keep students safe.

Second, given these serious privacy and safety interests, this Court should clarify that disclosure to parents is not permitted based solely on teachers' subjective, speculative perceptions of students' gender identities—for instance, "gendered" shifts in a student's clothing, mannerisms, or interactions with friends. Such an expansive interpretation of the district court's injunction would lack a justiciable outer boundary, in stark contrast to the clear delineation of disclosure only when parents have affirmatively sought an exemption and students have affirmatively submitted requests. *See, e.g.*, Ex. 6 to Compl., Dkt. 1, at 100 (example "Preferred Name/Gender Request Form" from California school district asking whether student has "requested a preferred name change due to their gender identity").[6] It would therefore violate the principle that "[i]njunctive relief must be tailored to remedy the specific harm alleged." *Nat'l Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007). To further avoid proactive "outing" based on such speculation, this Court should clarify that schools may impose

[6] While this appeal does not include claims against Escondido Union School District ("EUSD"), *see Mirabelli Stay*, 2026 WL 44874, at *1 n.1, this EUSD form is a representative example—the one that sparked this lawsuit—of a permissible vehicle for a student's request under the Name-Pronoun Policy.

administrative requirements on, for example, student requests for the use of different names and/or pronouns, and that schools may say parental disclosure is allowed only after certain requirements are met.

Third, the per curiam order does not require proactive "outing" of students. Instead, the Court held that "parents who *seek* religious exemptions" to the Name-Pronoun Policy would likely be entitled to an exemption under *Mahmoud v. Taylor*, 606 U.S. 522 (2025). *See Bonta*, 146 S. Ct. at 802 (emphasis added). In so holding, the Court placed the burden on parents to request an exemption from the Name-Pronoun Policy. Plaintiffs have already conceded as much.[7] Put simply: If no parental request is made, no disclosure to parents is constitutionally required.

In short, when it comes to parents' rights, the per curiam order did not invalidate the Name-Pronoun Policy. Rather, it is compliant with the per curiam order to require parents to affirmatively request an

[7] *See* Opp. to Emergency Mot. to Modify Stay Order, Dkt. 27.1, at 15 (rejecting interpretation of district court's injunction as imposing on "public school officials [] an affirmative constitutional duty to inform parents whenever they observe a student's expression of 'gender incongruence,' effectively imposing a mandatory 'see something, say something' obligation in all circumstances").

exemption from the Name-Pronoun Policy and to notify them pursuant to that exemption only when a student has actually requested the use of a different name and/or pronouns at school. This approach avoids teachers subjectively interpreting students' behavior—and potentially endangering students—beyond the scope of the per curiam. And as the per curiam emphasized, the state retains the ability to prohibit schools from disclosing a student's name/pronoun change request to their parents without the student's consent when such disclosures might threaten the student's safety. Schools still carry an obligation to ensure the safety of their students under California law, and the parental right to information about a student's request to go by a different name and/or pronouns at school does not override that obligation. This Court should clarify as much.

## II. TEACHERS DO NOT HAVE A FREE SPEECH RIGHT TO "OUT" STUDENTS.

Tellingly, the Supreme Court's per curiam order neither analyzed nor made any ruling on the teachers' claims in this case.[8] This Court

---

[8] *See Bonta*, 146 S. Ct. at 802 ("[T]he *parents and teachers* filed this application seeking vacatur of the Ninth Circuit's stay pending appeal. We grant the application and vacate the stay with respect to the *parents*[.]") (emphasis added).

should correct the district court's erroneous treatment of the teacher-Plaintiffs' free-speech claims. Allowing teachers to "out" students to their parents, unprompted and in a manner that would potentially endanger students, is the kind of unworkable situation that the Supreme Court recognized and warned against in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which the district court ignored entirely in evaluating the teachers' free-speech claims. This Court should reverse the district court's holding on these claims.

### A. GOVERNMENT EMPLOYEES' SPEECH UTTERED PURSUANT TO THEIR OFFICIAL DUTIES IS NOT PERSONAL SPEECH.

While public-school teachers do not "'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) (quoting *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)), a worker who "enters government service . . . must accept certain limitations on his or her freedom,' or else 'there would be little chance for the efficient provision of public services.'" *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 963 (9th Cir. 2011) (quoting *Garcetti*, 547 U.S. at 418); *accord Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 693 (4th Cir. 2007) ("[C]ertain limitations are placed on the free speech rights of

schoolteachers . . . due to the nature of their employment by government-operated schools."); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) ("[T]he school system does not 'regulate' teachers' speech as much as it *hires* that speech.").

Under the Free Speech Clause, a threshold question is whether a teacher's speech is uttered as a private citizen or as a government employee. If speaking as a private citizen on a matter of public concern, a school may restrict the teacher's speech only when the school's interest "in promoting the efficiency of the public services it performs through its employees" outweighs the employee's interest in First Amendment expression. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). However, if speaking "pursuant to their official duties," teachers are "not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421; *see also Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 908, 910 (2018) ("[I]f the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message. . . . When an employee engages in speech that is part of the

employee's job duties, the employee's words are really the words of the employer.").

### B. Use of Students' Names and Pronouns and Communications with Parents Are Part of Public-School Teachers' Official Duties.

In this case, public-school teachers are using students' names and pronouns solely pursuant to their official duties. Whether referring to their students in the classroom or discussing their academic performance with parents, any use of students' names and pronouns "owes its existence to a public employee's professional responsibilities"—here, to educate and provide an inclusive learning environment for students. Thus, the Name-Pronoun Policy "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti*, 547 U.S. at 421-22. The First Amendment's Free Speech Clause permits school districts to prohibit teachers from disclosing this information on their own volition.

Viewing teachers' use of students' names and pronouns, including in their communications with parents, as anything other than part of their official duties would be unworkable in precisely the way *Garcetti* warned against. Such a view would "mandat[e] judicial oversight of

communications between and among government employees and their superiors in the course of official business," which would result in "permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers." *Garcetti*, 547 U.S. at 423. In the classroom and throughout instruction, teachers refer to their students, whether by names or pronouns, dozens of times per day, if not more. Application of judicial scrutiny to each of these myriad references would render it impossible to conduct public education at all.

The Fourth Circuit's recent decision in *Polk v. Montgomery County Public Schools*, 166 F.4th 400 (4th Cir. 2026), which evaluated a policy similar to the Name-Pronoun Policy, is instructive. There, as here, the teachers' "Free Speech claim fail[ed] before [it] can break out of the gate" because the policy "does not concern the speech of a private citizen, but establishe[d] the official duties of a public-school teacher." *Id.* at 418.

The *Polk* court emphasized the practical stakes of sanctioning a First Amendment free-speech right for teachers to opt out of these policies. In "readily declin[ing]" the plaintiff-teacher's "invitation to run the public schools," it observed that "placing administrative

requirements on how teachers deliver th[e] curriculum" is a "decision[] . . . entrusted to the [school] Board, not to judges." *Id.* at 420. There are "democratically responsive" means through which teachers and parents can channel disagreements with individual school boards, but none for those with judges—or "individual teachers" themselves. *Id.* Though respecting a student's chosen name and pronoun is not part of curriculum delivery, it is part of a teacher's official duty to foster a safe, inclusive school environment. *Cf. Johnson*, 658 F.3d at 967-68 ("teachers do not cease acting as teachers each time the bell rings or the conversation moves beyond the narrow topic of curricular instruction" given "the position of trust and authority they hold" when they act "in a capacity one might reasonably view as official"). To maintain the workability of public education—and to secure the policies that were established to protect student safety in line with schools' legal obligations—teachers cannot be allowed to supersede their school-district-set job duties.

Accordingly, the *Polk* court held that *Garcetti* disposed of the teacher's free-speech claim because "how a teacher addresses a particular student in a particular classroom—and whether a teacher communicates with a student's parent—is merely a part of that teacher's job

description." 166 F.4th at 418. "[W]hen [a teacher] uses pronouns to refer to students in the classroom setting" or "speaks to parents about their child's behavior in school, she is acting as a teacher, not a citizen." *Id.* That "speech is not protected by the First Amendment": if one "chooses to teach in public schools, she is a government employee and must perform 'the tasks she was paid to perform.'" *Id.* (quoting lower court decision, available at 2025 WL 240996, and *Garcetti*, 547 U.S. at 422).

The Supreme Court recently reaffirmed the distinction between speech uttered privately and speech delivered in the course of public-school employees' official duties in *Kennedy*. There, the Court held that a public-school coach's prayer after football games was private speech, not government-employee speech, because "what matters is whether Mr. Kennedy offered his prayers while acting within the scope of his duties as a coach." *Kennedy*, 597 U.S. at 529-30. Pointing out that the prayers occurred "during a period in which the District has acknowledged that its coaching staff was free to engage in all manner of private speech," the Court explained:

> He did not speak *pursuant to government policy*. He was not seeking to convey a government-created message. He was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in *any other speech the District paid him*

> *to produce* as a coach. Simply put: Mr. Kennedy's prayers did not "ow[e their] existence" to Mr. Kennedy's *responsibilities as a public employee*.

*Id.* (quoting *Garcetti*, 547 U.S. at 421) (emphasis added) (alterations in original).

By contrast, the speech at issue here relates expressly to teachers' duties *qua* teachers, whether in the classroom, elsewhere in the school environment, or in communication with parents. California school districts pay teachers to provide class instruction and cultivate a safe, supportive learning environment, and they adopt policies, such as the Name-Pronoun Policy, to facilitate these goals. Plaintiffs do not have a free-speech right to disregard these policies surrounding their job duties with respect to addressing students or communicating with their parents. Referring to students at school and communicating with their parents about their behavior at school is speech teachers are "expected to deliver in the course of carrying out [their] job[s]." *Kennedy*, 597 U.S. at 529. The district court failed to recognize this important principle, and this Court should reverse its holding on this claim.

## III. TEACHERS DO NOT HAVE A FREE-EXERCISE RIGHT TO "OUT" STUDENTS.

The teachers' free-exercise claims in this case also fail because the Name-Pronoun Policy is religiously neutral and generally applicable.[9] The claims thus warrant at most only rational-basis review—not the strict-scrutiny analysis the district court erroneously applied —and easily meet this standard.

### A. THE NAME-PRONOUN POLICY IS RELIGIOUSLY NEUTRAL AND GENERALLY APPLICABLE.

First, as Plaintiffs do not dispute, the Name-Pronoun Policy is religiously neutral. A policy is "neutral when it 'has no object that infringes upon or restricts practices because of their religious motivation.'" *Polk*, 166 F.4th at 413 (quoting *Alive Church of the Nazarene v. Prince William Cnty.*, 59 F.4th 92, 108 (4th Cir. 2023)). In this neutrality analysis, "[t]he starting point . . . is the text of the challenged

[9] The per curiam's discussion of parents' free-exercise claims does not disturb this conclusion, since it was based entirely on *Mahmoud*. *See Bonta*, 146 S. Ct. at 802 (relying on *Mahmoud*, 606 U.S. at 559). *Mahmoud* holds that courts may bypass the neutral-and-generally-applicable analysis typically required under the Free Exercise Clause when *parents* raise such claims regarding childrearing. *Mahmoud*, 606 U.S. at 559 (citing *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). But for free-exercise claims raised by teachers, the traditional neutral-and-generally-applicable analysis must take place.

law or policy itself[,]" and "'the minimum requirement of neutrality is that a law not discriminate on its face.'" *Id.* (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)). Where, as here, "there is no mention of anything about religion" in the policy, it is facially neutral. *See id.*

Nor is there any suggestion here by Plaintiffs that the Name-Pronoun Policy was created "with the object of targeting a religious practice[,]" *id.* at 414, or otherwise motivated by hostility toward any particular religion or religious practice more generally. *See Foothills Christian Ministries v. Johnson*, 148 F.4th 1040, 1051 (9th Cir. 2025) ("A state 'fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature.'") (quoting *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021)).

To be sure, some teachers' religious views may conflict with the Name-Pronoun Policy, but laws that are neutral with respect to religion do not trigger heightened scrutiny, even if they "ha[ve] the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531; *accord Mahmoud*, 606 U.S. at 522 ("[T]he government is generally free to place incidental burdens on religious exercise so long as it does so

pursuant to a neutral policy that is generally applicable."). It would "turn[] the well-established neutrality analysis on its head" to hold "that, because persons who hold religious views are those most impacted by the [policy], [the policy] cannot be deemed 'neutral.'" *Polk*, 166 F. 4th at 414-15 (teacher had "failed to allege any conduct or statement by the [school] Board that evince[d] a 'beneath-the-surface' hostility toward those holding particular religious views" or "indicat[ed] that the Board's adoption of the [name-pronoun policy] was motivated by any religious hostility"); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1217, 1235 (9th Cir. 2020) (transgender-inclusive bathroom policy was neutral because it did not reference religious conduct or religious motivation and was not "adopted with the object of suppressing the exercise of religion"), *cert. denied*, 141 S. Ct. 894 (2020).

Second, the Name-Pronoun Policy is generally applicable. A policy that applies across the board to both religious and non-religious conduct is generally applicable unless it includes a "formal system of entirely discretionary exemptions" or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534, 536. "The relevant

inquiry . . . is whether the [policy] appl[ies] to all staff members equally." *Polk*, 166 F. 4th at 415; *see also Parents for Priv.*, 949 F.3d at 1235 ("[T]he question of general applicability addresses whether a law treats religious observers unequally.").

Here, religious and non-religious teachers, and religious and non-religious conduct, are treated equally under the Name-Pronoun Policy. The policy "'appl[ies] to every teacher.'" *See Polk,* 166 F. 4th at 416 (quoting district court opinion). "Anyone who disagrees with [the policy]—for religious, secular, or other reasons—must nevertheless abide by [it].'" *Id.* at 415 (quoting lower court opinion); *see also Parents for Priv.*, 949 F.3d at 1236 (absent "any showing" that the bathroom policy "selectively imposes certain conditions or restrictions only on religious conduct," it was "generally applicable for purposes of the free exercise analysis"); *Mead v. Rockford Pub. Sch. Dist.*, 800 F. Supp. 3d 836, 846 (W.D. Mich. 2025) (holding policy similar to one at issue here was generally applicable).

The Name-Pronoun Policy also does not include a formal system of entirely discretionary, individualized exemptions that would run afoul of *Fulton*. The only exceptions allowed for teachers are narrow: (1) when a

student consents to disclosure, (2) when disclosure is necessary to preserve a student's physical or mental wellbeing, and (3) when disclosure is otherwise required by law or district policy. *See, e.g.*, Ex. 26-B to 2d Amended Compl., Dkt. 133, at 302 (2016 FAQs explaining that other laws "expressly permit[] the disclosure of information from a student's records to appropriate parties in connection with an emergency if knowledge of the information is necessary to protect the health or safety of the student or other individuals") (cleaned up, citing 34 C.F.R. § 99.36(a)); Ex. 12 to Mot. for Prelim. Inj., Dkt. 153-3, at 93-94 (model policies from DOE providing that "the district will only disclose the information to others with the student's prior consent, except when the disclosure is otherwise required by law or is necessary to preserve the student's physical or mental well-being" and that district employees "shall keep the student's information confidential, unless … required to disclose or report the student's information pursuant to law or district policy").[10]

---

[10] As discussed *supra*, it is not clear whether these model policies are at issue in this appeal, since they have since been removed and superseded by additional guidance from CA DOE. However, they are cited here as an instructive example of the non-discretionary nature of the Name-Pronoun Policy.

These limited exceptions are far from entirely discretionary; indeed, they are not discretionary at all. When the decision to disclose lies with students, that leaves *no discretion* to teachers. So, too, for when disclosure is required by law or district policy.[11] Likewise, district employees have *no* discretion regarding disclosure as it relates to students' physical and mental well-being: Where such disclosure is *necessary* to preserve a student's physical or mental well-being, the employee *must* do so. That staff use their professional training and judgment to determine whether such disclosure is necessary to protect a student's well-being "does not render the [exception] discretionary." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 289-90 (2d Cir. 2021), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021) (physicians' and nurse practitioners' "use [of] their medical judgment to determine whether a particular individual has a contraindication or precaution against

---

[11] None of these laws or policies, however, are exemptions to the Name-Pronoun Policy as contemplated under *Tandon*'s general-applicability analysis. Rather, they function in tandem with the Name-Pronoun Policy; there is no inherent conflict. Even if they were exemptions, none of the secular conduct Defendants point to with respect to these laws and policies is comparable to a religious exemption that treats "comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

receiving the vaccine" did not create discretionary medical exemption and did not defeat general applicability of vaccine mandate under Free Exercise Clause). Any necessary disclosure would not be based on discretion but instead on an objective determination rooted in professional training and guidance and criteria from the state. *See Mirabelli Stay*, 2026 WL 44874, at *3 (citing Cal. Educ. Code § 49602, which delineates the five situations in which disclosure without students' consent is permissible, such as discussion with psychotherapists "for the sole purpose of referring the pupil for treatment"); Defs. Supp. Br., Dkt. 29.1 ¶ 3 (observing that "teachers and other employees could rely on the same understanding of 'abuse'—and the same standards for determining when abuse is likely—that they turn to in other contexts under mandatory abuse-reporting laws" and collecting examples).

Finally, the well-being exception does not undermine "the government's asserted interest" justifying the Name-Pronoun Policy in the same way that a religious exemption for teachers would. *See Fulton*, 593 U.S. at 534; *cf., e.g.*, *Tandon*, 593 U.S. at 63 (permitting religious exemption to California's COVID policies because religious gatherings posed same "risk of transmission" as exempted secular activities). On the

contrary, this exception *advances* the same interest underscoring the Name-Pronoun Policy writ large: student safety. Indeed, as discussed above, this is the basis on which the per curiam order endorsed a policy precluding disclosure to parents if a risk of abuse would result. *See Bonta*, 146 S. Ct. at 802-03 (finding "State's interest in *safety* could be served by a policy that . . . preclud[es] gender-identity disclosure to parents who would engage in *abuse*" so long as religious exemption for parents is otherwise available) (emphasis added).

Specifically, the well-being exception permits involuntary disclosure of students' requests for different names and pronouns to their parents *only when necessary to protect student safety* (i.e., a student's mental or physical or mental well-being), whereas a religious exemption for teachers to engage in involuntary disclosure would *threaten* student safety. *See infra* Part III, Section B (discussing potential harms to transgender and nonbinary students from involuntary outing). As this Court has held, a secular exception that furthers the safety interests of a broader policy does not mean that the policy fails the general-applicability inquiry. *See, e.g.*, *Doe*, 19 F.4th at 1178 (school district's vaccine mandate was generally applicable, despite medical exemption,

because medical exemption "serve[d] the primary interest for imposing the mandate—protecting student 'health and safety'—and so [did] not undermine the District's interests as a religious exemption would" under *Tandon*).

### B. The Name-Pronoun Policy Survives Rational-Basis Review.

Because the Name-Pronoun Policy is neutral and generally applicable, it is subject only to rational-basis review with respect to the teachers' free-exercise claims. *See Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878-79 (1990); *see also Polk*, 166 F.4th at 413 ("[I]f the policies are neutral and generally applicable, they are subject only to rational basis review, even where [they have] the incidental effect of burdening religious exercise.") (internal quotation marks omitted)..

Rational-basis review is a deferential inquiry, under which courts presume the challenged conduct is valid so long as it is "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). The Name-Pronoun Policy satisfies this threshold for the same reasons as in *Parents for Privacy*: It is "rationally related to the legitimate purpose of protecting student safety and well-

being, and eliminating discrimination on the basis of sex and transgender status." 949 F.3d at 1238 (collecting cases).

Involuntary outing like the kind the teacher-Plaintiffs seek to engage in here can cause serious and irreparable harm to the emotional and physical safety and well-being of transgender and nonbinary students. School is often a safer place for these students than home: 51% of transgender youth consider school an affirming space, but only 32% feel the same about their homes. *See 2022 National Survey on LGBTQ Youth Mental Health*, TREVOR PROJ. (2022), https://perma.cc/MU59-JBBT; *see also 2025 National Survey on LGBTQ Youth Mental Health*, TREVOR PROJ. (2025), https://perma.cc/M4KH-KY6Y (finding "[t]ransgender and nonbinary young people reported lower rates of attempting suicide when the people they live with respected their pronouns"—7% when all members of home respect pronouns, versus 18% when none do). The threat of involuntary outing eliminates this sense of safety at school and risks converting fear of unsafety into actual unsafety at home. For instance, the Rainbow Youth Project launched a hotline specifically for California students concerned about involuntary outing. From the hotline's launch in August 2023 to June 2024, it received a

staggering total of 5,934 phone calls, many from "young people [] in distress" who "have a fear of being outed" and "a fear of being rejected by families if they are." Jenavieve Hatch, *Bill Banning Parent Notification Policies in California Schools Gains Momentum Amid Protest*, SACRAMENTO BEE (June 27, 2024), https://perma.cc/CLN6-5M4K; *see also, e.g.*, THE TREVOR PROJECT, *Issues Impacting LGBTQ Youth*, p. 16 (Jan. 2023), https://perma.cc/N6JQ-YL7C (data demonstrating policies permitting involuntary outing cause "emotions like stress, fear, and nervousness" to "spike").

These fears are well grounded. As the record here shows, the state's interest in protecting the well-being of transgender students "is not to bypass parents in the gender journey." Tando Decl., Opp. to Pls. Mot. for Summ. Judgment, Dkt 256-3 ¶ 62. Ideally, "home is the safest place to reveal one's authentic gender[.]" *Id.* ¶ 63. But "not all home environments and relationships between parents and teenagers are ideal": "[t]he youth may have already come out at home and was possibly met with resistance and/or rejection, therefore making school the only place they can be referred to authentically. If this were to be revealed to the parents [before the youth is ready], the youth may face more rejection/ resistance at

home[.]" *Id.* ¶¶ 62, 63. For instance, transgender and nonbinary people are significantly more likely to experience physical, psychological, and sexual abuse from immediate family members, especially when they are involuntarily outed.[12] *See, e.g.*, *Platkin v. Middletown Twp. Bd. of Educ.*, No. A-0037-23, 2025 WL 440132, at *7 (N.J. Super. Ct. App. Div. Feb. 10, 2025) (affirming trial court's finding that policy allowing involuntary outing would cause irreparable harm, based in part on studies demonstrating serious risk of "mental health issues, suicide, illicit drug dependency, and infliction of physical or emotional harm by immediate family members" upon involuntary outing). Studies have shown that youth "who were outed to their parents" without their consent "reported

---

[12] *See* Peter McCauley et al., *Stress of Being Outed to Parents, LGBTQ Family Support, and Depressive Symptoms Among Sexual and Gender Diverse Youth*, 34 J. RSCH. ADOLESC. 205 (2024), https://onlinelibrary.wiley.com/doi/abs/10.1111/jora.12912; Brian Thoma et al., *Disparities in Childhood Abuse Between Transgender and Cisgender Adolescents*, 148(2) PEDIATRICS e2020016907 (2021), https://publications.aap.org/pediatrics/article/148/2/e2020016907/179762/Disparities-in-Childhood-Abuse-Between-Transgender; Arnold Grossman et al., *Parental Responses to Transgender and Gender Nonconforming Youth: Associations with Parent Support, Parental Abuse, and Youths' Psychological Adjustment*, 68(8) J. HOMOSEX. 1260 (2021), https://perma.cc/47TT-RNBC;; Andrea Roberts et al., *Childhood Gender Nonconformity: A Risk Indicator for Childhood Abuse and Posttraumatic Stress in Youth*, 129 PEDIATRICS 410, 413-14 (2012),https://perma.cc/3CK2-AK2D.

greater depressive symptoms and lower LGBTQ family support compared to youth who were not outed," and that, overall, "a lack of agency in disclosing a sexual and/or gender identity to parents can greatly undermine the well-being of" LGBTQ+ youth. McCauley et al., *supra*, at p. 219. Indeed, over a quarter of LGBTQ+ youth experience homelessness or housing insecurity—largely due to parental rejection after they come out or are outed to their parents. *See Homelessness and Housing Instability Among LGBTQ Youth*, TREVOR PROJ. (Feb. 3, 2022),https://perma.cc/6JQH-QSMQ.

Involuntary outing also disrupts students' education. The threat of teachers outing students to their parents without their consent causes feelings of unsafety that impede learning. *See* The Trevor Project, *supra*, at p. 13 (data demonstrating that "[p]olicies that require schools to tell a student's parent or guardian if they requested to use a different name/ pronoun or identify as LGBTQ ha[ve] a more intense emotional impact on trans and/or non-binary youth, particularly around being angry, stressed, scared, or nervous"). When these young people feel unsafe at school, they are more than twice as likely as peers to miss school. *See* Nicolas Suarez et al., *Disparities in School Connectedness, Unstable*

*Housing, Experiences of Violence, Mental Health, and Suicidal Thoughts and Behaviors Among Transgender and Cisgender High School Students — Youth Risk Behavior Survey, United States, 2023*, 73(4) MMWR SUPPLEMENTS 50 (2024), https://perma.cc/9GUD-EEJG.[13]

It is precisely these risks—parental rejection, fear of school, and potential school abandonment—that have caused other circuit courts to find that policies like the Name-Pronoun Policy easily survive rational-basis review. In *Polk*, for instance, the Fourth Circuit found that a similar policy satisfied the "not demanding" rational-basis inquiry because it was "rationally related to the Board's goal of supporting and protecting the safety of the students *whose parents may object to their decision to transition*." 166 F.4th at 416-17 (emphasis added) (also finding policy justified by "Board's goal of hiring staff who will treat and nurture every student equally," which also supported policy requiring "teachers address students by their preferred pronouns").

---

[13] *See also* Kasey Jackman et al., *Suicidality Among Gender Minority Youth: Analysis of 2017 YRBS Data*, 25 ARCH. SUICIDE RSCH. 208 (2019),https://perma.cc/TXV2-HRVN; Joseph Kosciw et al., *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools*, GLSEN (2022), https://perma.cc/HNK5-995N.

Likewise, in *Foote v. Ludlow School Committee*, the First Circuit held that a similar policy served not only a legitimate, but "a *compelling* interest in protecting the physical and psychological well-being of minors," which are at an "apex when a school board seeks to protect children who are particularly vulnerable, such as transgender minors." 128 F.4th 336, 356-37 (1st Cir. 2025) (emphasis added), *cert. denied*, No. 25-77, 2026 WL 1052101 (U.S. Apr. 20, 2026). Like the *Polk* court, the *Foote* court emphasized that "it is not uncommon for students exploring their gender identity to fear *parental backlash* against their choices," since "[s]ome transgender and gender nonconforming students are not openly so at home for reasons such as safety concerns or lack of acceptance." *Id.* at 357 (emphasis added) (internal quotation marks omitted). Moreover, the *Foote* court recognized that policies like the Name-Pronoun Policy "endeavor[] to remove psychological barriers for transgender students and equalize[] educational opportunities" by "cultivating an environment where students may feel safe in expressing their gender identity[.]" *Id.* So, too, here.

Because the Name-Pronoun Policy serves a legitimate—and, indeed, compelling—interest in securing student safety and well-being, it is plainly constitutional as applied to teachers.

## CONCLUSION

This Court should clarify the scope of parental rights in the context of student name/pronoun changes as (1) permitting denial of a parent's request when the student's safety is at risk, (2) applying only when a student submits a request to go by a different name and/or pronouns publicly at school, and (3) requiring parents to affirmatively request an exemption to the Name/Pronoun Policy. This Court should also reverse the portions of the district court's summary judgment decision and vacate the permanent injunction as to the teachers' alleged rights.

DATED: June 2, 2026

Respectfully submitted,

*/s/Alexandra R. Johnson*

Alexandra R. Johnson
*Counsel of Record*
Emerson Sykes
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
a.johnson@aclu.org

Amanda Goad
Christine Parker
Ariana Rodriguez
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, CA 90081
(213) 977-9500
agoad@aclusocal.org

cparker@aclusocal.org
arodriguez@aclusocal.org

Chessie Thacher
ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493
cthacher@aclunc.org

Jess Zalph
Amy Tai*
Jenny Samuels
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
(771) 244-2404
zalph@au.org
tai@au.org
samuels@au.org

*Admitted to practice in New York; not a member of the D.C. bar.

esykes@aclu.org

Elizabeth O. Gill
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0779
egill@aclu.org

Daniel Mach
Heather L. Weaver
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 675-2330
dmach@aclu.org
hweaver@aclu.org

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-8056

I am the attorney or self-represented party.

**This brief contains** 6,968 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated [ ].
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Alexandra Johnson **Date** June 2, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*