**No. 25-8056**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

ELIZABETH MIRABELLI, ET AL.,
*Plaintiff-Appellees*,

v.

ROB BONTA, ET AL.,
*Defendant-Appellants*.

On Appeal from the United States District Court
for the Southern District of California

**BRIEF OF PROFESSORS OF PSYCHOLOGY & HUMAN DEVELOPMENT AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS**

---

Alice W. Yao
Mary Rohmiller
Dylan Nicole de Kervor
(CA BAR: 269169)
POTOMAC LAW GROUP
1717 Pennsylvania Ave., NW
Suite 1025
Washington, DC 20006
(202) 558-5557
ayao@potomaclaw.com

Shannon Minter (CA BAR: 168907)
Amy Whelan (CA BAR: 215675)
NATIONAL CENTER FOR
LGBTQ RIGHTS
1401 21st Street #11548
Sacramento, CA 95811
(415) 392-6257
awhelan@nclrights.org

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICI CURIAE* ........ 1

SUMMARY OF ARGUMENT ........ 4

ARGUMENT ........ 7

I. There Is No Precedent to Compel School Personnel to Disregard Students' Names and Pronouns, and the Injunction is Overbroad ........ 7

A. School Personnel Support Student Wellbeing ........ 9

B. California's Nondiscrimination Framework ........ 10

II. Name and Pronoun Use Is Not Medical Treatment ........ 11

III. Preventing Discrimination and Protecting Student Wellbeing Are Compelling State Interests ........ 12

IV. Respectful Name and Pronoun Use Protects Students ........ 14

V. Professional Associations Support Respectful Name and Pronoun Use ........ 20

VI. The Injunction Is Overbroad and Undermines Student Safety ........ 22

CONCLUSION ........ 24

CERTIFICATE OF COMPLIANCE ........ 27

CERTIFICATE OF SERVICE ........ 29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*City of Huntington Beach v. Newsom*, No. 25-3826, 2025 WL 3169324, at *2 (9th Cir. Sept. 12, 2025) ....................20

*Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923) ....................7

*Mirabelli v. Bonta*, 607 U.S. ___, 146 S.Ct. 797 (2026) (per curiam) ....................5, 6, 22

*Mirabelli v. Olson*, 820 F. Supp. 3d 1123 (E.D. Cal. 2025) ....................4, 11, 23

*Mirabelli v. Olson*, No. 3:23-cv-0768, 2025 WL 3712993 (E.D. Cal. Dec. 22, 2025) .4, 23

*Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020) ....................8

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) ....................7

*Troxel v. Granville*, 530 U.S. 57, 65 (2000) ....................7, 24

*Whalen v. Roe*, 429 U.S. 589, 599–600 (1977) ....................8

## Statutes

Cal. Educ. Code § 220 ....................10, 21

Cal. Educ. Code § 220.3(a) ....................20

## Other Authorities

Alida Bouris & Brandon Hill, *Exploring the Mother-Adolescent Relationship as a Promotive Resource for Sexual and Gender Minority Youth*, 73 J. of Soc. Issues 618 (2017) ....................19

Am. Sch. Counselors Ass'n, *The School Counselor and Transgender and Nonbinary Youth* (rev. 2022) ....................21

Amanda M. Pollitt, et al., *Predictors and Mental Health Benefits of Chosen Name Use*

*Among Transgender Youth*, 53 Youth & Soc'y 320 (2019) ....................................13, 18

Bonnie Solomon, et al., *Creating Policies to Support Healthy Schools* at 24–26, Child Trends (Oct. 2018) .........................................................................20, 22, 23

Caitlin Ryan, et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346 (2009) ......................................................................................................15

Caitlin Ryan, et al., *Parent-Initiated Sexual Orientation Change Efforts With LGBT Adolescents*, 67 J. of Homosexuality 159 (2020) ..........................................................15

Cal. Dep't of Educ., *Frequently Asked Questions: School Success and Opportunity Act (AB 1266)* (September 16, 2021) .................................................................10–11

D.C. Pub. Schs., Transgender & Gender Nonconforming Policy Guidance (Jun. 2015) ....10

Glisten, *The 2025 National School Climate Survey: School Experiences of LGBTQ+ Youth in the U.S.* (2026)..................................................................16, 17, 18

Human Rts. Campaign & Gender Spectrum, *Supporting and Caring for Our Gender Expansive Youth* 10 (2014) ...........................................................................16

Jack K. Day, et al., *Gay-Straight Alliances, Inclusive Policy, and School Climate: LGBTQ Youths' Experiences of Social Support and Bullying*, 30 J. of Research on Adolescence 418 (2020)..............................................................................14–15

Jenifer K. McGuire, et al., *School Climate for Transgender Youth: A Mixed Method Investigation of Student Experiences and School Responses*, 39 J. Youth Adolescence 1175 (2010) ...............................................................................11, 17

Katharine B. Parodi, et al., *Associations Between School-Related Factors and Mental Health Among Transgender and Gender Diverse Youth*, 90 J. of School Psychol. 135 (2022) ......................................................................................................17

Kristie L. Seelman, et al., *School Engagement Among LGBTQ High School Students: The Roles of Safe Adults and Gay–Straight Alliance Characteristics*, 57 Children and Youth Services Review 19 (2015) ........................................................................17

L. Durwood, et al., *Social Support and Internalizing Psychopathology in Transgender Youth*, 50 J. of Youth and Adolescence 841-854 (2021) ........................................18, 19

Laura E. Durso & Gary J. Gates, *Serving Our Youth: Findings from a National Survey of Services Providers Working with LGBT Youth Who Are Homeless or At Risk of Becoming Homeless* (2012) ....................15

Lisa Simons, et al., *Parental Support and Mental Health Among Transgender Adolescents*, 53 J. of Adolescent Health 791 (2013) ....................19

Michael E. Newcomb, et al., *High Burden of Mental Health Problems, Substance Use, Violence, and Related Psychosocial Factors in Transgender, Non-Binary, and Gender Diverse Youth and Young Adults*, Archives of Sexual Behavior 645 (2020) ....................15

Michelle M. Johns, et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 MMWR 67 (2019) ....................16

Mollie McQuillan, et al., *Examining School Supports and Barriers to Improving the Health, Safety, and Academic Achievement of MMSD LGBTQ+ Students*, Madison, WI: Madison Education Partnership 26 (2021) ....................17–18

N.J. Dep't of Educ., Transgender Student Guidance for School Districts ....................10

N.Y. State Dep't of Educ., Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices ....................10

Nat'l Educ. Ass'n, *Legal Guidance on Transgender Students' Rights* at 5, 6, 9 (June 2016) ....................21

Rhonda Williams & Joseph Wehrman, *Collaboration and Confidentiality: Not a Paradox But an Understanding Between Principals and School Counselors*, 94(2) NASSP Bull. 107, 109 (2010) ....................13

Russell Toomey, et al., *Heteronormativity, School Climates, and Perceived Safety for Gender Nonconforming Peers*, 35 J. of Adolescence 187 (2012) ....................17

Sabra L. Katz-Wise, et al., *Family Functioning and Mental Health of Transgender and Gender-Nonconforming Youth in the Trans Teen and Family Narratives Project*, 55 J. of Sex Research 582 (2018) ....................19

Stephanie Budge, et al., *A Grounded Theory Study of the Development of Trans Youths'*

*Awareness of Coping with Gender Identity*, 27 J. of Child Family Studies 3048 (2018)19

Stephen T. Russell, et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 J. of Adolescent Health 503 (2018) ....................................................................12–13, 18, 19

Tiffany Jones, *Evidence Affirming School Supports for Australian Transgender and Gender Diverse Students*, 14 Sexual Health 412, 414 (2017) ........................................16

Tim Konold, et al., *School Climate, Student Engagement, and Academic Achievement*, 4 AERA Open 1, 9–10 (2018) ..........................................................................................22, 23

Tracey Peter, et al., *Still in Every Class in Every School: Final Report on the Second Climate Survey on Homophobia, Biphobia, and Transphobia in Canadian Schools* 128 (2021) ..........................................................................................................................14

# INTEREST OF *AMICI CURIAE*[1]

Dr. Stephanie Budge, Dr. Mollie McQuillan, Dr. Stephen Russell, Dr. Sabra Katz-Wise, Dr. Russell Toomey, Dr. Jenifer McGuire, and Dr. Katherine Kuvalanka[2] join as amici because of their collective understanding that compelling school personnel to disregard a transgender student's request regarding their name and pronouns—regardless of the student's individual circumstances or the educator's professional judgment—would contradict best practices, undermine supportive student-adult relationships, and harm student wellbeing. Amici are professors of sexuality, human development, psychology, and family science with extensive experience studying the effects of home and school environments on the development and wellbeing of young people, including LGBTQ+ youth.

**Dr. Stephanie Budge** is a licensed psychologist and Professor and Director of Clinical Training in the Department of Counseling Psychology at the University of Wisconsin-Madison. Her clinical work and research focus on improving medical and psychotherapy treatments for Two Spirit, trans, and nonbinary (2STNB) youth

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this brief. In addition, pursuant to Fed. R. App. P. 29(a)(4)(E), Amici represent that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no one other than Amici Curiae, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

[2] Amici's views and opinions expressed in this brief reflect their extensive research and scholarship on LGBTQ+ youth in school and family settings, but do not necessarily reflect the opinions of Amici's employers or affiliated institutions.

and adults. She founded the Trans CARE Collaborative at UW-Madison and serves as Associate Editor of *Psychology of Sexual Orientation and Gender Diversity*.

**Dr. Mollie McQuillan** is an Associate Professor in the Department of Educational Leadership and Policy Analysis at the University of Wisconsin-Madison. Her research examines the intersection of educational policy, school climates, and health of LGBTQ+ youth in PK-12 schools. Prior to her graduate studies, she spent 12 years working with adolescents, including 7 years as a public-school teacher.

**Dr. Stephen Russell** is Foundation Professor and Director of the T. Denny Sanford School of Social and Family Dynamics at Arizona State University. His research focuses on adolescent development, with emphasis on LGBTQ+ youth development and health, parent-adolescent relationships, and school policies associated with positive adjustment in adolescence. He was President of the Society for Research on Adolescence (2012–2014) and is a fellow of the National Council on Family Relations and elected member of the National Academy of Education.

**Dr. Sabra Katz-Wise** is an Associate Professor in Adolescent/Young Adult Medicine at Boston Children's Hospital, in Pediatrics at Harvard Medical School, and in Social and Behavioral Sciences at the Harvard T. H. Chan School of Public Health. She directs the SOGIE Health Equity Research Collaborative and the GenderWise Lab, and is a Senior Faculty Advisor for the Boston Children's Office

of Health Equity and Inclusion. Her research uses community-engaged methods to investigate sexual orientation and gender identity development, health inequities, and psychosocial functioning in families with transgender and nonbinary youth.

**Dr. Russell Toomey** is University Distinguished Scholar and Professor of Human Development and Family Science at the University of Arizona. He researches how LGBTQ+ youth thrive despite discrimination and systemic barriers, identifying individual-level mechanisms and systems-level policies that reduce discrimination's impacts. He has served on the Board of Directors for the Society for Research on Adolescence, the Governing Council of the Society for Research in Child Development, and the Editorial Board for the *Journal of Youth and Adolescence*.

**Dr. Katherine Kuvalanka** is a Professor in the Department of Family Science and Social Work at Miami University in Ohio. Her research focuses on sexuality and gender socialization within families, and on families with LGBTQ+ family members. She is principal investigator of the Trans*Kids Project, a longitudinal study of 50 families with transgender and gender-diverse children begun more than a decade ago.

**Dr. Jenifer McGuire** is a Professor of Family Social Science at the University of Minnesota. She studies the wellbeing of transgender young people, with a focus on how family environments can best support healthy development and

how social contexts like schools and families influence wellbeing. Her current focus is on gender identity development across a broad spectrum and family relationships among transgender and genderqueer youth and young adults.

Amici's research shows that when transgender and nonbinary students are supported at school, including by honoring the names and pronouns the child uses, they experience significant improvements in academic achievement and decreased depression symptoms. Amici urge this Court to reverse the district court's grant of summary judgment insofar as it requires school employees to disregard a student's requested name or pronouns, and to vacate and remand the permanent injunction for narrowing and clarification. *Mirabelli v. Olson*, 820 F. Supp. 3d 1123 (E.D. Cal. 2025) (order granting summary judgment in favor of the plaintiffs on Claims 1, 2, 3, 6, 7, and 8, and granting a permanent injunction); *Mirabelli v. Olson*, No. 3:23-cv-0768, 2025 WL 3712993 (E.D. Cal. Dec. 22, 2025) (order granting plaintiffs' motion for a class-wide permanent injunction).

## SUMMARY OF ARGUMENT

Amici are educators and researchers who have studied student wellbeing and school-family relationships. The State's decision not to contest the district court's principal holding regarding disclosure to parents who request information about the name and pronouns used for their child at school narrows the issues on appeal. What remains is whether the injunction properly extends to compel school employees to

violate state nondiscrimination laws by disregarding a student's request regarding their name and pronouns, and whether its vague and overbroad terms can be sustained. Professional standards and empirical research consistently demonstrate that respectful use of a student's name and pronouns significantly improves student mental health and academic outcomes, whereas compelling school employees to disregard those requests causes serious harm.

The district court's sweeping statewide injunction rests on a misunderstanding of how schools safely support students. Although the Supreme Court recently vacated the Ninth Circuit's stay, that interim ruling does not foreclose the merits arguments addressed here. *Mirabelli v. Bonta*, 607 U.S. ___, 146 S.Ct. 797, 803 (2026) (per curiam), As Justice Barrett emphasized in her concurrence, the Court's assessment is "preliminary" and reflects only a determination that the parents are entitled to the benefit of the district court's judgment while it is being appealed by the State. *Id.* at 805 (Barrett, J., concurring). The State has since elected not to appeal the disclosure holding, but the injunction sweeps far beyond disclosure—it effectively compels school employees to disregard a student's request regarding their name and pronouns whenever parents object, and its vague, overbroad terms threaten to chill school personnel from providing essential support to students.

The Supreme Court's per curiam opinion stated that "California's policies appear to fail the narrow-tailoring requirement" because "[t]he State's interest in

safety could be served by a policy that allows religious exemptions while precluding gender-identity disclosure to parents who would engage in abuse." *Id.* at 802–03. Amici respectfully submit that this preliminary assessment, made on an emergency posture without the benefit of the underlying record, leaves several considerations unaddressed. Most critically, the State's concession on disclosure removes the premise of this analysis—the question is no longer whether California may withhold information from parents, but whether California may be compelled to require school employees to disregard a student's request regarding their name and pronouns. California's interest in protecting transgender students from discrimination and harassment, and in maintaining a school environment where students can learn, supports preserving school personnel's ability to honor a student's name and pronouns.

This case now centers on whether the Constitution requires California to compel school employees to use names and pronouns contrary to a student's request and in violation of nondiscrimination laws. The research consensus demonstrates that respectful use of a student's name and pronouns is a pedagogical practice—not medical treatment—that significantly improves student mental health and academic achievement. Amici's research shows that compelling school employees to disregard transgender students' requests regarding names and pronouns would cause serious harm, including increased depression, anxiety, and suicidal ideation. The district

court's injunction is overbroad in multiple respects: it employs vague language regarding "gender incongruity," fails to specify which laws are enjoined, and sweeps far beyond the disclosure issue the State has conceded. Amici urge this Court to reverse in part and vacate and remand the injunction for narrowing and clarification.

## ARGUMENT

### I. There Is No Precedent to Compel School Personnel to Disregard Students' Names and Pronouns, and the Injunction is Overbroad

Amici acknowledge what is beyond serious dispute: parents possess a fundamental liberty interest in the care, custody, and control of their children. *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Neither the State nor Amici ask this Court to diminish that principle. The State has decided not to appeal the district court's core holding, acknowledging that it "may not generally prohibit school employees from informing parents, upon the parent's request, about the names and pronouns a school employee is using for their child." Defs.-Appellants' Opening Br. at 2. The issue that remains on appeal is whether the State must compel school employees to disregard a student's request regarding their name and pronouns—conduct that violates California's nondiscrimination law and causes documented harm to students.

The parental right recognized in *Meyer*, *Pierce*, and *Troxel* is a right against

state interference with parental decisionmaking—it does not require the state to compel school employees to engage in conduct that violates California's nondiscrimination protections and is harmful to student wellbeing. In the absence of concerns about abuse, parents who wish to know what names and pronouns are used for their child at school may obtain that information. The question is whether parents can further compel school staff to disregard a transgender student's request regarding their name and pronouns. Nothing in the parental-rights precedents requires this.

Compelling school employees to disregard a transgender student's request to be addressed by the student's name and pronouns raises serious concerns of its own. Requiring school employees to use names and pronouns that contradict a student's identity—over the student's objection and in violation of state nondiscrimination law—implicates the State's compelling interest in "protecting student safety and well-being, and eliminating discrimination on the basis of sex and transgender status." *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1238–39 (9th Cir. 2020). Students also possess a protected interest in avoiding governmental disclosure of personal matters and in attending school free from discrimination. *See Whalen v. Roe*, 429 U.S. 589, 599–600 (1977). The injunction's mandate does not merely address parental rights—it compels conduct harmful to students and contrary to California law.

In short, the fundamental parental right to receive information about their children is no longer at issue—the State has conceded that point. What remains is whether parental rights extend further, to compel school employees to disregard a transgender student's request regarding their name and pronouns. Given the competing interests in student wellbeing and nondiscrimination, they do not.

### A. School Personnel Support Student Wellbeing

School administrators, counselors, and teachers work to meet the myriad needs of students and foster an environment supporting each student's growth. Students often look to school personnel as a resource for issues such as substance misuse, problems with peers, unplanned pregnancy, and challenges at home. School personnel are entrusted to rely on their expertise and professional judgment to provide guidance, and numerous states expressly protect those conversations from disclosure.

Consistent with legal obligations and evidence-based best practices, state education agencies and school districts around the country have adopted policies to ensure that transgender students feel safe at school to learn and grow. *See, e.g.*, N.Y. State Dep't of Educ., Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices, https://www.nysed.gov/sites/default/files/programs/student-support-services/creating-a-safe-supportive-and-affirming-school-environment-for-

transgender-and-gender-expansive-students.pdf; Durham Pub. Schs., LGBTQIA+ (Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Asexual+) and Gender Supports Policy (rev. Dec. 15, 2023), https://go.boarddocs.com/nc/dpsnc/Board.nsf/goto?open&id=CLXMFD58A27C; D.C. Pub. Schs., Transgender & Gender Nonconforming Policy Guidance (Jun. 2015), https://dcps.dc.gov/sites/default/files/dc/sites/dcps/publication/attachments/DCPS%20Transgender%20Gender%20Non%20Conforming%20Policy%20Guidance.pdf; N.J. Dep't of Educ., Transgender Student Guidance for School Districts, https://www.nj.gov/education/safety/sandp/climate/docs/Guidance.pdf (last visited May 29, 2026).

Those policies also help guide school personnel to exercise their professional judgment regarding disclosure of a student's transgender status.

### B. California's Nondiscrimination Framework

California law prohibits discrimination against students based on sex, including gender identity. Cal. Educ. Code § 220. Addressing students by the names and pronouns they use is part of that nondiscrimination framework—it ensures transgender students receive the same respectful treatment as their peers. The State's guidelines reflect this approach, directing school personnel to use the student's name and pronouns that reflect a student's request. Cal. Dep't of Educ., *Frequently Asked Questions: School Success and Opportunity Act (AB 1266)* (September 16,

2021), https://web.archive.org/web/20241224194546/https://www.cde.ca.gov/re/di/eo/faqs.asp.

## II. Name and Pronoun Use Is Not Medical Treatment

The district court embraced an erroneous premise that school personnel who respect a student's name and pronouns are engaging in undisclosed medical treatment. *See Mirabelli*, 820 F. Supp. 3d at 1142. Schools routinely accommodate students' needs through pedagogical and administrative practices that are not medical care, from addressing bullying to supporting students facing a range of personal challenges. Jenifer K. McGuire, et al., *School Climate for Transgender Youth: A Mixed Method Investigation of Student Experiences and School Responses*, 39 J. Youth Adolescence 1175 (2010) (trust in school personnel is an important factor for transgender students' academic success). Using a student's requested name and pronouns is another such pedagogical practice—a basic component of creating a respectful learning environment grounded in educational rationale, not clinical judgment.

California's laws and policies do not regulate or direct medical care; they address student information and conditions under which school employees may be required to disclose it. Reframing ordinary educational practices as medical treatment distorts the record and undermines schools' ability to fulfill their core mission.

Schools regularly accommodate students' needs without becoming medical providers. Teachers arrange seating for students with vision difficulties, provide extra time for testing for anxious students, or allow quiet lunch spaces. Even when a doctor has recommended such accommodations, the teacher is not practicing medicine. Accepting Plaintiffs-Appellees' broad definition would transform any educationally supportive action into medical treatment—a result defying common sense and established standards.

The California policies at issue do not address medical care, and schools that honor a student's name and pronouns are not providing medical care. They are implementing pedagogically sound practices allowing all students to focus on their education.

## III. Preventing Discrimination and Protecting Student Wellbeing Are Compelling State Interests

Administrators and school personnel strive to build an environment that is welcoming and supportive of all students so they can thrive socially, emotionally, and academically. School personnel and parents share that common interest and are natural collaborators. A critical component of that supportive environment is addressing students by the names and pronouns they use. Research demonstrates that this practice significantly improves student outcomes. *See* Stephen T. Russell, et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation,*

*and Suicidal Behavior Among Transgender Youth*, 63 J. of Adolescent Health 503 (2018); Amanda M. Pollitt, et al., *Predictors and Mental Health Benefits of Chosen Name Use Among Transgender Youth*, 53 Youth & Soc'y 320 (2019).

Research consistently shows that students' willingness to seek adult support depends on trusting that school personnel will treat them with respect. Rhonda Williams & Joseph Wehrman, *Collaboration and Confidentiality: Not a Paradox But an Understanding Between Principals and School Counselors*, 94(2) NASSP Bull. 107, 109 (2010) (emphasizing that school counselors must develop "a trusting relationship so the student feels safe, heard, and validated"). When school employees are compelled to disregard a transgender student's request regarding their name and pronouns, that trust is undermined—with serious consequences for student wellbeing.

Longstanding public policy and well-established evidence-based best practices demonstrate that supporting transgender students, including through respectful use of their names and pronouns, benefits students by fostering a supportive school environment and protecting students from psychological injury. Compelling school employees to disregard a transgender student's request regarding their name and pronouns would undermine these interests and deter students from seeking adult support. It may also damage family relationships by signaling to students that school is not a safe environment and that adults cannot be trusted to

respect them.

## IV. Respectful Name and Pronoun Use Protects Students

The research below demonstrates why respectful use of a student's name and pronouns is critical to student wellbeing. The overwhelming majority of parents are loving and supportive, and the State's concession on disclosure ensures they may obtain information about the name and pronouns used for their child at school. What remains at issue is whether the injunction properly compels school employees to disregard a transgender student's request regarding their name and pronouns. The research shows this would cause serious harm.

As one student in a Canadian school climate survey explained: "When a student wants to change the name and pronouns they go by at school. . . . . . [S]chool might be the only place they feel like they can be themselves." Tracey Peter, et al., *Still in Every Class in Every School: Final Report on the Second Climate Survey on Homophobia, Biphobia, and Transphobia in Canadian Schools* 128 (2021). Schools that provide this supportive space can serve as a bridge, helping students build confidence to eventually have meaningful conversations with their families.

Research from the United States demonstrates that parental support is generally lower for LGBTQ+ youth compared to heterosexual and non-transgender youth, and schools may serve as an important context for modeling social support when family acceptance is uncertain. Jack K. Day, et al., *Gay-Straight Alliances,*

*Inclusive Policy, and School Climate: LGBTQ Youths' Experiences of Social Support and Bullying*, 30 J. of Research on Adolescence 418 (2020). Large U.S. studies confirm that transgender youth receive the least support from families compared to friends and significant others. Michael E. Newcomb, et al., *High Burden of Mental Health Problems, Substance Use, Violence, and Related Psychosocial Factors in Transgender, Non-Binary, and Gender Diverse Youth and Young Adults*, Archives of Sexual Behavior 645 (2020).

The negative effects of family rejection are serious and well-documented. Family rejection of LGBT youth is associated with homelessness and often includes parental attempts to change the child's sexual orientation or gender identity. Caitlin Ryan, et al., *Parent-Initiated Sexual Orientation Change Efforts With LGBT Adolescents*, 67 J. of Homosexuality 159 (2020); Laura E. Durso & Gary J. Gates, *Serving Our Youth: Findings from a National Survey of Services Providers Working with LGBT Youth Who Are Homeless or At Risk of Becoming Homeless* (2012), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Serving-Our-Youth-July-2012.pdf. LGBTQ+ youth who experience high levels of family rejection were over eight times more likely to have attempted suicide. Caitlin Ryan, et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346 (2009). Those with highly-rejecting families were also six times more likely to experience severe depression.

*Id.*

Transgender youth also face challenges at school, which for many is not a safe place. Glisten, *The 2025 National School Climate Survey: School Experiences of LGBTQ+ Youth in the U.S.* (2026) (finding 58 percent of LGBTQ+ students report "feeling somewhat or very safe overall in school"); *see also* Michelle M. Johns, et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017*, 68 MMWR 67 (2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf; Human Rts. Campaign & Gender Spectrum, *Supporting and Caring for Our Gender Expansive Youth* 10 (2014). Approximately 63 percent of students surveyed "often or frequently heard anti-LGBTQ+ comments from peers." Glisten, *2025 National School Climate Survey*. Transgender students are often targets of multiple forms of bullying and harassment. Without staff support, transgender students were more likely to be targets of bullying and discriminatory behavior. Tiffany Jones, *Evidence Affirming School Supports for Australian Transgender and Gender Diverse Students*, 14 Sexual Health 412, 414 (2017).

In contrast, transgender youth benefit greatly from supportive school environments. Students in schools with comprehensive policies reported fewer absences due to safety concerns and lower rates of LGBTQ+-related harassment

compared to those in schools with only partial or generic policies. Glisten, *2025 National School Climate Survey*. Those students also reported feeling greater enthusiasm for attending school and a stronger sense of belonging. *Id*. Students who reported being taught curriculum inclusive of LGBTQ+ people, or who had support from school personnel, had higher grades and better attendance. *Id. See also* McGuire, et al., *School Climate for Transgender Youth*, 39 J. Youth Adolescence 1175 (2010) (trust in school personnel is important for transgender students' academic success); Katharine B. Parodi, et al., *Associations Between School-Related Factors and Mental Health Among Transgender and Gender Diverse Youth*, 90 J. of School Psychol. 135 (2022) (a greater sense of connectiveness to school is associated with lower rates of anxiety and depression among transgender students); Russell Toomey, et al., *Heteronormativity, School Climates, and Perceived Safety for Gender Nonconforming Peers*, 35 J. of Adolescence 187 (2012) (finding students perceived schools with LGBTQ-inclusive curriculum and student LGBTQ and ally groups as safer); Kristie L. Seelman, et al., *School Engagement Among LGBTQ High School Students: The Roles of Safe Adults and Gay–Straight Alliance Characteristics*, 57 Children and Youth Services Review 19 (2015) (associating number of "safe adults" in whom transgender students can confide with greater connectiveness with their school, higher GPA, and decreased absences due to fear); Mollie McQuillan, et al., *Examining School Supports and Barriers to Improving the*

*Health, Safety, and Academic Achievement of MMSD LGBTQ+ Students*, Madison, WI: Madison Education Partnership 26 (2021) (finding schools with LGBTQ+-inclusivity training for staff had significantly fewer disciplinary problems than schools without such training programs).

The benefits of a positive school environment extend beyond academics. Being discriminated against is associated with worse mental health and self esteem. Glisten, *2025 National School Climate Survey*. Referring to a transgender student by their chosen name and correct pronouns significantly decreases symptoms of severe depression. Russell, et al., *Chosen Name Use*, 63 J. of Adolescent Health at 503; Pollitt, et al., *Predictors and Mental Health Benefits of Chosen Name Use*, 53 Youth & Society at 320 (finding that the use of chosen names at school predicted fewer depressive symptoms); L. Durwood, et al., *Social Support and Internalizing Psychopathology in Transgender Youth*, 50 J. of Youth and Adolescence 841–54 (2021) (concluding that greater school support of students' gender identities and other LGBTQ-supportive policies is associated with less anxiety and depression in transgender children). State laws and policies that safeguard confidentiality of a student's gender identity and promote family involvement help foster a welcoming learning environment.

A study of 129 transgender youth across 3 U.S. cities found that each additional context in which a young person could use their chosen name predicted a

5.37-unit decrease in depressive symptoms, a 29 percent decrease in suicidal ideation, and a 56 percent decrease in suicidal behavior. Russell, *Chosen Name Use*, 63 J. Adolescent Health at 505. These findings demonstrate that using students' correct names and pronouns directly promotes mental health and learning.

Supportive state laws and policies provide schools an opportunity to facilitate positive communication between students and their parents, including being a resource for building family acceptance, a strong protective factor as a child moves into adolescence and adulthood. *See* Stephanie Budge, et al., *A Grounded Theory Study of the Development of Trans Youths' Awareness of Coping with Gender Identity*, 27 J. of Child Family Studies 3048 (2018); Sabra L. Katz-Wise, et al., *Family Functioning and Mental Health of Transgender and Gender-Nonconforming Youth in the Trans Teen and Family Narratives Project*, 55 J. of Sex Research 582 (2018); Alida Bouris & Brandon Hill, *Exploring the Mother-Adolescent Relationship as a Promotive Resource for Sexual and Gender Minority Youth*, 73 J. of Soc. Issues 618 (2017); Durwood, et al., *Social Support and Internalizing Psychopathology*, 50 J. of Youth and Adolescence at 841–854; Lisa Simons, et al., *Parental Support and Mental Health Among Transgender Adolescents*, 53 J. of Adolescent Health 791 (2013).

Schools can help build family support by connecting parents with resources and providing students with communication skills and confidence to engage their

families. Focus-group evidence indicates students are more likely to seek this support from trusted adults, especially teachers they perceive as approachable and caring. Bonnie Solomon, et al., *Creating Policies to Support Healthy Schools* at 24–26, Child Trends (Oct. 2018).

California's legal framework reflects these realities. Research supports maintaining a school environment where transgender students' names and pronouns are respected: when schools provide this supportive space, students are better positioned to engage their families constructively, and families who have these conversations with appropriate preparation and support are better positioned to maintain strong bonds. *See* Cal. Educ. Code § 220.3(a); *City of Huntington Beach v. Newsom*, No. 25-3826, 2025 WL 3169324, at *2 (9th Cir. Sept. 12, 2025).

In sum, California's framework furthers the State's compelling interest in protecting transgender students from discrimination and harassment, and in fostering a safe and supportive school environment where students can learn. Respectful use of students' names and pronouns is central to those interests. The research record strongly supports this approach and cautions against compelling school employees to disregard transgender students' requests.

## V. Professional Associations Support Respectful Name and Pronoun Use

Major educational professional associations have issued guidance consistent with California's nondiscrimination law, Education Code § 220, which prohibits

discrimination against transgender students. These associations have emphasized the need to support transgender and nonbinary students, ensure equal educational opportunities, and honor students' names and pronouns.

Guidelines from the National Education Association highlight the importance of addressing students by the names and pronouns they use. Nat'l Educ. Ass'n, *Legal Guidance on Transgender Students' Rights* at 5, 6, 9 (June 2016), https://www.nea.org/sites/default/files/2020-07/2018_Legal%20Guidance_Transgender%20Student%20Rights.pdf. The American School Counselor Association's guidance similarly emphasizes a "student-centered approach" that focuses on respectful treatment and recommends that school staff use the name and pronouns a student requests. Am. Sch. Counselors Ass'n, *The School Counselor and Transgender and Nonbinary Youth* (rev. 2022), https://www.schoolcounselor.org/ Standards-Positions/Position-Statements/ASCA-Position-Statements/The-School-Counselor-and-Transgender-Gender-noncon. The National Association of School Psychologists supports inclusive policies that "protect students' right to express their gender identity, use and be called by the name and pronoun they want to use." Nat'l Ass'n of Sch. Psychs., *Position Statement: Inclusive and Affirming School-Based Practices for LGBTQ+ Students* at 5 (2025), https://www.nasponline.org/assets/documents/Research%20and%20Policy/Position%20Statements/PS_Inclusive%20and%20Affirming%20Schools%20for%20LGBTQ.pdf.

These professional standards reflect a broader research consensus on the importance of supportive adult-student relationships. A 2018 study with state policymakers, educators, and students found all three groups identified student relationships with caring adults as central to healthy schools. Solomon, *Creating Policies to Support Healthy Schools* at 15–16, 22, 24–25.

A statewide study of 298 Virginia high schools reinforces this point: schools where students and adults had strong interpersonal relationships had higher student engagement, linked to higher graduation rates and test scores. Tim Konold, et al., *School Climate, Student Engagement, and Academic Achievement*, 4 AERA Open 1, 9–10 (2018). Student engagement depends on school climates that foster supportive adult-student relationships—precisely the support that would be undermined if school employees were compelled to disregard students' requests regarding names and pronouns. *Id*.

## VI. The Injunction Is Overbroad and Undermines Student Safety

The Supreme Court's per curiam opinion characterized California's policies as "cut[ting] out the primary protectors of children's best interests: their parents." 146 S.Ct. at 802. But the State's concession on disclosure removes this premise. Parents who request information about names and pronouns used for their child at school may now obtain it. The injunction's directive that school employees disregard a transgender student's request regarding their name and pronouns whenever parents

object, however, is legally unsupported and must be reversed. Sustaining this portion of the injunction would unlawfully undermine California's nondiscrimination laws and the State's compelling interests in enforcing those laws and fostering support for student wellbeing.

The district court's injunction is overbroad and unworkable in other ways as well. It bars enforcement of the state constitution's privacy provision or "any other" state law, regulation, guidance, or training to the extent they would permit withholding information about a student's sexual orientation, gender identity, or gender expression. *Mirabelli*, 2025 WL 3712993, at *1–*2. Its terms do not specify which laws are enjoined and employ vague language regarding "gender incongruity." *Id.* The injunction characterizes ordinary educational practices—including respectful use of a student's name and pronouns—as unlawful secrecy or medical intervention. *See Mirabelli*, 820 F. Supp. 3d at 1142. That sweeping remedy is contrary to professional standards, misaligned with research, and threatens to chill school personnel from providing essential support to students.

Studies consistently show that student engagement depends on school climates in which students feel respected and supported by caring adults. Solomon, *Creating Policies to Support Healthy Schools* at 15–16, 22, 24–25; Konold, *School Climate, Student Engagement, and Academic Achievement* at 9–10. Compelling school employees to address transgender students in ways that contradict their

requests undermines precisely these relationships: students may disengage from school, avoid seeking help from teachers they would otherwise trust, and experience the documented harms to mental health and academic performance that the research describes. The better course is to reverse in part and vacate and remand the injunction so it can be narrowed and clarified, allowing California to maintain nondiscrimination protections that respect both student wellbeing and parental access to information, guided by professional judgment.

## CONCLUSION

The district court's order should be reversed in part and vacated and remanded in part. Amici take seriously the fundamental parental rights recognized in *Troxel*, 530 U.S. at 57, and the following three points that support this relief do not impose a burden on those rights. **First**, the State's concession on disclosure removes the premise of the district court's parental-rights analysis—parents who request information about names and pronouns used for their child at school may obtain it. There is no legal precedent for the remainder of the injunction—namely, an attempt to compel school employees to disregard a transgender student's request regarding names and pronouns. **Second**, the district court's premise that respectful use of a student's name and pronouns is "medical treatment" is a categorical error: schools accommodate students every day without becoming medical providers. **Third**, California has a compelling interest in protecting transgender students from

discrimination and psychological harm—an interest the injunction undermines by compelling conduct that violates this interest in addition to state nondiscrimination law.

Although the Supreme Court recently vacated the Ninth Circuit's stay pending appeal, that interim ruling does not resolve the merits. The research record and professional guidance from major educational associations support respectful use of students' names and pronouns as a pedagogical practice that promotes student wellbeing and academic success. None of the Supreme Court's parental-rights precedents require the relief that Plaintiffs seek here: a requirement that states compel school employees to disregard students' requests regarding names and pronouns. The district court's injunction misconstrues ordinary educational support as medical treatment and is overbroad and unworkable in multiple respects. This Court should reverse in part and vacate and remand the injunction for narrowing and clarification.

Dated: June 2, 2026

/s/ *Amy Whelan*

POTOMAC LAW GROUP
Alice W. Yao
Mary Rohmiller
Dylan Nicole de Kervor
1717 Pennsylvania Ave., NW
Suite 1025

NATIONAL CENTER FOR
LGBTQ RIGHTS
Shannon Minter (CA BAR: 168907)
Amy Whelan (CA Bar: 215675)
1401 21st Street #11548
Sacramento, CA 95811

Washington, DC 20006
(202) 558-5557
ayao@potomaclaw.com

(415) 392-6257
awhelan@nclrights.org

*Attorneys for Amici Curiae*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** __25-8056__

I am the attorney or self-represented party.

**This brief contains** _____**5,220**_________ **words,** including ____0______ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** __s/Amy Whelan________________________ **Date** 6/2/2026_____
*(use* "s/[typed name]" *to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Amy Whelan*
Amy Whelan