**Nos. 25-8056 & 26-2337**

# In the United States Court of Appeals for the Ninth Circuit

ELIZABETH MIRABELLI, an individual, on behalf of herself and all others similarly situated; LORI ANN WEST, an individual, on behalf of herself and all others similarly situated, et al.,
Plaintiffs-Appellees,

v.

ROB BONTA, in his official capacity as the Attorney General of California, et al.,
Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of California
Honorable Roger T. Benitez
(3:23-cv-768-BEN)

## PLAINTIFFS-APPELLEES' ANSWERING BRIEF

CHARLES S. LIMANDRI
PAUL M. JONNA
JEFFREY M. TRISSELL
WILLIAM T. DUKE
**LiMANDRI & JONNA LLP**
Post Office Box 9120
Rancho Santa Fe, CA 92067
(858) 759-9930
*pjonna@limandri.com*

PETER BREEN
MICHAEL MCHALE
CHRISTOPHER J.F. GALIARDO
**THOMAS MORE SOCIETY**
121 West Wacker Dr., Ste. 650
Chicago, IL 60601
(312) 782-1680
*pbreen@thomasmoresociety.org*

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS


JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF ISSUES .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1

STATEMENT OF THE CASE .......... 5

A. The Teacher-Plaintiffs: Four San Diego Teachers .......... 5

B. The Doe Family in Pasadena .......... 8

C. The Poe Family in Clovis .......... 11

D. The State Defendants .......... 14

E. CDE's and AG's Promulgation of Parental Exclusion Policies .......... 15

F. The California Legislature's Codification of Parental Exclusion Policies .......... 20

G. Initial Procedural History: The Original Teachers' Action .......... 21

H. Subsequent Procedural History: The Class Action .......... 22

I. Appellate Procedural History .......... 25

ARGUMENT .......... 27

I. The Court Should Decline California's Invitation to Attempt to Overrule the Supreme Court. .......... 27

A. Legal Background on the Effect of the Supreme Court's Summary Orders and Opinions. .......... 29

B. California's Arguments for Overruling the Supreme Court Are the Same Ones Presented to, and Rejected by, the Supreme Court .......... 31

1. The Court Should Reject California's Argument that Parents Do Not Have a Constitutional Right to Direct their Child's Gender Transition .......... 31

a. Parental Rights. .... 32

b. Free Exercise. .... 35

c. Strict Scrutiny. .... 39

2. The Court Should Reject California's Argument that Parents Do Not Have a Constitutional Right to Be Informed of Gender Confusion in their Children. .... 42

a. The Parental Right Includes the Right to Affirmative Notice of Gender Confusion. .... 43

b. The Parental Right Includes All Aspects of a Social Transition, Including Appearance. .... 46

3. The Court Should Reject California's Argument that An Amorphous "Abuse" Carve-Out Is Needed. .... 47

II. The Supreme Court's Opinion Effectively Resolves the Teachers' Claims As Well. .... 50

A. California's Exclusion Policies Lack a Rational Basis .... 50

B. California's Exclusion Policies Are Not Generally Applicable. .... 51

C. The Court Should Not Apply *Pickering-Garcetti* in the Free Exercise Context; Regardless, *Garcetti* Does Not Defeat Plaintiffs' Free Exercise or Free Speech Claims .... 52

III. The Permanent Injunction Does Not Otherwise Require Reformation. .... 58

CONCLUSION .... 61

STATEMENT OF RELATED CASES .... 62

CERTIFICATE OF COMPLIANCE .... 63

CERTIFICATE OF SERVICE .... 64

# TABLE OF AUTHORITIES

***Cases:***

*Akers v. McGinnis*,
352 F.3d 1030 (6th Cir. 2003) .......... 50

*Am. Acad. of Pediatrics v. Lungren*,
16 Cal. 4th 307 (1997) .......... 17

*Bacon v. Woodward*,
104 F.4th 744 (9th Cir. 2024) .......... 55

*Baz v. Walters*,
782 F.2d 701 (7th Cir. 1986) .......... 54

*Berry v. Dep't of Soc. Servs.*,
447 F.3d 642 (9th Cir. 2006) .......... 53, 55

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011) .......... 54

*Breiterman v. U.S. Capitol Police*,
15 F.4th 1166 (D.C. Cir. 2021) .......... 57

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011) .......... 41

*Brown v. Polk Cty.*,
61 F.3d 650 (8th Cir. 1995) .......... 54

*Bucklew v. Precythe*,
587 U.S. 119 (2019) .......... 31

*C.N. v. Wolf*,
410 F. Supp. 2d 894 (C.D. Cal. 2005) .......... 17

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .......... 49

*City of Huntington Beach v. Newsom*,
No. 25-3826, 2026 WL 1785110 (9th Cir. June 18, 2026) .......... 21

*Connick v. Myers*,
461 U.S. 138 (1983) .......... 53

*Coomes v. Edmonds Sch. Dist. No. 15*,
816 F.3d 1255 (9th Cir. 2016) ........................................ 56, 58

*Dahlia v. Rodriguez*,
735 F.3d 1060 (9th Cir. 2013) ........................................ 56

*Damiano v. Grants Pass Sch. Dist. No. 7*,
140 F.4th 1117 (9th Cir. 2025) ........................................ 54, 55

*Dep't of Homeland Sec. v. D.V.D.*,
145 S. Ct. 2627 (2025) ........................................ 30, 31

*Dixon v. Kirkpatrick*,
553 F.3d 1294 (10th Cir. 2009) ........................................ 57

*Dodge v. Evergreen Sch. Dist. #114*,
56 F.4th 767 (9th Cir. 2022) ........................................ 53

*Doe v. Horne*,
115 F.4th 1083 (9th Cir. 2024), *vacated and remanded*,
No. 24-449, 2026 WL 1871306 (U.S. June 30, 2026) ........................................ 47

*E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ........................................ 29

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ........................................ 34

*Erie Telecomms., Inc. v. City of Erie*,
853 F.2d 1084 (3d Cir. 1988) ........................................ 45, 46

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
82 F.4th 664 (9th Cir. 2023) ........................................ 52

*Foote v. Ludlow Sch. Comm.*,
128 F.4th 336 (1st Cir. 2025) ........................................ 35

*Fraternal Ord. of Police v. Newark*,
170 F.3d 359 (3d Cir. 1999) ........................................ 56

*Fusari v. Steinberg*,
419 U.S. 379 (1975) ........................................ 29

*Galvez v. Jaddou*,
52 F.4th 821 (9th Cir. 2022) .... 58

*Garcetti v. Ceballos,*
547 U.S. 410 (2006) .... 52, 53, 54, 56

*Gateway City Church v. Newsom*,
141 S. Ct. 1460 (2021) .... 30

*Greisen v. Hanken*,
925 F.3d 1097 (9th Cir. 2019) .... 58

*Grimm v. Gloucester Cty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) .... 32, 35

*Hill v. NCAA*,
7 Cal. 4th 1 (1994) .... 17

*In re M.T.*,
106 Cal. App. 5th 322 (2024) .... 17

*In re Sanford Fork & Tool Co.*,
160 U.S. 247 (1895) .... 30

*Ind. State Police Pension Tr. v. Chrysler LLC*,
556 U.S. 960 (2009) .... 50

*Indep. Towers of Wash. v. Washington*,
350 F.3d 925 (9th Cir. 2003) .... 42

*Isaacson v. Horne*,
716 F.3d 1213 (9th Cir. 2013) .... 48

*Janus v. AFSCME, Council 31*,
585 U.S. 878 (2018) .... 54, 57

*Johnson v. District of Columbia*,
182 F.4th 1052 (D.C. Cir. 2026) .... 57

*Johnson v. Poway Unified Sch. Dist.*,
658 F.3d 954 (9th Cir. 2011) .... 53

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .... 53, 55, 56

*Knight v. Conn. Dep't of Pub. Health*,
275 F.3d 156 (2d Cir. 2001) .......... 55

*Labrador v. Poe*,
144 S. Ct. 921 (2024) .......... 30

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 32, 36, 38, 41, 45, 49, 58

*Mandel v. Bradley*,
432 U.S. 173 (1977) .......... 29

*Miller Brewing Co. v. Jos. Schlitz Brewing Co.*,
605 F.2d 990 (7th Cir. 1979) .......... 29

*Mirabelli v. Bonta*,
607 U.S. 492 (2026) .......... passim

*Moonin v. Tice*,
868 F.3d 853 (9th Cir. 2017) .......... 57

*Mueller v. Auker*,
576 F.3d 979 (9th Cir. 2009) .......... 42

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) .......... 3, 4, 31

*Parham v. J.R.*,
442 U.S. 584 (1979) .......... 37, 41, 44

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*,
391 U.S. 563 (1968) .......... 52, 53, 54, 55, 56, 57

*Pierce v. Society of Sisters*,
268 U.S. 510 (1925) .......... 37, 38

*Polk v. Montgomery Cty. Pub. Schs.*,
166 F.4th 400 (4th Cir. 2026) .......... 57

*Pope v. Cty. of San Diego*,
719 F. Supp. 3d 1076 (S.D. Cal. 2024) .......... 42

*Pritchard v. Blue Cross Blue Shield of Ill.*,
159 F.4th 646 (9th Cir. 2025) .......... 52

*Ramos v. Louisiana*,
590 U.S. 83 (2020) ........................................................ 31

*Regino v. Staley*,
133 F.4th 951 (9th Cir. 2025) ........................................................ 46

*Riley's Am. Heritage Farms v. Elsasser*,
32 F.4th 707 (9th Cir. 2022) ........................................................ 54, 55

*Rodriguez v. Newsom*,
974 F.3d 998 (9th Cir. 2020) ........................................................ 30

*Roe v. Critchfield*,
137 F.4th 912 (9th Cir. 2025) ........................................................ 47

*Romer v. Evans*,
517 U.S. 620 (1996) ........................................................ 50, 51

*Roper v. Simmons*,
543 U.S. 551 (2005) ........................................................ 38

*S. Bay United Pentecostal Church v. Newsom*,
141 S. Ct. 716 (2021) ........................................................ 30, 41

*Sandoval v. Pali Inst., Inc.*,
113 Cal. App. 5th 616 (2025) ........................................................ 54

*Sherbert v. Verner*,
374 U.S. 398 (1963) ........................................................ 50

*Stanley v. Illinois*,
405 U.S. 645 (1972) ........................................................ 42

*Steffel v. Thompson*,
415 U.S. 452 (1974) ........................................................ 43

*Taking Offense v. State*,
66 Cal. App. 5th 696 (2021), *rev'd on other grounds*,
18 Cal. 5th 891 (2025) ........................................................ 16

*Theis v. InterMountain Educ. Serv. Dist.*,
No. 25-5641, 2026 WL 2100391 (9th Cir. July 21, 2026) .................... 55

*Theis v. InterMountain Educ. Serv. Dist.*,
182 F.4th 1091 (9th Cir. 2026) .......... 57

*Trump v. Boyle*,
145 S. Ct. 2653 (2025) .......... 30, 35

*Trump v. Cook*,
146 S. Ct. 2234 (2026) .......... 3

*Trump v. Illinois*,
146 S. Ct. 432 (2025) .......... 30

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025) .......... 30

*Tucker v. Cal. Dep't of Educ.*,
97 F.3d 1204 (9th Cir. 1996) .......... 53, 54, 55

*United States v. Blaine Cty.*,
363 F.3d 897 (9th Cir. 2004) .......... 3

*United States v. Innes*,
218 F. 705 (D. Or. 1914) .......... 59

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000) .......... 41

*United States v. Skrmetti*,
605 U.S. 495 (2025) .......... 32, 35, 37, 38

*Vlaming v. W. Point Sch. Bd.*,
302 Va. 504 (2023) .......... 55

*Vukasovich, Inc. v. Comm'r*,
790 F.2d 1409 (9th Cir. 1986) .......... 35

*Wallis v. Spencer*,
202 F.3d 1126 (9th Cir. 2000) .......... 42, 45

*Washington v. Trump*,
145 F.4th 1013 (9th Cir. 2025) .......... 51

*West Virginia v. B.P.J.*,
146 S. Ct. 2356 (2026) .......... 34, 35

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) .......... 59

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) .......... 36, 38

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009) .......... 50

***Constitutional Provisions:***

Cal. Const. art. I, §1 .......... 17

Cal. Const. art. III, §3.5 .......... 23

Cal. Const. art. V, §13 .......... 15

Cal. Const. art. IX, §§2-3.3 .......... 15

Cal. Const. art. IX, §5 .......... 15

Cal. Const. art. IX, §7 .......... 15

***Statutes, Rules & Regulations:***

42 U.S.C. §1983 .......... 8

9th Cir. R. 28.1-1 .......... 63

9th Cir. R. 28-2.6 .......... 62

9th Cir. R. 29-2(c)(2) .......... 63

9th Cir. R. 29-2(c)(3) .......... 63

9th Cir. R. 32-1 .......... 63

9th Cir. R. 32-2(a) .......... 63

9th Cir. R. 32-2(b) .......... 63

9th Cir. R. 32-4 .......... 63

Cal. Code Regs. tit. 2, §11034(h) .......... 17

Cal. Code Regs. tit. 5, §4670(a)(3) .......... 15

Cal. Code Regs. tit. 22, §83001(g)(2) .......... 17

Cal. Educ. Code §220 .......... 16, 51
Cal. Educ. Code §220.1 .......... 20
Cal. Educ. Code §220.3 .......... 20
Cal. Educ. Code §220.5 .......... 20
Cal. Educ. Code §221.5(f) .......... 17
Cal. Educ. Code §33031 .......... 15
Cal. Educ. Code §33301 .......... 15
Cal. Educ. Code §33316(a) .......... 15
Cal. Educ. Code §33316(b) .......... 15
Cal. Educ. Code §33316(c) .......... 15
Cal. Educ. Code §33316(d) .......... 15
Cal. Educ. Code §§41330-41344.6 .......... 15
Cal. Educ. Code §49602(c) .......... 60
Cal. Fam. Code §7050 .......... 39
Cal. Penal Code §§11164-11174.3 .......... 48
Cal. Stats. 2007, ch. 569, §4 .......... 16
Cal. Stats. 2013, ch. 85 .......... 17
Cal. Stats. 2024, ch. 95 .......... 20
Cal. Welf. & Inst. Code §§300-324.5 .......... 48
Cal. Welf. & Inst. Code §5150 .......... 13
Fed. R. App. P. 29(a)(5) .......... 63
Fed. R. App. P. 32(a)(5), (6) .......... 63
Fed. R. App. P. 32(f) .......... 63
Fed. R. Civ. P. 65(d)(1)(C) .......... 59

***Bills:***

Assem. Bill 1266, 2013-2014 Reg. Sess. (Cal. Feb. 22, 2013) .................. 15

***Other Authorities:***

*Know Your Rights – Mirabelli v. Bonta FAQ*,
ACLU S. Cal. (May 14, 2026) ........................................................ 48, 49

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellees agree with Appellants' jurisdictional statement.

## STATEMENT OF ISSUES

Issue 1: Whether *Mirabelli v. Bonta*, 607 U.S. 492 (2026), requires affirmance for the parents' claims, or is distinguishable in any manner?

Issue 2: Whether the teachers are entitled to summary judgment on their free exercise and free speech claims?

Issue 3: Whether the permanent injunction is vague, requiring clarification?

## INTRODUCTION AND SUMMARY OF ARGUMENT

For over a decade, California has required all public schools to hide children's expressed gender incongruence at school from their parents and to actively facilitate those children's gender transition over their parents' express objections. This blatantly unconstitutional policy led to a class action lawsuit against California officials brought by both parents and teachers. 2-ER-190-324.

On December 22, 2025, after full discovery and a searching review of the record, the District Court entered summary judgment and issued a class-wide permanent injunction on Free Exercise, Substantive Due Process, and Free Speech grounds. The court held that all parents—religious and nonreligious alike—have the right to notice and consent before a school facilitates a gender transition for their child. And the

District Court held that California cannot order teachers to violate parents' constitutional rights. 1-ER-73-128.

Then, on March 2, 2026, the Supreme Court vacated this Court's stay of the permanent injunction, via a detailed per curiam opinion, with respect to the parents' claims. *Mirabelli v. Bonta*, 607 U.S. 492 (2026). The most commonsense result of the Supreme Court's opinion would have been for California to abandon this appeal as the teachers' claims have always been, and remain, resolvable through the parents' claims. Indeed, California has explicitly abandoned its standing and class certification arguments. AOB.21.

Instead, California asks this Court to flout the Supreme Court on the parents' claims. It concedes only that schools may not stonewall parents who request information—what it calls the District Court's "principal" holding. AOB.2, 21. But, California argues, parents have no right to information unless they ask for it, no right to information if schools suspect they may engage in undefined abuse, and no right to refuse permission for a school to gender transition their child. AOB.27. California's decision to treat that single holding as "principal," while ignoring the rest of what the Supreme Court said, is inexplicable. In its opening paragraph, the Supreme Court framed the issues as follows:

> The parents object that [California's] policies prevent schools from telling them about their children's efforts to engage in gender transitioning at school unless the children consent to parental notification. *The parents also take issue with California's requirement that schools use children's preferred names and*

> *pronouns regardless of their parents' wishes*. The teachers object to their compelled participation in the implementation of the State's policies.

*Mirabelli*, 607 U.S. at 493 (emphasis added); *see also id*. at 494 ("Contrary to the Poes' instructions, teachers and school officials continued to use a male name and pronouns for their daughter"). The Supreme Court then unambiguously held that "the intrusion on parents' free exercise rights here [is] *unconsented* facilitation of a child's gender transition." *Id*. at 496 (emphasis added).

California's brief never notes this holding. The apparent reason why lies in California's note that Justice Barrett's concurrence stated that "the Court's 'assessment is preliminary' and does not 'conclusively resolve [the merits],' which will 'continue to [be] litigate[d] in the Ninth Circuit.'" AOB.17 (quoting *Mirabelli*, 607 U.S. at 500 (Barrett, J., concurring)); *see also* Cal.Supp.Br.3 (C.A.Dkt.29). California thus misreads Justice Barrett's concurrence as an invitation to ignore the High Court. That is wrong. "[A]s a matter of vertical *stare decisis*, the lower courts have no choice but to follow our lead. When we define a term or establish a background rule, we need not repeat ourselves—once is enough." *Trump v. Cook*, 146 S. Ct. 2234, 2253 (2026) (interim docket majority opinion of Roberts, C.J.); *see also United States v. Blaine Cty.*, 363 F.3d 897, 904 & n.6 (9th Cir. 2004).

Even assuming California had some narrow path it could navigate to justify continuing with this appeal, *see Nat'l Insts. of Health v. Am. Pub.*

*Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) (Barrett, J., concurring) (noting argument the government did not raise), California defaulted in its burden. California's response to the Supreme Court is not nuanced. In doubling down on exactly the same arguments the Supreme Court rejected, California's audacious request is that this Court override the Supreme Court's ruling *in this case* because circuit court cases supposedly "provide no support" for the judgment below, AOB.27, and the Supreme Court's ruling carries "vast implications" the Court "did not have the opportunity to consider." AOB.34. That is not how the federal courts work. The Supreme Court can take as long or as little time as it needs to decide a case and its decision—not those of lower courts—controls.

For the teachers' claims, the most direct resolution of them has always run through the parents' claims: California lacks a rational basis for ordering teachers to violate parents' constitutional rights. But should the Court decide it needs to address the teachers' claims, California's arguments fail on the merits. In that respect, this case was fully litigated with comprehensive discovery. While California's *amici* seek to add to the voluminous record below with new facts and evidence which California declined to introduce or rely upon, discovery in this case confirmed that the policies lack general applicability for Free Exercise purposes, are not part of teachers' job duties for Free Speech purposes, and actually harm children.

Finally, the injunction is not vague or ambiguous. There is no need to identify each California law enjoined—the injunction's use of the word "any" unambiguously means "all," and "permit" unambiguously means "allow." 1-ER-74-75. California's request for an abusive-parent carve-out ignores the Supreme Court's recognition that the injunction already "permits the State to shield children from unfit parents by enforcing child-abuse laws and removing children from parental custody in appropriate cases." *Mirabelli*, 607 U.S. at 497-98. This Court should affirm the judgment.

## STATEMENT OF THE CASE

### A. The Teacher-Plaintiffs: Four San Diego Teachers

In February 2022, the Escondido Union School District ("EUSD") in north San Diego County conducted a videoconference training titled "Rights of Gender Diverse Students," 2-SER-465-77, which Plaintiffs Elizabeth Mirabelli, Lori Ann West, Jane Boe, and Jane Roe—four devoutly religious EUSD middle-school teachers—attended. 2-SER-430, 537; 3-SER-594-95, 600.

As explained by EUSD's Director of Integrated Student Services, when a student asserted a new gender identity, teachers were required to "begin to treat the student immediately, consistently with that gender identity." 2-SER-467. The Director continued: "The student's assertion is enough. There is no need for a formal declaration. There's no requirement for parent or caretaker agreement or even for knowledge for us to begin

treating that student consistent with their gender identity." 2-SER-467. The Director further explained that "students shall be permitted to access facilities" "such as restrooms or locker rooms" consistent with their asserted gender identity. 2-SER-468-69.

Lastly, the Director explained: "A student's status is their private information" such that "[w]hen disclosure of a student's gender identity is made to a district employee by a student, the employee shall seek the student's permission to share with others including parents or caretakers." 2-SER-468 (cleaned up). And "revealing a student's transgender status or gender diverse status to individuals who do not have a legitimate need for the information without the student's consent, and this includes parents or caretakers," would be considered "discrimination or harassment of our gender diverse students." 2-SER-470-71.

These requirements shocked the consciences of all four teachers. Lori Ann West was an eighth grade P.E. teacher whose duties include overseeing the girls' locker room. 2-SER-537; 6-SER-1581. Thus, under the policy, she would be required to permit a boy who asserts he is a girl access to the girls' locker room upon his request, without either "parent or caretaker agreement." 2-SER-467. Plaintiff Jane Roe, an English teacher, found herself speaking less and less with parents. "[W]ith the advent of the Internet" and the emergence of "phone app[s] where students, parents, and teachers can instant message or email each other at any time," she had been "very open and communicative with [] parents, sending instant

messages whenever I see anything off with their child." 3-SER-599-600. The only way for Jane Roe to avoid lying to parents was to stop speaking to them.

The conflict between EUSD's policies and the teachers' consciences came to a head at the beginning of the 2022-2023 school year. On August 15, 2022, a school counselor sent Plaintiff Elizabeth Mirabelli—a seventh grade English teacher—an email with a list of seven transgender identifying students who would be in her classes, all girls identifying as boys, and for six of whom their parents were unaware of their transgender identification. 2-SER-487-89.

As a devout Catholic, this email created an immediate and practical conflict for her. The conflict arose not merely because she adheres to traditional Catholic teachings on gender and sexuality, although she does. 2-SER-427. No, the primary issue was that her Catholic faith teaches that individuals experiencing gender incongruence "are sincerely looking for ways to respond to real problems and real suffering." 2-SER-427 (quoting 2-SER-448-49). And, when *children* are dealing with "real suffering," her Catholic faith instructs her that parents must have the primary role in helping them. As the Vatican teaches, "participants in the process of education are only able to carry out their responsibilities in the name of the parents, with their consent and, to a certain degree, with their authorization." 2-SER-428 (emphasis omitted) (quoting 2-SER-462-63).

In October 2022, Elizabeth Mirabelli and Lori Ann West submitted requests for a religious accommodation to EUSD. After several rounds of discussion, their requests to be able to speak truthfully with parents were ultimately denied in March 2023. 2-SER-433-35, 491-510; 2-SER-540-41, 552-73. As explained by EUSD personnel, religious accommodations could not be granted because the policies were required by California law as interpreted by the California Department of Education's ("CDE") Frequently Asked Questions webpage on the rights of gender diverse students. 2-SER-492; 2-SER-553 (citing 4-SER-884-87).

In April 2023, Mirabelli and West initiated a 42 U.S.C. §1983 action for violation of their Free Exercise and Free Speech rights under the First Amendment. 2-ER-332. Later, they were joined by Jane Roe and another EUSD teacher, Jane Boe, in a putative class action. Jane Boe's school site, subject, and grade level have not been publicly disclosed due to her fear of retaliation. *See* 2-ER-190-310.

**B. The Doe Family in Pasadena**

John and Jane Doe lead a devout Catholic family living in Pasadena, California. John is the owner of a produce shipping company and Jane is an attorney. 3-SER-645, 667. They are firmly and devoutly Catholic, believing that "there are only two sexes, male and female, that each one of us was made as male or female by God for a reason, and that one's sex cannot be changed." *Id.*

In April 2021, John and Jane Doe discovered that their fifth grade daughter (Child Doe) had begun presenting as the opposite sex at school without their knowledge or consent, and that the school had been facilitating this behind their backs. 3-SER-647. A friend's mother told Jane Doe, but no teacher ever did. 3-SER-647. Due to fear of alienating her daughter, Child Doe, Jane Doe decided to wait and watch carefully. 3-SER-647-48.

With the next school year (2021-2022), Child Doe transferred to an expanded secondary school serving grades six through twelve that was operated by the Pasadena Unified School District ("PUSD"). 3-SER-648. Shortly after the beginning of the school year, Child Doe told her parents that she was "trans" and requested to cut her hair and wear a chest binder. The Does discussed the issue as a family, and then John and Jane Doe refused the request to transition. 3-SER-648-49. For the rest of the school year, John and Jane Doe believed that their instruction was being honored at Child Doe's school. 3-SER-649.

However, during Child Doe's seventh grade year (2022-2023), John and Jane Doe noticed that she began wearing more masculine clothing and decided to inquire about her at school. 3-SER-649. Those inquiries were like talking to a wall. The school principal responded to Jane Doe's emails with a hyperlink to CDE's FAQ page. But more investigating in January 2023 revealed a note from Child Doe to a friend complaining about being "deadnam[ed]" in class. 3-SER-649.

Jane Doe immediately set up parent-teacher conferences with several of Child Doe's teachers. After discussing academics, she asked if there was anything else they felt she should know about Child Doe. Each teacher said "no" even though Jane Doe could see Child Doe's male name on the seating chart. 3-SER-650. John and Jane Doe then met with the school principal, explained they knew that Child Doe's teachers were gender transitioning their daughter, and complained that the teachers lied to them about it. 3-SER-650. The principal denied that the school was doing so, while explaining that, even if the school were facilitating their daughter's gender transition, she could not tell them—because of CDE's FAQ page. 3-SER-650-51. Subsequently, PUSD's Rule 30(b)(6) designee confirmed these policies. 5-SER-1124-51.

Following this crisis of confidence, John and Jane Doe decided to find a therapist for Child Doe, which had an immediate, positive effect on her. 3-SER-651. At the beginning of the summer, Child Doe decided she was not transgender and stopped presenting as a boy. 3-SER-651. Child Doe presented as a girl at school during the beginning of her eighth grade year (2023-2024), but sometime towards the middle of the school year, John discovered that Child Doe had begun gender transitioning again at school, and realized that he could not count on the school to provide him with accurate information about it. 3-SER-673-74.

During the summer of 2024, John and Jane Doe decided to join this lawsuit, asserting violations of their Free Exercise and Substantive Due

Process rights. 2-ER-190-310. Further, because they could not trust Child Doe's school, they decided to move her to a new school. They could not afford a private school so, beginning with ninth grade (2024-2025), Child Doe has attended a different PUSD high school. 3-SER-653-54. The decision was heart-wrenching and strongly opposed by Child Doe, but today Child Doe is doing much better. 3-SER-655. John and Jane Doe still remain worried that her new school might gender transition Child Doe, and lie to them about it, like her prior school. 3-SER-656, 677-78.

**C. The Poe Family in Clovis**

John and Jane Poe lead a devout Catholic family in Clovis, California. John is a train mechanic; Jane is a stay-at-home mom. 3-SER-606, 635. They are active in their local Catholic church, attending Mass weekly, sending their children to catechism classes and Vacation Bible School. 3-SER-635. All of their children have attended schools run by the Clovis Unified School District ("CUSD"). 3-SER-635.

During her seventh grade year (2022-2023) attending a CUSD middle school, however, Child Poe's school began facilitating her gender transition without her parents' knowledge or consent. 3-SER-635-37. At that time, the school's decision to secretly gender transition her was congruent with its "Gender Acknowledgment Plan" ("GAP"), which directly block-quoted the privacy requirements from CDE's FAQ page. 4-SER-1109; 4-SER-1062-74.

By March 2023, Child Poe was depressed and asked to see a therapist. John and Jane Poe quickly agreed as they knew Child Poe's prior medical issues always worried her. 3-SER-636. The therapist determined that Child Poe had extremely elevated depression and anxiety with a history of self-cutting. 3-SER-791. The therapist also diagnosed Child Poe with gender dysphoria, but did not advise John and Jane Poe of the diagnosis. 3-SER-791. The therapist quickly referred Child Poe to a psychiatrist who prescribed multiple anti-depressants. 3-SER-636, 791.

With the beginning of eighth grade (2023-2024), John and Jane Poe attended a "back-to-school" night and met several of Child Poe's teachers. None of them mentioned that their daughter, Child Poe, was being gender transitioned at school or that they were using a male name and pronouns for her. 3-SER-636.

Child Poe attempted suicide by overdose on September 6, 2023. She was first admitted to a local medical center in Clovis, before being transferred 175 miles away to Fremont Hospital in the Bay Area. 3-SER-636, 791. Over the phone, a doctor told John and Jane Poe that their daughter had been diagnosed with gender dysphoria and that she was identifying as a boy at school. This was the first time anyone had told them. 3-SER-637-38.

A week later, Child Poe was discharged and John and Jane Poe brought her home. 3-SER-637. Child Poe's psychiatrist increased the dosage for one anti-depressant, dropped one, and added another. 3-SER-792-93. John

and Jane Poe withdrew Child Poe from in-person schooling and enrolled her in the online school offered by CUSD. 3-SER-637.

John and Jane Poe then scheduled a meeting with Child Poe's principal and school psychologist to ask about why the school had been gender transitioning her. Both lied, stating that the school had not socially transitioned her. 3-SER-608, 616-17, 637. The Poes also subsequently learned that CUSD had attempted to adopt a middle-ground policy (called the Student Site Plan) under which teachers could not gender transition a student without parental consent, but would not tell the parents about the child's gender confusion without the child's consent. Stated differently, if a child was gender questioning and not ready to tell her parents, the school would not affirmatively tell the parents but would also not instruct teachers to use opposite-sex pronouns or give her access to opposite-sex facilities. 4-SER-1116; 4-SER-1075-76. But that policy was blocked by a school counselor's union that filed a PERB complaint and contended that the new policy could lead to an enforcement action by the state, 4-SER-1077-85, 1096-97, and an amended Student Site Plan retained the GAP policy's secrecy provisions. 4-SER-1118-20; 4-SER-1058-61, 1072, 1085.

Hoping to get as far away as they could from CUSD, in December 2023, the Poes decided to move Child Poe again, this time to an online charter school. 3-SER-638. But on December 7, 2023, Child Poe was readmitted to the hospital as a threat to herself. 3-SER-609; Cal. Welf. & Inst. Code §5150.

In January 2024, John and Jane Poe repeatedly emailed the teachers at Child Poe's online charter school to find out whether that school was gender transitioning her too. The response they received was a link to CDE's FAQ page and the following statement: "We cannot share the gender identity of the student with the parent even if that gender identity is expressed openly in class." 3-SER-610, 619-20, 639. Because of this, during the summer of 2024, John and Jane Poe also decided to join this lawsuit, asserting violations of their Free Exercise and Substantive Due Process rights. 2-ER-190-310.

With the beginning of Child Poe's ninth grade year (2024-2025), John Poe decided to email the teachers at her online charter school to instruct them to not gender transition her, but to instead take a gender-neutral approach by using her last name. Only one teacher responded, stating that his school had to follow California law. The teachers then proceeded to use a male name and pronouns to refer to Child Poe. 3-SER-610-11, 622-33, 639-40.

With the beginning of Child Poe's tenth grade year (2025-2026), John Poe tried again. He emailed Child Poe's teachers to "insist" that they take a gender-neutral approach. They again refused, citing the alleged requirements of state law. 1-SER-97-100.

**D. The State Defendants**

The State Defendants include California Attorney General Rob Bonta, California State Superintendent Tony Thurmond, and the eleven

members of the California State Board of Education. 2-ER-204-05. Attorney General Bonta is the chief law enforcement officer for the State of California, generally responsible for seeing that all laws are enforced. Cal. Const. art. V, §13.

In California, the state has assumed specific responsibility for a statewide public education system. Cal. Const. art. IX, §5. CDE is the department of the California government responsible for administering and enforcing the laws related to education. *Id.* at §§2-3.3, 7. CDE is run by the State Superintendent and the State Board of Education. Cal. Educ. Code §33301. It is tasked with providing training to local school officials, *id*. at §33316(d), with issuing regulations to implement various provisions of the Education Code, *id.* at §§33031, 33316(b), and with distributing state funds to local school districts, *id.* at §§33316(a), (c), 41330-41344.6. CDE has plenary authority over school districts. If CDE determines a school district is out of compliance with California law, it can order the school district to comply. Cal. Code Regs. tit. 5, §4670(a)(3). The school district has a ministerial duty to comply. 3-SER-858-60; 4-SER-895-97.

**E. CDE's and AG's Promulgation of Parental Exclusion Policies**

In February 2013, the California Legislature introduced AB 1266, a bill providing that students will be permitted to participate in sex-segregated activities, and use sex-segregated facilities, based on their gender identity. Assem. Bill 1266, 2013-2014 Reg. Sess. (Cal. Feb. 22, 2013). That same month, a lobby group led by the National Center for Lesbian Rights

("NCLR") met with CDE officials because they wanted CDE to issue an updated Gender Identity Legal Advisory to replace a prior 2004 one. 6-SER-1408-12.

On March 18, 2013, NCLR sent CDE its draft legal advisory and model policy regarding gender identity, both of which comprehensively covered California law concerning students presenting as gender incongruent. 6-SER-1414-28. As relevant here, the draft legal advisory provided that "all members of the school community must use a transgender student's chosen name and pronouns." 6-SER-1419-20. Further, it provided that, in light of a child's privacy rights in "medical information" under the California Constitution, "schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents." 6-SER-1419.

This summary was generally supported by California case law. Under the Equal Protection Clause of the California Constitution, transgender status is a suspect characteristic. *Taking Offense v. State*, 66 Cal. App. 5th 696, 722-24 (2021), *rev'd on other grounds*, 18 Cal. 5th 891 (2025). Further, since 2007, California schools have been expressly prohibited from discriminating on the basis of "gender identity." Cal. Stats. 2007, ch. 569, §4 (redefining "gender" to include "gender identity"); Cal. Educ. Code §220 (prohibition on discrimination). Gender identity is defined as "the individual's stated gender identity … without regard to any contrary

statement by … a family member." Cal. Code Regs. tit. 22, §83001(g)(2). And, as stated by California, "addressing a student with names or pronouns that do not correspond to the student's asserted gender identity is discrimination." AOB.28; *accord* Cal. Code Regs. tit. 2, §11034(h).

Under the California Constitution, "[a]ll people … have inalienable rights," which include "privacy." Cal. Const. art. I, §1. This Privacy Right has two components: "(1) interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')." *Hill v. NCAA*, 7 Cal. 4th 1, 35 (1994). The California Constitution provides informational privacy rights with respect to gender identity. *In re M.T.*, 106 Cal. App. 5th 322, 338-41 (2024). And these privacy rights extend to minors as well as adults. *Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th 307, 334-36 (1997) (mature minors have state constitutional right to abortion); *C.N. v. Wolf*, 410 F. Supp. 2d 894, 903 (C.D. Cal. 2005) (denying motion to dismiss claim that minor's privacy rights were violated through disclosure of sexual orientation to parent).

In August 2013, AB 1266 was signed into law, *see* Cal. Stats. 2013, ch. 85 (AB 1266) (eff. Jan. 1, 2014) (creating Cal. Educ. Code §221.5(f)), and CDE began reviewing NCLR's draft legal advisory. After review, 6-SER-1430, the draft was ultimately divided into two parts: a Legal Advisory and a Frequently Asked Questions page, published by CDE on

January 29, 2016, and circulated to all school districts to advise them of the "minimum requirements" for compliance with California law. 3-SER-841-45, 877-78; 4-SER-881-92. At the same time, the FAQ page linked to the California School Boards Association's ("CSBA") 2014 Final Guidance on AB 1266, Model Board Policy ("BP") 5145.3, Model Administrative Regulation ("AR") 5145.3, and Policy Brief on Transgender Rights, 4-SER-912-21, which CDE itself helped write. 3-SER-831-32; 4-SER-908.

The FAQ page explained that **(1)** "school districts should accept and respect a student's assertion of their gender identity where the student expresses that identity at school," **(2)** "schools must consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, including the student's family"; **(3)** "[w]ith rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents"; and **(4)** "[a] transgender student's right to privacy does not restrict a student's right to openly discuss and express their gender identity or to decide when or with whom to share private information." 4-SER-884-87. These directives were also reiterated in both the 2014 Policy Brief and the Model AR 5145.3. 4-SER-916-17, 921. Later, CDE updated its FAQ page to replace the link to CSBA's 2014 guidance, with a link to CSBA's 2022 guidance and current model policies, which also continued to reiterate these requirements. 4-SER-923-28.

These four aspects of CDE's policy, working together, are CDE's Parental Exclusion Policy. It is not a merely "secrecy" policy because the requirement to "accept" the child's "assertion of their gender identity," even over parental objection, excludes parents from decisionmaking. 2-ER-236:13-21. Further, CDE circulated the Legal Advisory and FAQ page to all school districts, 3-SER-844-45, who correctly believed they were mandatory. *See* 5-SER-1157-59, 1171, 1186-94 (EUSD); 5-SER-1134-37, 1141-43, 1150-51 (PUSD); 4-SER-1073-74, 1086-99, 1102-05 (CUSD). This led to the adoption of thousands of identical policies at the local level: California's Parental Exclusion Policies.

One such identical policy was adopted by the Attorney General. On June 20, 2023, Attorney General Bonta issued a press release announcing his new "State of Pride" webpage on the California Department of Justice website, and his inaugural "State of Pride Report," which annually documents his office's efforts to expand LGBT rights. 4-SER-1029-33. Both the webpage and the report included a "Know Your Rights" section which stated that, "[y]our school, whether public or private, doesn't have the right to 'out' you as LGBTQ+ to anyone without your permission, including your parents." 4-SER-1033, 1037-38. It continued, stating that under constitutional privacy rights:

> [E]ven if you are "out" about your sexual orientation or gender identity at school, if you're not "out" to your parents at home, and you can reasonably expect that they're not going to find out, then school staff can't tell your family that you are LGBTQ+ without your

> permission. Being open about your sexuality in school doesn't mean you automatically give up your right to privacy outside school. … If your principal or teachers are threatening to "out" you to your parents and you need advice, give us a call.

*Id.*

### F. The California Legislature's Codification of Parental Exclusion Policies

On January 1, 2025, California's new AB 1955 became effective. Cal. Stats. 2024, ch. 95 (AB 1955). It prohibits school districts from disciplining teachers for socially gender transitioning children, Cal. Educ. Code §220.1, from requiring any individual employee to disclose a child's gender incongruence to her parents, *id.* at §220.3, and from adopting policies requiring such disclosure. *Id.* at §220.5.

As a result of AB 1955, CDE replaced its 2016 Legal Advisory with new guidance that it sent to all school districts. 4-SER-900-06. In the new guidance, CDE stated that "AB 1955 [itself] does not mandate non-disclosure" and "does not specifically address whether a school employee may voluntarily disclose any information related to a pupil's … gender identity." 4-SER-903. CDE did not address whether it maintained its position that the Privacy Clause of the California Constitution mandates nondisclosure. However, CDE's Rule 30(b)(6) designee, Richard Barrera, confirmed that CDE continues to believe as much. 3-SER-855; *see also* 3-SER-836-39, 846-48, 850-57, 860-74. The Attorney General's Rule 30(b)(6) designee, Laura Faer, did likewise. 4-SER-940-73, 977-79, 990-1000, 1017-23.

On June 18, 2026, citing *Mirabelli v. Bonta*, 607 U.S. 492 (2026), this Court held that key portions of AB 1955 were unconstitutional in an unpublished order and enjoined their enforcement. *City of Huntington Beach v. Newsom*, No. 25-3826, 2026 WL 1785110 (9th Cir. June 18, 2026).

### G. Initial Procedural History: The Original Teachers' Action

In April 2023, Mirabelli and West initiated this action, alleging violations of their Free Exercise and Free Speech rights. 2-ER-332. With the initial complaint, they named as defendants the EUSD Superintendent, the EUSD Board of Education members, various EUSD personnel who directly enforced the policy against them (collectively "EUSD"), the CDE State Superintendent, and the CDE State Board of Education members (collectively "CDE"). 2-ER-335-337.

Mirabelli and West immediately moved for a preliminary injunction. 2-ER-407-08 (Dkt.5). EUSD responded with a motion to dismiss for failure to state a claim, 2-ER-406 (Dkt.17), and CDE responded with a motion to dismiss limited to standing. 2-ER-406 (Dkt.25). On September 14, 2023, the district court denied the motions to dismiss the Free Speech and Free Exercise claims, in a ruling accompanied by a discussion of Substantive Due Process rights, and granted a preliminary injunction. 6-SER-1512-47; 6-SER-1548-74.

In August 2023, Attorney General Bonta filed an enforcement action in California Superior Court against a school district for adopting a policy requiring notification to parents of their child's gender transition. 6-SER-

1475-76; 4-SER-1041-55. Further, in response to the District Court's September 2023 preliminary injunction, EUSD adopted the policy which CUSD had tried for less than a year. Under that policy, without parental consent, EUSD personnel would not actively gender transition a child by having all staff use a new name and opposite-sex pronouns for the child or by giving the child access to opposite-sex spaces. But EUSD would also not affirmatively notify the parents about the child's gender confusion if the child asserted she was not ready to obtain that parental consent. 5-SER-1160-66, 1185, 1203-06, 1218-20; 1-SER-36-38. In response, in October 2023, counsel from the Attorney General's office called EUSD to inform them that the policy was illegal and could subject them to an enforcement action. 6-SER-1474; 6-SER-1499-502; 5-SER-1167-71, 1195-97, 1209.

### H. Subsequent Procedural History: The Class Action

In June 2024, Mirabelli and West moved for leave to amend their complaint, which the District Court granted in part. 6-SER-1455-63. The amended complaint: (1) added employment claims for West (not Mirabelli) against EUSD; (2) added teachers Roe and Boe as plaintiffs raising the same Free Speech and Free Exercise claims as West and Mirabelli; (3) added the Does and Poes as plaintiffs asserting Free Exercise and Substantive Due Process claims; (4) converted the action into a putative

class action; and (5) added Attorney General Bonta as a defendant. 2-ER-190-310.[1]

In August 2024, Plaintiffs filed the operative Second Amended Class Action Complaint. 2-ER-190-310. At the same time, Plaintiffs filed a motion for class certification and an early motion for summary judgment. 2-ER-396 (Dkt.136, 137). CDE and Attorney General Bonta (collectively "State Defendants") then applied ex parte to stay those motions, which the District Court granted, ultimately denying them without prejudice. 2-ER-395-96 (Dkt.144, 151); 2-ER-389 (Dkt.221). The various Defendants then filed four separate motions to dismiss, 2-ER-394-95 (Dkt.149, 150, 156, 157), and Plaintiffs filed a cross-motion for a class-wide preliminary injunction. 2-ER-395 (Dkt.153). In January 2025, the District Court denied the motions to dismiss, 6-SER-1358-83, but deferred ruling on Plaintiffs' motion for a class-wide preliminary injunction until it was eventually withdrawn. 6-SER-1385-87; 1-SER-129-30.

Immediately after the District Court denied the motions to dismiss, CDE filed a motion to dismiss the action as moot because it had withdrawn the 2016 FAQs and replaced them with new AB 1955 guidance. 2-ER-391

[1] As early as October 2023 in the state enforcement action, the state court had advised the Attorney General that his privacy argument would fail. 6-SER-1504. But the California Constitution precludes a state agency from treating any aspect of California law as unconstitutional absent an appellate ruling. Cal. Const. art. III, §3.5. Thus, the Attorney General continued pressing his privacy arguments both publicly and in this case. 6-SER-1404-05; 1-SER-120-21.

(Dkt.195). But CDE did not disavow its interpretation of the Privacy Clause of the California Constitution and the District Court denied the motion. 6-SER-1317-1322. Shortly thereafter, the Attorney General took over representation of CDE from its in-house counsel. 2-ER-387 (Dkt.238, 239). In the meantime, the parties engaged in comprehensive discovery, including taking twenty fact-witness depositions and four expert-witness depositions. *E.g.*, 1-SER-132-294; 2-SER-295-424; 3-SER-827-78; 4-SER-879-1120; 5-SER-1121-1315.

In July 2025, Plaintiffs filed a renewed motion for class certification, 2-ER-387 (Dkt.244), and a renewed motion for summary judgment. 2-ER-386 (Dkt.247). The State Defendants did not file a cross-motion for summary judgment. In October 2025, the District Court severed and stayed the claims against EUSD, 2-ER-382 (Dkt.290),[2] and certified a modified class. 1-ER-129-141.

The class contained four administrative subclasses, based on the four substantive claims: (1) school employees who "object" to complying with Parental Exclusion Policies (Free Speech); (2) employees who "submit a request for a religious exemption or opt-out" from complying with the same (Free Exercise); (3) parents who "object" to Parental Exclusion Policies' application "against them" (Substantive Due Process); and (4) parents

[2] The EUSD claims contained a complicated discussion of whether Sovereign Immunity continues to apply to school districts in light of subsequent precedent. *See* 2-ER-383 (Dkt.281).

who "submit a request for a religious exemption or opt-out" from the same (Free Exercise). 1-ER-140-41.

The State Defendants' opposition brief reiterated CDE's mootness arguments. But Plaintiffs discovered that CDE had reposted the same content from the FAQ page in its new mandatory "PRISM" training for teachers, leading the District Court to issue an order to show cause "as to why the Court should not impose sanctions for misleading the Court regarding the California Department of Education's ('CDE') purported withdrawal of Parental Exclusion Policies." 1-SER-92. CDE responded by withdrawing its mootness argument, 1-SER-89-90, and the district court never imposed sanctions.

At the summary judgment hearing in November 2025, Defendants conceded there is no genuine dispute of material fact. 1-ER-86:19-87:2 (quoting 1-SER-66:8-19). On December 22, 2025, the District Court granted summary judgment to the Plaintiffs and entered a class-wide permanent injunction against the State Defendants for the four certified subclasses. 1-ER-73-128.

### I. Appellate Procedural History

On December 23, 2025, the State Defendants filed their notice of appeal, 2-ER-351-55, and promptly moved this Court for a stay pending appeal. C.A.Dkt.7. On January 5, 2026, this Court granted the State Defendants' motion for a full stay pending appeal. C.A.Dkt.13.

Plaintiffs then simultaneously filed a motion for reconsideration en banc with this Court, C.A.Dkt.14, and an emergency application to vacate the stay with the Supreme Court. *See* App. to Vacate, No. 25A810 (U.S. Jan. 8, 2026) (C.A.Dkt.15); Opp. to Vacatur, No. 25A810 (U.S. Jan. 21, 2026) (https://bit.ly/4x5wfkw); Reply ISO Vacatur, No. 25A810 (U.S. Jan. 22, 2026) (https://bit.ly/4hueBlS). After deliberating on the application for more than seven weeks, on March 2, 2026, the Supreme Court vacated the stay, in part, and issued a precedent-setting opinion. *Mirabelli v. Bonta*, 607 U.S. 492 (2026). This Court then issued its own order vacating the stay in part, C.A.Dkt.19, ordered supplemental briefing on whether any issue remained disputed in this appeal, C.A.Dkt.20, and denied reconsideration en banc. C.A.Dkt.26.

Plaintiffs responded to the Court's orders with a supplemental brief contending that the case was ripe for summary affirmance because the Supreme Court's opinion resolved all issues. C.A.Dkt.31. In contrast, the State Defendants moved this Court to modify its vacatur order, arguing the Supreme Court's vacatur order was inconsistent with its own reasoning in its opinion. C.A.Dkt.24. This Court denied the motion without prejudice to the State Defendants moving in the District Court in the first instance. C.A.Dkt.33. The State Defendants immediately did so, 2-ER-375 (Dkt.358), the District Court denied the motion, 1-ER-2-72, and the State Defendants filed another notice of appeal. 2-ER-346-50.

## ARGUMENT

### I. The Court Should Decline California's Invitation to Attempt to Overrule the Supreme Court.

In March 2026, the Supreme Court vacated this Court's stay of the parents' permanent injunction. *Mirabelli v. Bonta*, 607 U.S. 492 (2026). That injunction has three parts protecting parental rights. (1) It prohibits teachers from misleading parents about their child's gender presentation, including by using a different set of pronouns or names when speaking with the parents. 1-ER-75:3-8. (2) It prohibits teachers from using opposite-sex pronouns and names over parental objection. 1-ER-75:9-12. And (3) it prohibits schools from interfering with teachers' ability to speak with parents about their child's gender presentation. 1-ER-75:17-20.

The injunction text itself does not include (4) an affirmative obligation for schools to notify parents about their child's gender incongruence. However, the District Court's original grant of declaratory relief issued before the Supreme Court's opinion, recognized that "Parents and guardians have a federal constitutional right to be informed if their public school student child expresses gender incongruence." 1-ER-75:28-76:1; *see also* 1-ER-106:1-3; 1-ER-27:11-28:6; 1-SER-68-72. Also, because the injunctive language does not impose an affirmative obligation to provide notice to parents, exemptions to that obligation appear only as part of the declaratory relief discussions. *See* 1-ER-81:19-25; 1-SER-25:24-27; 1-ER-6:13-9:17, 16:13-17:25 (the injunction does not interfere

with regular CPS processes). And because the declaratory relief language discusses the parental right, it necessarily incorporates exemptions for situations where parental rights have been terminated. *See* AOB.55 n.14 (raising such situations).

On appeal, California argues that its challenge is "narrow[]." AOB.36. It does not challenge "that the State may not generally prohibit school employees from informing parents, upon the parent's request, about the names or pronouns that school employees are using for their child." AOB.2. But California does challenge (1) the District Court's declaration that parents have a constitutional right to be informed if their child expresses gender incongruence absent a specific request for information. AOB.23-27. California also challenges (2) the District Court's injunction providing that parents can overrule a school's decision to socially transition their child. AOB.27-47. And California wants (3) language added to the injunction that teachers may mislead parents about their child's gender presentation under a vague "would engage in abuse" standard. AOB.51-55.

Each of these three points was squarely resolved in Plaintiffs' favor by the Supreme Court, with six Justices stating that the Parent-Plaintiffs are "likely to succeed on the merits," *Mirabelli*, 607 U.S. at 497 (per curiam), three Justices stating their "assessment is preliminary," *id.* at 500 (Barrett, J., concurring), and two Justices calling the opinion "designed to conclusively resolve the dispute." *Id.* at 502 (Kagan, J.,

dissenting). Because the Supreme Court's "assessment [wa]s preliminary"—as stated in the concurrence, not the majority—California may have had a narrow path to justify continuing to prosecute this appeal. However, because of California's concession that there are no disputed material facts, 1-ER-86:19-87:2; 1-SER-66:8-19, the standards for the stay pending appeal and the ultimate appeal are not meaningfully different. *See Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990, 995 (7th Cir. 1979) (applying res judicata to preliminary injunction order entered on undisputed facts).

In any event, California's arguments for why this Court should reject the Supreme Court's holdings are the same ones it has pressed since the beginning of this case and are the same ones presented to the Supreme Court. Those "same legal question[s]" were resolved by the Supreme Court in Plaintiffs' favor and so are "binding." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 n.3 (9th Cir. 2021).

Below, Plaintiffs first address the relevant legal principles governing California's three arguments for reversing the Supreme Court, before applying those principles to each argument.

### A. Legal Background on the Effect of the Supreme Court's Summary Orders and Opinions.

When the Supreme Court issues summary orders without any reasoning, such "[a]n unexplicated" decision "settles the issues for the parties." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (quoting *Fusari v. Steinberg*, 419 U.S. 379, 391-92 (1975) (Burger, C.J.,

concurring)). Thus, "any matter 'disposed of by' decree of this Court must be carried 'into execution, according to the mandate,' by the courts below." *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2627, 2630 (2025) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)).

*Unexplained* summary orders even provide precedent to guide *other* decisions. In that context, unexplained summary orders "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." *Rodriguez v. Newsom*, 974 F.3d 998, 1005 (9th Cir. 2020) (quoting *Mandel*, 432 U.S. at 176); *see*, *e.g.*, *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (holding application "squarely controlled by" *Trump v. Wilcox*, 145 S. Ct. 1415 (2025)); *Gateway City Church v. Newsom*, 141 S. Ct. 1460 (2021) (holding "outcome is clearly dictated by" *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021)).

Justice Kavanaugh has explained that the brevity or fulsomeness of opinion issued on the interim docket depends on a weighing of the complexity and substantive import of the issue. *Trump v. Illinois*, 146 S. Ct. 432, 435-36 (2025) (Kavanaugh, J., concurring in the judgment); *Labrador v. Poe*, 144 S. Ct. 921, 933-34 & n.5 (2024) (Kavanaugh, J., concurring). And a majority of Justices generally agree. Issuing an opinion on the interim docket is binding and appropriate when the issues are straightforward. *Mirabelli*, 607 U.S. at 499 (Barrett, J., concurring, joined by Roberts, C.J., and Kavanaugh, J.) (summary opinion

appropriate because "parent-applicants are likely to succeed on the merits under a straightforward application of these cases."); *id*. at 503-04 (Kagan, J., dissenting, joined by Jackson, J.) (should have decided issue after grant of certiorari because case raises "novel legal questions").

Regardless of *when* it is appropriate to issue an opinion granting interim relief on the emergency docket (such as an injunction pending appeal), when the Court does so, it is no less binding than an opinion granting interim relief on the regular docket (such as a preliminary injunction). *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring, joined by Kavanaugh, J.); *D.V.D.*, 145 S. Ct. at 2630 (Kagan, J., concurring). Even when an opinion is issued on the interim docket, "just as binding as th[e] holding is the reasoning underlying it." *Bucklew v. Precythe*, 587 U.S. 119, 136 (2019); *see also Ramos v. Louisiana*, 590 U.S. 83, 104 n.54 (2020).

### B. California's Arguments for Overruling the Supreme Court Are the Same Ones Presented to, and Rejected by, the Supreme Court.

#### 1. The Court Should Reject California's Argument that Parents Do Not Have a Constitutional Right to Direct their Child's Gender Transition.

California's principal attempt to undermine the Supreme Court's ruling is its argument that this Court should reverse the District Court's injunction precluding schools from socially transitioning children over parental objection. AOB.27-47. California's argument has to navigate a narrow path because (1) the injunction clearly provides this relief, 1-ER-

75:9-12; 1-SER-70-72; (2) the parties specifically briefed it before the Supreme Court, App. to Vacate, pp.1, 5, 12, 25, 27, Opp. to Vacatur, pp.31-32, Reply ISO Vacatur, pp.4, 6-7, 8-9, 13-14; and (3) the Supreme Court vacated this Court's stay of that specific relief. *See Mirabelli*, 607 U.S. at 493, 494, 496.

For Substantive Due Process, California argues that "the Supreme Court's legal reasoning, as well as the decisions of this Court and other courts, provide no support for [the above]." AOB.27. And similarly on Free Exercise, California argues that the Supreme Court misunderstood "[t]he core teaching of *Mahmoud* [*v. Taylor*, 606 U.S. 522 (2025)]." AOB.41. But California then recycles the same arguments it has pressed since the beginning of this case, leaving this Court with no basis for distinguishing the Supreme Court's holdings.

**a. Parental Rights.**

As argued by California, the parental right extends only to decisionmaking regarding "a child's mental health, not their gender identity or gender expression more generally," AOB.33, because "there is a 'lack of identity' between transgender status and" "gender dysphoria," AOB.33 (quoting *United States v. Skrmetti*, 605 U.S. 495, 519 (2025)), and because "[b]eing transgender is [] not a psychiatric condition." AOB.33-34 (quoting *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020)). California further states that "the intentional use of names and pronouns that do not correspond to an individual's gender

identity [i]s a form of sex or gender identity-based discrimination." AOB.28-29.

Both of these statements miss the actual issue. Here, Child Doe from Pasadena was born a girl and currently identifies as a girl. 3-SER-645. Her gender identity has always been female. For a period, however, she mistakenly thought she was a boy. 3-SER-646-52. Her parents suspected that their 11-year-old daughter was not really transgender and so rejected a gender transition. 3-SER-648-49. But Child Doe's school still facilitated a misguided transition for years. 3-SER-649-52. Child Doe's experience is not unique. *See* 1-ER-95:1 ("The Plaintiffs' experts and the State's experts agree"); 1-ER-100:27-101:1 ("Sometimes, a child mistakes his gender and a conversation with a therapist will help the child realize his mistake. [Defense expert] Dr. Brady estimates that twenty percent of patients that think they want to socially transition later decide not to.") (citing 2-SER-357). California's argument assumes, without elaboration, that a child's gender identity is whatever the child says—no matter the child's age or a parent's suspicion that the child may be mistaken. It is that assumption which explains California's misinterpretation of the Supreme Court's opinion.

This case has never been about "being transgender." AOB.33. Rather, as explained by the District Court, this case concerns how "a *child's* unusual gender expression may be a sign of psychological distress that *may need treatment* and the constitutional right of parents to know." 1-

ER-86:3-6 (first emphasis added). Stated differently, there is a "lack of identity" between (i) a *person "being transgender,"* and (ii) a *child "expressing gender incongruence." See* 1-ER-88-106 (summary judgment order); 1-SER-42-62, 73-83 (summary judgment hearing); 6-SER-1388-91, 1393-96 (motion to dismiss hearing).

The latter is not a subset of the former. Rather, *in the case of children*, a larger group expresses "symptoms" of gender confusion than are actually transgender, such that here, the injunction "do[es] not classify based on gender identity or transgender status," *West Virginia v. B.P.J.*, 146 S. Ct. 2356, 2378 (2026), but merely a child's expression of "symptoms" of gender confusion. *Mirabelli*, 607 U.S. at 497. Symptoms which, as Child Poe's case proved, could lead to serious health concerns, *see* 6-SER-1569-70; 6-SER-1485-88; 6-SER-1392; 1-SER-83-85, such that parents have the constitutional right to decide how to proceed—whether with the "treatment" of a social transition or not. 1-ER-87:15-22, 105:11-19; *Edmo v. Corizon, Inc.*, 935 F.3d 757, 770 (9th Cir. 2019); 2-SER-420-22; 2-SER-383-87 (Brady: "By itself, social transition … is a medically recognized treatment for gender dysphoria"); 2-SER-415-16; 2-SER-360-64, 369 (Brady: gender questioning children "need[] the help of a mental health professional"); 2-SER-313; 1-SER-209-24 (Tando: parents need "to look at your child's being transgender as something concrete, like a medical condition"); 1-SER-293-94; 1-SER-217-218; 2-SER-329 (Tando: "I do believe being transgender is a medical condition").

In this procedurally unique context, the Court's primary role is to "decide [this] case[] according to [its] reasoned view of the way Supreme Court would decide the pending case today." *Vukasovich, Inc. v. Comm'r*, 790 F.2d 1409, 1416 (9th Cir. 1986). Thus, although "interim orders are not conclusive as to the merits," *Boyle*, 145 S. Ct. at 2654, the question is solely whether the Supreme Court somehow missed the principal holding of the District Court and whether its misunderstanding of that holding would have changed the result. The question is self-answering: All of the experts recognized that there is a difference between "expressing gender incongruence" and "being transgender," *see* 1-ER-95:1-2 ("The Plaintiffs' experts and the State's experts agree that when a child expresses a new gender it is a significant event"); California presses the same arguments it has made since this case began, *see* 6-SER-1507-08; 1-SER-125-26 (citing *Grimm*, 972 F.3d 586); Opp. to Vacatur, p.32 (citing *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 350 (1st Cir. 2025)); App. to Vacate, pp.29-30; and the Supreme Court has repeatedly and recently rejected attempts to conflate distinctions made on the basis of "being transgender" and other, related but distinct concepts. *B.P.J.*, 146 S. Ct. at 2378; *Skrmetti*, 605 U.S. at 518-19. This case represents simply another application of that well-founded principle.

**b. Free Exercise.**

**i.** On the Parents' Free Exercise claim, California first argues that the Supreme Court's holding turned on its conclusion that "the State 'cut out

the primary protectors of children's best interests: their parents.'" AOB.42 (quoting *Mirabelli*, 607 U.S. at 496). But California now argues that because it concedes parents should no longer be stonewalled, "there can be no question that, going forward, California law does not 'cut out' or 'shut out' parents from anything." AOB.42.

The quoted language, however, comes from the Supreme Court's strict scrutiny analysis. On Free Exercise, the Court's actual holding was that: "the intrusion on parents' free exercise rights here—*unconsented facilitation of a child's gender transition*—is greater than the introduction of LGBTQ storybooks we considered sufficient to trigger strict scrutiny in *Mahmoud*." *Mirabelli*, 607 U.S. at 496 (emphasis added). This was a straightforward application of precedent. *See Wisconsin v. Yoder*, 406 U.S. 205, 211 (1972) (burden was "exposure of their children to a 'worldly' influence … hostile to Amish beliefs"). California *never once* acknowledges this portion of the Court's holding; its argument thus fails because it rests on a blatant misrepresentation of the opinion.

**ii.** California secondly argues that this Court should effectively reverse the Supreme Court because *Yoder*, on which *Mahmoud* relied, did not involve a disagreement between children and their parents. AOB.43-45. Yet here, the Supreme Court did apply *Yoder*/*Mahmoud* in the context of strong disagreements within the Poe and Doe families,

*Mirabelli*, 607 U.S. at 496, and California provides no explanation for why the Supreme Court was wrong to do so.

In any event, California fails to specifically identify the countervailing constitutional right at issue other than to reiterate a slightly modified version of the same parade of horribles that it presented to the Supreme Court, such as a child who does not want to honor his faith's dietary restrictions or a girl who doesn't want to wear her hijab. AOB.44-45; Opp. to Vacatur, p.35; CTA Br.18. These examples imply that California is focusing on the child's religious rights in an attempt to mask its recognition that there is no constitutional right to a gender transition, *see Skrmetti*, 605 U.S. at 522-25 (applying rational basis review to ban on medical or surgical gender transitions for minors), and the constitutional right to reject mental health treatment, as applied to a child, is circumscribed. *Parham v. J.R.*, 442 U.S. 584, 604 (1979) ("The fact that a child may balk at hospitalization … does not diminish the parents' authority to decide what is best for the child.").

But the Supreme Court also long ago rejected California's argument as applied to religion: "We cannot assume that the result in … *Pierce v. Society of Sisters*, [268 U.S. 510 (1925)], would have been different if the children there had announced … a preference to go to a public, rather than a church, school." *Parham*, 442 U.S. at 603-04 (distinguishing mature minor doctrine in the abortion context because each constitutional right has to be addressed individually).

**iii.** Lastly, California argues that it is improper to apply *Mahmoud* to all minors, regardless of age. AOB.45-46. The District Court cannot be faulted for issuing an injunction that applies to all minors as California *never* raised the issue of the purportedly mature minor until its appeal, *see* 1-SER-106-12—arguing before the District Court simply that "[m]inors, as well as adults, possess a right of privacy." 1-SER-120-21; 1-SER-49-51.

Moreover, this argument, too, was directly advanced by California with the Supreme Court, yet not accepted. Opp. to Vacatur, p.34. And rightly so. The children in *Mahmoud* were "between 5 and 11 years old," 606 U.S. at 533, but the children in *Yoder* were "ages 14 and 15," 406 U.S. at 207, and the children in *Pierce* were "between 8 and 16." 268 U.S. at 530-31. Here, California's policies "apply to children as young as two," 1-ER-83:12-13, or as the Attorney General says, "regardless of [] age." 4-SER-1033, 1037. Yet parental rights end with emancipation or maturity—not teenage-hood. Cal. Fam. Code §7050. And the Supreme Court's affirmation of the injunction regardless of age makes perfect sense because even up to age 18, "[t]he reality [is] that juveniles still struggle to define their identity." *Roper v. Simmons*, 543 U.S. 551, 569 (2005); *accord Skrmetti*, 605 U.S. at 540 (Thomas, J., concurring) (citing *Roper* as support for banning minor gender transitions).

**c. Strict Scrutiny.**

California next argues that, even when the parental right is applied to a child's mental health, parents should not be able to "unilaterally dictate the outcome," AOB.32, because it can satisfy strict scrutiny through recourse to its two experts, Christine Brady, Ph.D., and Darlene Tando, LCSW. AOB.37-40, 46-47. California, of course, also presented its experts to the Supreme Court, to no avail. Opp. to Vacatur, pp.28, 41; Reply ISO Vacatur, p.15.

That testimony did not move the Supreme Court, and for good reason: it was extraordinarily weak. Many of the cited opinions are based solely on Brady's and Tando's say-so. 1-ER-101:9-22 (Brady's "opinion in this respect carries no weight because she concedes there are no studies to support her opinion"). For example, Tando's opinion in this case that Child Doe should have suffered no ill-effects from being treated like a boy for years by her school because "'[t]rying on a different name and pronouns is a unique and valuable way to see if being referred to in that way feels more authentic," is based solely on her ipse dixit. 2-ER-170.

As explained by Plaintiffs' expert Dr. Anderson, that opinion is "a dangerous underestimation of the potential harm associated with gender dysphoria and related conditions and the potential for iatrogenic harm caused by social transitioning itself." 3-SER-712-13. And, oddly, Tando actually agreed with Anderson before this case, stating it is "dangerous" for children to socially transition without simultaneously medically

transitioning, 1-SER-291-92; 1-SER-241-54, and that the one place where children should not hide their gender confusion is in the home. 2-SER-309; 1-SER-175, 177-79. Indeed, Child Poe did just that—and then attempted suicide. 3-SER-636, 791.

Even when literature is discussed, "none of the literature cited by the defense experts evaluates the mental health and well-being of youth who undergo a social transition *over their parents' objection*." 3-SER-722 (Anderson Report); *see also* 3-SER-716-31, 743-50, 752-54. The same is true for California's army of *amici*. *See* Psych. Profs. Br.12-22; PFLAG Br.4-28; CTA Br.20. Even assuming that parentally opposed and parentally supported gender transition are equivalent, "[t]he Cass Review—[] the most comprehensive systematic review of youth gender treatment available—concludes that 'there is no clear evidence that social transition in childhood has positive or negative mental health outcomes' and '[t]here is relatively weak evidence for any effect in adolescence.'" 3-SER-722-23. The same conclusion was reached by HHS. 1-SER-88. And even assuming that a gender transition would be good for the child, both of California's experts testified that denying one does not rise to the level of abuse or neglect. 1-SER-275-77; 2-SER-395-400.

California also argues that there is no way of accommodating parents' rights without destroying "the learning environment" because it forces other students to "listen to their teacher deny their fellow student's asserted identity" and "to send an unmistakable message of

discrimination against transgender people." AOB.47. But this same argument was rejected in *Mahmoud*—i.e., "that permitting some [religious] students to exit the classroom while the storybooks were being taught would expose other [LGBT] students 'to social stigma and isolation.'" *Mahmoud*, 606 U.S. at 538. The Supreme Court held that schools "cannot purport to rescue one group of students from stigma and isolation by stigmatizing and isolating another." *Id.* at 568.

Even though judges "are not scientists," "[t]he whole point of strict scrutiny is to test the government's assertions." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (Statement of Gorsuch, J.). And because California "bears the risk of uncertainty, [citing] ambiguous proof will not suffice." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799-800 (2011) (citing *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816-17 (2000)). Here, when California's assertions were examined by the District Court and the Supreme Court, they were found wanting. 1-ER-114-18; *Mirabelli*, 607 U.S. at 496-97.

California's argument also misunderstands the proper scrutiny in the context of parental rights. *See* AOB.31 n.8. With respect to the mental healthcare of children, because "natural bonds of affection lead parents to act in the best interests of their children," parents "retain plenary authority to seek such care for their children, subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 602, 604. There are only two exceptions: (1) when a "'neutral fact finder'

determines, through due process hearing, that parent is not acting in child's best interests," or (2) "some urgent medical problem exists requiring immediate attention." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000); *accord Pope v. Cty. of San Diego*, 719 F. Supp. 3d 1076, 1086 (S.D. Cal. 2024). These two exceptions are necessarily *individualized*—not something that California can satisfy across-the-board. *Stanley v. Illinois*, 405 U.S. 645, 657 (1972); *Mueller v. Auker*, 576 F.3d 979, 995 (9th Cir. 2009).

#### 2. The Court Should Reject California's Argument that Parents Do Not Have a Constitutional Right to Be Informed of Gender Confusion in their Children.

California's next challenge to the Supreme Court's order concerns whether parents have a constitutional right *to be informed* if their child expresses symptoms of gender confusion. AOB.23-27. As California frames the issue, it should not be required "to impose affirmative 'see something, say something' disclosure obligations" on schools "even when parents do not ask for, or do not wish to receive" information about their child's gender presentation, with its duty instead limited to responding to "parents who ask." AOB.23-24. In so doing, California asks this Court to vacate two key provisions in the District Court's orders solely on procedural grounds, thereby forfeiting the merits. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

**a. The Parental Right Includes the Right to Affirmative Notice of Gender Confusion.**

California first asks this Court to reverse the District Court's conclusion that parents have a "right to be informed about the gender identity expressed within the schoolhouse gate of one's child." AOB.31 (quoting 1-ER-106); AOB.23-24. Instead, California argues that the right extends only to "parents who ask." AOB.24. California's basis for limiting this holding is that the certified class consists only of "those parents *who object* to the challenged policies or seek religious exemptions,' not 'all the parents of California public school students.'" AOB.23-24 (quoting *Mirabelli*, 607 U.S. at 498); *see* 1-ER-131. But this confuses the constitutional right at issue with the breadth of the injunction. *Steffel v. Thompson*, 415 U.S. 452, 469 (1974) (declaratory and injunctive relief have "different considerations").

California also argues that the Supreme Court "did not accept that unduly broad formulation," instead limiting the parental right to "'the right not to be shut out of participation in decisions regarding their children's mental health.'" AOB.31 (quoting *Mirabelli*, 607 U.S. at 497); AOB.54-55. California apparently reads "shut out" as requiring active deception, but a person can be "shut out of participation" by not being told. Indeed, the Supreme Court held that its ruling "guarantee[d] fit parents a role in some of the most consequential decisions in their children's lives." *Mirabelli*, 607 U.S. at 497. How can that role be "guaranteed" if the parents aren't told?

And the Supreme Court vacated this Court's stay of the permanent injunction—*including* the injunction's required notice that "Parents and guardians have a federal constitutional right to be informed if their public school student child expresses gender incongruence." 1-ER-75:28-76:1. The Supreme Court's opinion recounts that very requirement—the injunction "compels defendants to include in state-created or approved instructional materials a notice of the rights protected by the injunction," *Mirabelli*, 607 U.S. at 495—and vacated the stay as to the parents without qualification.

California's hypothetical of the parent who doesn't want to be told about their child's struggles is implausible. AOB.23. Take Jane Doe, for example. She was shocked to learn about Child Doe's gender confusion, but still let Child Doe bring the issue to her on her own time. 3-SER-647-48.

And this argument also fails on the merits. As California's *amici* stress, 50% of transgender youth surveyed "wanted professional mental health care but were unable to access it," mainly because they were reluctant to seek their parents' help—a reluctance California's policies validate. PFLAG Br.13. Yet, "parental rights [a]re bound by parental *duty*." Legal History Br.7 (emphasis added). Parents have "a 'high duty' to recognize symptoms" and seek care for their children, *Parham*, 442 U.S. at 602, such that the parental right "includes the right of parents to make important medical decisions for their children, *and of children to*

*have those decisions made by their parents rather than the state*." *Wallis*, 202 F.3d at 1141 (emphasis added). The parental duty cannot be shirked. Nor does the notice itself impose any "see something, say something" duty on any individual teacher. AOB.23. It operates on the State's own training materials and identifies a parental right, but commands no individual to monitor or report anything. That disposes of California's no-affirmative-duty cases. *See* AOB.32.

Lastly, because California argues that parents may not withhold consent to a school's gender transition of their child, AOB.27-47, this argument would permit schools to begin transitioning a child without parental knowledge—that would definitely "shut out" the parents in violation of the Supreme Court's order. *See Mahmoud*, 606 U.S. at 550, 560 (policy unconstitutional for "withhold[ing] notice to parents" because "it is not realistic to expect parents to rely on after-the-fact reports by their young children to determine whether the parents' free exercise rights have been burdened."). PFLAG's own brief proves the point: family responses are "often supportive," and parental support is among the strongest protective factors for these children. PFLAG Br.20-21. Yet California's *amici* defend concealment even from parents a child believes will be supportive. PFLAG Br.27.[3]

[3] California also argues that the District Court intended to limit relief to "parents who ask." AOB.55 (citing 1-ER-68-69). That's incorrect. The District Court placed the burden on schools to obtain an affirmative waiver of constitutional rights. *See* 1-SER-40-41; *Erie Telecomms., Inc. v.*

### b. The Parental Right Includes All Aspects of a Social Transition, Including Appearance.

California secondly argues that even if parents had a right to be informed about a school's use of a new name and opposite-sex pronouns, that right would not similarly extend to other aspects of a social transition, such as clothing. AOB.25-26. Thus, California asks the Court to vacate "Section 1(d) of the injunction"—an injunction the Supreme Court blessed. AOB.58. That section bars California from "interfer[ing] with a teacher … communicating to parents that his, her, or their child has manifested a form of gender incongruity." 1-ER-75.

California's argument here is similarly limited to a mistaken procedural understanding. California argues that Plaintiffs defined "social transition" to mean solely names and pronouns, and so other aspects of a social transition are beyond the "'articulation of the fundamental right'" in the complaint. AOB.26 (quoting *Regino v. Staley*, 133 F.4th 951, 964 (9th Cir. 2025)). That is incorrect. The Parent-Plaintiffs have always objected to more than mere use of opposite-sex names and pronouns—but to a gender transition more broadly. 1-ER-107:20-28 (quoting 2-ER-304:26-305:4) ("Parent Plaintiffs' religious faith precludes them from adhering to or espousing transgender theory"); (quoting 2-ER-305:9-11) (parents seek "to be actively involved in all significant decision-making by their children, including gender

---

*City of Erie*, 853 F.2d 1084, 1096 (3d Cir. 1988) (discussing standard for waiver of constitutional rights).

transition"); 2-ER-197:4-6 (state "ignor[es] the real harm that can occur through transitioning to another gender during childhood, while removing the key parental oversight"); 2-ER-230:7-9 (for children who later desist "all forms of treatment—whether psychosocial or medical—that 'validate' the gender identity inconsistent with the child's biological sex are harmful"); 2-ER-225:9-11 (Doe Family "did not agree that she was a boy, and they did not agree that she should socially transition and present at school—or anywhere—as a boy"); 2-ER-228:2-4 ("Mr. and Mrs. Doe wish to be involved in every part of Child Doe's life.").

In any event, a social transition is not limited to names and pronouns. It actually means "a process by which a child is acknowledged by others and has the opportunity to live publicly … in the gender identity they affirm." *Roe v. Critchfield*, 137 F.4th 912, 920 n.4 (9th Cir. 2025). It can include "adopting a new name, pronouns, appearance, and clothing, and correcting identity documents." *Doe v. Horne*, 115 F.4th 1083, 1107 n.13 (9th Cir. 2024), *vacated and remanded*, No. 24-449, 2026 WL 1871306 (U.S. June 30, 2026); *accord* 3-SER-683-84 (Anderson Report). Moreover, the Supreme Court has now made clear that "unconsented facilitation of a child's *gender transition*" intrudes upon parents' Free Exercise rights. *Mirabelli*, 607 U.S. at 496 (emphasis added).

**3. The Court Should Reject California's Argument that An Amorphous "Abuse" Carve-Out Is Needed.**

California also argues that the permanent injunction needs to be modified to include a provision "precluding gender-identity disclosure to

parents who would engage in abuse." AOB.53 (quoting *Mirabelli*, 607 U.S. at 497). As noted above, however, *supra*, p.27, the *injunction* itself does not mandate disclosure to any parents—let alone parents who would engage in abuse. 1-ER-75. Rather, the District Court *declared* that parents have a right to be informed of their child's gender incongruence as part of a discussion that incorporated standard CPS processes by reference. 1-ER-106:1-3; 1-ER-81:19-25.

The injunction does bar California from interfering with a teacher "communicating to parents that his, her, or their child has manifested a form of gender incongruity" with no exceptions for "abuse," a provision with which California takes issue. 1-ER-75:17-20. In so doing, California inverts the Supreme Court's holding that it fails to meet strict scrutiny because of the absence of such an exception, to mean that the presence of such an exception necessarily "would satisfy strict scrutiny." AOB.53. That does not logically follow, *Isaacson v. Horne*, 716 F.3d 1213, 1227-28 (9th Cir. 2013), and California fails to provide any explanation for why its comprehensive child protective services statutes are inadequate, *see* Cal. Pen. Code §§11164-11174.3; Cal. Welf. & Inst. Code §§300-324.5, or how its amorphous "would engage in abuse" standard would actually work. California schools have been known to mistake a parent's refusal to accede to their child's gender transition as abuse, 1-SER-12-21, and California's amici believe seeking therapy for the child should be considered abuse. *Know Your Rights – Mirabelli v. Bonta FAQ*, ACLU

S. Cal. (May 14, 2026) (https://bit.ly/4zwbOzb); *but see Chiles v. Salazar*, 146 S. Ct. 1010 (2026) (overturning ban on "conversion therapy"). Indeed, California's *amici* cannot agree whether the State's child-protection system is the answer or the problem. *Compare* CTA Br.7 (mandatory-reporter training makes school employees "well positioned" to assess abuse risk), *with* NCYL Br.5, 14-24 (the child-welfare system "compounds harm" for these children).

In any event, the Supreme Court observed that *California* could adopt "a *policy*" respecting both parental religious rights and any need to withhold "gender-identity disclosure to parents who would engage in abuse." *Mirabelli*, 607 U.S. at 497 (emphasis added). The Supreme Court did *not* countenance a categorical carve-out that—without *a priori* due process—would effectively trample the very parental rights it upheld in *Mirabelli* and *Mahmoud*.

California also implies that it seeks solely to modify the injunction to incorporate California's CPS standards. AOB.53 ("[T]he district court explained that it did not intend the injunction to 'prohibit[] a teacher from pursuing lawful approaches to either avoiding or resolving possible abuse.'"). Yet, when the District Court offered to do just that, it was inadequate for California. Opp. to Mtn. Modify Stay Order, pp.12-13 (C.A.Dkt.27); Reply ISO Mtn. Modify Stay Order, pp.4-5 & Add. (C.A.Dkt.28). Moreover, leaving the child in the custody of the parent, while limiting the information available to the parent, is simply not how

the process works. If there is a legitimate threat of abuse, may invoke its child-protective processes—up to and including taking custody—while parental rights, including the right to information, remain intact unless and until a court curtails them. 1-SER-3-10. And the Supreme Court itself recognized that the injunction leaves this process entirely in place and thus *already* "permits the State to shield children from unfit parents." *Mirabelli*, 607 U.S. at 498.

## II. The Supreme Court's Opinion Effectively Resolves the Teachers' Claims As Well.

### A. California's Exclusion Policies Lack a Rational Basis.

The Supreme Court's interim opinion did not grant emergency vacatur with respect to the teachers' claims. *Mirabelli*, 607 U.S. at 498. This prudential disposition does not indicate much because the Court might have denied emergency relief for any number of reasons. *Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 960 (2009). But the Supreme Court's reasoning is binding and that *reasoning*—how it reached its decision in this case—is dispositive of the teachers' claims. *See* Plt.Supp.Br.9 (citing new CSBA guidance).

Most obviously, objections to government regulations are always at least subject to rational basis review. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359 (2009) (speech); *Sherbert v. Verner*, 374 U.S. 398, 406 (1963) (religion); *see Akers v. McGinnis*, 352 F.3d 1030, 1037 (6th Cir. 2003) (government employee speech). Under that standard, the regulation must have a "*legitimate* end." *Romer v. Evans*, 517 U.S. 620,

631 (1996) (emphasis added). But California has no legitimate state interest in an unconstitutional policy. *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025). Thus, the best way to resolve the teachers' claims is to hold that California cannot order teachers to violate parents' rights.

### B. California's Exclusion Policies Are Not Generally Applicable.

If this Court were to accept California's invitation to override the Supreme Court, however, it would need to address the teachers' claims on the merits. California's first argument is a straw man. For the teachers' Free Exercise claim, California states that the "relevant state law[]" is Education Code section 220, which "plaintiffs do not challenge the neutrality of." AOB.50. That's not true.

California's policies actually flow from its interpretation of the requirements of the California Constitution—a point California noted at the Supreme Court but has apparently since forgotten. Opp. to Vacatur, p.36; Reply ISO Vacatur, p.13; *see* 1-ER-121:17-20 (citing 6-SER-1534-40) (permanent injunction incorporating preliminary injunction analysis by reference). Moreover, the issue is not the text of any specific statute, but rather how "California has interpreted" that they practically apply here. *See* AOB.1.

Here, when asked to confirm when exactly disclosure is appropriate California explicitly confirmed via sworn discovery responses that the answer is standardless:

> Whether there is a compelling "need to know" would necessarily vary based on all of the factors present in a specific situation. It is not possible to speculate about every potential scenario where it might be warranted to disclose a pupil's gender nonconforming status to a parent over the pupil's objection. Specific facts, which have not been presented in this interrogatory, would need to be provided to determine whether a given scenario would support the disclosure of a pupil's gender nonconforming identity to the pupil's parents over the pupil's objection.

6-SER-1438; *see* 1-SER-63. This triggers strict scrutiny. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 688 (9th Cir. 2023) (en banc) ("broad discretion to grant exemptions on less than clear considerations" makes anti-discrimination policies not generally applicable).[4]

### C. The Court Should Not Apply *Pickering-Garcetti* in the Free Exercise Context; Regardless, *Garcetti* Does Not Defeat Plaintiffs' Free Exercise or Free Speech Claims

California next argues that the *Pickering-Garcetti* framework for analyzing Free Speech objections should apply to Free Exercise objections. AOB.48-49. California, however, forfeited the argument by failing to raise it in opposing summary judgment. 1-SER-112-19; *Pritchard v. Blue Cross Blue Shield of Ill.*, 159 F.4th 646, 663 (9th Cir. 2025). More, this Court has not applied *Pickering-Garcetti* to a Free

[4] California's *amici* respond that the policy's exceptions are "non-discretionary," ACLU Br.32-37—yet by their own description, staff must apply the "well-being" exception through "professional training and judgment," case by case. ACLU Br.34-35. Such individualized judgments are precisely what *Fellowship of Christian Athletes* condemns. 82 F.4th at 686-88.

Exercise objection for over twenty years, in light of intervening Supreme Court precedent which called the practice into question. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 531 n.2 (2022). In any event, whether *Pickering-Garcetti* applies to only Plaintiffs' Free Speech claim, or also their Free Exercise claim, Plaintiffs succeed on both.[5]

Under the *Pickering-Garcetti* analysis, employees cannot be forced to engage in speech **(1)** relating to matters of political, social, or other concern to the community (i.e., public concern analysis of *Connick v. Myers*, 461 U.S. 138 (1983)), **(2)** that is unnecessary for their actual job duties (i.e., the public v. private speech analysis of *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and *Johnson v. Poway Unified School District*, 658 F.3d 954, 961 (9th Cir. 2011)), **(3)** unless doing so is sufficiently necessary for the effective operation of the government as to outweigh Free Speech rights (i.e., the interest balancing of *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968)). *See Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776-83 (9th Cir. 2022).

Twenty and thirty years ago, this Court applied the third element—*Pickering* balancing—to government-employer bans on religious speech in the workplace. *See Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204 (9th Cir. 1996); *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 649-650 (9th Cir. 2006).

---

[5] California complains that "conscientious" objectors exceed the certified class. AOB.58 n.15. But the permanent injunction protects "religious" objectors under the Free Exercise Clause and "conscientious" objectors under the Free Speech Clause. 1-ER-75:13-20, 140-41.

*Tucker* was issued long before *Garcetti* and so did not address the second element. Instead, it held that "religious expression" "is obviously of public concern" and that a broad ban on religious speech failed *Pickering* balancing. *Tucker*, 97 F.3d at 1210-14. This is self-evidently true. The first element is aimed at limiting protection to "matters that lie at the core of the first amendment"—a test that religious speech necessarily satisfies. *Brown v. Polk Cty.*, 61 F.3d 650, 658 (8th Cir. 1995) (en banc); *Johnson*, 658 F.3d at 966 ("speech concerning religion is unquestionably of inherent public concern"). This rule cannot turn on the religious *content* of the speech but relies on its religious *motivation*. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 406 (2011) (Scalia, J., concurring) (for this reason, stating the "public concern" requirement could not apply in the Free Exercise context).[6]

But even if the content were at issue, "[w]ith the amount of public discourse in the recent years at all levels of society nationwide—from government to local communities and everything in between—concerning gender identity, the topic and matters related to it (e.g., use of personal pronouns) are undoubtedly issues of public interest." *Sandoval v. Pali Inst., Inc.*, 113 Cal. App. 5th 616, 626-27 (2025) (citing *Janus v. AFSCME, Council 31*, 585 U.S. 878, 913-14 (2018)); *accord Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1138 (9th Cir. 2025); *Riley's Am.*

[6] *Accord Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 164 (2d Cir. 2001); *Baz v. Walters*, 782 F.2d 701, 708 (7th Cir. 1986) (assuming that religious speech was a matter of public concern).

*Heritage Farms v. Elsasser*, 32 F.4th 707, 723 (9th Cir. 2022); *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 568 (2023).

Ten years after *Tucker*, in *Berry*, this Court implicitly assumed without deciding that religious expression is a matter of public concern not within an employee's job duties (by failing to comment on it at all). This Court, however, came to a different conclusion on *Pickering* balancing because the employee's interactions with the public raised Establishment Clause concerns. 447 F.3d at 649-650. That Establishment Clause worry was then overruled by the Supreme Court in *Kennedy*, which also left open the question of whether or how the *Pickering-Garcetti* analysis could apply in the Free Exercise context. 597 U.S. at 531 n.2. Since *Kennedy*, this Court has not again applied *Pickering-Garcetti* to a Free Exercise claim, instead applying the traditional analysis. *Bacon v. Woodward*, 104 F.4th 744, 750-53 (9th Cir. 2024); *Theis v. InterMountain Educ. Serv. Dist.*, No. 25-5641, 2026 WL 2100391, at *1-2 (9th Cir. July 21, 2026).

California notably does not argue that Plaintiffs would fail the third element, interest balancing, merely that they fail the second element. *See* AOB.49. This makes sense because the government's burden to stifle politically contentious speech is high and the analysis fact-intensive, *see Damiano*, 140 F.4th at 1138-47, and there is no evidence of actual disruption here. Moreover, whether *Pickering* balancing or some higher standard would apply is unresolved. *Kennedy*, 597 U.S. at 532 (reserving

on the issue of whether strict or intermediate scrutiny apply since school district would fail even *Pickering* balancing); *Fraternal Ord. of Police v. Newark*, 170 F.3d 359, 366 & n.7 (3d Cir. 1999) (Alito, J.) (assuming without deciding that at least intermediate scrutiny applies).

Thus, the only question is whether complying with California's Parental Exclusion Policy is part of teachers' educational duties. *Kennedy*, 597 U.S. at 529-31. On this element, California and its *amici* oddly cite no record facts, *see* AOB.49, ACLU Br.24-28, even though this element is a "'practical,' fact-specific inquiry." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1071 (9th Cir. 2013) (en banc) (quoting *Garcetti*, 547 U.S. at 424-25). Instead, California argues that "communicating with parents about students is 'part and parcel' of a teacher's job." AOB.49 (quoting *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1264 (9th Cir. 2016)).

*Coomes* does not carry the day. It merely reiterates that *Garcetti* is a fact-intensive inquiry and notes that, on a different record, a teacher "*could* have gone outside her duties in speaking to parents *about other matters*." 816 F.3d at 1264 (emphasis added); *accord* CTA Br.21 (teachers can "express[] their personal religious or moral commitments when they are not acting for the government"). That is precisely this case. "[W]hen a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties." *Dahlia*, 735 F.3d at 1075 (en banc).

Here, teachers are prohibited from speaking to parents about their children's gender identity. 4-SER-884-87. *Thus, should they do so, that speech would not be government speech*. When an employee speaks in violation of a confidentiality policy, courts treat that speech as outside the employee's duties and resolve the case on *Pickering* interest balancing. *See Moonin v. Tice*, 868 F.3d 853, 862-68 (9th Cir. 2017); *Johnson v. District of Columbia*, 182 F.4th 1052, 1059 (D.C. Cir. 2026); *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1176 (D.C. Cir. 2021); *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1298, 1302 (10th Cir. 2009).

The District Court here resolved this claim on the second element also, holding that teachers' job duties cannot involve violating parental rights. 1-ER-125-26, 6-SER-1534; *Janus*, 585 U.S. at 908 ("the employer may insist that the employee deliver any *lawful* message") (emphasis added); *Polk v. Montgomery Cty. Pub. Schs.*, 166 F.4th 400, 419 (4th Cir. 2026) (acknowledging rule but disagreeing about legality of Parental Exclusion Policies). Similar to finding that California's policies lack a rational basis, this is the best way to resolve this appeal.

California and its *amici* argue, in contrast, that schools can regulate everything a teacher says—even to other adults—because "it is part of a teacher's official duty to foster a safe, inclusive school environment." ACLU Br.26; AOB.49. Schools do have broad authority to regulate "speech directed at students within a school setting." *Theis v. InterMountain Educ. Serv. Dist.*, 182 F.4th 1091, 1097 (9th Cir. 2026).

But this rule "focuse[s] on the 'impressionable and captive minds' to whom the employees at issue espoused their views." *Greisen v. Hanken*, 925 F.3d 1097, 1112 (9th Cir. 2019); *accord Mahmoud*, 606 U.S. at 557 ("The government's operation of the public schools is not … akin to the administration of Social Security … [because] [i]t implicates direct, coercive interactions between the State and its young residents"). There is no precedent that everything a teacher says to a parent—including speech the teacher is forbidden from engaging in—is part of a teacher's official job duties. The precedent is to the opposite. *Coomes*, 816 F.3d at 1264 ("she could have gone outside her duties in speaking to parents about other matters").

## III. The Permanent Injunction Does Not Otherwise Require Reformation.

California lastly requests that this Court vacate the injunction so the District Court can modify it to be in compliance with the Supreme Court's opinion. AOB.52-59. Most of California's arguments are addressed above and need not be repeated, but three points remain, each of which is reviewed for abuse of discretion. *Galvez v. Jaddou*, 52 F.4th 821, 829 (9th Cir. 2022); AOB.52 n.12.

First, California argues that the word "permit" in the injunction is vague and could mean "allow" or could mean "compel the conduct." AOB.57. Not so. CDE has plenary authority over the statewide school system. 1-ER-132-33. To "permit" something means "[t]o suffer or allow to be, come to pass, or to take place, by tacit consent or by not prohibiting

or hindering." *United States v. Innes*, 218 F. 705, 706 (D. Or. 1914); *see* 1-SER-67-68.

Second, California complains that Section 1(d)'s phrase "manifested a form of gender incongruity" is vague and could extend to "a whole swath [of] student behavior," including clothing, hobbies, or interests. AOB.58-59. But Section 1(d) restrains the State from interfering with a teacher's voluntary communications to parents. 1-ER-75:17-20. No other aspect of California law limits teachers' ability to speak with parents about their child's clothing, hobbies, or interests and California now cannot limit such discussions on the basis that the hobbies may reveal the child's gender identity.

Third, California states that the injunction is ambiguous as to which specific laws are enjoined, and seeks limitation of the injunction to identified code provisions. AOB.56-57; CTA Br.5 n.2; Psych. Profs. Br.23. But an injunction must describe "the act or acts restrained"—not the laws restrained. Fed. R. Civ. P. 65(d)(1)(C). Indeed, "no court may … purport to enjoin challenged 'laws themselves.'" *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021).

Here, the same issue arose during the summary judgment hearing, with the District Court raising the concern that if its injunction addressed merely one California statute, "the next day," State Defendants would start advising school districts that some other California statute requires Parental Exclusion Policies. 1-SER-31-33; 1-

ER-84:20-85:28. Nor are the statutes California cites new. *See, e.g.*, 6-SER-1489:13-1490:8; 6-SER-1576:24-1577:4; 6-SER-1400-01. They allow disclosure of information from school counselors to parents to protect the child's "health, safety, or welfare," Cal. Educ. Code §49602(c), so the District Court clarified that Parental Exclusion Policies are contrary to health and safety interests.

In light of the procedural history of this case, the District Court acted within its broad discretion in using its "olfactory nerve" to determine "that the case smelled" and "the State has been playing games." 1-SER-29:23-30:15. Upon making that determination, the District Court appropriately ceased trying to "wrestl[e] with a bowl of Jell-O," 6-SER-1453:18-19, and participate in California's "[h]ide the ball" litigation. 1-ER-26:15. Instead, the District Court cut through California's "circular firing squad," 6-SER-1397:1, or "Abbott and Costello skit" of "Who's on First," 1-SER-28:7, by enjoining California from enforcing Parental Exclusion Policies pursuant to "*any* [] provision of California law," 1-ER-74:24-25 (emphasis added).

## CONCLUSION

The Court should affirm the judgment below.

Respectfully submitted,

Dated: August 26, 2026 By: */s/ Paul M. Jonna*

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
William T. Duke
LiMANDRI & JONNA LLP
Post Office Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930

Peter Breen
Michael McHale
Christopher J.F. Galiardo
THOMAS MORE SOCIETY
121 West Wacker Dr., Ste. 650
Chicago, IL 60601
(312) 782-1680

*Counsel for Plaintiffs-Appellees*

## STATEMENT OF RELATED CASES

Pursuant to 9th Cir. R. 28-2.6, Plaintiffs-Appellees state that the following related cases are pending in this Court: *City of Huntington Beach v. Newsom*, No. 25-3826; *Chino Valley Unified School District v. Newsom*, No. 25-3686; *Regino v. Blake*, No. 26-475; *Ramirez v. Oakland Unified School District*, No. 25-7232; and *Mirabelli v. Bonta*, No. 26-2334 (appeal from post-judgment attorneys'-fee orders).

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** **25-8056 & 26-2337**

I am the attorney or self-represented party.

**This brief contains 13,999 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Paul M. Jonna* **Date** August 26, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2026, I electronically filed the foregoing Appellants' Answering Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system and by email to all counsel of record.

*/s/ Paul M. Jonna*
Paul M. Jonna