Nos. 25-8056

# In the United States Court of Appeals for the Ninth Circuit

ELIZABETH MIRABELLI, ET AL.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA, ET AL.,
*Defendants-Appellants*.

On Appeal from the United States District Court for the Southern District of California
Honorable Roger T. Benitez
(3:23-cv-768-BEN)

**BRIEF OF FLORIDA, IDAHO, AND 15 STATES AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

RAÚL LABRADOR
*Attorney General*

MICHAEL ZARIAN
*Solicitor General*

JADEN STEEVES
*Fellow*

OFFICE OF THE IDAHO ATTORNEY GENERAL
700 W. Jefferson St. #210
Boise, ID 83720

JAMES UTHMEIER
*Attorney General*

DAVID M.S. DEWHIRST
*Solicitor General*

JASON J. MUEHLHOFF
*Chief Deputy Solicitor General*

THOMAS F. KELLY, IV
*Assistant Solicitor General*

OFFICE OF THE FLORIDA ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
Jenna.hodges@myfloridalegal.com

September 2, 2026

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICI CURIAE* ........ 1

SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 3

I. Parental rights are among the oldest and most established rights in our legal tradition. ........ 3

II. Family liberty interests are entrenched in Anglo-American society and flow from natural order. ........ 10

III. Plaintiffs' relief requested implicates parental rights nationwide. ........ 13

CONCLUSION ........ 16

ADDITIONAL SIGNATORIES ........ 18

# TABLE OF AUTHORITIES

## Cases

*Brandt ex rel. Brandt v. Griffin*,
147 F.4th 867 (8th Cir. 2025)................................................................5
*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011)..........................................................................5, 6
*Calabretta v. Floyd*,
189 F.3d 808 (9th Cir. 1999)...............................................................1
*Gruenke v. Seip*,
225 F.3d 290 (3d Cir. 2000)...............................................................13
*In re Guardinaship of Faust*,
123 So. 2d 218 (Miss. 1960)...............................................................11
*In re J.P.*,
648 P.2d 1364 (Utah 1982)...........................................................11, 12
*In re Luscier's Welfare*,
524 P.2d 906 (Wash. 1974).................................................................11
*Lacher v. Venus*,
188 N.W. 613 (Wis. 1922)............................................................11, 12
*Mahmoud v. Taylor*,
145 S. Ct. 2332 (2025)........................................................................4
*May v. Anderson*,
345 U.S. 528 (1953)............................................................................1
*McDonald v. City of Chicago, Ill.*,
561 U.S. 742 (2010)............................................................................3
*Meyer v. Nebraska*,
262 U.S. 390 (1923).........................................................................1, 4
*Mirabelli v. Olson*,
761 F. Supp. 3d 1317 (S.D. Cal. 2025)...............................................16
*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*,
145 S. Ct. 14 (2024)...........................................................................14
*Parham v. J.R.*,
442 U.S. 584 (1979)......................................................................4, 5, 9
*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*,
268 U.S. 510 (1925)............................................................................4
*Raskin on behalf of JD v. Dallas Indep. Sch. Dist.*,
69 F.4th 280 (5th Cir. 2023)...............................................................12

*Smith v. Org. of Foster Fams. For Equal. & Reform*,
431 U.S. 816 (1977) .......... 11
*Stanley v. Illinois*,
405 U.S. 645 (1972) .......... 1, 4
*Troxel v. Granville*,
530 U.S. 57 (2000) .......... 3, 4, 8
*United States v. Skrmetti*,
145 S. Ct. 1816 (2025) .......... 8
*United States v. Skrmetti*,
605 U.S. 495 (2025) .......... 10
*Vernonia Sch. Dist. 47J v. Acton*,
515 U.S. 646 (1995) .......... 6
*Wisconsin v. Yoder*,
406 U.S. 205 (1972) .......... 4, 11

**Statutes**

Cal. Educ. Code § 220.15 .......... 16
Cal. Educ. Code § 220.35 .......... 16
Cal. Educ. Code § 220.55 .......... 16

**Other Authorities**

Adele Diamond, Normal Development of Prefrontal Cortex from Birth to Young Adulthood: Cognitive Functions, Anatomy, and Biochemistry, in Principles of Frontal Lobe Function (D. Stuss & R. Knight eds., 2002) .......... 7
Chloe K. Jones, *The Façade of Medical Consensus: How Medical Associations Prioritize Politics Over Science*,
2025 Harv. J.L. & Pub. Pol'y Per Curiam (2025) .......... 8
Melissa Moschella, *Natural Law, Parental Rights and Education Policy*,
59 AM. J. JURIS. 197 (2014) .......... 13
Melissa Moschella, *Natural Law, Parental Rights, and the Defense of "Liberal" Limits on* Government,
98 NOTRE Dame L. Rev. 1559 (2023) .......... 13
Lawson B. Hamilton, *Parent, Child, and State: Regulation in A New Era of Homeschooling*,
51 J.L. & Educ. 45 (2022) .......... 12

Sarah C. J. Jorgensen, Transition Regret and Detransition: Meanings and Uncertainties, 52 Arch Sex Behav., 2173, 2173–84 (2023), https://doi.org/10.1007/s10508-023-02626-2 ........................................ 10

Frances Williamson, *The Meaning of "Public Meaning": An Originalist Dilemma Embodied by Mahanoy Area Scho*ol DISTRICT, 46 HARV. J.L. & PUB. Pol'y 257 (2023) ................................................. 13

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are the States of Florida, Idaho, and 15 states ("*Amici States*"). *Amici States* seek to ensure that parents retain their fundamental right to direct the upbringing of their minor children—a right described as "essential" and "far more precious . . . than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (first quoting *Meyer v. Nebraska*, 262 U.S. 390, 299 (1923); and then *May v. Anderson*, 345 U.S. 528, 533 (1953)). A state's "interest in the welfare of children embraces not only protecting children from physical abuse, but also protecting children's interest in the privacy and dignity of their homes and in the lawfully exercised authority of their parents." *Calabretta v. Floyd*, 189 F.3d 808, 820 (9th Cir. 1999).

## SUMMARY OF ARGUMENT

Parental rights are fundamental and foundational. Parents—not the government—are entrusted with ultimate responsibility for the care, formation, and well-being of their children. Regrettably, parental rights

---

[1] All parties were noticed of the filing of this brief. No party's counsel authored this brief in whole or in part pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E). No person, party, or party's counsel financed or funded the preparation of this brief other than *amici curiae*.

have been forced to take on a new focus in response to California's harmful policies requiring public schools to hide students' mistaken transgender status from their own parents, even over express parental objection. Worse, the laws at issue here further require that public schools support students' "social transition" at school—meaning, schools must treat a child as being of the opposite sex—all while taking deliberate steps to hide it from parents. Intervention of this kind is destructive and can lead to permanent damage to the child's mental and physical health. Nonetheless, this Court previously held that Applicants suffered no substantial injury. *See* C.A.Dkt.13. That cannot be right, especially since this view turns a blind eye to harm done nationwide[2] by similar policies. All of this is preventable. It only takes this Court recognizing that parental rights extend to this context.

This application of parental rights fits comfortably within the existing precedent. As this Court has recognized, "the interest of parents in the care, custody, and control of their children" "is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v.*

[2] *See* 3-SER-636, 79 (describing attempted suicide); *see* 3-SER-712-13 (describing iatrogenic harm).

*Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). Yet California circumvents these constitutional mandates, despite the Fourteenth Amendment existing "to enforce constitutionally declared rights against the States." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 833 (2010) (Thomas, J., concurring). And our Constitution places the burden on States to respect fundamental rights, not on citizens to claw back the right to parent their own children after their express demands are flatly rejected. The decision below inverts this constitutional reality.

## ARGUMENT

*Amici States* offer three points below. First, parental rights are some of the oldest fundamental rights that this Court has recognized and play a bedrock role in American society. Second, family liberty interests are deeply entrenched in history and flow from the natural order of creation. Third, California's encroachment on parental rights represents a nationwide problem.

### I. PARENTAL RIGHTS ARE AMONG THE OLDEST AND MOST ESTABLISHED RIGHTS IN OUR LEGAL TRADITION.

Courts have long acknowledged the importance of empowering parents to manage their child's care. Such rights are "perhaps the oldest of the fundamental liberty interests recognized." *Troxel*, 530 U.S. at 65

(plurality opinion). Because children are unable "to make sound judgments concerning many decisions," the Court has understood our Constitution to incorporate "broad parental authority over minor children." *Parham v. J.R.*, 442 U.S. 584, 602–03 (1979). Accordingly, the Court has recognized a parent's right to direct their child's education, *see Meyer v. Nebraska*, 262 U.S. at 400; *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925) (religious upbringing); *see Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972) (and their own relationship); *see Stanley*, 405 U.S. at 651.

This Court has also heralded a parent's right "to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66 (plurality); *see Mahmoud v. Taylor*, 145 S. Ct. 2332, 2358 (2025) ("We reject this chilling vision of the power of the state to strip away the critical right of parents to guide the religious development of their children."). As relevant here, that right "include[s] their need for [lawful] medical care or treatment." *Parham*, 442 U.S. at 603; *see Brandt ex rel. Brandt v. Griffin*, 147 F.4th 867, 884–88 (8th Cir. 2025) (holding that prohibition of gender-transition procedures was constitutional against parental-rights assertion). Whereas a "child may balk at

hospitalization or complain about a parental refusal to provide cosmetic surgery," a parent typically will know better and should have the "authority to decide what is best for the child." *Id.* at 604. That basic right is only more pressing when the ideology pushed by schools ignores basic reality about the two sexes and further confuses innocent and impressionable children.

History and tradition undergird those precedents. As early commentators recognized, children do not understand "how to govern themselves." 2 Samuel Pufendorf, *The Whole Duty of Man According to the Law of Nature 202* (1735). Their "wants and weaknesses" thus "render it necessary that some person maintains them" until adulthood. 2 James Kent, *Commentaries on American Law* 190 (1873); 1 William Blackstone, *Commentaries on the Laws of England* 447 (1753); Pufendorf, *Whole Duty of Man* at 202; *see also Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 828–29 (2011) (Thomas, J., dissenting). Parents have traditionally been entrusted as "the most fit and proper person[s]" for that task. Kent, *American Law* at 190. And so, the common law equipped parents with equally robust parental rights. "[H]ousehold heads" were empowered to "speak for their dependents in dealings with the larger world," Toby L. Ditz,

*Ownership and Obligation: Inheritance and Patriarchal Households in Connecticut, 1750-1820*, 47 Wm. & Mary Q. 235, 236 (1990), and parents enjoyed the "right . . . to govern their children's growth," *Brown*, 564 U.S. at 828 (Thomas, J., dissenting); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995) ("Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination—including even the right of liberty in its narrow sense, *i.e.,* the right to come and go at will.").

Medical and social-science literature only confirms the wisdom of our tradition. Longstanding research shows that children are unable to "deliberate maturely" towards their own best interests. Ferdinand Schoeman, *Parental Discretion and Children's Rights: Background and Implications for Medical-Decision-Making*, 10 J. Med. & Phil. 45, 46 (1985). As any parent knows, children often make poor decisions because they lack life experience. Medical science also tells us that children make these poor decisions because a child's prefrontal cortex, the portion of the

brain that deals with reasoning and long-term consequences, is underdeveloped.[3]

Those deficiencies also make parental involvement critical in the context of gender dysphoria. One nefarious "treatment" for that ailment—the treatment school officials secretly provided the parent-plaintiffs' child—is "social transitioning": the practice of treating a person in line with their imagined proper gender. But recent reports reveal that social transitioning "can concretize gender dysphoria" and may not "improve[] mental health status in the short term."[4] Worse still, "de-transition and/or regret could be more frequent than previously reported" for individuals suffering from adolescent-onset gender dysphoria, and continuing down these types of treatment paths may lead to "irreversible effects."[5] *Id.* Indeed, social transitions are serious psychosocial

[3] *See* Adele Diamond, *Normal Development of Prefrontal Cortex from Birth to Young Adulthood: Cognitive Functions, Anatomy, and Biochemistry, in Principles of Frontal Lobe Function* 466 (D. Stuss & R. Knight eds., 2002) (noting that the pre-frontal cortex takes "over two decades to reach full maturity"), https://tinyurl.com/4fb7ss7s.

[4] Sarah C. J. Jorgensen, *Transition Regret and Detransition: Meanings and Uncertainties*, 52 Arch. Sex Behav., 2173, 2173–84 (2023), https://doi.org/10.1007/s10508-023-02626-2.

[5] Officials encouraging children to transition—whether socially or medically—heavily relied on position statements published by medical associations

interventions that have shown long-term negative consequences for mental health.[6]

California discounts this authority. It dismisses parental rights at issue here by citing general concerns over expanding the concept of substantive due process. AOB.27. That general statement of law ignores the wealth of history and precedent affirming parental rights over their children in analogous contexts.

In particular, the parental right to make lawful decisions regarding a child's "medical care or treatment," must survive. *Parham*, 442 U.S. at 603. That right is not thoroughly discussed by historical sources because "[i]n an earlier day, the problems inherent in coping with children

---

like the World Professional Association for Transgender Health ("WPATH"). *See* Chloe K. Jones, *The Façade of Medical Consensus: How Medical Associations Prioritize Politics Over Science*, 2025 Harv. J.L. & Pub. Pol'y Per Curiam 4–6 (2025). There is, however, compelling evidence to suggest these medical associations "often [choose] their positions . . . to advance policy objectives rather than scientific principles." *Id.* at 6. Indeed, "[r]ecent revelations suggest that WPATH, long considered a standard bearer in treating pediatric gender dysphoria . . . bases its guidance on insufficient evidence and allows politics to influence its medical conclusions." *United States v. Skrmetti*, 145 S. Ct. 1816, 1847 (2025) (Thomas, J., concurring).

[6] *See* Hilary Cass, *Independent review of gender identity services for children and young people* 158–64 (2024), https://tinyurl.com/cytx5spn. "Clinical involvement in the decision-making process should include advising on the risks and benefits of social transition as a planned intervention, referencing best available evidence. This is *not* a role that can be taken by staff without appropriate clinical training." *Id.* at 164 (emphasis added).

afflicted with mental or emotional abnormalities were dealt with largely within the family." *Id.* at 598. But the parental right to make lawful medical decisions on behalf of minor children has only become more salient as "states have expanded their efforts to assist the mentally ill" and physically ill in ideologically-charged ways. *Id.* at 599.

Still, the United States Supreme Court has given guidance on the parental right to make lawful medical decisions for a child. It explained that "children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment." *Parham*, 442 U.S. at 603. "Parents can and must make those judgments." *Id.* "Simply because the decision is not agreeable to the child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* Thus, a "child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery," but a parent typically will know better and thus must maintain the "authority to decide what is best for the child." *Id.* at 604.

The need for parental involvement and oversight is only more pressing when the ideology pushed by the state confuses innocent and

impressionable children experiencing "gender dysphoria." Some seek to treat gender dysphoria with so-called "gender-affirming care," which employs social, mental-health, and physical interventions to treat a person in line with his or her preferred gender. *See id.* at 1263. But there are "fierce scientific and policy debates about the safety, efficacy, and propriety of" these treatments. *United States v. Skrmetti*, 605 U.S. 495, 525 (2025). Recent reports reveal that this treatment "can concretize gender dysphoria" and may not "improve[] mental health status in the short term."[7]

## II. FAMILY LIBERTY INTERESTS ARE ENTRENCHED IN ANGLO-AMERICAN SOCIETY AND FLOW FROM NATURAL ORDER.

Not only are family liberty interests recognized in law, but the "history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children." *Yoder*, 406 U.S. at 232. This tradition in Anglo-American society is so entrenched that the "primary role of the parents in the upbringing of their children is [ ] established beyond debate as an enduring American

[7] Sarah C. J. Jorgensen, *Transition Regret and Detransition: Meanings and Uncertainties*, 52 Arch Sex Behav., 2173, 2173–84 (2023), https://doi.org/10.1007/s10508-023-02626-2.

tradition." *Id.* Indeed, "[t]he integrity of the family and the parents' inherent right and authority to rear their own children have been recognized as fundamental axioms of Anglo-American culture, presupposed by all our social, political, and legal institutions." *In re J.P.*, 648 P.2d 1364, 1373 (Utah 1982) (Oaks, J.); *In re Luscier's Welfare*, 524 P.2d 906, 907 (Wash. 1974) (overruled on other grounds) ("The family entity is the core element upon which modern civilization is founded."); *In re Guardinaship of Faust*, 123 So. 2d 218, 221 (Miss. 1960); *see also*, *Lacher v. Venus*, 188 N.W. 613, 617 (Wis. 1922) ("The unit of the state is the individual, its foundation is the family.").

Accordingly, the legal "liberty interest in family privacy has its source . . . in intrinsic human rights." *Smith v. Org. of Foster Fams. For Equal. & Reform*, 431 U.S. 816, 845 (1977); *see also*, *In re J.P.*, 648 P.2d at 1373 ("This parental right . . . is rooted not in state or federal statutory or constitutional law, to which it is logically and chronologically prior, but in nature and human instinct."). Our tradition has long recognized that "[t]he parent-child relationship is a sacred, pre-political bond that preexists" the United States, as well as any local law. *Raskin on behalf of JD v. Dallas Indep. Sch. Dist.*, 69 F.4th 280, 298 (5th Cir. 2023)

(Oldham, J., concurring); *see also*, *In re J.P.*, 648 P.2d at 1373 ("The rights inherent in family relationships . . . are 'natural,' 'intrinsic,' or 'prior' in the sense that our Constitutions presuppose them, as they presuppose the right to own and dispose of property."); *Lacher*, 188 N.W. at 617 ("A natural affection between the parents and offspring . . . has always been recognized as an inherent, natural right, for the protection of which . . . our government is formed."). In sum, our government recognizes "parental rights"; it does not create them. Lawson B. Hamilton, *Parent, Child, and State: Regulation in A New Era of Homeschooling*, 51 J.L. & EDUC. 45, 69 (2022).

Our Anglo-American legal tradition has always understood this pre-political parental authority as flowing from the natural order of things—especially the inherent vulnerabilities of children. *See* John Locke, *Second Treatise of Government* §§ 55–58, 71 (1690) (stating that parental "jurisdiction" arises from a duty to care for children during the "imperfect state of childhood," and distinguishing parental from political power); H. Maine, *Ancient Law,* 163-64 (1st American ed. 1870) (stating that children "before years of discretion . . . are subject to extrinsic control

on the single ground that they do not possess the faculty of forming a judgment on their own interests.").

This framework—which the Ninth Circuit undermined—remains crucial because it acknowledges the reality that multiple nested and interlocking communities have an interest in a child's well-being. Frances Williamson, *The Meaning of "Public Meaning": An Originalist Dilemma Embodied by Mahanoy Area School District*, 46 HARV. J.L. & PUB. POL'Y 257, 283 (2023) (calling them "two spheres of control"). But a child's primary, base unit community is the family. Melissa Moschella, *Natural Law, Parental Rights, and the Defense of "Liberal" Limits on Government*, 98 NOTRE DAME L. REV. 1559, 1572 (2023). This community is sovereign in its own sphere and mission—the common good of the family and individuals in it. Melissa Moschella, *Natural Law, Parental Rights and Education Policy*, 59 AM. J. JURIS. 197, 212-13 (2014). This higher status is why parents hold the "primary rights" to direct every aspect of their child's life. *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000).

## III. PLAINTIFFS' RELIEF REQUESTED IMPLICATES PARENTAL RIGHTS NATIONWIDE.

Across the country, government officials are fundamentally altering the upbringing of children while keeping parents in the dark.

Dizzying numbers of school districts and a growing number of states have passed similar "secret transition" laws and ordinances without concern for parental rights. A flood of litigation has followed.

Here, public school officials facilitated a secret "social transition" for a junior-high female. Only after her attempted suicide did her parents learn their daughter had been treated as a male for most of the prior year. Despite transferring their daughter to another public school and demanding notice of her daughter's gender presentation, the school still refused to honor the parents' request—citing the State's policies for justification. To this day, her parents remain in the dark regarding their daughter's gender at school.

This school district is one of many across the country that will happily hide and facilitate a child's social transition. Just over a year ago, "more than 1,000 districts [had] adopted such policies." *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, 145 S. Ct. 14, 14 (2024) (Alito, J., dissenting from denial of certiorari). That number has increased to more than 1,200 school districts today.[8] 12.3 million students,

---

[8] *See List of School District Transgender – Gender Nonconforming Student* Policies, Defending Educ. (Apr. 21, 2025), https://tinyurl.com/7rtmmv7r (last accessed Jan. 14, 2026).

approximately one quarter of all public K-12 students nationwide, are subject to these policies.[9]

Newly enacted laws and policies at the state level have created increasing tension with parents' rights. In 2023, the New York State Education Department promulgated guidance to public school teachers on how to conceal a social transition from a child's parents.[10] "The key takeaway: if your child decides that he or she wants to socially transition to the opposite gender, it is now a 'best practice' for the school to lie to you about it."[11] New York follows New Jersey, which has had near-identical policies on the books since 2018.[12]

---

[9] *See id.*; *Public School Enrollment*, Nat'l Ctr. for Educ. Stat., (last accessed Jan. 14, 2026), https://tinyurl.com/5d2vvwcs (estimating public K-12 public school enrollment at 48.2 million students in 2025).

[10] *See* N.Y. State Dep't of Educ., *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* 16–17 (2023), https://tinyurl.com/3685jcjd.

[11] Max Eden, *New York State's Directive to Schools: Lie to Parents*, City J. (June 16, 2023), https://tinyurl.com/mr44mdnd.

[12] *See* Dana DiFilippo, *State, School District Defend NJ Guidance on Transgender Students from Court Challenge*, N.J. Monitor (Sept. 5, 2025, at 6:35 AM), https://tinyurl.com/bdezkcdt; *see also* N.J. Dep't of Educ., *Transgender Student Guidance for School Districts* 3 (2018), https://tinyurl.com/mr47m2hm.

In 2024, California took a step further by enacting protections for all school officials who refuse to disclose any information concerning a child's gender expression to any other person. *See* Cal. Educ. Code § 220.3. California also provides robust anti-retaliation protections for school officials that feel the need to shape a child's sexual identity away from parental supervision. *See id.* § 220.1. And it further bars school districts from requiring parental disclosures concerning efforts to socially transition children. *See id.* § 220.5(a).[13]

These radical policies have revealed a blind spot in the Court's jurisprudence. As the district court below lamented, "[t]here are no controlling decisions" in this context. *Mirabelli v. Olson*, 761 F. Supp. 3d 1317, 1332 (S.D. Cal. 2025). This Court should hold for Plaintiffs, and in so doing, support parental rights nationwide.

## CONCLUSION

This Court should affirm.

---

[13] *See also* Diana Lambert & Monica Velez, *Newsom Signs Bill to End Parental Notification Policies at Schools; Opponents Say Fight is Not Over*, EdSource (July 17, 2024), https://tinyurl.com/4fcavsrb.

Respectfully submitted,

RAÚL LABRADOR
*Attorney General*

MICHAEL ZARIAN
*Solicitor General*

JADEN STEEVES
*Fellow*

JAMES UTHMEIER
*Attorney General*

DAVID M.S. DEWHIRST
*Solicitor General*

JASON J. MUEHLHOFF
*Chief Deputy Solicitor General*

THOMAS F. KELLY, IV
*Assistant Solicitor General*

*/s/ David M.S. Dewhirst*
*Counsel for Amici Curiae*

OFFICE OF THE IDAHO
ATTORNEY GENERAL
700 W. Jefferson St. #210
Boise, ID 83720

OFFICE OF THE FLORIDA
ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399
Thomas.kelly@myfloridalegal.com

*Counsel for Amici Curiae*

September 2, 2026

## ADDITIONAL SIGNATORIES

STEVE MARSHALL
*Attorney General of Alabama*

STEPHEN J. COX
*Attorney General of Alaska*

TIM GRIFFIN
*Attorney General of Arkansas*

CHRIS CARR
*Attorney General of Georgia*

THEODORE E. ROKITA
*Attorney General of Indiana*

BRENNA BIRD
*Attorney General of Iowa*

KRIS KOBACH
*Attorney General of Kansas*

LYNN FITCH
*Attorney General of Mississippi*

MICHAEL T. HILGERS
*Attorney General of Nebraska*

DREW H. WRIGLEY
*Attorney General of North Dakota*

ALAN WILSON
*Attorney General of South Carolina*

MARTY JACKLEY
*Attorney General of South Dakota*

JONATHAN SKRMETTI
*Attorney General of Tennessee*

KEN PAXTON
*Attorney General of Texas*

JOHN B. MCCUSKEY
*Attorney General of West Virginia*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-8056

I am the attorney or self-represented party.

**This brief contains** 4,023 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated ______.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** David M.S. Dewhirst **Date** 9/2/26

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*