Nos. 25-8056; 26-2337

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

ELIZABETH MIRABELLI *et al.*,

*Plaintiffs-Appellees,*

*v.*

ROB BONTA, in his official capacity as
Attorney General of California; *et al.*,

*Defendants-Appellants,*

---

On Appeal from the United States District Court
for the Southern District of California
No. 3:23-cv-00768-BEN-VET
The Hon. Roger T. Benitez

---

# BRIEF *AMICI CURIAE* OF PROFESSORS ROBERT P. GEORGE, MELISSA MOSCHELLA, AND ERIC A. DEGROFF

*in Support of Plaintiffs-Appellees and Urging Affirmance*

---

Steven W. Fitschen
*Counsel of Record*
National Legal Foundation
524 Johnstown Road
(757) 463-6133
sfitschen@nationallegalfoundation.org

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .................................................................... iii

**INTERESTS OF *AMICI CURIAE*** ..........................................................1

**SUMMARY OF THE ARGUMENT** ...........................................................3

**ARGUMENT** ...............................................................................................4

I. At Common Law, the "Best Interests of the Child" Justified the Authority Given Parents to Act on Their Children's Behalf; It Did Not Constitute an Independent Standard by Which Third Parties Could Displace Parents' Consent .........................................4

A. The Common Law Placed Upon Parents the Right and Responsibility to Act for Their Children's Good ...........................4

B. The Common Law Presumed, Rather Than Adjudicated Case-By-Case, That Parents Act for Their Children's Good ..............................................................8

C. The Common Law Treated the "Best Interests of the Child" as a Guiding Principle to Describe the Duties Appertaining to Parental Rights, Not as a Freestanding Legal Standard Supplanting Parental Authority ..................................11

II. The Common Law Required a Parent's Affirmative Consent—Not the Consent of the Child or Notice to the Parents—Before Third Parties Could Act on a Child's Health ....................................13

A. Parental Consent, Not Notice, Was the Common Law's Default Rule for Medical and Health-Related Intervention ................13

B. Notice—Whether Furnished After the Fact or Only Upon Request—Has Never Functioned as a Substitute for Consent .................................................................17

C. Where Courts Have Displaced Parental Consent for the Child's Interest, They Did So Through Narrow, Judicially Supervised Exceptions, Not Unilateral Third-Party Judgment ........................................................................ 19

III. A Policy Disclosing Social Transition Only Upon Parental Inquiry Satisfies Neither of the Principles Discussed Above ........................ 22

**CONCLUSION ........................................................................................ 25**

## TABLE OF AUTHORITIES

**Cases**

*Bakker v. Welsh*, 108 N.W. 94 (Mich. 1906) ........ 17

*Bonner v. Moran*, 126 F.2d 121 (D.C. Cir. 1941) ........ 16, 18-19, 24

*Commonwealth v. Murray*, 4 Binn. 487 (E.D. Pa. 1812) ........ 7-8

*Custody of a Minor*, 379 N.E.2d 1053 (Mass. 1978) ........ 20

*Deanda v. Becerra*, 645 F. Supp. 3d 600 (N.D. Tex. 2022) ........ 19

*In re Hudson*, 126 P.2d 765 (Wash. 1942) ........ 21

*In re Jensen*, 633 P.2d 1302 (Or. Ct. App. 1981) ........ 20

*Kennedy v. School District of Lebanon*, No. 11-cv-00382, 2011 U.S. Dist. LEXIS 157416 (M.D. Pa. Dec. 21, 2011) ........ 15

*May v. Anderson*, 345 U.S. 528 (1953) ........ 13

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ........ 13, 19

*Moore v. City of East Cleveland*, 431 U.S. 494 (1977) ........ 13

*Morrison v. State*, 252 S.W.2d 97 (Mo. Ct. App. 1952) ........ 20

*Moss v. Rishworth*, 222 S.W. 225 (Tex. Comm'n App. 1920) ........ 14-15, 19

*Newmark v. Williams*, 588 A.2d 1108 (Del. 1991) ........ 21

*Parham v. J.R.*, 442 U.S. 584 (1979) ........ 19, 22

*People ex rel. Wallace v. Labrenz*, 104 N.E.2d 769 (1952) ........ 20

*Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015) ........ 20

*Prince v. Massachusetts*, 321 U.S. 158 (1944)

*Troxel v. Granville*, 530 U.S. 57 (2000) .................................................... 12-13, 16

*United States v. Bainbridge*, 24 F. Cas. 946 (C.C.D. Mass. 1816) ....................... 6-8

*Wells v. McGehee*, 39 So. 2d 196 (La. Ct. App. 1949)....................................18, 24

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ....................................................... 21-22

*Zoski v. Gaines*, 260 N.W. 99 (Mich. 1935)........................................ 15, 18-19, 24

**Other Authorities**

Bacon, Matthew, *A New Abridgment of the Law*
(W. Strahan & M. Woodfall 4th ed. 1778)................................................ 5-6

Berger, Lawrence M. & Font, Sarah A.,
*The Role of the Family and Family Centered Programs*
*and Policies*, 25 Future Child 155 (2015) ...................................................11

Bohl, J., *"Those Privileges Long Recognized:"*
*Termination of Parental Rights Law,*
*the Family Right to Integrity and the Private*
*Culture of the Family*, 1 Cardozo Women's L.J. 323 (1994)..........................9

Bouvier, John, 1 *Institutes of American Law*........................................................10
(Robert E. Peterson & Co. 1854)

Hilary Cass, *Independent Review of Gender Identity Services*
*for Children and Young People: Interim Report* (2022) ..............................22

D'Anvers, Knightley, 2 *General Abridgment of the*
*Common Law* (Nutt, Nutt & Gosling 2d ed. 1722) ........................................6

DeGroff, Eric A., *Parental Rights and Public School Curricula:*
*Revisiting* Mozert *After 20 Years*, 38 J. Law & Educ. 83 (2009)....................8

DeGroff, Eric A. & Fitschen, Steven W., *The Not-So-Silent Epidemic*
*of Secret Gender-Affirming Policies in the Nation's Schools:*
*Parental Rights and the Promise of Pierce v. Society of Sisters*,
100 Notre Dame L. Rev. 1795 (2025)....................................................14, 20

Eichner, Maxine, *Bad Medicine: Parents, the State, and the Charge of "Medical Child Abuse,"* 50 U.C. Davis L. Rev. 205 (2016) .................. 20-21

Forsythe, William, *A Treatise on the Law Relating to the Custody of Infants* (William Benning & Co. 1850)..................................9

Kent, James, *Commentaries on American Law* (O. Halsted 1827) .........................10

Kent, James, *Commentaries on American Law* (Little, Brown & Co. 1873)..........11

Kohm, Lynne Marie, *Do Children Have Rights? International and Domestic Approaches to the Protection of Children*, 12 J. Global Just. & Pub. Pol'y 8 (2026) ................................11

Kohm, Lynne Marie, *Tracing the Foundations of the Best Interests of the Child Standard in American Jurisprudence*, 10 J. Law & Fam. Studies 1 (2008).....................................12

Locke, John, *Second Treatise on Civil Government* § 56 (1690), *reprinted in* John Locke, *On Politics and Education* 101 (1947) ...................5

McPherson, William, *A Treatise on the Law Relating to Infants* (John S. Littell 1843)

Moschella, Melissa, *Defending the Fundamental Rights of Parents: A Response to Recent Attacks*, 37 Notre Dame J.L. Ethics & Pub. Pol'y 397 (2023)........................................................................9

Moschella, Melissa, *Strict Scrutiny as the Appropriate Standard of Review for Parental Rights Cases: A Historical Argument*, 28 Tex. Rev. L. & Pol. 771 (2024) ..............................................................20

Office of Population Affairs, Dep't of Health & Human Services, *Gender-Affirming Care and Young People* (2022) ......................................22

Sheridan, John, *The Present Practice of the Court of King's Bench* (James Moore 1792) ............................................................6

Society for Evidence Based Gender Medicine,
*Early Social Transgender in Children is Associated with High Rates of Transgender Identity in Early Adolescence*, https://segm.org/early-social-gender-transition-persistence (May 6, 2022) ....................23

Story, Joseph, 2 *Commentaries on Equity Jurisprudence* § 1341 (2d ed. 1839) .................... 10-11

Witte, Daniel E., People v. Bennett*: Analytic Approaches to Recognizing a Fundamental Parental Right Under the Ninth Amendment*, 1996 B.Y.U. L. Rev. 183 ....................10

Zucker, Kenneth J., *Debate: Different Strokes for Different Folks*, 25 Child & Adolescent Mental Health 36 (2020) ....................23

## INTERESTS OF *AMICI CURIAE*[1]

*Amici Curiae* are professors of law, philosophy, and jurisprudence who are experts on parental rights, legal history, constitutional law, and the nation's common law heritage, and bring an interdisciplinary perspective to the present litigation. Their particular interest in this case is in the constitutional and common law history of parental authority over the health-related care of minor children.

Professor Robert P. George (B.A., Swarthmore College; M.T.S. and J.D., Harvard University; D. Phil., B.C.L., D.C.L., and D. Lott., Oxford University) is McCormick Professor of Jurisprudence and Director of the James Madison Program in American Ideals and Institutions at Princeton University. He has also frequently taught at Harvard Law School. He writes and regularly teaches in the areas of constitutional interpretation, civil liberties, philosophy of law, and moral and political philosophy. He explores questions of parental rights and duties both as matters of philosophical inquiry and constitutional doctrine.

Professor Melissa Moschella (Ph.D., Princeton University; A.B. Harvard University) is Professor of the Practice in Philosophy at the University of Notre

[1] All parties consent to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than the *Amici Curiae* or their counsel contributed money that was intended to fund preparing or submitting the brief.

Dame's McGrath Institute for Church Life, and formerly McDonald Distinguished Fellow in the Center for Law and Religion at Emory University School of Law. Her teaching focuses on bioethics and the moral and political status of the family, and her scholarship addresses issues related to jurisprudence and constitutional law, particularly with regard to the issues of parental rights in education and religious freedom.

Professor Eric A. DeGroff (J.D., Regent University; M.P.A., University of Southern California, B.A., History, University of Kansas) is Professor of Law at Regent University, where he has taught courses in the Schools of Law, Government, and Education in school law, administrative law, and legal history. His scholarship has focused on parental rights, education policy, and religious liberty, and he has lectured on topics related to the history and principles of American education, the origins of the Western legal tradition, and contemporary public-school issues.

*Amici* write to counter a flawed historical premise advanced by the Appellants in this case that the common law's concern for the welfare of children has created a standard by which a public school can supplant the authority of a parent and usurp the parents' constitutional and common-law rights respecting a child's health-related care merely by disclosing the child's social transition to the parent upon request.

## SUMMARY OF THE ARGUMENT

Anglo-American law has long recognized that parents—not the state—are the primary decision-makers for their children's medical care. This reflects a considered judgment that parents are best positioned to know their children's needs, weigh risks and benefits in light of family values, and act in their children's interests. Our legal tradition has never treated parental authority as absolute. But the limits history has placed on that authority reflect two principles that, properly understood, reinforce rather than diminish the primacy of parental decision-making.

First, concern for the "best interests of the child" functioned at common law as the rationale for parental authority in the realm of healthcare, not as an independent standard by which schools, physicians, or other third parties could ordinarily override the requirement for parental consent. Eighteenth- and nineteenth-century sources linked parental power with parental duty and presumed that parents would act for their children's good; they did not envision that outside institutions would substitute their own judgments for the parents' whenever they believed a different course of action preferable. Where courts did displace parental consent in the name of the child's welfare, they did so only in narrow, judicially administered circumstances—usually involving imminent risk to life or irreversible harm—and only after a demanding evidentiary review, not through the unilateral determination of an institution acting on its own assessment of the child's best interests.

Second, the common law required a parent's or guardian's prior consent before a third party could render medical treatment or other health-related care to a minor child. It did not accept notice, whether freely offered after the fact or conditioned on a parent's specific inquiry, as a substitute. As a rule, courts imposed liability on physicians who acted without such consent even where the medical intervention was successful, and even where the minor had voluntarily agreed to the treatment. A policy that discloses a student's school-assisted social transition only if a parent thinks to ask upends this historical tradition: it treats parental passivity as the norm and parental authority as the exception, when at common law the reverse was true.

Properly understood, these two principles confirm that a school policy conditioning parental awareness of a student's social transition on the parent's own request cannot be reconciled with the historical framework which has undergirded this area of the law for centuries.

## ARGUMENT

### I. At Common Law, the "Best Interests of the Child" Justified the Authority Given Parents to Act on Their Children's Behalf; It Did Not Constitute an Independent Standard by Which Third Parties Could Displace Parents' Consent.

#### A. The Common Law Placed Upon Parents the Right and Responsibility to Act for Their Children's Good.

Parental rights are grounded in the welfare of the child. But the bare assertion

that "parental authority is not absolute" never reaches the premise that undergirded familial relations under the common law—that children generally lack the knowledge, experience and judgment to make life-altering decisions for themselves, and that a competent decision maker must therefore be substituted for them. That omission matters because the dispute in this case is precisely about who is best qualified to serve in that substitutionary role.

From an early date, the common law placed upon parents both the duty and the right to guide their children's development and make key decisions for them. The philosopher John Locke expressed this mindset when he wrote as follows:

> [Adam's descendants] are all born infants, . . . without knowledge or understanding. But to supply the defects of this imperfect state till the improvement of growth and age had removed them, . . . all parents were, by the law of Nature, under an obligation to preserve, nourish, and educate the children they had begotten . . . .[2]

The same rationale was reflected in the work of England's most influential jurists, who were motivated by a desire to protect children from the potential pitfalls of their immaturity. Matthew Bacon, whose summary of the English common law became a leading reference on both sides of the Atlantic, emphasized the common law's efforts to prevent minors from "being imposed upon" by "Persons of more Years and Experience" (Mathew Bacon, 3 *A New Abridgment of the Law* 136 (W.

[2] John Locke, *Second Treatise on Civil Government* § 56 (1690), *reprinted in* John Locke, On Politics and Education 101 (1947).

Strahan & M. Woodfall, 4th ed. 1778). John Sheridan, reflecting a similar view, described the legal disabilities to which minors were subject under the common law as "privileges" meant "to secure them from hurting themselves by their own improvident acts" (John Sheridan, *The Present Practice of the Court of King's Bench* 559 (James Moore 1792).

Given their relative lack of knowledge and experience, minors were generally protected from the enforcement of contracts other than those for necessities;[3] they had limited authority to dispose of their estates; they were sheltered from lawsuits in a variety of contexts; and they were largely precluded from holding positions of public trust. 2 Knightley D'Anvers, *General Abridgment of the Common Law* 769 (Nutt, Nutt & Gosling, 2d ed. 1722); 4 Matthew Bacon, *A New Abridgment of the Law* 336, 341, 345-46. There were, of course, exceptions to these rules—primarily for minors who were emancipated or whose parents were unable or refused to supply their needs or were otherwise unfit.

In *United States v. Bainbridge*, 24 F. Cas. 946 (C.C.D. Mass. 1816), for example, the United States Circuit Court for the District of Massachusetts denied a request to void a minor's contract of enlistment in the Navy. It was not clear whether the petition for habeas corpus was sued out by the boy's father or by the son himself,

[3] Even contracts for "Necessities" were subject to review for their reasonableness. Bacon at 133.

but it was apparently motivated by a desire to avoid the Navy's discipline for the son's desertion. The court held that the Navy had the constitutional and statutory authority to enlist minors, and it noted that an after-the-fact refusal to enforce the enlistment contract would prevent the Navy from executing proper discipline. *Id.* at 949 ff. While declining to rule on the validity of the original contract, Judge Story opined that it likely would have been enforceable at common law. But the circumstances surrounding the boy's enlistment are relevant. At the time of enlistment, the boy was almost 20 years of age, he appears to have been impliedly if not formally emancipated, and there was no evidence that his father—who was also in the Navy—had objected to his enlistment. *Id.* at 948.

The facts in *Commonwealth v. Murray*, 4 Binn. 487 (E.D. Pa. 1812), were similar. The mother of a minor who had enlisted in the Navy sought avoidance of her son's enlistment contract, arguing that the son had signed it without her approval. The court denied the son's discharge and found the contract binding. The court noted, however, that at the time he enlisted, the boy was seventeen, his father was dead, and he had no guardian or master "who had any lawful authority over him;" the boy was therefore free from parental control as a matter of law. *Id.* at 493.[4] In

[4] The decision also reflects the culture of that period, when mothers did not enjoy the same legal standing as fathers to act on behalf of their children, and the reality that navies of all developed nations—in the words of Justice Story—considered "the employment of minors almost indispensable." *Id.* at 949.

both *Bainbridge* and *Murray*, the courts considered the circumstances of the parties and the benefits of their contracts. Both courts noted that minors could contract for themselves in a number of settings. But the fact that the courts carefully evaluated the contracts' terms before enforcing them is itself telling. Such careful review would have been unnecessary if the law treated minors as fully capable contracting parties. The courts' analysis instead reflected the common law's underlying premise that minors are presumed to lack the judgment and experience of adults and require protection from improvident commitments. "Infants are shielded by the policy of the law, from the effect of contracts, which may terminate in their ruin; but they cannot avoid every contract made during their infancy, which may tend to their benefit." *Id.* at 494 (Judge Yeates, concurring). "I agree it to be a principle of the common law, that an infant cannot bind himself by indenture, nor contract for more than such necessaries as become the estate which he has . . . . He may however contract for his necessary subsistence and clothing, because these are essential to his existence." *Id.* at 495 (Brackenridge, J., concurring) (emphasizing that the boy, at the time he enlisted, had "neither father nor guardian, nor any means of livelihood").

## B. The Common Law Presumed, Rather Than Adjudicated Case-By-Case, That Parents Act for Their Children's Good.

Given the perceived incapacity of minors, the common law placed great responsibility upon parents, particularly fathers, for the care and welfare of their children. Eric A. DeGroff, *Parental Rights and Public School Curricula: Revisiting*

Mozert *After 20 Years*, 38 J. Law & Educ. 83, 109 (2009) (hereinafter "*Revisiting* Mozert"). During a child's minority, the parent was absolutely bound to provide reasonably for the child's maintenance, protection, and education. William Forsythe, *A Treatise on the Law Relating to the Custody of Infants* 9 (William Benning & Co. 1850). Though the connection was seldom explicit, the rationale for according parents such sweeping control over decisions affecting their children was premised upon the common lawyers' view of the nature of the family:

> For Blackstone, writing in 1758, the family formed the "first natural society" . . . . This "society" was separate from the State and predated the formation of civil government. Lord Coke, too, in his detailed breakdown of the "divers laws within the realm of England" described familial relationships as arising by virtue of "*lex naturae*" . . . . Even Sir Matthew Hale . . . echoed Blackstone's conception of the family as an ancient and autonomous little "society," categorizing familial matters as part of the "unwritten law" already in existence before time of memory.[5]

Parental control was never absolute, but given such a respectful view of the family, courts were highly deferential to parental decisions. "At the common law of England, a parent's right to custody and control of minor children was a sacred right with which courts would not interfere except where by conduct the parent abdicated

---

[5] J. Bohl, *"Those Privileges Long Recognized:" Termination of Parental Rights Law, the Family Right to Integrity and the Private Culture of the Family*, 1 Cardozo Women's L.J. 323, 328 (1994). For a philosophical defense of the view that "[c]hildren belong to their families before they belong to the state," see Melissa Moschella, *Defending the Fundamental Rights of Parents: A Response to Recent Attacks*, 37 Notre Dame J.L. Ethics & Pub. Pol'y 397 (2023).

or forfeited that right." Daniel E. Witte, People v. Bennett: *Analytic Approaches to Recognizing a Fundamental Parental Right Under the Ninth Amendment*, 1996 BYU L. REV. 183, 190-91.

The early common law view was naturally extended into the colonies; and while the law in this country gradually took on a uniquely American flavor, the same respect for parental decision making remained predominant. *Revisiting* Mozert at 112. Thus, Chancellor James Kent observed that "[w]hat is necessary for the child is left to the discretion of the parent. . . . [T]here must be a clear omission of duty, as to necessaries, before a third person can interfere." James Kent, *Commentaries on American Law* 192 (Little, Brown & Co. 1873). Other commentators likewise noted that, from the outset, our Nation's law had made parents "the guardian[s] of [their] children by nature and by nurture," William McPherson, A Treatise on the Law Relating to Infants 61 (John S. Littell 1843). "To enable the parents to perform their duties toward their children, and for their benefit, the law has invested them with considerable authority." 1 John Bouvier, Institutes of American Law 138 (Robert E. Peterson & Co. 1854) (emphasizing the reliance of infants on the legal protection of parents "until [they have] attained a sufficient maturity to manage [their] affairs"). And Joseph Story noted in the 1830s that the law operates with the "natural presumption" that parents will take proper care of their children, a presumption which can only be overridden by proof of "gross ill treatment" on the

part of the parent. 2 Joseph Story, Commentaries on Equity Jurisprudence § 1341 (2d ed. 1839).

### C. The Common Law Treated The "Best Interests of the Child" as a Guiding Principle To Describe the Duties Appertaining to Parental Rights, Not as a Freestanding Legal Standard Supplanting Parental Authority.

The phrase "best interests of the child" subsumes multiple meanings, and its uses should be clearly distinguished. In its general sense, the phrase reflects a concern for the wellbeing of children that all parties would naturally share. From an early date, our Nation's legal system has demonstrated a unique commitment to that value. Lynne Marie Kohm, *Do Children Have Rights? International and Domestic Approaches to the Protection of Children*, 12 J. Global Just. & Pub. Pol'y 8 (2026). Today, for example, all states have codified "best interests" as a legal standard when judicial intervention in the family is called for. *Id.* at 5. And our common law from the very beginning grounded the doctrine of parental rights on the presumption that fit parents who knew and loved their children would be the most likely designees to act in their children's best interests. Lawrence M. Berger & Sarah A. Font, *The Role of the Family and Family-Centered Programs and Policies*, 25 Future Child 155 (2015). As James Kent noted in his Commentaries on American Law, "[t]he wants and weaknesses of children render it necessary that some person maintain them, and the voice of nature has pointed out the parent as the most fit and proper person." James Kent, Commentaries on American Law 159 (New York, O. Halsted 1827).

On the other hand, as a formal doctrine, "best interests of the child" is a defined legal standard that courts apply in specific proceedings—typically custody disputes, contested guardianship, adoption, foster care placement, and termination of parental rights cases. Lynne Marie Kohm, *Tracing the Foundations of the Best Interests of the Child Standard in American Jurisprudence,* 10 J. Law & Fam. Studies 1 (2008). These are all narrowly-defined proceedings in which it has already been determined that judicial intervention is necessary. And in each situation, the needs of the parties and the merits of the case are determined through an exacting evaluation by the courts using specific criteria. Historically, in no area of the law has the "best interests" standard been applied as a test through which third parties could surveil and independently circumvent the rights of parents. Unfortunately, the position asserted by the Appellants and the historical analysis it presumes blur the distinction between the use of "best interests" as an aspirational guideline versus its use as a legal standard.

Our Nation's courts have held that parents have the duty and the correlative right to direct the upbringing of their children absent a finding of abuse, neglect, or abandonment. "[S]o long as a parent . . . is fit[], there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel v. Granville*, 530 U.S. 57, 68-69 (2000) (plurality

opinion). The Supreme Court has frequently affirmed that this right is both reflected in our common law heritage and protected by the Constitution—characterizing parental rights as "precious," "deeply rooted in [our] Nation's history," "essential to the orderly pursuit of happiness by free men," and "perhaps the oldest of the fundamental liberty interests recognized by this Court."[6] This Court should avoid applying the "best interests of the child" mantra in a way that would conflate its meanings and circumvent the right of parents to direct the upbringing of their children in accordance with such well-established common law and Constitutional principles.

## II. The Common Law Required a Parent's Affirmative Consent—Not the Consent of the Child or Notice to the Parents—Before Third Parties Could Act on a Child's Health.

### A. Parental Consent, Not Notice, Was the Common Law's Default Rule for Medical and Health-Related Intervention.

American courts, with few exceptions, have treated a parent's consent as a legal prerequisite to lawful medical treatment of a minor child regardless of the competence of the provider, the good intentions of the adults involved, or the wishes of the child. The courts' approach to this issue has rested on the premise that: (1) children lack the capacity to consent to medical treatment; (2) nonconsensual

[6] *May v. Anderson*, 345 U.S. 528, 533 (1953); *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion).

treatment constitutes an assault or battery by the provider; and thus (3) consent must be obtained, if possible, from a parent or guardian with legal authority to act on the child's behalf. *See* Eric A. DeGroff & Steven W. Fitschen, *The Not-So-Silent Epidemic of Secret Gender-Affirming Policies in the Nation's Schools: Parental Rights and the Promise of Pierce v. Society of Sisters*, 100 Notre Dame L. Rev. 1795, 1810 (2025) (hereinafter "*Not-So-Silent Epidemic*"). A 1920 decision by the Texas Commission of Appeals ("Commission") illustrates this thinking. *Moss v. Rishworth*, 222 S.W. 225 (Tex. Comm'n App. 1920). The Commission held for a father who sued doctors for performing a nonemergency tonsillectomy on his eleven-year-old daughter without his permission. The daughter was visiting an adult sister when the daughter became ill. The sister, who had trained for three years as a graduate nurse, took the daughter to a doctor and ultimately gave permission for the surgery when the doctors convinced her that it was medically necessary. Unfortunately, the young girl died under anesthesia. Despite the sister's extensive medical training, her close familial relationship with the daughter, and her temporary lawful custody of the child, the Commission held that the surgery was nonconsensual because "the only one who could legally give consent to perform it" was the girl's parent. *Id.* at 226. The Commission explained that "[t]he law wisely reposes in the parent the care and custody of the minor child, and neither a physician nor those in temporary custody of the child will be permitted . . . to determine those matters

touching its welfare." *Id.* at 227.

Fifteen years later, the Supreme Court of Michigan likewise held that parental permission was essential before a minor could receive medical treatment. *Zoski v. Gaines,* 260 N.W. 99 (Mich. 1935). The teacher of a nine-year-old boy suspected that the boy had infected tonsils. She therefore had the boy taken, during the school day, to the city physician. *Id.* at 100. The physician concluded that surgery was necessary, and the boy was transported to a hospital where surgery was performed by authority of the city doctor. The surgery was successful, but the parents learned about it only after-the-fact. Despite all the adults involved having agreed the treatment was justified, the court found the surgery was unlawful. Citing *Moss v. Rishworth*, 222 S.W. at 226, the court stressed that "[e]xcept in the very extreme cases, a surgeon has no legal right to operate upon a child without the consent of its parents or guardian." *Zoski*, 260 N.W. at 102.

The courts have extended the requirement for parental consent well beyond situations involving surgery or other direct physical intervention. In *Kennedy v. School District of Lebanon*, No. 11-cv-00382, 2011 U.S. Dist. LEXIS 157416 (M.D. Pa. Dec. 21, 2011), a school district required all students to receive periodic physical exams administered by a specific provider. The district had informed parents of the time and location of the exams and had assured parents they could be present. Some physicals were later rescheduled, however, without notice. Under the revised

schedule, health officials took plaintiffs' child from his class a month earlier than planned and gave him a complete physical. The unannounced change of schedule prevented the parents from attending. Although they had originally consented to the exam, the parents sued the school district for violating their Fourteenth Amendment due process rights. Holding for the parents, the court declared:

> [T]he right of parents to the care, custody, and nurture of their children has long been recognized as a liberty interest protected by the Fourteenth Amendment to the Constitution. Specifically, . . . the right to familial association is a right with many subsets, including both the right of parents to make medical decisions for their child, and the right of the child to have those decisions made by their parent rather than the state.[7]

*Bonner v. Moran*, 126 F.2d 121 (D.C. Cir. 1941), extends the same rule to a context especially relevant here: one in which the minor's own voluntary agreement to a course of treatment was said to justify dispensing with parental consent. There, a fifteen-year-old voluntarily agreed to serve as a skin-graft donor for his injured cousin at the urging of his aunt, with whom the boy was temporarily living. Unfortunately, the donor process turned into a painful, two-month cycle of surgeries and blood transfusions for the boy. When the boy's mother sued doctors for failing to seek her prior consent, the trial court instructed the jury that the boy's own capacity to understand and voluntarily consent to the procedure could substitute for his mother's permission. The D.C. Circuit reversed, holding that the mother's

[7] *Id.* at 12-13 (citing *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000)).

consent was legally required notwithstanding the boy's own voluntary agreement. *Id.* at 122–23.

Even the narrow and exceptional, judicially recognized departures from this rule confirm rather than negate it. In *Bakker v. Welsh*, 108 N.W. 94 (Mich. 1906), a Michigan court declined to impose liability on a physician who operated on a seventeen-year-old without parental consent, but only after the court examined the particular circumstances in detail: the boy was "almost grown to manhood," had prior experience with medical care, and had consulted other adult family members before agreeing to the procedure. *Id.* at 96. He was also living with his father who, though he did not give formal consent, was aware of his son's condition and that his son had been travelling to seek the advice of physicians. That fact-intensive, case-specific inquiry—undertaken by a court, weighing the minor's age and the appearance of the father's tacit approval—is entirely different from a categorical policy under which a school extends the same treatment to every student who requests it, regardless of age, without any comparable inquiry and without seeking the parent's prior consent.

### B. Notice—Whether Furnished After the Fact or Only Upon Request—Has Never Functioned as a Substitute for Consent.

To refer to the school district's revised policy in this case as "notice" would be overly generous. The school proposes merely to acknowledge a child's otherwise-secret social transition at school only if the parents directly ask. In each

of the cases cited above, the family eventually learned what had occurred. In *Zoski* and *Bonner*, for example, the parents became aware of the arrangements after medical intervention had taken place. 260 N.W. at 100; 126 F.2d at 122. Neither court treated the parents' eventual awareness as curing the earlier failure to obtain their consent. The rule was framed the same way in *Wells v. McGehee*, 39 So. 2d 196 (La. Ct. App. 1949), one of the rare cases in which a court excused the absence of consent. In that case, a young girl was badly injured on her school playground. The school made a documented, good-faith effort to reach the child's mother before taking her to the hospital for emergency surgery, but they were unable to contact her despite their best efforts. When the mother later learned that her daughter had died on the operating table, she sued over—among other things—the hospital's failure to obtain her consent. The court upheld the trial court's dismissal of her claim due to the emergency that the child's injury created and the effort the school had made to contact the mother prior to treatment; but the court described its decision as an exception to the general rule that a surgeon operates at his peril if he treats a patient without first obtaining consent from the patient or from someone legally authorized to speak on the patient's behalf. *Id.* at 202. The exception made in these circumstances affirms, rather than negates, the underlying rule that parental consent is required in advance if the parent can be contacted.

This distinction directly answers the Appellants' suggestion that a school

satisfies its constitutional and common-law obligations by disclosing a student's social transition after the fact and only if the parent specifically asks. Such a policy does not even rise to the level of the after-the-fact notice that the courts found insufficient in *Zoski* and *Bonner*. It places the burden on the parent to discover that an intervention has already occurred. Nor is the outcome different because a student's participation in social transition may be voluntary. The minors in *Moss*, *Zoski*, and *Bonner* all cooperated voluntarily in their own treatment; voluntariness on the minor's part does not substitute for the parent's consent. *See*, *Deanda v. Becerra*, 645 F. Supp. 3d 600, 625–28 (N.D. Tex. 2022) (rejecting the assertion that parental rights are at stake only when state action involves some form of "coercion"), *aff'd in part, rev'd in part*, 96 F.4th 750 (5th Cir. 2024). The Supreme Court itself spoke to the legal insufficiency of a child's consent in Parham when it opined that "[w]e cannot assume that the result in *Meyer v. Nebraska* and *Pierce v. Society of Sisters* would have been different if the children there had announced a preference to learn only English or a preference to go to a public, rather than a church, school" *Parham v. J.R.*, 442 U.S. 584, 603-04 (1979).

### C. Where Courts Have Displaced Parental Consent for the Child's Interest, They Did So Through Narrow, Judicially Supervised Exceptions, Not Unilateral Third-Party Judgment.

The right of parents to determine their children's medical care is not unlimited, but cases in which courts have overridden parental decisions affirm the

presumption of parental authority rather than undermine it. *Not-So-Silent Epidemic* at 1814. *See generally* Melissa Moschella, *Strict Scrutiny as the Appropriate Standard of Review for Parental Rights Cases: A Historical Argument,* 28 Tex. Rev. L. & Pol. 771 (2024). Circumvention of parental decisions has occurred only in narrow circumstances: (1) where a child's life was immediately at risk, *e.g.*, *Morrison v. State*, 252 S.W.2d 97 (Mo. Ct. App. 1952) (ordering a blood transfusion for a twelve-day-old infant); *Custody of a Minor*, 379 N.E.2d 1053 (Mass. 1978) (ordering chemotherapy as the only life-saving option for an infant);[8] or (2) where withholding treatment would cause severe and irreversible harm, *e.g.*, *People ex rel. Wallace v. Labrenz*, 104 N.E.2d 769 (1952) (ordering blood transfusion to prevent severe and permanent brain impairment); *In re Jensen*, 633 P.2d 1302 (Or. Ct. App. 1981) (ordering treatment for hydrocephalus).[9] Legal scholar Maxine Eichner has similarly summarized the case law on this issue, observing that courts have generally been deferential to parental medical decision-making, and have authorized state

---

[8] While overriding the parents' directives in this instance, the court emphasized that "courts have shown great reluctance to overturn parental objections to medical treatment where the child's condition is not life-threatening, and where the proposed treatment would expose the child to great risk." *Id.* at 1062.

[9] Parental directives have also been overruled where withholding medical treatment was deemed likely to compromise public health, *e.g.*, *Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015) (holding the requirement for all children to be vaccinated prior to attending public school to be a valid exercise of the police power even if challenged by the parents).

intervention to override parents' wishes only when: (1) there is a clear and unanimous medical consensus about the proposed treatment; (2) the treatment promises great benefit and few risks; and (3) the child will suffer serious harm (e.g., death) if the treatment is forgone. Maxine Eichner, *Bad Medicine: Parents, the State, and the Charge of "Medical Child Abuse,"* 50 U.C. Davis L. Rev. 205, 242 (2016).

Even within this narrow band of exceptions, courts weigh the certainty and severity of harm against the risks of the proposed treatment and typically deferred to the parent where the underlying medical judgment was contested, the child's condition was non-fatal, or the trade-offs were uncertain. *See*, *In re Hudson*, 126 P.2d 765, 778 (Wash. 1942) (declining to override a mother's preference to delay her daughter's amputation surgery); *Newmark v. Williams*, 588 A.2d 1108, 1115 (Del. 1991) (declining to compel chemotherapy in light of the primacy of the familial unit and the uncertainty of the treatment's success). In none of these cases did a school, medical provider, or other institution override the parent's decisions on its own accord; the decision was made by a court, with input from the parents, applying a demanding evidentiary standard, and following a presumption of parental rights.

The presumption of parental decision-making is consistent with Supreme Court decisions bearing on parental rights. In both *Prince v. Massachusetts*, 321 U.S. 158 (1944), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), a court—not a school

board or a medical professional—weighed a specific, articulated state interest against the parental right based on a developed record. *See*, *Prince*, 321 U.S. at 168–70; *Yoder*, 406 U.S. at 234–36. Neither decision suggests that a state actor may invoke the child's welfare unilaterally to dispense with parental consent. Indeed, in affirming the historic role of parents in navigating questions of health care for their children, the Supreme Court opined, in *Parham v. J.R.*, that a parent's "'high duty' to recognize symptoms of illness and to seek and follow medical advice" should be the "starting point" in determining their role in directing their children's health care. 442 U.S. at 602.

## III. A Policy Disclosing Social Transition Only Upon Parental Inquiry Satisfies Neither of the Principles Discussed Above.

The policy at issue in this case directly implicates both principles discussed above. Social transition—including affirmation of new names or pronouns, the use of gender-specific facilities, and grooming or dress consistent with a chosen identity—has been described by both proponents and critics of the practice as a health-related intervention, or at least a critical first phase. *See*, Off. of Population Affs., Dep't of Health & Hum. Servs., *Gender-Affirming Care and Young People* (2022) (describing "gender affirming care" as a "crucial" aspect of "healthcare" for children exploring gender identity); Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Interim Report* 62 (2022) (describing social transition as an "active intervention" that is "not a neutral act").

Even if social transition were not health care *per se*, secret gender-transition practices place children on a path that is so determinative of their long-term choices that it effectively prevents many parents from weighing in while there is still time to make a meaningful difference. *See*, Soc'y for Evidence Based Gender Med., *Early Social Transgender in Children is Associated with High Rates of Transgender Identity in Early Adolescence*, https://segm.org/early-social-gender-transition-persistence (May 6, 2022) (reporting that over ninety-seven percent of children who underwent early social transition persisted with gender transition five years later, with over sixty percent eventually seeking hormone or surgical treatment). Moreover, early social transition has, in many cases, been linked to long-term mental health consequences that children are unlikely to fully grasp at the time. Kenneth J. Zucker, *Debate: Different Strokes for Different Folks*, 25 Child & Adolescent Mental Health 36, 36 (2020) (noting that "[g]ender social transition of prepubertal children will increase dramatically the rate of gender dysphoria persistence when compared to follow-up studies of children with gender dysphoria who did not receive this type of psychosocial intervention and, oddly enough, might be characterized as iatrogenic.").

As explained in Section I above, a school's belief that assisting a student's transition serves that student's welfare does not, by itself, authorize the school to bypass the parent; the common law reserved that kind of override for courts applying

a demanding standard on a developed record, not for an institution's own judgment. As shown in Section II, an intervention of that nature has historically required a parent's prior consent—not the conditional, parent-initiated disclosure that the Appellants' proposed policy would offer nor the consent of the minor child herself.

The result is that a policy withholding from parents the fact that school personnel are assisting their child's social transition, unless and until the parent specifically asks, is contrary to both historical principles. It treats notice as a substitute for consent, contrary to *Zoski*, *Bonner*, and *Wells*; and it treats a school's judgment of the child's best interests *Debate: Different Strokes for Different Folks*—or the child's own judgment—as sufficient to displace parental authority. Whatever this Court ultimately concludes, it should not accept the suggestion that conditional notice has ever served as the historical or constitutional equivalent of the consent parents have been entitled to give or withhold.

The unsettled nature of this issue in the lower courts highlights the need for this Court to anchor its analysis in the historical principles described above. Once social transition is recognized as a health-related intervention—as sources on both sides of the underlying debate have at least tacitly acknowledged it is—the historical rule requiring prior parental consent applies with the same force it has applied to other health care issues. Our nation's common-law tradition of parental rights required affirmative parental consent before third parties undertook health-related

interventions on behalf of a minor child, and concern for the "best interests of the child" functioned historically as the rationale for parental authority rather than as a license for third parties to negate the requirement for parental consent.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully urge this Court to recognize that California's proposed policy is contrary to our nation's consistent and longstanding tradition of requiring parental consent for their minor children's medical care, and is therefore an unconstitutional violation of parental rights.

For these reasons, this Court should affirm the decision below.

Respectfully submitted,
this 2nd day of September, 2026,

s/ Steven W. Fitschen
Steven W. Fitschen
*Counsel of Record*
National Legal Foundation
524 Johnstown Road
(757) 463-6133
sfitschen@nationallegalfoundation.org

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-8056; 26-2337

I am the attorney or self-represented party.

**This brief contains** 6,230 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated ______.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Steven W. Fitschen **Date** 9/2/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 34. Disclosure Statement under FRAP 26.1 and Circuit Rule 26.1-1

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form34instructions.pdf*

**9th Cir. Case Number(s)** 25-8056; 26-2337

Name(s) of party/parties, prospective intervenor(s), or amicus/amici filing this form:

Proffessors Robert P. George, Melissa Moschella, and Eric A. DeGroff

Under FRAP 26.1 and Circuit Rule 26.1-1, I make the following disclosures:

1. I disclose the following information required by FRAP 26.1(a) and/or Circuit Rule 26.1-1(b) for any nongovernmental corporation, association, joint venture, partnership, limited liability company, or similar entity[1] which is a party, prospective intervenor, or amicus curiae in any proceeding, or which the government identifies as an organizational victim below in section 2 of this form,[2] or which is a debtor as disclosed below in section 3 of this form.

   a. Does the party, prospective intervenor, amicus, victim, or debtor have any parent companies? Parent companies include all companies that control the entity directly or indirectly through intermediaries.
   ○ Yes ◉ No

   If yes, identify all parent corporations of each entity, including all generations of parent corporations *(attach additional pages as necessary)*:

   b. Is 10% or more of the stock of the party, prospective intervenor, amicus, victim, or debtor owned by a publicly held corporation or other publicly held entity?
   ○ Yes ◉ No

[1] A corporate entity must be identified by its full corporate name as registered with a secretary of state's office and, if its stock is publicly listed, its stock symbol or "ticker."
[2] To the extent it can be obtained through due diligence.

If yes, identify all such owners for each entity *(attach additional pages as necessary)*:

2. In a criminal case, absent good cause shown, the government must identify here any organizational victim of the alleged criminal activity:

   N/A

3. In a bankruptcy case, the debtor, the trustee, or, if neither is a party, the appellant must identify here each debtor not named in the court of appeals caption:

   N/A

4. Are you aware of any judge serving on this Court who participated at any stage of the case, either in district court, administrative proceedings, or in related state court proceedings?

   ○ Yes ◉ No

   If yes, list the name of the judge and the case name, case number, and name of court of the related proceedings:

   N/A

I certify that *(select only one)*:

◉ this is the first disclosure statement filed in the above-referenced case by the above-identified party/parties, prospective intervenor(s), or amicus/amici, and this disclosure statement complies with FRAP 26.1 and Circuit Rule 26.1-1.

○ the party/parties, prospective intervenor(s), or amicus/amici submitting this supplemental disclosure statement has previously filed a compliant disclosure statement in this case, and this updated disclosure statement discloses changed or additional information.

○ I have reviewed this form, FRAP 26.1, and Circuit Rule 26.1-1 and, to the best of my knowledge, have no information to disclose at this time.

**Signature** s/ Steven W. Fitschen **Date** 9/2/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

I hereby certify that all counsel are registered users of ACMS.

s/ Steven W. Fitschen
Steven W. Fitschen
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va 23322
(757) 463-6133
sfitschen@nationallegalfoundation.org