Nos. 25-8056, 26-2337

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

ELIZABETH MIRABELLI, *et al*.,
*Plaintiffs-Appellees*,

v.

ROB BONTA, *et al*.,
*Defendants-Appellants*.

**On Appeal from the United States District Court for the Southern District of California**
No. 3:23-cv-0768-BAS-VET
The Honorable Cynthia Bashant, Judge

# DEFENDANTS-APPELLANTS' REPLY BRIEF

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
CHERYL L. FEINER
*Senior Assistant Attorney General*

JULIE VEROFF
*Deputy Solicitor General*
DARRELL W. SPENCE
*Supervising Deputy Attorney General*
JENNIFER A. BUNSHOFT
KEVIN L. QUADE
*Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3776
Julie.Veroff@doj.ca.gov
*Attorneys for Defendants-Appellants*

October 16, 2026

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................ 1
Argument............................................................................................ 2
I. The Supreme Court's interim, emergency-docket ruling informs but does not resolve this appeal .................................. 2
II. Parent plaintiffs do not have a constitutional right to force school employees to use names and pronouns at odds with a student's gender identity....................................................... 5
A. Plaintiffs have not shown that California's name-and-pronouns policy impermissibly burdens parents' substantive due process or free exercise rights............... 6
B. California's name-and-pronouns policy satisfies any applicable standard of scrutiny .................................... 17
III. The teacher plaintiffs' claims fail on the merits ..................... 19
IV. The Court should vacate the permanent injunction and remand for narrowing and clarification.................................. 22
Conclusion ......................................................................................... 29

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Berry v. Dep't of Soc. Servs.*
447 F.3d 642 (9th Cir. 2006) ....................................................20

*Chaudry v. Thorsen*
2026 WL 766048 (N.D. Ill. Mar. 18, 2026) ....................................15

*Chen v. Allstate Ins. Co.*
819 F.3d 1136 (9th Cir. 2016) ....................................................21

*Chevron USA, Inc. v. Cayetano*
224 F.3d 1030 (9th Cir. 2000) ..............................................18, 19

*Dayton Bd. of Ed. v. Brinkman*
433 U.S. 406 (1977)....................................................................22

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*
489 U.S. 189 (1989)................................................................7, 22

*Doe v. Franklin Square Union Free Sch. Dist.*
100 F.4th 86 (2d Cir. 2024) ..........................................................9

*Dubbs v. Head Start, Inc.*
336 F.3d 1194 (10th Cir. 2003) .....................................................9

*E. Bay Sanctuary Covenant v. Biden*
993 F.3d 640 (9th Cir. 2021) .........................................................3

*Foote v. Ludlow Sch. Comm.*
128 F.4th 336 (1st Cir. 2025).................................................4, 9, 10

*Foote v. Ludlow Sch. Comm.*
146 S. Ct. 2571 (2026)................................................................10

*Fortyune v. Am. Multi-Cinema, Inc.*
364 F.3d 1075 (9th Cir. 2004) .......................................................3

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Frazee v. Ill. Dep't of Emp. Sec.*
489 U.S. 829 (1989)........................................................................15

*Fulton v. City of Philadelphia*
593 U.S. 522 (2021)........................................................................11

*Harris v. McRae*
448 U.S. 297 (1980)........................................................................22

*Kanuszewski v. Mich. Dep't of Health & Hum. Serv.*
927 F.3d 396 (6th Cir. 2019) ..........................................................9

*Kennedy v. Bremerton School District*
597 U.S. 507 (2022)........................................................................20

*Loper Bright Enters. v. Raimondo*
603 U.S. 369 (2024)........................................................................12

*Mahmoud v. Taylor*
606 U.S. 522 (2025)..........................................11, 12, 15, 16, 17

*Miller v. Gammie*
335 F.3d 889 (9th Cir. 2003) (en banc) ........................................20

*Mirabelli v. Bonta*
607 U.S. 492 (2026).....................................2, 3, 5, 6, 11, 20, 22, 24, 26, 27

*Mueller v. Auker*
700 F.3d 1180 (9th Cir. 2012) ........................................................9

*Norse v. City of Santa Cruz*
629 F.3d 966 (9th Cir. 2010) (en banc) ........................................19

*Parents for Priv. v. Barr*
949 F.3d 1210 (9th Cir. 2020) ....................................................6, 7

*Parham v. J. R.*
442 U.S. 584 (1979)..................................................9, 12, 13, 27

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Penthouse Int'l, Ltd. v. Barnes*
792 F.2d 943 (9th Cir. 1986) ....................23

*Polk v. Montgomery Cnty. Pub. Sch.*
166 F.4th 400 (4th Cir. 2026) ....................17

*Roper v. Simmons*
543 U.S. 551 (2005) ....................16

*Runyon v. McCrary*
427 U.S. 160 (1976) ....................6

*San Antonio Indep. Sch. Dist. v. Rodriguez*
411 U.S. 1 (1973) ....................14

*Schmidt v. Lessard*
414 U.S. 473 (1974) ....................28

*South Bay United v. Newsom*
141 S. Ct. 2563 (2021) ....................4

*Stanley v. Illinois*
405 U.S. 645 (1972) ....................10

*Theis v. InterMountain Educ. Serv. Dist.*
182 F.4th 1091 (9th Cir. 2026) ....................21

*Tingley v. Ferguson*
47 F.4th 1055 (9th Cir. 2022) ....................9

*Trump v. Boyle*
145 S. Ct. 2653 (2025) ....................2, 4

*Trump v. Illinois*
146 S. Ct. 432 (2025) ....................4

*Wallace v. Jaffree*
472 U.S. 38 (1985) ....................13, 14

# TABLE OF AUTHORITIES
# (continued)

**Page**

*Wallis v. Spencer*
202 F.3d 1126 (9th Cir. 2000) .......... 10

*Whalen v. Allers*
302 F. Supp. 2d 194 (S.D.N.Y. 2003) .......... 15

*Whole Women's Health v. Jackson*
141 S. Ct. 2494 (2021) .......... 4

*Whole Women's Health v. Jackson*
595 U.S. 30 (2021) .......... 4

*Wisconsin v. Yoder*
406 U.S. 205 (1972) .......... 11, 12, 14, 16, 17

**STATUTES AND REGULATIONS**

20 U.S.C.
§ 1232g(e) .......... 25
§ 1232g(a)(1)(A) .......... 24

Assembly Bill No. 1955, 2023-2024 Reg. Sess. (Cal. 2024), 2024
Cal. Stat., ch. 95 .......... 24

Cal. Educ. Code
§ 220 .......... 8, 11, 17, 21
§ 44691 .......... 27
§ 48980 .......... 25
§ 49602 .......... 29
§ 51938 .......... 25
§ 51938(b)(4) .......... 25
§ 51938(c) .......... 25
§ 72621 .......... 29

Cal. Penal Code § 11165.6 .......... 26

# TABLE OF AUTHORITIES
**(continued)**

**Page**

**OTHER AUTHORITIES**

Amicus Br. of Presiding Bishop of the Episcopal Church et al., *Gloucester Cnty. Sch. Bd. v. G.G.*, No. 16-273 (U.S. Mar. 2, 2017) .......... 14

Cal. Dep't of Educ., Child Abuse Identification & Reporting Guidelines (last reviewed Nov. 4, 2024) .......... 27

Donna St. George, *Gender Transitions at School Spur Debate Over When, Or If, Parents Are Told*, Wash. Post. (July 18, 2022) .......... 23

*Heads of Major American Religious Traditions Issue Landmark Statement Supporting Trans, Intersex and Nonbinary People*, Unitarian Universalist Assoc. (Nov. 12, 2025) .......... 14

# INTRODUCTION

Now that the State has abandoned its appeal of the district court's principal holding regarding parental disclosure, the central remaining question is whether the Constitution compels public schools to disregard a student's gender identity and use only the name and pronouns dictated by the student's parents. The State has made the policy judgment that intentionally referring to a student by a name or pronouns that contradict the student's gender identity—often referred to as "misgendering"—is a form of discrimination under California law. In the State's view, school employees should use a student's requested name and pronouns—not just for the student's benefit, but also to impart a lesson of inclusion to all students who attend public schools.

Plaintiffs seek to override that judgment. The State takes seriously parents' rights to direct the upbringing of their children, and their needs and wishes to be involved in their children's education. But plaintiffs here invite an unprecedented level of judicial interference with school administration, whereby teachers will effectively be transformed into the agents of parents, tasked with actively imposing parenting philosophies and religious creeds on students who do not share them, even when, as here, doing so will cause harm to the students, alter classroom instruction, and undermine the State's ability to cultivate a pluralistic learning environment. The only authority that plaintiffs invoke for this sweeping expansion

of parents' constitutional rights is the Supreme Court's preliminary opinion in this case. But it cannot bear that weight. The Court said very little about requirements governing name and pronoun usage in school settings—certainly nothing to suggest that the Court wished to definitively resolve all remaining issues in this appeal and open the floodgates to novel parental-rights claims. For that reason, and because the district court's award of classwide relief was overbroad and unclear in multiple respects, the Court should vacate and remand for further proceedings.

## ARGUMENT

### I. THE SUPREME COURT'S INTERIM, EMERGENCY-DOCKET RULING INFORMS BUT DOES NOT RESOLVE THIS APPEAL

The Supreme Court's interim rulings "inform how a court should exercise its equitable discretion in like cases," but they "are not conclusive as to the merits." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). That is because interim rulings address only "limited question[s]." *Mirabelli v. Bonta*, 607 U.S. 492, 500 (2026) (Barrett, J., concurring). That rule applies with particular force here, where the Supreme Court did not answer the merits question now before this Court, and where the interim ruling focused on an alleged disclosure policy the State is no longer defending.

In its interim decision, the Supreme Court applied the traditional "four-factor test" that governs preliminary relief. *Id.* at 496 (majority). The appeal before this

Court, by contrast, does not involve a likelihood-of-success-on-the-merits determination. Because the appeal arises following entry of a final judgment, the question here is whether plaintiffs *do succeed* on the merits. *E.g.*, *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir. 2004); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021) ("predictive analysis" in interim rulings "should not, and does not, forever decide the merits of the parties' claims").

Three of the Justices who signed onto the interim ruling in this case—without whom there would not have been a majority—took care to emphasize as much. "[O]ur assessment is preliminary," they explained. "We consider the merits not to conclusively resolve them, but because they bear on the limited question before us: Are the parents entitled to the benefit of the judgment entered by the District Court while California tries to overturn that judgment on appeal?" *Mirabelli*, 607 U.S. at 500 (Barrett, J., concurring). Accordingly, plaintiffs "must continue to litigate in the Ninth Circuit, and if necessary, [the Supreme] Court." *Id.*; *see also id.* at 497 (majority) (contemplating "potential[]" for a "protracted appellate process").

Consistent with the preliminary nature of its decision, the Supreme Court subsequently denied certiorari in multiple cases presenting essentially the same parental substantive due process claim as the one at issue here. *See* Opening Br. 17 n.5. The lower courts in those cases had *rejected* the parent plaintiffs' claims. *See,*

*e.g.*, *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 357 (1st Cir. 2025), *cert. denied* No. 25-77 (U.S. Apr. 20, 2026). If the Supreme Court had intended its brief interim opinion in this case to forever resolve the merits of similar constitutional claims, *see* Answering Br. 28, it is highly unlikely that the Court would have left those decisions in place. Instead, the Court would likely have granted, vacated, and remanded. *See, e.g., South Bay United v. Newsom*, 141 S. Ct. 2563 (2021).

In asserting otherwise, plaintiffs invoke cases in which the Supreme Court issued a summary disposition. Answering Br. 29-30. Plaintiffs argue that summary dispositions have binding, precedential effect. *See id.* That is certainly true—but beside the point. The Supreme Court did not summarily affirm the district court's injunction. It made a preliminary, likelihood-of-success determination. That likelihood-of-success determination would be dispositive if this appeal presented the same likelihood-of-success question. *See, e.g.*, *Boyle*, 145 S. Ct. at 2654; *Trump v. Illinois*, 146 S. Ct. 432, 435-36 (2025) (Kavanaugh, J., concurring in the judgment). But because the question in this appeal is different than the one before the Supreme Court, *supra* pp. 2-3, the Supreme Court's order is not determinative.[1]

---

[1] The Supreme Court has itself issued merits opinions that depart from an earlier predictive determination made in an interim ruling. *Compare, e.g.*, *Whole Women's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (denying emergency application to vacate stays of district court proceedings) *with* 595 U.S. 30, 45-48,

(continued…)

That said, the Supreme Court's interim ruling is of course highly relevant here. That is why the State has asked the Court to focus on what the Supreme Court said in its opinion. In particular, the Court focused on the harms of "cut[ting] out" parents by denying them information. *E.g.*, 607 U.S. at 496. The three-Justice concurrence likewise focused on nondisclosure; it did not even mention the names-and-pronouns policy. *Id.* at 498-502 (Barrett, J., concurring). And the Court's predictive, likelihood-of-success assessment was conducted with respect to "California's policies" as a whole, without policy-by-policy differentiation. *Id.* at 497 (majority). The Court had no occasion to address whether the State would be likely to succeed on the merits in defending a narrower policy that respects a student's choice of name and pronouns at school, while also ensuring that parents can learn that information if they wish. *See* Opening Br. 27, 28-47. For the reasons discussed below, the Court should uphold that policy.

## II. Parent Plaintiffs Do Not Have a Constitutional Right to Force School Employees to Use Names and Pronouns At Odds With a Student's Gender Identity

The principal merits question remaining in this appeal is whether the State may lawfully require teachers and other school employees to use the name and pronouns requested by a student who wishes to express a transgender identity at

---

51 (2021) (holding, upon full review following grant of certiorari before judgment, that certain district court proceedings could move forward).

school. *See* Opening Br. 23-27. The answer is "yes." So long as parents are able to obtain information about their child's use of a certain name or pronouns, they have everything they need to "participat[e] in decisions regarding their children's mental health," *Mirabelli*, 607 U.S. at 497, and "guide the religious development of their children," *id.* at 496. Plaintiffs fail to support the remarkable proposition that parents have a constitutional right to go a step further and force public-school employees to become *active participants* in parents' preferred parenting philosophies and religious views.

### A. Plaintiffs Have Not Shown that California's Name-And-Pronouns Policy Impermissibly Burdens Parents' Substantive Due Process or Free Exercise Rights

On plaintiffs' view, teachers and other public-school employees would be forced to discriminate against transgender students by addressing them with names and pronouns that those students have said do not match their gender identity. If accepted, plaintiffs' theories would inject chaos into our public-school system without precedent in our Nation's history. *See Runyon v. McCrary*, 427 U.S. 160, 176-177 (1976) (no parental right to send child to school that discriminates based on race); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1233 (9th Cir. 2020), *cert. denied* No. 20-62 (U.S. Dec. 7, 2020) ("accommodating the different 'personal, moral, or religious concerns of every parent' would be 'impossible' for public

schools, because different parents would often likely . . . prefer opposite and contradictory outcomes”).

It is telling how little plaintiffs have to say in response to the parade of horribles discussed in the State’s opening brief (at p. 45): among many examples, teachers could be constitutionally compelled to chastise students for expressing their sexual orientation by holding hands with another student of the same sex; to monitor and control what students eat for lunch in the cafeteria, or what religious attire they wear during school hours; and to discipline students for reading books contrary to their parents’ preferences and beliefs. Neither substantive due process doctrine nor the Free Exercise Clause imposes such obligations on public-school employees.

1. As the State has explained, *see* Opening Br. 32, the Due Process Clause does not require the government to assist the holder of a constitutional right in the exercise of that right. *See generally DeShaney v. Winnebago Cnty. Dep’t of Soc. Servs.,* 489 U.S. 189, 195 (1989). And this Court has repeatedly rejected substantive due process claims by parents seeking “to direct the curriculum that is taught to their children” or “to direct school administration more generally.” *E.g.*, *Parents for Priv.*, 949 F.3d at 1231.

Parent plaintiffs’ due process claim here cannot be reconciled with those principles. Plaintiffs seek not just information about students’ use of names or

pronouns at school (which the State no longer objects to), but also *active support* from public-school employees in enforcing their parenting philosophy with respect to a child's gender identity. Such support would effectively compel public schools to alter their instruction and nondiscrimination policies by forcing teachers to engage in ongoing discriminatory treatment of some students—intentionally using names and pronouns that contradict a student's gender identity—in front of and in conversation with other students, throughout each and every school day. In other words, plaintiffs' substantive due process claim would alter the inclusive educational environment that public schools in the State wish to cultivate, and undercut the lesson they wish to convey: that respecting a student's gender identity is a form of equal treatment that should be valued. *See, e.g.*, Opening Br. 28-29.[2]

Plaintiffs' response is to assert that respecting a student's requested name and pronouns is a form of medical treatment that parents have a due process right to control. Answering Br. 34. That framing is at odds with what plaintiffs said in

[2] Plaintiffs appear to contest the State's view that refusal to use a student's requested name or pronouns constitutes a form of discrimination under the California Education Code. According to plaintiffs, the State cannot "assume[] . . . that a child's gender identity is whatever the child says." Answering Br. 33. But plaintiffs propose no alternative means of determining a child's gender identity. And section 220 of the Education Code bars discrimination on the basis of "gender identity" as well as "gender expression."

their Supreme Court briefing, where they stated that it was "[n]ot true" that they "'base[d]' their parental rights claim on the right to 'direct their children's medical treatment.'" Reply Br. 14, *Mirabelli v. Bonta*, No. 25A810 (U.S. Jan. 22, 2026). In any event, using a person's requested name and pronouns is not medical treatment. Medical treatment is what licensed healthcare professionals provide in the course of diagnosis and treatment, consistent with the regulated practice of medicine. *See, e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1082-1083 (9th Cir. 2022). Courts have accordingly recognized a parental substantive due process right to make decisions about a child's medical treatment with respect to "a medical procedure, examination, or hospitalization." *Foote*, 128 F.4th at 350.[3]

Using someone's requested name and pronouns, by contrast, is not regulated as part of the practice of medicine and need not be prescribed or performed by medical personnel. It is "something people routinely do with one another" in everyday life. *Foote*, 128 F.4th at 350. The Supreme Court closely reviewed the

[3] *See, e.g.*, *Parham v. J. R.*, 442 U.S. 584, 603 (1979) (hospitalization); *Mueller v. Auker*, 700 F.3d 1180, 1186-1189 (9th Cir. 2012) (antibiotics and spinal tap); *Kanuszewski v. Mich. Dep't of Health & Hum. Serv.*, 927 F.3d 396, 411-416 (6th Cir. 2019) (retention of blood samples for disease screening); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203-1204 (10th Cir. 2003) (medical examinations, blood tests); *see also Doe v. Franklin Square Union Free Sch. Dist.*, 100 F.4th 86, 96-97 (2d Cir. 2024) (rejecting argument that "the wearing of a mask qualifies as medical treatment" because, although a "'[m]ask [m]andate was obviously intended as a health measure, it no more requires a 'medical treatment' than laws requiring shoes in public places or helmets while riding a motorcycle'").

First Circuit's recent determination to that effect: it evaluated a petition for writ of certiorari in *Foote* at thirteen separate conferences, including four conferences after the issuance of the preliminary ruling in this case. *See Foote v. Ludlow Sch. Comm.*, No. 25-77 (U.S.), https://tinyurl.com/yw49uv4y. The Court ultimately denied certiorari with no noted dissents. 146 S. Ct. 2571 (2026).

For similar reasons, plaintiffs' argument that the State cannot require teachers to use a student's requested name and pronouns over a parent's objection without an "individualized" determination is misplaced. Answering Br. 41-42. Plaintiffs' cases provide that the State generally must obtain permission from a neutral official in an individualized proceeding before it can subject a child to medical treatment without parental consent. *E.g., Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000); *see also Stanley v. Illinois*, 405 U.S. 645, 657-658 (1972) (similar for removal from parental custody). Because using a person's requested name and pronouns is not medical treatment, no individualized proceeding is necessary before a teacher may adhere to the State's nondiscrimination law despite a parent's preference otherwise.[4]

[4] Even if the Court would prefer to leave open the possibility that there are "certain circumstances" under which "acceding to a student's use of a chosen name and pronouns could . . . constitute medical treatment," *Foote*, 128 F.4th at 351 n.18, the Court can do so and still hold that *classwide* relief—which extends to every public-school parent in California who objects to the State's name-and-pronouns policy—is unwarranted.

2. Nor does the Free Exercise Clause provide parents with a right to force public-school employees to use names and pronouns that are inconsistent with a student's gender identity. As a general matter, neutral and generally applicable laws are subject to rational-basis review. *Fulton v. City of Philadelphia*, 593 U.S. 522, 533-534 (2021). Plaintiffs nowhere contest that the relevant state law—Education Code, section 220—is neutral and generally applicable. Instead, plaintiffs argue that it triggers strict scrutiny under *Mahmoud v. Taylor*, 606 U.S. 522 (2025), which applies where "the burden imposed [on free exercise] is of the same character as that" in *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

Plaintiffs are incorrect. They focus on language in the Supreme Court's preliminary ruling stating that the "unconsented facilitation of a child's gender transition" burdens free exercise rights in ways comparable to the laws struck down in *Mahmoud* and *Yoder*. *Mirabelli*, 607 U.S. at 496. But as discussed, *supra* p. 5, the Court was evaluating the *combined effect* of two alleged policies: (i) refusing to disclose information about gender identity to parents, and (ii) requiring public-school employees to use students' requested names and pronouns. Under those two alleged policies, the "facilitation of a child's gender transition" would be "unconsented" in the sense that parents *would not even know* about the names and pronouns being used at school. So parents would not be in a position to "'guide the religious development of their children.'" *Mirabelli*, 607 U.S. at 496

(quoting *Mahmoud*, 606 U.S. at 559). The Court nowhere suggested that parental free exercise rights would be materially burdened if parents *were* informed upon request—and thus had all the information necessary to provide religious counseling and instruction to their children on the subject of gender identity. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 426 (2024) (Gorsuch, J., concurring) ("[I]t would be a mistake to read judicial opinions like statutes. . . . A later court assessing a past decision must . . . appreciate the possibility that different facts and different legal arguments may dictate a different outcome.").

This case is also fundamentally different from *Mahmoud* and *Yoder* in that there is an "actual conflict between the wishes of parents and children." *Yoder*, 406 U.S. at 232; *see* Opening Br. 43-44. The challenged nondiscrimination requirement comes into play only if a student requests that school employees use a certain name or pronouns. Plaintiffs' principal response is to assert that parents' rights always trump the interests or beliefs of their children. *See* Answering Br. 37-38. But the only authority plaintiffs invoke for that assertion is *Parham*, 442 U.S. 584, a procedural due process case addressing the requirements for hospitalizing children for mental-health reasons. In that particular context, the Court recognized that "[t]he fact that a child may balk at hospitalization . . . does not diminish the parents' authority to decide what is best for the child." *Id.* at 603. For the reasons discussed above, *Parham* and other due process cases involving

medical treatment do not support relief here—certainly not the sweeping classwide injunction granted by the district court. *Supra* pp. 8-10 & n.3. And unlike in *Parham*, where a parent's decision regarding their child's need for confinement was "in no sense" final because a state health official had to independently agree, plaintiffs here demand "an absolute parental veto over the child's ability" to express their gender identity at school. 442 U.S. at 604.

The consequences of plaintiffs' view would also be extraordinary: as discussed above, *supra* p. 7, parents would have the right to force public schools to enforce student compliance with all manner of religious beliefs during the school day. Plaintiffs' only response is to suggest that a "child's [own] religious rights" would trump parental rights—for example, in the case of "a child who does not want to honor his faith's dietary restrictions or a girl who doesn't want to wear her hijab." Answering Br. 37. According to plaintiffs, parental free exercise rights are paramount unless a child has a "countervailing constitutional right." *Id.* But when children reject the State's imposition of their parents' religious beliefs—as relevant here, when they ask school employees to address them consistently with their gender identity, despite their parents' religious views otherwise—they *are* exercising a countervailing constitutional right: "the individual freedom of conscience" protected by the Free Exercise Clause. *Wallace v. Jaffree*, 472 U.S.

38, 53 (1985). That freedom encompasses the right not only to adopt one's own religious beliefs, but also "to refrain from accepting" others' beliefs. *Id.* at 52.[5]

Plaintiffs also fail to explain their apparent assumption that children who express a gender identity disfavored by their parents are necessarily acting on the basis of secular, non-religious considerations. Although *some* religious sects believe that "there are only two sexes, male and female . . . and that one's sex cannot be changed," Answering Br. 8, other religious traditions have a different perspective. Some religions, for example, preach that God wants all people to be true to their gender identity, regardless of the sex assigned to them at birth.[6] It is quite likely that at least some students who attend California public schools—students covered by the expansive classwide injunction here—share such beliefs. Those students' beliefs are just as worthy of constitutional protection as the beliefs

---

[5] Plaintiffs' suggestion that the child must have a "countervailing constitutional right" (Answering Br. 37) is also in tension with *Yoder*, 406 U.S. at 230-231. *Yoder* never suggested that "a conflict between the wishes of parents and children" would be relevant only where the child is exercising an independent constitutional right. *Id.* at 232. Indeed, there is no federal constitutional right to do what the children in *Yoder* were blocked from doing: obtain a secondary education. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973).

[6] *See, e.g.*, *Heads of Major American Religious Traditions Issue Landmark Statement Supporting Trans, Intersex and Nonbinary People*, Unitarian Universalist Assoc. (Nov. 12, 2025), https://www.uua.org/pressroom/press-releases/interfaith-statement-trans-support (statement "unequivocally proclaim[ing] the holiness of transgender, nonbinary, and intersex people"); Amicus Br. of Presiding Bishop of the Episcopal Church et al. at 10-16, *Gloucester Cnty. Sch. Bd. v. G.G.*, No. 16-273 (U.S. Mar. 2, 2017) (similar).

of "a child who does not want to honor his faith's dietary restrictions." Answering Br. 37; *see Frazee v. Ill. Dep't of Emp. Sec.*, 489 U.S. 829, 834 (1989); *Whalen v. Allers*, 302 F. Supp. 2d 194, 203 (S.D.N.Y. 2003) ("There is ample judicial authority for the proposition that the religious opinion or decisions of a mature child conflicting with those of the parent are entitled to First Amendment protection."); *cf. Chaudry v. Thorsen*, 2026 WL 766048, at *9 (N.D. Ill. Mar. 18, 2026) ("Parents suffer no legal injury when their child uses his or her own free will and independent judgment to embrace beliefs that differ from their own."). For that reason, the Court should at least hold that classwide relief is improper.

Another problem with the breadth of the district court's order is that it extends to all public-school students, regardless of age. Opening Br. 45-46. Plaintiffs dismiss the notion that age is ever relevant to a parental-rights analysis, *see* Answering Br. 38, but *Mahmoud* repeatedly stated otherwise, calling age "*highly* relevant." 606 U.S. at 555 n.8 (emphasis added); *see also id.* at 550, 551. Rather than seriously engage with that inquiry, plaintiffs offer only one out-of-context quote about juvenile maturity from a decision holding that it is cruel and unusual to execute children. Answering Br. 38 (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)).[7]

---

[7] That age is relevant does not mean that policies targeting young children will always impose a greater burden than policies targeting older children. The (continued…)

Plaintiffs' sought-after expansion of *Yoder* and *Mahmoud* would also be unworkable. The premise of those decisions was that it would be relatively easy to allow children to "opt out" of public-school instruction, either by excusing them from school attendance altogether, *see Yoder*, 406 U.S. at 219-229, or by excusing them from certain discrete lessons, *see Mahmoud*, 606 U.S. at 566-568. It is not possible for students to simply "opt out" of school nondiscrimination policies, like those requiring teachers and other employees to use names and pronouns consistent with gender identity. As a practical matter, a teacher *must* use a name or pronouns to identify a student. And they must do so multiple times a day, every day, in front of, and in conversation with, other students, in the course of instruction and all other aspects of the school day. If a teacher were forced to use names and pronouns inconsistent with a student's gender identity, despite that student's express request for equal treatment, it would threaten to send a message of intolerance and discrimination to other students, thereby altering a school's instruction and policies in ways that neither *Yoder* nor *Mahmoud* contemplated. *See, e.g.*, *Mahmoud*, 606 U.S. at 568 ("It must be emphasized that what the parents

---

inquiry is context-sensitive. In *Mahmoud*, which involved instruction with "unmistakably normative" books, 606 U.S. at 550, the Court emphasized the susceptibility of "young children" to "authority figures in elementary school classrooms," *id.* at 554. In *Yoder*, where the challenged policy compelled high-school education, the Court emphasized how "crucial and formative [the] adolescent period" is to preparing for Amish adulthood. 406 U.S. at 211.

seek here is not the right to micromanage the public school curriculum, but rather to have their children opt out of a particular educational requirement[.]”).

### B. California's Name-and-Pronouns Policy Satisfies Any Applicable Standard of Scrutiny

Because California Education Code section 220 does not trigger heightened due process or free exercise scrutiny, *supra* pp. 6-16, rational-basis review applies. And the requirement to use a student's requested name and pronouns easily comports with that deferential standard. *See, e.g.*, *Polk v. Montgomery Cnty. Pub. Sch.*, 166 F.4th 400, 416-417 (4th Cir. 2026) (policy requiring teachers to address students by their requested pronouns survives rational basis review). Indeed, as the State explained in its opening brief (at pp. 37-40, 46-47), the challenged requirement would even survive strict scrutiny.

Plaintiffs do not dispute that the State has compelling interests in eliminating discrimination against transgender students, safeguarding the well-being of minors, and promoting a safe and inclusive learning environment. *See* Opening Br. 37-38, 46. Nor do they dispute that the State does not allow any exceptions to section 220's prohibition on discrimination, *id.* at 46-47, unlike the school district in *Mahmoud*, 606 U.S. at 566, which allowed "opt outs in a variety of other circumstances" and thus could not show that its policy was narrowly tailored.

Instead, plaintiffs assert that record evidence suggests that there is "harm caused by social transitioning." Answering Br. 39. But the State's experts testified

to the contrary. They explained, for example, that calling students by names and pronouns that do not correspond to their gender identity threatens grave mental, social, and academic harm. Opening Br. 39 (citing, *e.g.*, 2-ER-154-155). They also explained that when a student's gender identity is respected at school, the student feels safe and less anxious, is better able to focus on academic work, and enjoys improved self-esteem and well-being. *Id.* (citing, *e.g.*, 2-ER-148-149; 2-ER-161; 2-ER-169-175).

At most, the competing evidence plaintiffs invoke "establish[es] that genuine issues of fact remain," requiring a remand for trial—not affirmance. *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1038 (9th Cir. 2000); *see* 1-ER-103 (acknowledging experts' disagreement). Plaintiffs are incorrect that the State "conceded there is no genuine dispute of material fact" at the summary judgment hearing. Answering Br. 25. In the relevant passage of the transcript, *see* 1-SER-66, the State's trial attorney was merely explaining that plaintiffs' claims fail as a matter of law, for the reasons detailed above, *supra* pp. 6-16, making the resolution of any factual disputes unnecessary. The State never conceded that *if* the district court agreed with plaintiffs that application of strict scrutiny was warranted as a legal matter, *then* no material disputes of fact would exist.[8]

[8] The State lodged multiple objections to the expert report submitted by plaintiffs, *see* D.Ct. Dkt. 256-7, which the district court failed to resolve before

(continued…)

In any case, even a concession to that effect would not prevent the Court from reversing and remanding for trial. In *Chevron*, this Court reversed a grant of summary judgment based on its determination that genuine issues of material fact remained, "[n]otwithstanding the fact that both sides [had] moved for summary judgment and agreed that summary judgment was appropriate one way or the other." 224 F.3d at 1037. The Court disagreed with the submission that a "party that failed to raise the existence of genuine issues of material fact before the district court waived the right to do so on appeal." *Id.* at 1037 n.5. The Court explained that "*the district court* is responsible for determining whether the requirements of Federal Rule of Civil Procedure 56 are met, whether or not the parties believe that they are." *Id.* (emphasis added).

## III. THE TEACHER PLAINTIFFS' CLAIMS FAIL ON THE MERITS

The Court should also reverse the grant of summary judgment to the teacher plaintiffs and vacate the teacher-focused portions of the injunction. *See* Opening Br. 47-51. Doing so would hardly be "overrid[ing] the Supreme Court." Answering Br. 51. Plaintiffs asked the Supreme Court to vacate this Court's stay

---

granting summary judgment. That too was error that prevents affirmance. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (en banc) ("Before ordering summary judgment in a case, a district court must . . . rule on evidentiary objections that are material[.]")

in its entirety. But the Supreme Court *denied* that request as to the teachers, opting instead to vacate the stay only as to parent plaintiffs. *Mirabelli*, 607 U.S. at 498.

That decision was understandable. The *Pickering* framework governs the teachers' claims, *see* Opening Br. 48-49, and under *Pickering*, public-school employees have diminished free speech and free exercise rights when they act in their capacity as government employees, *see, e.g.*, *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006). Plaintiffs are wrong in asserting that the Supreme Court "called the practice [of applying *Pickering* to free exercise claims] into question" (Answering Br. 53) in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022). In *Kennedy*, the Court merely declined to consider "whether the Free Exercise Clause may sometimes demand a different analysis at the first step of the *Pickering-Garcetti* framework." *Id.* at 531 n.2. A statement from the Supreme Court declining to take up an issue is hardly "clearly irreconcilable" with this Court's precedent. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). And as plaintiffs acknowledge, this Court's precedent applied *Pickering* to free exercise claims "over twenty years" ago. Answering Br. 53.[9]

[9] Plaintiffs' forfeiture argument (Answering Br. 52) is unfounded. Before the state defendants began filing joint briefs, the State Superintendent of Public Instruction filed a brief arguing that *Pickering* applies to public employees' free exercise claims. D.Ct. Dkt. 146 at 18-19; *see also* D.Ct. Dkt. 163 at 9 (raising *Pickering* in opposition to plaintiffs' motion for classwide preliminary injunction).

In any event, plaintiffs make no effort to show that teachers' rights are violated by the requirement under Education Code section 220 to use names and pronouns requested by students. To the contrary, plaintiffs concede that schools "have broad authority to regulate 'speech directed *at students* within a school setting." Answering Br. 57 (emphasis added); *see Theis v. InterMountain Educ. Serv. Dist.*, 182 F.4th 1091, 1097 (9th Cir. 2026); Opening Br. 49. Plaintiffs instead devote all their briefing on the teachers' claims to the question whether California may permissibly bar teachers from disclosing information about a student's gender identity to parents. *See* Answering Br. 51-58. But given that the State has abandoned its appeal of the district court's principal holding as to disclosure, *see* Opening Br. 23-27, there is no longer any need for the Court to address the teachers' disclosure-related arguments. As plaintiffs acknowledge, "the teachers' claims have always been, and remain, resolvable through the parents' claims," Answering Br. 2, and the Court need not reach the teachers' claims to the extent the Court affirms the relief granted to the parents, *see id.* at 4; *Chen v. Allstate Ins. Co.*, 819 F.3d 1136, 1138 (9th Cir. 2016) ("Under Supreme Court and Ninth Circuit case law, a claim becomes moot when a plaintiff actually receives complete relief on that claim" (emphasis omitted)).

## IV. THE COURT SHOULD VACATE THE PERMANENT INJUNCTION AND REMAND FOR NARROWING AND CLARIFICATION

Regardless of the Court's rulings on the merits, it should at least vacate the district court's permanent injunction and remand with instructions to narrow it in multiple respects. *See* Opening Br. 23-27, 52-55.

1. Unclear language in the injunction could give the misimpression that school employees must *affirmatively notify* parents about a student's name and pronoun use, regardless of whether the parent has asked for that information. *See* Opening Br. 54-55 & nn.13-14. Any such affirmative duty would be in substantial tension with the Supreme Court's order, which emphasized that relief was provided "only for those parents who object to the challenged policies." *Mirabelli*, 607 U.S. at 498. Plaintiffs argue that the Supreme Court was merely describing "the breadth of the injunction," not the "constitutional right at issue." Answering Br. 43. But the scope of an injunction generally corresponds to the scope of the constitutional right at stake. *See generally Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 420 (1977). And plaintiffs provide no reason to think that the Supreme Court conceived of the right more broadly, especially in light of the settled principle of constitutional law that courts typically refrain from "confer[ring] . . . affirmative right[s] to governmental aid." *DeShaney*, 489 U.S. at 195 (distinguishing "a limitation on the State's power to act" from "an affirmative obligation on the State"); *see also, e.g.*, *Harris v. McRae*, 448 U.S. 297, 317-318

(1980). In any event, plaintiffs concede that "the injunction itself does not mandate disclosure to any parents," Answering Br. 48 (emphasis omitted), and so have no serious basis to contest the State's request to expressly clarify as much.[10]

Moreover, plaintiffs overlook the considerable harms—and serious constitutional concerns—of imposing an affirmative obligation on schools to inform parents of a student's gender expression in the absence of any request for that information from the parents. Plaintiffs are unable to conceive that a parent would prefer not to learn that information from a school employee, calling the notion "implausible." Answering Br. 44. But for some parents, the right way to love and support their child is to trust the child to tell them about their gender identity *when they are ready* to do so. Such parents respect a child's preferred timing because they know that children sometimes need space to grow into their identity by expressing it first at school—with peers and sometimes with teachers—before coming out as transgender at home. *See, e.g.*, Donna St. George, *Gender Transitions at School Spur Debate Over When, Or If, Parents Are Told*, Wash.

---

[10] Although plaintiffs agree that the injunction does not require affirmative disclosure, they now contend that the district court issued "declaratory relief" recognizing a parental right to affirmative notice. Answering Br. 27. But that would have been an abuse of discretion because plaintiffs never requested any such declaratory relief. *See, e.g.*, *Penthouse Int'l, Ltd. v. Barnes*, 792 F.2d 943, 950 (9th Cir. 1986). The operative complaint merely sought invalidation of the alleged state policies, not recognition of any affirmative disclosure obligation. *See, e.g.*, 2-ER-310.

Post. (July 18, 2022), https://tinyurl.com/nhjewmft (describing experience of a father of a transgender child who explained his perspective that "[y]our kid is the only one who should" decide when to come out and "[o]ne thing [he] never expected was the school to tell him").[11]

Plaintiffs may disagree with that parenting philosophy. But they cannot credibly suggest that there are no parents who subscribe to it. And forcing information about a student's gender identity on unwilling parents would pose its own constitutional concerns by overriding that parental philosophy and fundamentally altering a parent's relationship with a child, against the parent's wishes. In other words, if there is a right on the part of parents to receive this information from public-school employees, *cf. Mirabelli*, 607 U.S. at 496-497, there is also a right not to.

To the extent plaintiffs are concerned that parents will still be "shut out" because it would be overly burdensome to have to request information from school employees, *cf.* Answering Br. 45 n.3, that concern is misplaced. Federal and state laws frequently require parents to notify school employees of their desire to learn certain information about their child's schooling or to opt-out of a certain school policy. *See, e.g.*, 20 U.S.C. § 1232g(a)(1)(A) (exercising parental right to inspect

[11] *See also* Assembly Bill No. 1955, 2023-2024 Reg. Sess. (Cal. 2024), 2024 Cal. Stat., ch. 95, § 2(c)-(e) (legislative findings that some parents "want to support their children in coming out to them on their own terms," "when they are ready").

and review child's education records requires "request by parents for access"); Cal. Educ. Code § 51938 (allowing parents to "opt-out" of comprehensive sexual health education and certain health-related research). And schools generally, and often must, notify parents of their right to request and receive information or to opt-out of a given school policy or practice. *E.g.,* 20 U.S.C. § 1232g(e); Cal. Educ. Code §§ 48980, 51938(b)(4), (c).

By contrast, the consequences of plaintiffs' affirmative-notification theory are vast, especially in light of plaintiffs' insistence that parents are owed affirmative notification of any signs of "gender incongruity," which plaintiffs view as encompassing "*all aspects* of a social transition, including appearance"—not just name and pronoun use. Answering Br. 46 (capitalization and bolding omitted). In seeking a constitutional right of that scope, plaintiffs depart markedly from their own complaint in this case.[12] And they fail to grapple with the untenable repercussions of their proposal: For example, must a teacher call home when a boy

[12] This case has always been focused on name and pronoun use at school. *See* Opening Br. 12-13, 24-26. That is plain from the operative complaint, which challenges the policy of compelling teachers to "assist in a student's 'social transition' by using any pronouns or a gender-specific name requested by the student during school" and to "revert to using biological pronouns and legal names when speaking with parents in order to actively hide information about their child's gender identity from them." 2-ER-193. Plaintiffs also defined "'social transition'"—a term used throughout the complaint—as "the use of a new name and pronouns to 'validate' a gender identity that is not consistent with the person's sex." 2-ER-193; *see also* 2-ER-229-230 (similar).

in kindergarten chooses a tiara from the dress-up bin, or expresses interest in wearing a peer's nail polish? When a girl in middle school ties back her long hair, or changes out of the skirt her parents selected and into pants? Plaintiffs never say. This Court should confirm that plaintiffs' constitutional rights do not extend so far as to transform school employees into a roving "gender incongruity" surveillance system, constitutionally compelled to report any perceived variation from stereotypical gender norms.

2. A second critical problem with the injunction is that it does not allow for any exceptions—in particular, where parents would engage in abuse if teachers disclose a child's gender identity. Opening Br. 52-54. The Supreme Court recognized that the State would satisfy strict scrutiny to the extent it adopted a "policy that . . . preclud[es] gender-identity disclosure to parents who would engage in abuse." 607 U.S. at 497. If a law that "preclude[s] gender-identity disclosure to parents who would engage in abuse" would satisfy strict scrutiny, *id.*, then the parents' claims here cannot support an injunction prohibiting the State from restricting disclosure in exactly that circumstance.

Plaintiffs' response rests on a strawman. The State is not advocating an "undefined" or "amorphous" abuse exception. Answering Br. 2, 47. "Child abuse and neglect" is specifically defined by state law. Cal. Penal Code § 11165.6. As mandatory reporters, school employees are required to receive training on "what

constitutes child abuse" and "how to identify potential signs." Cal. Dep't of Educ., Child Abuse Identification & Reporting Guidelines (last reviewed Nov. 4, 2024), https://tinyurl.com/ymmeybxc; *see also* Cal. Educ. Code § 44691. The State merely seeks clarification that the injunction here does not require school employees to disclose information to a parent where abuse *as defined by state law* would result. As the State informed the district court, a parent's mere disagreement with, or concern about, a child's gender identity is not abuse under that definition. D.Ct. Dkt. 361 at 3 n.1; *see* Answering Br. 40.

On plaintiffs' view, a school employee must disclose a student's gender identity to a parent when asked, even if the employee knows the child will be abused as a result. Answering Br. 49-50. According to plaintiffs, the employee's only recourse is to alert Child Protective Services and hope they respond quickly enough to save the child from harm. *Id*. The Constitution does not require that cruel result. *Cf. Mirabelli*, 607 U.S. at 497 ("children's safety is the overriding equity"); *Parham*, 442 U.S. at 604 ("parents cannot always have absolute and unreviewable discretion" with regard to their children).

3. Finally, the State's opening brief discussed multiple other ways in which the district court's injunction is vague and unworkable. Opening Br. 55-59. Plaintiffs provide no persuasive response. To the contrary, their answering brief only serves to underscore the serious problems with the injunction. As discussed

above, for example, plaintiffs' briefing highlights the many questions raised by requiring school employees to monitor students for any sign of "gender incongruity" and report that information to parents. *Supra* pp. 25-26.

Plaintiffs' briefing also confirms that the term "permit," as used in the injunction, is unclear in scope. *See* Opening Br. 56. Plaintiffs take an expansive view, asserting that "CDE has plenary authority over the statewide school system," Answering Br. 58, and "'permit' unambiguously means 'allow,'" *id.* at 5; *see also id.* at 58-59 (to "'allow to be, come to pass, or take place, by tacit consent or by not prohibiting or hindering'"). If that were true, it would expose state officials to extraordinary contempt-liability risk, such that they could be deemed responsible for any actions taken in this context by public-school employees. Before the district court, however, plaintiffs took a different position: that the State would *not* be in violation of the injunction when public-school employees fail to disclose gender-identity information to parents, so long as the State had "circulate[d] the [district court's] order to all of the school districts." 1-SER-68. The State has already done so. D.Ct. Dkt. 345. If plaintiffs themselves cannot even decipher the scope of the injunction, it is "too vague to be understood," *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974), and requires clarification on remand.

Plaintiffs dismiss (at Answering Br. 59-60) the State's concern that the injunction could be read to apply to laws that plaintiffs unambiguously did not

challenge. *See, e.g.*, Opening Br. 56-57; 1-ER-84 ("this case is not about" AB 1955); 1-ER-131 (identifying only three aspects of state law subject to plaintiffs' challenge). The State does not disagree with plaintiffs that an injunction must describe "the act or acts restrained." Answering Br. 59 (quoting Fed. R. Civ. P. 65(d)(1)(c)). The problem here is that, in so broadly describing "the acts restrained," the injunction risks being understood to enjoin laws that plaintiffs have not challenged, such as the State's confidential school counseling laws. *See* Cal. Educ. Code §§ 49602, 72621. Remand is needed so that the district court can craft a narrower injunction that eliminates such risk.

## CONCLUSION

The judgment of the district court should be reversed in part and vacated and remanded in part.

Dated: October 16, 2026

Respectfully submitted,

*s/ Julie Veroff*

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
CHERYL L. FEINER
*Senior Assistant Attorney General*
JULIE VEROFF
*Deputy Solicitor General*
DARRELL W. SPENCE
*Supervising Deputy Attorney General*
JENNIFER A. BUNSHOFT
KEVIN L. QUADE
*Deputy Attorneys General*

*Attorneys for Defendants-Appellants*

# CERTIFICATE OF COMPLIANCE

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-8056

I am the attorney or self-represented party.

**This brief contains 7,000 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Julie Veroff **Date** 10/16/2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*